**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAULA DEANGELIS,<br><br>Plaintiff,<br><br>v.<br><br>BERNARDO HEES, JAGDEEP PAHWA, ANU HARIHARAN, LYNN KROMINGA, GLEN LURIE, KARTHIK SARMA, JOSEPH A. FERRARO, IZILDA P. MARTINS and SRS INVESTMENT MANAGEMENT LLC,<br><br>Defendants,<br><br>AVIS BUDGET GROUP, INC.,<br><br>Nominal Defendant. | Case No.: 2:24-cv-05687-JXN-JSA<br><br>**AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Paula DeAngelis ("Plaintiff"), by and through undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant Avis Budget Group, Inc. ("Avis" or the "Company") and against defendants Bernardo Hees, Jagdeep Pahwa, Anu Hariharan, Lynn Kromingh, Glen Lurie, Karthik Sarma, Jospeh A. Ferraro, Izilda P. Martins (collectively, the "Individual Defendants") and SRS Investment Management LLC, ("SRS") (collectively "Defendants") for violation of federal securities laws, breaches of the directors' and controlling shareholders' fiduciary duties, and for unjust enrichment. Plaintiff alleges the following against the Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the public documents, transcripts of conference calls and announcements made by Avis, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, Avis, news

reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to (a) remedy fiduciary breaches by the Individual Defendants and SRS arising out of Avis's share repurchases and SRS transactions in Avis securities in 2022 and 2023; (b) to nullify an agreement between SRS and Avis, which illegally usurped the Board's powers under Delaware General Corporate Law; and (c) to set aside the shareholder votes in 2022 and 2023 based on violations of Section 14(a) of the Securities Exchange Act of 1934.

2. Demand upon the board under Rule 23.1, Fed. R. Civ. P. would be futile because a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves or SRS on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that a majority of the Company's current directors are conflicted as to SRS and/or have a substantial probability of personal liability in this derivative action for unexculpated breaches of fiduciary duty and securities laws violations and because SRS controls Avis and dominates its board.

## II.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to § 14 of the Exchange Act and Rule 14(a)-9 promulgated thereunder.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

5. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

6. Defendant Avis maintains its headquarters with executive leadership and corporate functions in this judicial district in Parsippany, New Jersey, and the alleged misconduct by its directors and by SRS and the subsequent damages took place in substantial part in this judicial district.

## III.

## PARTIES

### 1. Plaintiff

7. Plaintiff Paula DeAngelis is a current shareholder of Avis common stock at all times since April 2022. Plaintiff is a citizen of Canada.

8. Plaintiff has filed this derivative action on behalf of the Company to address and remedy the injuries incurred and anticipated as a direct consequence of the breaches of fiduciary duties committed by the Individual Defendants.

9. Avis is included as a nominal party in this action, with no intention of colluding to confer jurisdiction on this Court that it would not otherwise possess.

10. Plaintiff, a current shareholder of Avis throughout the period of the alleged wrongdoing by the Individual Defendants, is committed to adequately and fairly representing the Company's interests in pursuing and enforcing its rights. The plaintiff is represented by counsel competent and experienced in derivative litigation.

**2. <u>Nominal Defendant Avis</u>**

11. Avis ("Avis") is a Delaware corporation with its principal executive offices located in Parsippany, New Jersey.

**3. <u>Defendants</u>**

12. Defendant Bernardo Hees ("Hees") is Executive Chairman of Avis. He has been a director since February 2020.

13. Defendant Jagdeep Pahwa ("Pahwa") is a director of Avis and its Vice Chairman. Pahwa has been a director since April 2019 and Vice Chairman since February 2020. Since 2017, he has been President of Defendant SRS.

14. Defendant Anu Hariharan ("Hariharan") is a director of Avis and has been since January 2022.

15. Defendant Lynn Krominga ("Krominga") is a director of Avis and has been a director since 2006.

16. Defendant Glen Lurie ("Lurie") is a director of Avis and has been a director since May 2018.

17. Defendant Karthik Sarma ("Sarma") is a director of Avis and managing partner of SRS Investment Management LLC. He has been an Avis director since 2020. Sarma is the Chair of Avis's Compensation Committee and thus has direct control over Mr. Hees compensation. He founded SRS in 2006 and is its current CEO. He is one of two members of Avis Corporate Governance Committee.

18. Defendant Jospeh A. Ferraro ("Ferraro") is President and CEO of Avis and in December 2023, he sold 18,460 shares Avis stock based on material non-public information ("MNPI") and earned disgorgeable profits of approximately $2 million.

19. Defendant Izilda P. Martins ("Martins") is an Executive Vice President of Avis and in December 2023 sold 3,950 shares of Avis stock based on MNPI and earned disgorgeable profits of approximately $400,000.

20. Defendant SRS is a Delaware Limited Liability Company with its main office in New York City and has reported itself in SEC filings as a beneficial owner of approximately 1,8430,882 shares of Avis common stock as of August 31, 2022, over which it also claims to have voting and dispositive power of the shares. SRS describes itself in SEC filings as a director of Avis "by deputization," as such it is a "director" for all fiduciary purposes in addition to the fiduciary duty it owes as controlling shareholders.

21. In 2023, director compensation was $250,000 per year with additional compensation from $12,000 to $35,000 depending on committee membership.

22. Defendant Hariharan earned additional fees as a member of Audit Committee.

23. Defendant Krominga earned additional fees as a member of the Audit Committee and Compensation Committee and Chair of Corporate Governance Committee.

24. Defendant Lurie earned additional fees as the Chair of Audit Committee and member of Compensation Committee.

25. Defendant Sarma earned additional fees as Chair of Compensation Committee and member of Corporate Governance Committee.

26. The foregoing fees are set by the Compensation Committee the chair which is and was Sarma.

## IV.

## FIDUCIARY AND OTHER DUTIES OF THE INDIVIDUAL DEFENDANTS AND SRS

### A. Fiduciary Duties Of Officers, Directors And Controlling Shareholder, SRS

27. By reason of their positions as officers, and/or directors, of Avis, the Individual Defendants owed Avis and its shareholders fiduciary obligations of trust, loyalty, good faith, due care, and candor and were and are required to use their utmost ability to control and manage Avis in a fair, just, open, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Avis and its shareholders so as to benefit all shareholders equally and not prefer the interests of SRS at the expense of Avis or other shareholders.

28. Defendant SRS has fiduciary duties as a controlling shareholder of Avis and also has director fiduciary duties because it has voluntarily become a director "by deputization."

29. Each Individual Defendant owes to Avis and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and to adhere to the highest obligations of fair dealing.

30. To discharge their duties, the Individual Defendants of Avis were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company and formulate adequate information systems and procedures to recognize and address conflicts of interest and monitor and manage related party transactions.

31. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Avis, a failure to enforce Avis's standards and codes and policies, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32. By virtue of such duties, the officers and directors of Avis were required to, among other things most relevant here:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, and the United States federal securities laws, and pursuant to Avis's own Code of Ethics (the "Code of Ethics") and Directors' Code;

(b) conduct the affairs of the Company with respect to conflicts of interest and related party transactions in a manner to identify and mitigate conflicts and ensure that all related party transactions are consummated on an arms-length basis both as to process and price;

(c) remain informed as to all material transactions of Avis in advance, such related party transactions and stock repurchase and capital allocation operations;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Avis and procedures for the reporting of the business and internal affairs to the Board which involve the controlling shareholder and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Avis's operations would comply with all applicable laws and Avis's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate and in full compliance with applicable laws and rules;

(f) exercise reasonable control and supervision over the contents of proxies used to seek shareholder action such a votes for directors and other proposals on the ballots;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) protect the minority shareholders from SRS, the controlling shareholder.

33. Each of the Individual Defendants further owed to Avis and its shareholders the duty of loyalty requiring that each favor Avis's interest and that of its unaffiliated shareholders over their own and not allow shareholder SRS/Sarma to obtain control to enrich themselves at the expense of Avis without paying a control premium and/or to allow SRS/Sarma and/or Pahwa at the expense of Avis or its shareholders and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34. Avis's board had a duty to take action to oppose, constrain or even dilute a large or controlling shareholder in order to protect all shareholders. *In re Orchard Enterprises Inc. S'holder Litig.*, 88 A 3d 1, 28 (Del. Ch. 2014). A breach of such duty constitutes, *inter alia*, a breach of the duty of loyalty and good faith. *Crescent/Mach v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000). It is therefore not exculpable under Avis's governing documents or Delaware law.

**B. <u>Duties Under Avis's Audit Committee Charter</u>**

35. Under the Audit Committee Charter of Avis, there is no provision which requires, or even allows the Audit Committee to review conflicts of interests nor to determine which transactions constitute related party transactions.

36. The Audit Committee duties are limited and as relevant here, with respect to the Company's ethical, legal and regulatory compliance matters:

1. Assess the design, implementation and effectiveness of the Corporation 's compliance processes and programs, including the Code of Conduct.
2. Review with management, the independent auditor and the General Counsel, as appropriate, any legal, regulatory or compliance matters that may have a material impact on the Corporation's financial statements or compliance

policies, including any correspondence with or other action by regulators or governmental agencies.

. . .

3. Review reports and disclosures of significant conflicts of interest and related person transactions.

4. The Audit Committee is required to "evaluate annually the processes, activities and effectiveness of the Committee, including the composition, expertise, and availability of the Committee members."

### C. Duties Under Avis Compensation Committee Charter And Corporate Governance Committee Charter

37. Avis Compensation Committee Charter requires that all of its members be non-employee directors within the meaning of Rule 16b-3 of the ’34 Act. Defendant Sarma was not a non-employee board member due to his status under 17 CFR § 229.407.

38. Avis Corporate Governance Charter did not impose any duties on its board members with respect to conflict of interests or transactions in company stock, and/or related party transaction issues and/or to prevent allowing control of Avis to pass the SRS without adequate compensation.

### D. Duties Under Avis’s Codes Of Conduct

39. At all relevant times Avis maintained a Code of Conduct (“CoC”) and a supplemental Code for Directors (“Director Code”).

40. Avis CoC describes as a company asset, *inter alia*, “proprietary business information, business plans and product development.” That would logically include non-public information at Avis about its operations to which SRS as a deputized director was privy.

41. Avis’s CoC describes “Insider Information as material information that hasn’t been widely disseminated to investors or the public but might be important in making a decision to buy,

sell or hold stock . . . Common examples include: . . . Financial results that have not yet been disclosed through a regulatory filing or press release; . . . Projection of future earnings or losses."

42. The CoC makes a director and/or officers' failure to disclose a conflict or violation of the CoC.

43. Avis also has a Code of Business Conduct and Ethics for Directors ("Directors' Code") which requires ("must"), among other things, directors to "comply with every provision of this Code applicable to such directors."

44. The Directors' Code states that "a conflict . . occurs when an individual's private interest interferes in any way with the interests of Avis. . ."

45. The Directors Code requires that actual or potential conflicts of interest must be brought to the attention of the Chair of the CG Committee and Chair of the Board.

46. The Directors Code also requires compliance with all applicable securities laws and insider trading laws and prohibits use of confidential information for a directors' own benefit.

**E. <u>Avis Insider Trading And "Anti-Hedging" Policy</u>**

47. The Company's insider trading policy prohibits directors, executive officers and other employees [who are] required to pre-clear trades in Company securities, along with members of their families and others living in their households and investment partnerships and other entities over which they have or share voting or investment control (collectively, the "Covered Persons") from:

- engaging in hedging and monetization transactions that permit any Covered Person to continue to own the Company's equity securities without the full risks and rewards of ownership, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds;
- holding the Company's equity securities in a margin account or otherwise pledging the Company's equity securities as collateral for a loan;

- participating in transactions involving options in relation to the Company's securities, such as puts, calls or other derivative securities on an exchange or in any other organized market; and
- engaging in short sales of the Company's equity securities.

48. According to Avis, The Cooperation Agreement, entered into between SRS and Avis on January 25, 2016, and discussed in detail below, purports to exempt Defendant Sarma from this policy and seems to state that, in his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund, Defendant Sarma is not prohibited from pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, the securities of the Company, which transactions are otherwise in compliance with applicable law and the Cooperation Agreement.

49. Neither SRS nor Pahwa are included in the foregoing exemption and both fit the definition of "covered persons" subject to the insider trading and anti-hedging policies extant at Avis.

**F. <u>Avis's Procedures For Review And Approval Of Related Party Transactions</u>**

50. The Company has adopted written procedures for the review, approval or ratification of transactions with related persons that apply to any transaction, arrangement or relationship in which:

- the Company (including any of its subsidiaries) was, is or will be a participant; and
- any related person (*i.e.*, a director, executive officer, director nominee, or any greater than 5% beneficial owner, or any immediate family member of the foregoing, or any entity in which any of the foregoing persons is employed, or is a partner, principal or in a similar position, or has any greater than 5% beneficial interest) had, has or will have a direct or indirect interest.

51. Under the Company's related persons policy, transactions with related persons are supposed to be reviewed in advance by the General Counsel, Chief Compliance Officer and Corporate Secretary of the Company, or in certain circumstances, as soon as possible thereafter. If

it is determined by such officer that the transaction is a related person transaction and the amount involved exceeds $120,000:

- The transaction will be submitted for review to the Audit Committee, or, under certain circumstances, to the Chairman of the Audit Committee.
- The Audit Committee or its Chairman will then consider all relevant facts and circumstances available.
- The Audit Committee or its Chairman will approve only those transactions, determined in good faith to be in, or not inconsistent with, the best interests of the Company and its shareholders.

52. Additionally, under certain circumstances, the General Counsel or Chairman of the Audit Committee may recommend that the independent members of the Board consider the advisability of a related person transaction.

53. Avis related party transaction policy applies to transactions between Avis (as a participant) and *inter alia*, any director, executive officer or any greater than 5% beneficial owner of Avis (or immediate family).

**G. Avis's Board And Committees Are Dysfunctional And Their Collective And Individual Misfeasance And Malfeasance Constitute Breach Of Duties Of Good Faith And Loyalty**

54. Avis corporate governance documents described herein were amended in July 2022, and therefore were applicable to the wrongful conduct alleged herein.

55. In calendar year 2023, Avis's board held only seven meetings. Only three directors of Avis attended the 2023 Annual Meeting of Shareholders.

56. Of Avis's Board six members, none other than Defendants Pahwa and Sarma have held an investment banking, corporate finance or accounting professional position in their careers. Therefore no one on the board was on equal footing with Pahwa and/or Sarma in evaluating the manner in which SRS has used its position to obtain control of Avis and/or to otherwise disadvantage Avis and other shareholders.

57. Avis Audit Committee ("AC"), Compensation Committee ("CC") and Corporate Governance ("CG") held 4, 6 and 4 meeting in 2023, respectively.

58. Avis's board allowed SRS to engage in transactions in Avis securities which were contrary to Avis's policies and disadvantageous to Avis.

59. Avis's Board allowed SRS to increase its percentage ownership into a 49.1% controlling position via Avis's self-destructive stock repurchase program and reauthorization thereof and execution thereon. Avis's board thus squandered a valuable asset of Avis – a control premium – and conferred a windfall benefit on SRS – gaining control without paying a control premium.

60. In addition, while in possession of material adverse information indicating that Avis's public trading price was inflated, Avis's board purchased a block of Avis stock from SRS at an inflated market price in August 2023 without even seeking a "block discount." This action conferred an unfair benefit on SRS at Avis's expense.

61. Avis's board failed to enforce Avis's anti hedging and related party transactions and insider trading policies.

62. Avis's board has failed to prevent Sarma from steering Avis into Cooperation Agreements which usurped powers from Avis and its board and unlawfully reposed such powers in SRS.

63. Avis's board allowed SRS to sell stock while its price was inflated by the non-disclosure of material non-public information ("MNPI") known to Sarma and SRS.

64. As detailed herein Avis's board made recommendations in proxies that Avis's stockholders vote in favor of election of Avis's directors allowing SRS to dominate the Board, destroy the Board's independence from SRS where such proxies were affirmatively materially

false and misleading and by omission.

## V.

## SUBSTANTIVE ALLEGATIONS

### A. Avis, The Company

65. Avis was a subsidiary of Cendant until it became Avis Budget Group in 2006 when Cendant spun off all its other businesses and then Cendant changed its name to Avis Budget Group, Inc.

66. Avis consists of three main brands "Avis," "Budget" and "Zipcar." It rents cars, trucks, and facilitates car sharing. Its two reportable business segments are "Americas" and "International."

67. In 2023, Avis and Budget generated $11.3 billion in revenue. Of that amount, approximately 80% was generated in the Americas segment.

68. Avis's worldwide global rental fleet averaged 691,500 vehicles in 2023, up substantially from 655,000 vehicles average in 2022.

69. Avis's rental car business profits depend upon and are very sensitive to the number of age of the cars in their rental fleet. Management of rental fleets depends upon proper fleet rotation, *i.e.* getting older cars out of the fleet inventory and getting new cars to replace them while carefully balancing supply and demand to maximize.

70. On August 1, 2023, Avis had an earnings call in which Ferraro continuously touted Avis fleet management activities as a positive influence on Avis's current and future performance.

71. Defendant Ferraro stressed the importance of Fleet Management in the August 2023 earnings call with analysts discussing Avis's 2nd fiscal quarter results:

a. In that call, Ferraro admitted:

"Fleet rotation is extremely important. How you buy cars and deliver them into your business and then exit cars out at the right time at the right place is extremely critical."

b. Ferraro said:

"We took advantage of our growth in new cars to exit or rotate out older higher mileage vehicles . . ."

In summary the Americas segment delivered solid second quarter results and every aspect of our business from fleet positioning to demand pricing . . . all geared towards taking full advantage of the 2023 summer season."

. . .

We are pleased with the support we get from our OEM partners to deliver new vehicles. . . ."

I believe our fleet growth this quarter reflects that position and we'll continue to fleet just under demand to optimize utilization and mitigate the headwinds of vehicle depreciation and intent.

c. Ferraro also said:

We got good insight from the OEMs and what our deliveries were going be like and we operate it accordingly.

We are in constant communications with our OEMs . . . So we are always talking to them and gaining insights into what they see whether it's going to be, are there going to be vehicle delays, are they going to be on schedule . . ."

An analyst from Deutsche Bank was moved to current "You guys obviously did a terrific job on Fleet management as always. But the questions is really what you're seeing in the industry landscape."

Ferraro said "we'll continue to rotate our fleet. . ."

**B. <u>The MNPI</u>**

72. "Fleet Management" is critical to Avis's financial success and requires careful "fleet rotation" and "cycling of fleet." Avis, in July and August 2023, was experiencing delays in getting deliveries of new vehicles from OEMs without which Avis could not execute its basic fleet management practices which it assured investors it was engaged in constantly.

73. As Avis disclosed in 2023, Avis in summer 2022 experienced an undisclosed delay in "deliveries of new fleet by several of our OEM partners. Given that new model year vehicles were delivered after the summer peak, it was necessary to exit older vehicles to right size our fleet size to demand."

74. Because Avis could not rotate out of older vehicles due to failure of deliveries of new vehicles, the old fleet vehicles continued to burden Avis with incremental (not merely deferred) depreciated, lease, interest, maintenance costs and had to be either sidelined or rented at lower rates. This led to a nearly doubling of vehicle depreciation and lease charges from $245 million in Q-4 '22 to $424 million in Q-4 '23.

75. Avis's disappointing reported results were the result of the negative impact on vehicle utilization caused by Avis's failure to be able to rotate its fleet due to OEM delivery failures which were undisclosed that began in the third quarter of 2023 and continued into the fourth quarter. The factors caused Avis Adjusted EBITDA for Q-4 "23 to decline to $311 million from $658 million in Q-4 '22.

Ferraro admitted in February 2024 that Avis's failure in fleet management was exacerbated given the environment where both vehicle costs and financing costs were rising in 2023.

### C. SRS Share Acquisition And Hedging Activities Allowed An Accumulation Of Controlling Position Of Voting Stock But Heding Economic Riks And Without Paying A Control Premium

76. By 2015, SRS had accumulated 10 million shares of common stock of Avis, then 9.4% of Avis outstanding stock. By 2016, SRS had only 9,500,000 Avis shares but had another 12,500,000 "national shares" beneficially owned by SRS through "cash settled equity swaps."

77. By 2017, SRS was able to lower its number of shares owned to 8,500,000 shares of Avis constituting 9.9% of Avis stock because of Avis stock repurchases. SRS also beneficially owned another 13,500,000 notional shares but its ownership percentage increased to an additional 3 million shares through option contracts.

78. By 2016, SRS had placed a partner Brian Choi on Avis's board pursuant to the Cooperation Agreement between Avis and SRS entered into in 2016.

79. By 2018, SRS launched a proxy challenge to Avis seeking election to the Board of SRS' five nominees, Brian Choi, Matthew Espe, Jaydeep Pahwa, Carl Sparks and Sanoke Viswanathan ("SRS Nominees").

80. On January 23, 2017, Avis adopted a shareholder rights plan which would have been triggered by SRS accumulation of more shares and diluted SRS but not other shareholders.

81. SRS objected and pressured Avis to rescind it which led to the May 3, 2017 Amended and Restated Cooperation Agreement pursuant to which SRS agreed not to acquire voting power over more than 12 million shares. SRS refused to agree to a three year standstill.

82. On January 15, 2018, when the A&R Coop Agreement expired, Avis approved the adoption of a new shareholder rights plan. On February 18, 2018, SRS gave formal notice to Avis of its intention to nominate its slate on the Board.

83. By 2018, SRS owned 12,504,554 shares constituting 14.8% of Avis's outstanding stock. SRS also had 13,000,000 notional shares (16.9% of Avis) through cash settled equity swaps and options.

84. By 2019, SRS owned 16,189,300 shares of Avis constituting 21.4% of Avis and an additional 8,810,700 notional shares through equity swaps.

85. By 2020, SRS owned 16,189,300 shares constituted 21.8% of Avis stock and an additional 8,810,700 notional shares.

86. By 2021, SRS owned 18,430,882 shares constituting 26.4% of Avis plus an additional 11,354,508 "notional shares" through "cash settled equity swaps."

87. By 2021, SRS owned 18,430,883 shares constituted 35.7% of Avis stock and, SRS reported that it had an additional 8,010,84 "notional shares."

88. SRS increased its control over Avis up to approximately 49.3% of voting control by having Avis repurchase its own shares thus increasing SRS's percentage ownership without SRS having to pay for control. On March 16, 2022, SRS a 10% owner of Avis acquired and disposed of Avis securities within a six month period (*i.e.* same day transactions) at acquisition prices substantially below their disposition prices as reflected in the SRS Form 4 dated March 18, 2022.

89. On May 4, 2022, SRS, a 10% owner of Avis, acquired and disposed of Avis common stock and/or derivative securities within a six-month period (*i.e.* same day transaction) at acquisition prices substantially below their disposition prices as reflect in the SRS Form 4 dated May 6, 2002.

90. On February 9, 2022, SRS, a 10% owner of Avis, acquired and/or disposed of Avis common stock and/or derivative securities within a six-month period (*i.e.* same day

transactions) acquisition prices substantially below their disposition prices as reflected in the SRS Form 4 dated February 11, 2022.

91. As of March 13, 2023, SRS owned 18,430,882 shares of Avis constituting 46.4% of the 39,761,415 outstanding shares as of March 13, 2023.

92. On August 31, 2022, SRS, a 10% owner of Avis, acquired and disposed of the shares of Avis common stock within a six-month period (*i.e.* same day transactions) at acquisition prices substantially below the disposition price as reflected in SRS Form 4 dated September 2, 2022.

93. On August 25, 2023, SRS sold 1,000,000 shares of Avis in a "broker to broker" transaction at the then market price of $229.91. The transaction was purportedly approved by Avis Compensation Committee chaired by Sarma.

94. If SRS' August 2023 sale was a sale directly to Avis, then SRS uses its control position to take advantage of Avis by failing to discount the market price by an appropriate percentage for "blockage valuation discount" defined by American Institute of Certified Public Accountants Statement for Standards for Valuation Services No. 1 (SSVS-1) as "an amount or percentage deducted from the current market price of a publicly traded stock to reflect the decrease in the per share value of a block of stock that is of a size that could not be sold in a reasonable period of time given normal trading volume."

95. If this sale was not to Avis, then SRS's Avis securities would constitute "control securities" under Section 5 of the '33 Act and should have been sold pursuant to Rule 144 because SRS was an "affiliate" of Avis under the Rule 144 definition thereof.

96. According to the Amended And Restated Certificate of Incorporation, of Cendant, Avis's predecessor, 80% affiliate vote of the holders of at least 80% of the voting power of

common stock for, *inter alia*, any sale, lease, exchange, mortgage pledge transfer or other disposition to or with any Interested Stockholder [defined at Article 10 as a 5% or more stockholder] or any affiliate of any Interested Stockholder in exchange for cash, securities or other property . . . having an aggregate Fair Market Value of $10 million or more.

97. Broker-to-broker transactions are utilized to obscure the sale of large blocks of stock from the market for trading in these same securities.

98. As of March 15, 2022, SRS owned 18,430,833 shares of Avis constituting 35.7% of the shares outstanding of 51,580,919 shares on March 15, 2022.

99. After August 30, 2023, Avis stock began a long decline from a close of $208.96 on August 30, 2023 to $168.36 on February 12, 2024 until its approximately $40 per share drop on February 13, 2024 on approximately 4 million shares or 8x its daily average volume.

100. On December 15, 2023, Defendant Martins sold 3,950 shares of Avis stock at $196.86 per share following which he owed 21,145 shares of Avis.

101. On December 15, 2023 Defendant Ferraro sold 18,460 shares of Avis stock at prices from $194.33 per share to $196.17.

102. As of March 14, 2024, SRS owned 17,430,822 shares of Avis common stock constituting 48.9% of Avis's 35,647,164 shares outstanding.

**D. <u>Cooperation Agreement</u>**

103. The original Cooperation Agreement (referred to by Avis as the "Initial Cooperation Agreement") signed on January 25, 2016 was an agreement between SRS and Avis whereby Avis would increase its board size to twelve directors and appoint Choi, an SRS partner, to the board and appoint another director recommended by SRS with SRS agreeing to a standstill of any further acquisitions of Avis stock.

104. Avis's 2018 Proxy described the Initial Cooperation Agreement, in part:

> On January 25, 2016, we entered into a cooperation agreement with Avis (the "Initial Cooperation Agreement"), whereby the parties agreed, among other things and subject to certain conditions, that the Company would increase the size of the Board to twelve directors and appoint Brian Choi, a Partner at SRS and a Nominee in this Proxy Statement ("Mr. Choi"), to the Board; and to further increase the size of the Board and appoint a reasonably acceptable independent director recommended by SRS. The Initial Cooperation Agreement also provided for customary standstill provisions and voting commitments on the part of SRS.

105. The 2018 Proxy also provided an update of certain events since the signing of the Initial Cooperation Agreement:

> On March 18, 2016, pursuant to the Initial Cooperation Agreement and upon the recommendation of SRS, Avis increased the size of the Board from twelve to thirteen directors and appointed Sanoke Viswanathan ("Mr. Viswanathan"), the Chief Administrative Officer of the Corporate & Investment Bank of JPMorgan Chase & Co, to fill the Board vacancy.
>
> On January 23, 2017, Avis announced that it was adopting a stockholders rights plan (the "Poison Pill"), which provided for what SRS believed to be an unenforceable and entrenching provision that SRS believes may have precluded stockholders from acting within the scope of their rights as stockholders. The Poison Pill contained ambiguous provisions that would allow the Board to unilaterally determine that stockholders were acting as a group and which SRS believed was designed to have a chilling effect on stockholder communication. Due to our pressure to have the Company remove the Poison Pill in the interests of stockholders, on May 3, 2017, we entered into an Amended and Restated Cooperation Agreement (the "Amended Cooperation Agreement") with Avis, pursuant to which, among other things, the Company agreed that its previously announced Poison Pill would expire concurrent with execution of the Amended Cooperation Agreement. Despite SRS's good faith efforts to extend its term, the Amended Cooperation Agreement expired according to its terms on January 15, 2018. We were willing to extend the term of the Amended Cooperation Agreement and proposed what we believe were reasonable terms regarding Board representation and refreshment in the interests of all stockholders and were even willing to agree to a limit on SRS's beneficial ownership at the

request from the Company. However, Avis demanded that SRS agree to off-market terms, including an unreasonable three-year standstill, which we were unwilling to do. The same day the Amended Cooperation Agreement expired, the Company approved the adoption of a new one-year poison pill.

On February, 14, 2018, based on a belief that Avis's long-term business could be strengthened with a refreshed Board, SRS submitted to the Company a formal notice of its intention to nominate the Nominees for election to the Board at the Annual Meeting.

On March 21, 2018, the Company filed the Company's Preliminary Proxy Statement, announcing that it was nominating Carl Sparks ("Mr. Sparks"), Mr. Viswanathan, and Jagdeep Pahwa ("Mr. Pahwa") to stand for election on the Company's proxy card. The Company did not nominate Mr. Choi for re-election. Though SRS endorses Messrs. Sparks, Viswanathan and Pahwa and has nominated these candidates, along with Mr. Choi and the other Nominees, to stand for election at the Annual Meeting, SRS does not believe that the Company's proposed slate, as presented in the Company's Preliminary Proxy Statement, provides for sufficient change to its Board membership. This is, in part, because the Company's slate proposes a Board constituted by a majority of legacy directors whom SRS believes will continue to maintain the status quo at the Company. Therefore, the Participants are determined to continue with the Proxy Solicitation with the aim of achieving what the Participants believe is the necessary Board refreshment to provide increased value to stockholders.

Between March 23, 2018 and March 27, 2018, Mr. Sarma engaged in discussions with certain representatives of the Company regarding the terms of a possible settlement pursuant to which Mr. Choi would remain on the Board. As explained further in this Proxy Statement, the Participants strongly believe that a greater number of independent directors as compared to legacy directors should serve on the Board in order to provide for sufficient change to what the Participants believe to be a Board that has exhibited a lack of independence from management. Nevertheless, due to the unwillingness of the Company to provide assurances that such greater proportion of independent directors would be provided under the terms of a formal settlement, SRS was unable to proceed. Accordingly, the Participants are determined to continue with the Proxy Solicitation with the aim of achieving what the Participants believe is the necessary Board refreshment to provide increased value to stockholders.

106. In January 2020, Avis's board publicly stated that its shareholder Rights Plan, *i.e.* its "poison pill" was "intended to prevent SRS . . . from obtaining effective control of Avis . . . without paying a control premium. . ." At the time of that announcement, SRS owned "only" 21.9% of Avis outstanding shares.

107. The Initial Cooperation Agreement was superseded several times and became the Third Amended and Restated Cooperation Agreement ("3rd A&R" dated February 23, 2020) as amended on August 12, 2020 and September 15, 2021.

108. By 2021, Avis's board was downsized from 12 directors to 6, two of whom, Pahwa and Sarma, were nominated and elected pursuant to terms of a new edition the 3rd A&R Cooperation Agreement between Avis and SRS. At that time, Defendant Hees was nominated and elected as Executive Chairman of Avis, a position deemed "non-independent" by Avis in its Proxy.

109. On December 30, 2022, SRS and Avis entered into a Fourth Amended and Restated Agreement ("4th A&R") which superseded the version dated February 23, 2020.

110. The 4th A&R allows SRS to appoint two additional directors to Avis's board and includes a standstill until December 2024.

111. The term of the Fourth A&R was December 23, 2022 to December 31, 2024 (unless SRS ownership dropped below 5% or 60 days prior to the date for nominations of directors for the 2025 annual meeting).

112. During the Fourth A&R Coop Agreement two-year period, Avis was <u>required</u> to nominate Pahwa and Sarma for election <u>and</u> the Board was required to recommend a vote in favor of their election <u>and</u> prohibited Avis from removing Pahwa or Sarma as directors.

113. If Pahwa or Sarma resigned, SRS could designate the other directors whom Avis "shall appoint."

114. SRS had the power to appoint a director to the Governance Committee and the Compensation Committee and to appoint its director to Chair of the Compensation Committee.

115. SRS had the power to keep board membership and six members to force Avis to increase board size to seven and seat an SRS designee in the seventh board seat.

116. The Cooperation Agreements provisions which grant SRS the right to appoint directors and committee members undermine Avis's by law provisions and Delaware law by overriding board powers, including at Article III, Section 1 and Article V Section 1(b)(i) and (ii).

117. The Fourth A&R Coop Agreement provides, *inter alia*, that SRS "will be entitled" to appoint 2 (or 3) directors to the board; that Avis "will include" Pahwa and Sarma in Avis's slate of nominees for election; SRS can itself cause an expansion of the Board and appoint a third SRS member to Avis's Board; the Board is required to keep the board at no more than six to eight directors; SRS can appoint the Vice Chairman of the Board; SRS is entitled to appoint one person to serve on the Nominating Governance Committee and one person to serve as Chair of the Compensation Committee.

118. The Fourth A&R Coop Agreement also violates Avis's Corporate Governance Committee Charter (July 2022) at Article II, III(A)(1).

119. The Fourth A&R Coop Agreement violates Delaware law by divesting the Avis's Board of its powers under Avis's Charter, bylaws, and DGCL by bestowing SRS with the exclusive power to appoint a director to each of the CG and CC and designate the CC Chair and appoint the Vice Chair of Avis's Board.

120. SRS has circumvented the standstill agreement's prohibition not to acquire more than 44.5% of the Company's outstanding voting shares by surpassing that level via Avis share buybacks.

**E. Avis's Stock Repurchase Program**

121. In 2013, Avis authorized an $885 million share repurchase plan which was expanded in 2014 and 2015. In 2016, Avis authorized a $300 million increase in the program. That repurchase program had no expiration or termination date.

122. The repurchase program was expanded to $1.5 billion in 2016. By end of 2017, the program had only $100,501,894 remaining of the $1.5 billion.

123. In August 2018, Avis expanded the program to $1.7 billion. By end 2017, the program had $150,501,899 remaining.

124. Avis has engaged in unfavorable capital allocation decisions which were a benefit to SRS, Sarma and Pahwa at the expense of Avis. Before 2020, Brian Choi, an SRS Partner, was an Avis director. In 2020-2021, Brian Choi left the Board and became Avis's Executive Vice President and Chief Financial Officer. Despite being appointed to that position in August 2020, Choi was awarded $3.172 million in compensation by the Compensation Committee chaired by Sarma for that partial year of work by a compensation committee chaired by Defendant Sarma, Choi's partner at SRS.

125. As a result of the execution of the share repurchases in 2023, Avis finished the year with negative shareholder equity of $343 million.

126. By the end of 2023, Avis borrowings for stock purchase and vehicle financing had depleted Avis's borrowing capacity to $35 million from $1.454 billion as of December 31, 2021.

127. After Avis's stock crash in mid-February 2024, analysts and commentators noted that Avis's car funding subsidiary, Avis Budget Group Funding, increased its borrowings during 2023 from $11.322 billion at the end of 2022 to $15.502 billion by end of 2023.

128. Avis's board expanded its share repurchase program in February 2023.

## DEMAND FUTILITY ALLEGATIONS

129. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if set forth fully herein.

130. Pre-suit demand on the Board of Avis is futile and, therefore, excused. Every currently sitting Avis board member is also a named defendant herein because they served as a board member during the misconduct alleged herein.

131. At the time of filing of the original complaint, the six-member Board consists of Defendants Bernardo Hees, Jagderp Pahwa, Anu Hariharan, Lynn Kromingh, Glen Lurie, Karthik Sarma and SRS Investment Management LLC (by deputization).

132. Plaintiff need only allege demand futility as to three of the six Directors that were on the Board (the "Demand Board") when the original complaint was filed. At least three board members are conflicted and not independent and demand as to them would be futile.

133. Avis admits in its latest proxy that Hees and Pahwa do not qualify as "independent" in accordance with NASDAQ rules.

134. Defendant Sarma is not independent and demand upon him would be futile, as he has a material relationship with and ownership interest in SRS, Avis's largest shareholder, which interferes with the exercise of judgment carrying out the responsibilities of a director. Sarma has significant voting power and control over Avis. Such substantial voting power may render the other stockholder votes "mere formalities." Because stockholder approval is required for "many of the most fundamental corporate changes" — including election of directors, amendments to certificates of incorporation, mergers, consolidations, sales of all or substantially all of a corporation's assets, and dissolutions — a stockholder with substantial voting power has tremendous influence and cannot be deemed independent.

135. Defendant Hees is not independent and demand upon him would be futile because his Avis compensation depends on Sarma's decisions as Chair of the Compensation Committee and Hees is in effect an employee of Avis and SRS. From 2020 to 2023, Mr. Hees' compensation from Avis was $3.8 million, $5.09 million, $5.16 million and $5.5 million, a substantial amount of compensation. These amounts far surpass Mr. Hees's compensation in his last year at Kraft of $2.8 million.

136. Demand is excused as to all of the other Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their approval of Avis share repurchases at prices inflated by Avis's material omissions regarding its car inventory and because such repurchases allowed SRS to obtain control of Avis without paying any control premium. This conduct renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

137. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

## COUNT I

### Insider Trading Against SRS, Pahwa, Sarma, Ferraro and Martins

138. Plaintiff repeats and realleges each and every allegation of this complaint as if more fully set forth herein.

139. If SRS's August 2023 sale of stock constituted a related party transaction between a controlling shareholder and the controlled corporation, it thus implicates the "entire fairness" review standard.

140. If SRS's August 2023 sale being a broker-to-broker transaction is not a related party transaction between Avis and SRS then it constitutes a sale of stock by SRS while in possession of MNPI and thus constitutes a breach of loyalty under *Brophy v. City Services Co.*, 70 A.2d 5 (Del. Ch. 1949).

141. SRS, Pahwa, Sarma, Ferraro and Martins were motivated in whole or in part by the MNPI and each used the MNPI improperly to engage in sales of Avis stock.

142. The MNPI possessed by Pahwa, Sarma, Ferraro and Martins was "inside" information and it was adverse to Avis and that was materially different than that in the marketplace at the time of Defendants trades. This information showed that Avis's near term financial results would deviate materially negatively from public expectations.

**COUNT II**

**Against the Individual Defendants for Breach of Fiduciary Duties**

143. Plaintiff restates and incorporates the preceding allegations as though fully detailed herein.

144. The Individual Defendants were entrusted with fiduciary responsibilities toward the Company. By virtue of these fiduciary relationships, the Individual Defendants were obligated to uphold the highest standards of good faith, equitable dealings, loyalty, and due diligence in their actions.

145. The Individual Defendants violated and breached their fiduciary duties, including duties of care, loyalty, reasonable inquiry, and good faith.

146. The Individual Defendants persistently and systematically failed in fulfilling their fiduciary obligations in order to favor the interests of SRS over the interests of Avis and thus breached loyalty duties. Specifically, they breached duties of loyalty and good faith by allowing inadequate practices and procedures to guide the accurate disclosure of Company information to the investing public and shareholders. This included permitting false and misleading statements in the Company's Proxies.

147. Such actions could not be deemed a good-faith exercise of prudent business judgment in safeguarding and advancing the Company's corporate interests.

148. As a consequence of the misconduct alleged herein, the Individual Defendants bear liability to the Company. The Company has incurred damages, both financial and non-monetary, as a direct and proximate outcome of the Individual Defendants' breach of fiduciary duties.

149. Plaintiff, as a shareholder of Avis and on behalf of Avis, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

150. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(l), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781]."

152. NASDAQ rules require that a “majority of the board of directors must be independent Directors meaning they must not be people who have a relationship which in the opinion of the Company’s board would interfere with the exercise of judgment carrying out the responsibilities of a director. The board has a “responsibility to make an affirmative representation that no such relationship exists.” *See* NASDAQ Rules 5605(a)(2); (b)(1); NASDAQ Rule IM-5605.

153. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240. l 4a-9.

154. Under the direction and watch of the Individual Defendants, the 2022, 2023, and 2024 Proxy Statements (the "Proxy Statements") failed to disclose and explain to investors the material aspects of the relationship between SRS and Avis and SRS ownership of and transactions in Avis stock.

155. Avis’s materially false and misleading proxy statements issued April 8, 2022, April 5, 2024, April 3, 2024, contained substantially similar proposals and recommendations and descriptions:

> Proposal No. 1
>
> **Election of Directors**
>
> The Board of Directors (the “Board”) has nominated Bernardo Hees, Jagdeep Pahwa, Anu Hariharan, Lynn Krominga, Glenn Lurie and

Karthik Sarma to be elected at the 2023 Annual Meeting of Shareholders (the "Meeting") to serve as directors for a one-year term ending at the 2024 annual meeting of shareholders and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. The nominations of Mr. Pahwa and Mr. Sarma are in accordance with the terms of the Fourth Amended and Restated Cooperation Agreement (as amended through the date hereof, the "Cooperation Agreement"), dated as of December 23, 2022, between the Company and SRS and certain of its affiliates.

**Director Independence**

To determine director independence, our Board of Directors reviews, among other things, commercial and charitable relationships of each director to evaluate such director's independence in accordance with the listing standards of the Nasdaq Stock Market LLC ("Nasdaq"). In conducting its review, the Board of Directors considers a number of factors, including the director's and his or her family members' relationships with the Company and its subsidiaries, affiliates, executive officers and auditors and his or her relationships with foundations, universities and other non-profit organizations to which the Company has made a certain level of contributions during the past three years.

**Independent Nominees**

After evaluating the factors described above, the Board of Directors has affirmatively determined that each of the following director nominees is independent in accordance with Nasdaq rules.

Lynn Krominga

Glenn Lurie

The Board has determined that Mr. Hees is not independent because of his status as Executive Chairman of the Board and that Mr. Pahwa is not independent because his brother-in-law is a partner at Deloitte Haskins & Sells LLP, which is affiliated with Deloitte & Touche, LLP, our independent auditor. All of the directors currently serving on our Corporate Governance Committee, Compensation Committee, and Audit Committee are independent based upon Nasdaq corporate governance listing standards and applicable rules of the SEC.

**Board Leadership Structure**

Our current Board leadership structure consists of:

- Executive Chairman of the Board: Bernardo Hees;
- Vice Chairman of the Board: Jagdeep Pahwa; and
- Fully independent Compensation, Corporate Governance and Audit Committees.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR ALL" OF THE NOMINEES**

156. The Cooperation Agreement and restatements and amendments thereof and the SRS August 22, 2023 stock sale and SRS equity swap transactions are all related party transactions under Item 404.

157. In addition all of the foregoing transactions are rife with conflict between SRS and Avis and should have been but were not described as conflicted transactions in proxies and other disclosures.

158. The Cooperation Agreement also violated Avis's bylaws and certificate of incorporation.

159. The Proxy statements were all materially false and misleading for (1) failing to disclose Defendant Sarma's lack of independence due to his ownership of SRS; (2) failing to fairly and accurately describe the benefits of SRS of Avis share buyback program in 2021, 2022 and 2023 and the role of two of Avis directors in said buybacks and their self interest in said buybacks not shared by unaffiliated shareholders; (3) failing to describe the Cooperation Agreement and August 2023 sale of Avis stock and as "related party transactions" as required by the SEC in proxies and annual reports according to 17 C.F.R. 229.404 "Transactions with related persons, promoters and certain control persons;" (4 ) failing to disclose all information required

by Rule 229.404; (5) failing to disclose that Avis had failed to conduct "appropriate review and oversight of all related party transactions to be disclosed under Item 404 as required by Nasdaq Marketplace Rule 5630; (6) that the share buybacks constituted related party transactions.

160. The failure to disclose this information made certain statements and representations materially misleading.

161. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Company's directors.

162. The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

163. Plaintiff on behalf of Avis has no adequate remedy at law.

**COUNT IV**

**Unjust Enrichment as to Defendants**

164. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, Avis.

166. Defendants benefitted financially from their improper conduct.

167. Plaintiff, as a shareholder and a representative of Avis, seeks restitution from the Defendants named in this Count and seeks an order from this Court disgorging all profits, benefits

and other compensation procured by the Defendants named in this Count due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT V**

**For Declaratory Judgment Pursuant To The Declaratory Judgment Act**

168. Plaintiff repeats and realleges each and every allegation above as if more fully set forth herein.

169. Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

170. A dispute between Plaintiff and Defendant SRS is before this Court concerning the validity of the Fourth Amended And Restated Cooperation Agreement between Defendant SRS and Avis with respect to SRS' rights to "appoint" directors and designate board committee members and to restrict the size of Avis's board and its composition.

171. Plaintiff seeks a declaration of rights and liabilities of SRS and Avis under the Fourth Cooperation Agreement.

172. Specifically, Plaintiff seeks a declaration that the provisions of the Fourth Cooperation Agreement which restrict the Board's powers under Delaware General Corporation Law 141 and/or Avis's by laws or Certificate of Incorporation are illegal and ultra vires and must be nullified.

173. The restrictions on Avis's Board as described herein are ongoing. Accordingly, SRS continues to have a contractual right to exercise control over functions and powers properly available only to Avis's Board. SRS's power causes harm to franchise rights.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Avis and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing Avis to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Avis and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

1. Nullifying the illegal provisions of the Fourth A&R Coop Agreement;
2. Implementing corporate governance reforms to address the issues raised herein;
3. voiding the results of the 2022 and 2023 shareholder votes; and
4. ordering SRS, Pahwa, Sarma, Ferraro and Martins disgorge all insider trading profits.

D. Awarding damages against the directors for harm to Avis;

E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 15, 2024

Respectfully submitted,

**SQUITIERI & FEARON, LLP**

*/s/ Lee Squitieri, Esq.*

Lee Squitieri
305 Broadway, 7th Floor
New York, New York 10007
Email: lee@sfclasslaw.com
Phone: (212) 421-6492

**MOORE LAW, PLLC**
Fletcher Moore
30 Wall Street, 8th Floor
New York, New York 10005
Email: fletcher@fmoorelaw.com
Phone: (212) 709-8245

Attorneys for Plaintiff