## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PAULA DEANGELIS,

    Plaintiff,

    v.

BERNARDO HEES, JAGDEEP PAHWA,
ANU HARIHARAN, LYNN KROMINGA,
GLENN LURIE, KARTHIK SARMA,
JOSEPH A. FERRARO, IZILDA P. MARTINS
and SRS INVESTMENT MANAGEMENT
LLC,

    Defendants,

AVIS BUDGET GROUP, INC.,

    Nominal Defendant.

No. 2:24-cv-05687-JXN-JSA

*Document Filed
Electronically*

Hon. Julien Xavier Neals

### DECLARATION OF KRISTINA A. BUNTING IN SUPPORT OF AVIS, THE OUTSIDE DIRECTOR DEFENDANTS, AND THE OFFICER DEFENDANTS' MOTION TO DISMISS THE AMENDED VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

I, KRISTINA A. BUNTING, ESQ., hereby declare as follows:

1.    I am an associate at the law firm of Paul, Weiss, Rifkind,

Wharton & Garrison LLP, located at 1285 Avenue of the Americas, New York, New

York, 10019, counsel for Nominal Defendant Avis Budget Group, Inc. ("Avis" or

the "Company"), Defendants Bernardo Hees, Anu Hariharan, Lynn Krominga,

Glenn Lurie (the "Outside Director Defendants"), and Joseph A. Ferraro, and Izilda

P. Martins (the "Officer Defendants" and, together with Avis and the Outside

Director Defendants, "Defendants"), I am admitted *pro hac vice* in this matter. I submit this declaration in support of Defendants' Motion to Dismiss the Amended Complaint.

2.    Attached hereto are true and correct copies of the following documents referenced in the Memorandum in Support of Defendants' Motion to Dismiss the Verified Amended Complaint:

Exhibit 1:    Form 8-K dated December 27, 2022 enclosing as Ex. 10.1 the Fourth Amended and Restated Cooperation Agreement, dated as of December 23, 2022, by and among Avis Budget Group, Inc. and SRS Investment Management, LLC, SRS Partners Master Fund LP, SRS Special Opportunities Master II, LP, and SRS Long Opportunities Master Fund, LP.

Exhibit 2:    Excerpts of Avis Budget Group Inc.'s Schedule 14A Definitive Proxy Statement as filed with the SEC on April 3, 2024.

Exhibit 3:    The Amended and Restated Certificate of Incorporation of Cendant Corporation, dated as of September 1, 2006.

Exhibit 4:    *Cascia* v. *Farmer, et al.*, C.A. No. 2023-0520-KSJM (Del. Ch. June 20, 2024), Telephonic Rulings of the Court on Defendants' Motion to Dismiss.

Exhibit 5:    Excerpts of Avis Budget Group, Inc.'s Schedule 14A Definitive Proxy Statement as filed with the SEC on April 8, 2022.

Exhibit 6:    Excerpts of Avis Budget Group., Inc.'s Schedule 14A Definitive Proxy Statement, as filed with the SEC on April 5, 2023.

| | |
|---|---|
| Exhibit 7: | Excerpts of Avis Budget Group., Inc.'s Form 10-K, as filed with the SEC on February 16, 2023, including Exhibit 10.9 (the Fourth Amended and Restated Cooperation Agreement, incorporated by reference to Ex. 10.1 to the Form 8-K dated December 27, 2022). |
| Exhibit 8 | Excerpts of Avis Budget Group, Inc. Investor Relations "SEC Filings" webpage, https://ir.avisbudgetgroup.com/financial-information/sec-filings. |
| Exhibit 9 | Schedule 13D Amendment as to Avis Budget Group, Inc., as filed with the SEC on August 25, 2023. |
| Exhibit 10 | SEC Form 4 Filing by SRS Investment Management and Karthik R. Sarma, as filed with the SEC on August 25, 2023. |
| Exhibit 11: | Avis Budget Group, Inc., *Avis Budget Group Announces Management Realignment*, (November 1, 2023). |
| Exhibit 12: | *In re Puda Coal, Inc. S'holders Litig.*, C.A. No. 6476–CS (Del. Ch. Feb. 6, 2013), Telephonic Rulings of the Court on Defendants' Motion to Dismiss. |
| Exhibit 13: | Excerpts of The Kraft Heinz Company's Schedule 14A Definitive Proxy Statement, as filed with the SEC on March 27, 2020. |
| Exhibit 14: | Avis Budget Group, Inc., *Avis Budget Group Appoints Bernardo Hees chairman of the Board of Directors*, (February 10, 2020). |
| Exhibit 15: | Certain SEC Form 4 Filings by Joseph A. Ferraro (Dec. 16, 2022; Dec. 19, 2023). |

Exhibit 16:          Certain SEC Form 4 Filings by Izilda P. Martins (Dec. 16, 2022; Dec. 19, 2023).

        In accordance with 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       November 18, 2024

KRISTINA A. BUNTING

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of Earliest Event Reported): December 23, 2022**

# Avis Budget Group, Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-10308 | 06-0918165 |
|---|---|---|
| (State or Other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **6 Sylvan Way** | |
|---|---|
| **Parsippany, NJ** | **07054** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(973) 496-4700**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, par value $0.01 | CAR | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

## Item 1.01    Entry into a Material Definitive Agreement.

### Fourth Amended and Restated Cooperation Agreement

On December 23, 2022, Avis Budget Group, Inc. (the "Company") entered into a Fourth Amended and Restated Cooperation Agreement (the "Fourth A&R Cooperation Agreement") with SRS Investment Management, LLC and certain of its affiliates (collectively, "SRS"), regarding the membership and composition of the Company's board of directors (the "Board") and related matters, following approval thereof by the directors not designated by SRS. The Fourth A&R Cooperation Agreement amends and restates the Third Amended and Restated Cooperation Agreement by and between the Company and SRS dated as of February 23, 2020, as previously amended (the "Prior Agreement").

Pursuant to the Fourth A&R Cooperation Agreement, SRS has agreed to continue abiding by certain standstill provisions during a standstill period ending on the earlier of (i) December 31, 2024, (ii) the date on which SRS's Beneficial Ownership (as such term is defined in the Fourth A&R Cooperation Agreement) falls below the greater of (x) 1,973,485 and (y) 5% of the Company's issued and outstanding Voting Securities (as such term is defined in the Fourth A&R Cooperation Agreement) publicly disclosed as of such date and (iii) the date that is 60 days prior to the last date for which notice of a stockholder's intention to nominate any individual as a director of the Company at the Company's 2025 annual meeting of stockholders must be received by the Company (the "Standstill Period"). During the Standstill Period, SRS has agreed not to (among other things) acquire Beneficial Ownership of more than the greater of (x) 18,500,000 and (y) 44.5% of the Company's outstanding Voting Securities.

Pursuant to the Fourth A&R Cooperation Agreement, during the Standstill Period, SRS is entitled to continue to designate two persons to serve as members of the Board, and has the additional right to name a third designee (each, an "Applicable Director"). The Fourth A&R Cooperation Agreement provides that should SRS exercise its right to designate a third person to serve as a member of the Board, the Company shall (i) take such action as is required to expand the size of the Board to seven directors, and (ii) have the right, but not the obligation, to further expand the size of the Board to eight directors, which eighth director shall be designated by a majority of the directors of the Board not designated by SRS. The Company has agreed to include SRS' director designees in the Company's slate of nominees for election to the Board, and to recommend that the Company's stockholders vote in favor of the election of such nominees, at each meeting of the Company's stockholders occurring during the Standstill Period at which directors are to be elected.

Consistent with the Prior Agreement, under the terms of the Fourth A&R Cooperation Agreement, the size of each of the Corporate Governance Committee and the Compensation Committee will be set at no fewer than two and no more than three members, all of whom must qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements (unless otherwise permitted by such stock exchange requirements). The Fourth A&R Cooperation Agreement also provides that during the Standstill Period, (i) SRS will be entitled to appoint one Applicable Director to each of the Corporate Governance Committee and the Compensation Committee of the Board, (ii) the Applicable Director appointed by SRS to the Compensation Committee will serve as the Chair of such committee, and (iii) SRS will be entitled to designate an Applicable Director to serve as the Vice Chairman of the Board.

During the Standstill Period, SRS has agreed to vote its Voting Securities in favor of the Company's nominees and other proposals at any meeting of the Company's stockholders occurring during the Standstill Period, subject to certain limited exceptions. In addition, in the event that SRS obtains (as a result of buybacks or repurchases by or on behalf of the Company, purchases by SRS, or otherwise) the right to exercise voting rights attached to Voting Securities in excess of 35% of the outstanding Voting Securities, SRS has committed to exercise such voting rights in the same proportion in which all other Voting Securities are voted.

Additionally, pursuant to the Fourth A&R Cooperation Agreement, for so long as SRS beneficially owns 5% or more of the outstanding Voting Securities or has one or more designees serving on the Board, then (i) SRS shall not directly or indirectly participate in certain transactions involving the Company or any of its subsidiaries or any of their respective securities (each, an "Extraordinary Transaction") unless the terms of such Extraordinary Transaction provide for the same type and amount of per share consideration received by SRS and the other shareholders of the Company, and (ii) any Extraordinary Transaction between the Company or its subsidiaries and SRS shall be negotiated with and approved by a special committee of the Board comprised solely of directors not designated by SRS.

The foregoing summary of the Fourth A&R Cooperation Agreement does not purport to be complete and is qualified in its entirety by reference to the full text of the Fourth A&R Cooperation Agreement, a copy of which is attached as Exhibit 10.1 hereto and is incorporated herein by reference.

**Item 9.01    Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 10.1 | Fourth Amended and Restated Cooperation Agreement, dated as of December 23, 2022, by and among Avis Budget Group, Inc., SRS Investment Management, LLC and certain of its affiliates. |
| 104 | The cover page from this Current Report on Form 8-K formatted in Inline XBRL (included as Exhibit 101). |

## SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereto duly authorized.

**AVIS BUDGET GROUP, INC.**

By:   /s/ Jean Sera

Name: Jean Sera

Title:  Senior Vice President, General Counsel, Chief Compliance Officer and Corporate Secretary

Date: December 27, 2022

EX-10.1 2 eh220316264_ex1001.htm EXHIBIT 10.1

**EXHIBIT 10.1**

**EXECUTION VERSION**

FOURTH AMENDED AND RESTATED

COOPERATION AGREEMENT

This Fourth Amended and Restated Cooperation Agreement, dated as of December 23, 2022 (this "Agreement"), is by and among Avis Budget Group, Inc. (the "Company") and the entities set forth on Schedule A hereto (together with their Affiliates, "SRS").

WHEREAS, as of the date hereof, SRS Beneficially Owns 18,430,882 shares of common stock of the Company, par value $0.01 per share (the "Common Stock");

WHEREAS, the Company and SRS have previously entered into that certain Third Amended and Restated Cooperation Agreement, dated as of February 23, 2020, and amended on August 12, 2020, and September 15, 2021 (such agreement, as so amended, the "Prior Agreement"), with respect to certain matters relating to the Board of Directors of the Company (the "Board") and certain other matters, as provided therein;

WHEREAS, the Company and SRS wish to amend and restate the Prior Agreement on the terms set forth herein.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Board Representation.

(a)    The Company's slate of nominees for election as directors of the Company at (i) the next annual meeting of stockholders of the Company (the "2023 Annual Meeting") and (ii) each other meeting of stockholders of the Company held during the Standstill Period at which directors are to be elected (such meetings, together with the 2023 Annual Meeting, the "Applicable Meetings") shall include each of the Applicable Directors. The Company shall recommend that the Company's stockholders vote in favor of the election of each of the Applicable Directors at each of the Applicable Meetings and shall support the Applicable Directors for election at each of the Applicable Meetings in substantially the same manner as the Company's other nominees. "Applicable Directors" means each of Jagdeep Pahwa, Karthik Sarma and (in the event a Board Expansion Notice is delivered) the Additional Director (as defined below). No Applicable Director that is (or is appointed to be) a member of the Board prior to the 2023 Annual Meeting shall be removed from or (except in the limited circumstances specifically set forth in Section 1(e)) required to resign from the Board prior to the 2023 Annual Meeting.

(b)    At all times while serving as a member of the Board (and as a condition to such service), the Applicable Directors shall (i) comply with all policies, codes and guidelines applicable to Board members (subject to Section 9), copies of which are either publicly available or have been provided to SRS or their counsel and (ii) not serve as a director or officer of any Competitor ((i) and (ii), the "Applicable Director Criteria"). During the Standstill Period,

Case 2:24-cv-05687-JXN-JSA   Document 16-2   Filed 11/18/24   Page 12 of 208 PageID: 549

SRS shall ensure at least one of the Applicable Directors shall at all times qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements.

(c)        During the Standstill Period, SRS shall be entitled to designate two (2) (or if a Board Expansion Notice has been delivered (and subject to the proviso in 1(g)), three (3)) persons to serve as members of the Board. Such persons shall serve as the Applicable Directors in accordance with this Agreement and may, but are not required to be, former or current employees of SRS or an affiliate of SRS. SRS shall be entitled to change its designation of the persons serving as the Applicable Directors from time to time and at any time during the Standstill Period. The Applicable Directors shall be entitled to resign from the Board at any time in their discretion. Should any of the Applicable Directors resign from the Board, become unable to serve on the Board due to death, disability or other reasons or otherwise cease to serve on the Board for any reason (including as the result of SRS changing its designation of an Applicable Director) prior to the expiration of the Standstill Period, SRS will have the right to recommend for appointment to the Board a replacement director (a "<u>Replacement</u>"); <u>provided</u>, that any Replacement of an Applicable Director shall meet the Applicable Director Criteria. The appointment of a Replacement will be subject to a customary due diligence process by the Board (including the review of a completed D&O questionnaire (in the Company's standard form), interviews with members of the Board and a customary background check) and completion by the Replacement of the following documents required of all non-executive directors on the Board: the Certification for the Procedures and Guidelines Governing Securities Trades by Company Personnel and the Majority Voting Conditional Resignation Letter. The Company will use its reasonable best efforts to complete its approval process as promptly as practicable. The Company shall appoint the Replacement to the Board unless (i) the Board, in good faith, upon the advice of outside legal counsel, determines that appointing the proposed director would be inconsistent with its fiduciary duties under applicable law, (ii) the Replacement fails to satisfy the Applicable Director Criteria or (iii) if upon the appointment of such Replacement, none of the Applicable Directors would qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements. For the avoidance of doubt, SRS will be entitled to continue to recommend different persons which meet the foregoing criteria until a Replacement is appointed. Except as otherwise specified in this Agreement, if a Replacement is appointed, all references in this Agreement to the term "Applicable Director" will include such Replacement. For the avoidance of doubt, in the event that a Board Expansion Notice is delivered, the provisions of this <u>Section 1(c)</u> applicable to Replacements shall apply, mutatis mutandis, to the initial Additional Director (and the designation, approval, appointment and any future replacements thereof).

(d)        During the Standstill Period, (i) SRS shall be entitled to appoint one (1) Applicable Director to the Corporate Governance Committee of the Board, (ii) SRS shall be entitled to appoint one (1) Applicable Director to the Compensation Committee of the Board, which Applicable Director shall serve as Chair of the Compensation Committee of the Board, (iii) the size of each of the Corporate Governance Committee and the Compensation Committees shall be not less than two (2) nor more than three (3) members, all of whom shall qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements (unless the Board (including, solely in the case of an Applicable Director joining such committee, a majority of the directors who are not former or current employees of, or advisors or consultants to, SRS or an Affiliate of SRS) approves the appointment to such committee of a director who does not qualify as "independent" of the Company in accordance with an applicable exception

-2-

thereunder) and (iv) SRS shall be entitled to designate one Applicable Director to serve as Vice Chairman of the Board. SRS shall be entitled to change its appointments and designations pursuant to this <u>Section 1(d)</u> from time to time and at any time during the Standstill Period. If SRS elects to change the Vice Chairman or the committee positions on which an Applicable Director serves, SRS shall provide written notice furnishing the name of the Person being replaced, the name of the Person to be appointed, and setting forth the positions in which the new appointee will serve. The Company shall promptly appoint the Applicable Director to the designated positions so long as, in the case of any committee appointments, such Applicable Director satisfies the applicable stock exchange listing requirements for serving on such committee. As of the Agreement Date, SRS has designated Mr. Sarma (x) to serve on the Corporate Governance Committee and (y) to serve on, and be Chair of, the Compensation Committee. SRS has presently designated Mr. Pahwa to serve as Vice Chairman of the Board.

(e)    Promptly after the execution and delivery of this Agreement (or, in the case of any Replacement or the Additional Director, immediately prior to such Person's appointment to the Board), each of the Applicable Directors shall deliver (and any Replacement shall deliver, as applicable) to the Company an irrevocable resignation letter pursuant to which such Person shall resign from the Board and all applicable committees thereof, subject to the Board's acceptance of such resignation (which may be accepted or rejected in its sole discretion), in the event of any of the following:

(i)    such Applicable Director is required to resign pursuant to the proviso set forth in the first sentence of <u>Section 5</u> as a result of SRS's aggregate Beneficial Ownership of Voting Securities falling below the Minimum Ownership Level set forth in the applicable of clause (a), clause (b) and/or clause (c) of <u>Section 5</u> hereof, as applicable;

(ii)    a judicial determination that such Applicable Director has materially breached any of the terms of this Agreement, in which case the resignation letter provided by such Applicable Director shall become effective; or

(iii)    a judicial determination that SRS has materially breached any of the terms of this Agreement, in which case the resignation letters provided by all of the Applicable Directors shall become effective.

(f)    During the period commencing with the Agreement Date through the expiration or termination of the Standstill Period, the Board and all applicable committees of the Board shall take all necessary actions (including with respect to nominations for election at the Applicable Meetings) so that the size of the Board is (i) (if no Board Expansion Notice has been delivered) six (6) directors, (ii) (if a Board Expansion Notice has been delivered but the Company Expansion Right has not been exercised) seven (7) directors and (iii) (if a Board Expansion Notice has been delivered and the Company Expansion Right has been exercised) eight (8) directors.

(g)    At any time during the Standstill Period, SRS may deliver written notice to the Company (a "<u>Board Expansion Notice</u>") to require the increase of the size of the Board to seven (7) directors and to designate a third director to the Board. Subject to the following sentence, upon the delivery by SRS of a Board Expansion Notice (i) the Board shall take all such

-3-

action as is required to expand the size of the Board to seven (7) directors (it being understood that the resulting new seventh seat on the Board shall remain vacant unless and until the Additional Director (as defined below) is appointed to or elected to fill such seat) and (ii) SRS shall be entitled to designate a third director to the Board, subject to the following sentence (in addition to Mr. Sarma (or any Replacement therefor) and Mr. Pahwa (or any Replacement therefor)) (the "Additional Director"). At any time during the Standstill Period after SRS has delivered a Board Expansion Notice, the Company shall have the right (the "Company Expansion Right"), but not the obligation, to further expand the size of the Board at any time from seven (7) directors to eight (8) directors; provided that if, after SRS has delivered a Board Expansion Notice but before the Additional Director has been appointed or elected to the Board, the Company notifies SRS of its intention to exercise the Company Expansion Right, the Additional Director shall only be appointed to the Board at the earlier of (i) sixty (60) days following the date of delivery of the Board Expansion Notice or (ii) the time at which the Company appoints a director to fill the eighth seat (the director initially appointed to such seat, the "Company Expansion Director") on the Board resulting from the exercise of the Company Expansion Right. During the Standstill Period, candidates for the Company Expansion Director shall be proposed for appointment to the Board only by a majority of the members of the Board other than the Applicable Directors. Any other candidates for the Board of Directors (other than Applicable Directors and the Company Expansion Director) may be proposed by any member of the Board of Directors, and all members of the Board shall be entitled to take part in the consideration and voting upon all non-Applicable Director candidates for the Board.

(h) Unless the Board determines otherwise, all determinations regarding, and actions with respect to, SRS and this Agreement (including any amendment to or waiver under this Agreement) shall be made by either (i) the Board (excluding all directors who are current or former employees of, or advisors or consultants to, SRS or an Affiliate of SRS) or (ii) a committee of the Board comprised solely of directors who are independent under the standards of the Nasdaq Stock Exchange and are not current or former employees of, or advisors or consultants to, SRS or an Affiliate of SRS.

(i) SRS agrees that the Applicable Directors shall recuse themselves from the portion of any Board or committee or subcommittee meeting at which the Board or any such committee or subcommittee is evaluating and/or taking action with respect to (i) the exercise of any of the Company's rights or enforcement of any of the obligations under this Agreement, (ii) any proposed or pending (x) Extraordinary Transaction between the Company or any of its subsidiaries and SRS or its Affiliates, (y) other material transaction between the Company or any of its subsidiaries and SRS or any of its Affiliates from which SRS or an Affiliate of SRS receives or otherwise derives a material benefit (other than a benefit to which SRS or any of its Affiliates would be entitled in its capacity as a shareholder of the Company and in which all shareholders of the Company participate pro rata) or (z) material transaction between the Company or any of its subsidiaries and another entity in which SRS has representation on the board of directors (or equivalent governing body), or has beneficial ownership of 10% or more, of such entity or such entity's direct or indirect parent company, or (iii) any public stockholder proposal or public proposal to nominate any Person for election to the Board made by SRS or its Affiliates (the matters described in clauses (i)–(iii) of this Section 1(i) referred to as "Recusal Matters"). SRS agrees that the Applicable Directors shall not have access to documents or other information relating to Recusal Matters.

-4-

2.      Standstill Provisions. During the period (the "Standstill Period") commencing with the execution and delivery of this Agreement and ending on the earliest to occur of (i) December 31, 2024, (ii) the date on which SRS's Beneficial Ownership ceases to satisfy the Minimum Ownership Level set forth in clause (c) of Section 5 hereof and (iii) the date that is sixty (60) calendar days prior to the Advance Notice Deadline, SRS shall not, directly or indirectly, in any manner, take any of the following actions (unless specifically permitted to do so in writing in advance by the Board):

(a)      acquire, offer to acquire, or cause to be acquired any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of more than the greater of (x) 18,500,000 and (y) 44.5% of the outstanding Voting Securities (the "Independent Ownership Limit") immediately following the consummation of such transaction; provided, that for the avoidance of doubt, nothing contained in this Agreement shall in any way limit the ability of SRS to acquire, offer to acquire or cause to be acquired any ownership or other interest in any Synthetic Position that (i) is not required or permitted to be settled, in whole or in part, in Voting Securities and (ii) does not grant SRS a right, option or obligation to own, acquire or control or direct the voting of any Voting Securities upon Exercise;

(b)      solicit proxies or written consents of stockholders or conduct any other type of referendum (binding or non-binding) with respect to, or from the holders of, Voting Securities, or become a "participant" (as such term is defined in Instruction 3 to Item 4 of Schedule 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), in or assist, advise, knowingly encourage or knowingly influence any Third Party in any "solicitation" of any proxy, consent or other authority (as such terms are defined under the Exchange Act) to vote any Voting Securities (other than such advice, encouragement or influence that is consistent with the Board's recommendation in connection with such matter);

(c)      other than through open market or block trade brokered sale transactions where (i) the identity of the purchaser is unknown to SRS, or (ii) SRS does not directly or indirectly select or influence the selection of the purchaser, sell, offer or agree to sell any Voting Securities of the Company to any Third Party that, to the knowledge of SRS after due inquiry, (x) has aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock or (y) would result in such Third Party having aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock;

(d)      effect or seek to effect, offer or propose to effect, cause or participate in, or in any way assist, facilitate or encourage any other Person to effect or seek, offer or propose to effect or participate in, any tender or exchange offer, merger, consolidation, acquisition, scheme, arrangement, business combination, recapitalization, reorganization, sale or acquisition of all or a substantial portion of the Company's assets, liquidation, dissolution or other extraordinary transaction involving the Company or any of its subsidiaries or any of their respective securities (each, an "Extraordinary Transaction"); provided that nothing in this paragraph (d) shall preclude or prohibit SRS (or its Affiliates) from (i) tendering into a tender or exchange offer; (ii) making a proposal providing for a Change of Control Transaction (as defined below) involving the acquisition of all of the outstanding Common Stock of the Company (a "Wholeco Transaction")

-5-

directly to the Board or a committee thereof and making filings in connection with such proposal and related discussions or negotiations under Section 13(d) of the Exchange Act and related regulations; provided, that SRS has provided notice of its intention to make such filing (together with a reasonable description of the material items to be disclosed in such filing and, if available, a draft thereof) to the Company as soon in advance as reasonably practicable; (iii) in the event the Board is no longer engaging in good faith negotiations relating to, or rejects an offer made by SRS (whether binding or non-binding), in each case, in accordance with clause (ii) above, making such offer directly to stockholders of the Company after providing notice of its intent to do so as soon in advance as reasonably practicable; or (iv) engaging in discussions with Third Parties (other than a Competitor) for a period of no more than seventy-five (75) days after providing written notice to the Company (which notice may be given not more than once during any twelve (12) month period; provided that an additional notice may be given during any twelve (12) month period if the Third Party enters into a confidentiality and standstill agreement on customary terms with the Company with respect to a potential Wholeco Transaction), about the possibility of partnering in the making of an offer for a Wholeco Transaction under clause (ii) or, to the extent applicable, clause (iii) above and making an offer (whether binding or non-binding) contemplated by such clauses in partnership with any Person (other than a Competitor) as long as such offer to the Board under clause (ii) above is first made on or prior to the end of such 75-day period; provided, that (x) nothing in clauses (ii)–(iv) above shall be deemed to permit SRS to disclose any confidential information of the Company to any Person without the prior written consent of the Company (which consent shall not be withheld, delayed or further conditioned in the event that such Person is willing to enter into a confidentiality agreement and a standstill agreement, in each case on customary terms), (y) Sections 2(d), (f), (g), (h) and (j) shall not prevent actions (and the other subsections of Section 2 shall not be deemed to prohibit actions taken by SRS that otherwise would be prohibited by Sections 2(d), (f), (g), (h) and (j) had they applied) to the extent such actions are taken in connection with discussions and offers made in compliance with clause (iii) or (iv) above (provided, that for the avoidance of doubt, Section 2(a) shall continue to prohibit the acquisition of Voting Securities except as results solely from being deemed a "group" with another Person as a result of such discussions or offers or from consummating a Wholeco Transaction that otherwise complies with this Section 2(d)), and (z) exploratory discussions by SRS in response to an unsolicited initiation by another Person of discussions with SRS with respect to partnering in the making of an offer for a Wholeco Transaction shall not be deemed to contravene the restrictions set forth in this Section 2(d), provided that thereafter engaging in substantive discussions about the material terms of the partnership and Wholeco Transaction shall either require the consent of the Board or the giving of the notice contemplated by clause (iv) above.

(e)    (i) call or seek the Company or any other Person to call any meeting of stockholders, including by written consent, (ii) seek representation on, or nominate any candidate to the Board (except as expressly provided by this Agreement), (iii) nominate any candidate to the board of directors of any Competitor unless such candidate is independent from SRS and SRS takes all appropriate acts to prevent such third party from providing any competitively sensitive information to SRS, (iv) seek the removal of any member of the Board or (v) make any proposal at any annual or special meeting of the Company's stockholders; provided, that, the foregoing clauses (ii) and (iv) of this Section 2(e) shall not prevent the Applicable Directors from (x) discussing such matters at any Board or Board committee meeting or discussing such matters with other members of the Board at any time and (y) introducing qualified director candidates to the Board or the Corporate Governance Committee;

-6-

(f)    take any public action in support of or make any public proposal or request that constitutes or relates to: (i) advising, controlling, changing or influencing the Board or management of the Company, including any plans or proposals to change the number or term of directors or to fill any vacancies on the Board, (ii) any material change in the capitalization, stock repurchase programs and practices, capital allocation programs and practices or dividend policy of the Company, (iii) any other material change in the Company's management, business or corporate structure, (iv) seeking to have the Company waive or make amendments or modifications to the Company's certificate of incorporation or bylaws, or other actions that may impede or facilitate the acquisition of control of the Company by any Person, (v) causing a class of securities of the Company to be delisted from, or to cease to be authorized to be quoted on, any securities exchange or (vi) causing a class of securities of the Company to become eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act;

(g)    make any public disclosure, announcement or statement regarding any intent, purpose, plan or proposal with respect to the Board, the Company, its management, policies or affairs, any of its securities or assets or this Agreement that is inconsistent with the provisions of this Agreement;

(h)    except as is reasonably acceptable to the Company, form or join in a partnership, limited partnership, syndicate or other group, including a "group" as defined under Section 13(d) of the Exchange Act (a "Group"), with respect to the Voting Securities (for the avoidance of doubt, excluding any group composed solely of SRS and its Affiliates or as contemplated by Section 2(d) herein);

(i)    institute, solicit or join, as a party, any litigation, arbitration or other proceeding (including any derivative action) against the Company or any of its future, current or former directors or officers or employees (provided, that nothing shall prevent SRS from bringing litigation to enforce the provisions of this Agreement, seeking a declaratory judgment with respect to compliance with the terms of this Agreement or being a party to a class action instituted by a Third Party without the assistance or encouragement of SRS);

(j)    except as is reasonably acceptable to the Company or as contemplated by Section 2(d) herein, enter into any discussions, negotiations, agreements, or understandings with any Third Party to take any action or make any statement with respect to any of the foregoing, or assist, advise, knowingly encourage or knowingly influence any Third Party to take any action or make any statement with respect to any of the foregoing, or otherwise take or knowingly cause any action, or make any statement, inconsistent with any of the foregoing; or

(k)    (i) contest the validity of, or (ii) publicly request any waiver of, the obligations set forth in this Section 2; provided, that clause (i) shall not be deemed to prevent SRS from defending any claim by the Company that SRS has breached this Section 2.

Notwithstanding anything in this Agreement to the contrary, the foregoing provisions of this Section 2 shall not be deemed to (x) prohibit SRS or its directors, officers, partners, employees, members or agents (acting in such capacity) from communicating privately with the Company's directors or officers so long as such communications are not intended to, and would not reasonably be expected to, require any public disclosure (including under Section 13(d)

-7-

of the Exchange Act and related regulations) of such communications (except to the extent permitted by <u>Section 2(d)</u>) or (y) restrict any Applicable Director in the exercise of his fiduciary duties to the Company and all of its stockholders. Notwithstanding anything to the contrary in this Agreement, <u>Sections 2(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> shall be of no further force and effect (and the other subsections of <u>Section 2</u> shall not be deemed to prohibit actions taken by SRS that otherwise would be prohibited by <u>Sections 2(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> had they been in effect to the extent such actions are taken in pursuit of a Change of Control Transaction; <u>provided</u>, that for the avoidance of doubt, <u>Section 2(a)</u> shall continue to fully apply in accordance with its terms except for offers (but not acquisitions of Voting Securities) relating to a Change of Control Transaction) in the event that (i) the Company shall enter into a definitive agreement providing for (A) a merger, consolidation, business combination or similar transaction immediately following which the stockholders of the Company immediately prior to the consummation of such transaction (other than stockholders of the Company who have entered into, or who are members of a Group any member of which has entered into, a definitive agreement with the Company in respect of a transaction of the type described in this <u>clause (A)</u>) will hold less than 80% of the total combined voting power of the Company or any successor holding company, (B) a tender or exchange offer for 20% or more of the Voting Securities of the Company, (C) a sale of 20% or more of the consolidated assets of the Company and its subsidiaries (including equity securities of subsidiaries) in a single transaction or series of related transactions (other than in the ordinary course of business), or (D) a sale of 20% or more of the Voting Securities outstanding immediately prior to such sale in a single transaction or series of related transactions (each of (A), (B), (C) and (D) constituting a "<u>Change of Control Transaction</u>"), (ii) the Company formally or publicly commences a process contemplating a Change of Control Transaction and (x) does not provide SRS an opportunity to participate in such a process on the same terms as Third Parties, or (y) includes conditions to participation that are designed to prevent SRS from participating in such a process on the same terms as Third Parties or (iii) a Third Party shall commence a tender offer or exchange offer or otherwise make a bona fide public offer to acquire the Company, all or substantially all of the assets of the Company, or 50% or more of the Voting Securities of the Company, in each case, not resulting from a violation of this <u>Section 2</u>.

        3.    <u>Stockholder Rights Plan</u>. The Company agrees not to, at any time prior to five (5) business days before the expiration of the Standstill Period, adopt or enter into any stockholder rights plan or similar agreement that would cause the rights thereunder to be "triggered" by (or would otherwise cause SRS to be materially and disproportionately adversely affected as compared to other stockholders of the Company as a result of) any action to be taken by SRS that would otherwise be permitted by <u>Section 2</u> (except in response to SRS delivering a notice of its intent to make an offer directly to stockholders of the Company pursuant to <u>Sections 2(d)(iii)</u> or <u>2(d)(iv)</u> with respect to which the Company shall be permitted to adopt or enter such a plan or agreement; <u>provided</u> that thereafter SRS shall not be restricted from (i) in connection with such offer taking actions that would otherwise be prohibited by <u>Sections 2(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> had they applied and (ii) acquiring, offering to acquire, or causing to be acquired any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of no more than the Independent Ownership Limit immediately following the consummation of such transaction).

-8-

Case 2:24-cv-05687-JxN-JSA   Document 16-2   Filed 11/18/24   Page 19 of 208
PageID: 556

4. <u>Voting Commitments</u>.

(a)    SRS agrees that it will cause all Voting Securities Beneficially Owned by SRS as of the record date for any meeting of stockholders of the Company occurring during the Standstill Period (including, for the avoidance of doubt, Beneficial Ownership of any Voting Securities acquired after the date of this Agreement) to be present for quorum purposes and voted at such meetings (i) in favor of the Company's nominees, (ii) against the election of any directors that have not been nominated by the Company, (iii) in accordance with the Board's recommendation with respect to auditor ratification proposals and (iv) in accordance with the Board's recommendation with respect to any other proposal presented at such meeting, <u>provided however</u>, that in the case of this <u>clause (iv)</u>, SRS shall be permitted to vote in its sole discretion (subject to any limitations attached to Excess Voting Rights pursuant to <u>Section 4(b)</u>) with respect to any proposal (A) related to an Extraordinary Transaction, (B) which has received an "against" recommendation from Institutional Shareholder Services, (C) related to the implementation of takeover defenses or adversely affecting the rights of stockholders, or (D) related to new or amended incentive compensation plans.

(b)    In the event SRS Beneficially Owns (as a result of buybacks or repurchases by or on behalf of the Company, purchases by SRS, or otherwise) the right to exercise voting rights attached to Voting Securities in excess of 35% of the outstanding Voting Securities (the "<u>Excess Voting Rights</u>"), and for so long as SRS continues to (i) have the right to exercise such Excess Voting Rights and (ii) Beneficially Own more than 35% of the outstanding Voting Securities, SRS shall (A) on each and every matter that is submitted to the stockholders of the Company for their vote and with respect to which the Excess Voting Rights may be voted by SRS, exercise such Excess Voting Rights in the same proportion in which all other Voting Securities voted on such matter are voted (treating broker non-votes and abstentions as votes "against" (except with respect to votes of the stockholders of the Company for the election of directors) and without taking into consideration, in determining such proportions, any Voting Securities that are voted by SRS on such matter), and (B) take reasonable steps to cooperate with the Company in order to exercise such Excess Voting Rights in the manner contemplated by this <u>Section 4(b)</u>.

5.    <u>Minimum Ownership</u>. If at any time following the execution and delivery of this Agreement, SRS's aggregate Beneficial Ownership of Voting Securities is less than (in each case, subject to adjustment in the event of stock splits, dividends, recapitalizations, reorganizations and the like) (a) the greater of (x) 3,946,970 and (y) 10% of the issued and outstanding Voting Securities publicly disclosed as of such date, then (solely in the event that there are then three Applicable Directors on the Board) the resignation letter provided by one Applicable Director (or any Replacement thereof) shall become effective, (b) the greater of (x) 2,960,227 and (y) 7.5% of the issued and outstanding Voting Securities publicly disclosed as of such date, then (solely in the event that there are then at least two Applicable Directors on the Board) the resignation letter provided by one Applicable Director (or any Replacement thereof) shall become effective or (c) the greater of (x) 1,973,485 and (y) 5% of the issued and outstanding Voting Securities publicly disclosed as of such date, the resignation letter provided by the final Applicable Director (or any Replacement thereof), shall become effective (each of the percentages in clauses (<u>a</u>), (<u>b</u>) and (c), a "<u>Minimum Ownership Level</u>"); <u>provided</u>, that in the case of <u>clauses (a)</u> and (<u>b</u>),

-9-

SRS shall promptly notify the Company of which Applicable Director (as applicable) will resign in each instance and, failing such notice, the Corporate Governance Committee of the Board shall determine which Applicable Director (as applicable) will resign. Following the effectiveness of an Applicable Director's resignation letter pursuant to this Section 5, SRS shall no longer be entitled to recommend for appointment to the Board any Replacement for such Applicable Director and (ii) the Company shall not be obligated to nominate such Applicable Director or any Replacement thereof (as applicable) for election to the Board at any meeting of stockholders at which directors are to be elected occurring after such time. SRS shall promptly (and in any event within five (5) business days) inform the Company in writing if at any time SRS has failed to maintain any Minimum Ownership Level.

6.    Non-Disparagement. Until the expiration of the Standstill Period, SRS and the Company agree not to (and will cause any Persons acting on their behalf not to) make, or cause to be made (whether directly or indirectly), any public statement or any public announcement (including in any document filed with or furnished to the SEC or through the media), or any statement made by a senior officer or director of SRS or the Company to any stockholder or investor of the other party or any analyst, in each case which constitutes an *ad hominem* attack on, or otherwise disparages, the other party's past, present or future directors, officers, partners, principals or employees; provided, that from and after the time at which Sections 2(d), (f), (g), (h) and (j) of this Agreement are no longer in full force and effect (including, for the avoidance of doubt, such time at which SRS provides notice pursuant to Sections 2(d) (iii)–(iv) in connection with the relevant offer), nothing herein shall limit SRS from making any statement or announcement regarding any breach of fiduciary duty by the Company or any of its officers or directors to the extent such statement or announcement is made in pursuit of a Change of Control Transaction; provided, further, that the Company shall also be permitted to make its own statement or announcement or comment on any statement or announcement made by SRS. Nothing in this Section 6 shall be deemed to prevent either the Company or SRS from complying with its respective disclosure obligations under applicable law, legal process, subpoena, law, the rules of any stock exchange, or legal requirement or as part of a response to a request for information from any governmental authority with jurisdiction over the party from whom information is sought.

7.    Public Announcements. The Company acknowledges that SRS may file this Agreement as an exhibit to its Schedule 13D. The Company shall be given a reasonable opportunity to review and comment on any Schedule 13D filing made by SRS with respect to this Agreement, and SRS shall give reasonable consideration to the comments of the Company. SRS acknowledges and agrees that the Company may file this Agreement and file or furnish the Press Release with the SEC as exhibits to a Current Report on Form 8-K and other filings with the SEC.

8.    Confidentiality.

(a)    Each Applicable Director shall be required to comply with the Company's Code of Business Conduct and Ethics for Directors applicable to the other members of the Board, including provisions relating to the confidentiality, disclosure and use of (including trading or influencing the actions of any Person based on) any non-public information entrusted to or obtained by such director by reason of his or her position as a director of the Company ("Confidential Information").

-10-

(b)        Notwithstanding the foregoing, each of the Applicable Directors (or any Replacement thereof that is an Affiliate of SRS) may, if he wishes to do so, provide Confidential Information to SRS's investment professionals ("SRS Investment Professionals"), solely to the extent such SRS Investment Professionals need to know such information in connection with SRS's investment in the Company; provided, however, that SRS (i) shall inform each SRS Investment Professional of the confidential nature of the Confidential Information, (ii) shall cause each SRS Investment Professional not to disclose any Confidential Information to any Person other than SRS Investment Professionals in compliance with this Section 8(b) and (iii) shall cause each SRS Investment Professional not to use any Confidential Information other than in connection with SRS's investment in the Company. SRS shall be responsible for the breach of this Section 8(b) by any of its directors, officers, employees, agents or other representatives (collectively, its "Representatives").

(c)        Notwithstanding anything in this Agreement to the contrary, in the event that the SRS or any of its Representatives is required in connection with a legal, judiciary, regulatory or administrative investigation or proceeding, by interrogatories, subpoena, civil investigative demand or similar legally mandatory process (excluding any such requirement arising out of any action or proceeding initiated by SRS or its Representatives, including for the avoidance of doubt any requirement to make a filing with the SEC or under any securities laws or regulations) (each, a "Legal Requirement"), to disclose Confidential Information, it is agreed that SRS or such Representative will, to the extent legally permissible, provide the Company with prompt written notice of such event so that the Company may seek a protective order or other appropriate remedy, at its expense, or waive compliance with the applicable provisions of this Agreement and, if applicable, the Company's Code of Business Conduct and Ethics for Directors by SRS or such Representative. In the event that (x) such protective order or other remedy is not obtained and disclosure of Confidential Information is therefore required (and such requirement does not arise from a breach of this Agreement by SRS) or (y) the Company consents in writing to having the Confidential Information produced or disclosed pursuant to such Legal Requirement, SRS or such Representative, as the case may be, (i) may, without liability hereunder, furnish that portion (and only that portion) of the Confidential Information that SRS or such Representative's legal counsel advises is legally required to be disclosed and (ii) will use reasonable efforts, at the Company's expense, to obtain reasonable assurance that confidential treatment is accorded to any Confidential Information so furnished. In no event will SRS or its Representatives oppose any action by the Company to obtain a protective order or other relief to prevent the disclosure of the Confidential Information or to obtain reliable assurance that confidential treatment will be afforded to the Confidential Information.

(d)        Any confidentiality obligations under this Section 8 shall expire 24 months after the date on which no Applicable Director (or any Replacement thereof that is an Affiliate of SRS) serves as a director of the Company; provided, that SRS shall maintain in accordance with the confidentiality obligations set forth herein any Confidential Information constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3); and provided, further, that this Section 8 is not intended to be, and shall not be interpreted as, a contractual restriction on any trading activities of SRS taken in SRS's own judgment.

-11-

9. <u>Securities Laws</u>. SRS acknowledges that it is aware, and will advise each SRS Investment Professional who receives Confidential Information pursuant to <u>Section 8(b)</u>, that United States securities laws prohibit any Person who has received material, non-public information from purchasing or selling securities on the basis of such information or from communicating such information to any other Person under circumstances in which it is reasonably foreseeable that such Person may trade securities on the basis of such information. SRS agrees that neither it nor its investment professionals will use or communicate any Confidential Information in violation of such laws. SRS maintains customary policies and procedures designed to prevent unauthorized disclosure and use of material, non-public information. As long as the Applicable Directors (or any Replacement thereof that is an Affiliate of SRS) are on the Board, SRS shall not purchase or sell, directly or indirectly, any securities of the Company during any blackout periods applicable to all directors under the Company's insider trading policy; <u>provided</u>, <u>however</u>, that nothing herein shall prohibit SRS or Mr. Sarma (solely in his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund) from purchasing or selling any securities of the Company pursuant to a 10b5-1 trading plan that complies with Rule 10b5-1 under the Exchange Act and that is not adopted during any such blackout period. The Company agrees to notify SRS of the opening and closing of any such blackout periods. The restrictions contained in the Company's policies and procedures applicable to the Applicable Directors (in their capacity as such) on pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, securities of the Company, which transactions are otherwise in compliance with applicable law and this Agreement, shall not be deemed to apply to SRS or Mr. Sarma (solely in his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund).

10. <u>Representations and Warranties of All Parties</u>. Each of the parties represents and warrants to the other party that: (a) such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms (subject to applicable bankruptcy and similar laws relating to creditors' rights and to general equity principles), and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such Person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

11. <u>Extraordinary Transactions</u>. For so long as (i) SRS or an Affiliate of SRS has Beneficial Ownership of 5% or more of the issued and outstanding Voting Securities or (ii) a director of the Company that was appointed or designated by SRS or an Affiliate of SRS continues to serve on the Board, any Extraordinary Transaction between the Company or its subsidiaries and SRS or its Affiliates shall be  negotiated with and approved by a special committee of the Board comprised solely of directors who and who are not former or current employees of, or advisors or consultants to, SRS or an Affiliate of SRS. For so long as (i) SRS or an Affiliate of SRS has Beneficial Ownership of 5% or more of the issued and outstanding Voting Securities or (ii) a director of the Company that was appointed or designated by SRS or an Affiliate of SRS continues to serve on the Board, in the event of any Extraordinary Transaction, SRS shall not, directly or indirectly, in any way participate in a such transaction, unless such Extraordinary Transaction provides for the same type and amount of per share consideration (or the right to elect to receive the same type and amount of consideration), in respect of shares of Company Common Stock

-12-

and/or any other equity interests of the Company or its subsidiaries that is subject to such Extraordinary Transaction (excluding, for the avoidance of doubt, any customarily "excluded shares" such as dissenting stockholders); provided, that, with respect to any such Extraordinary Transaction involving less than 100% of the Company Common Stock, each holder of Company Common Stock (other than customarily "excluded shares" such as dissenting stockholders) must have the same right to participate in such Extraordinary Transaction, including with respect to the election to participate in such transaction (if any) on the same economic terms and to proportionate treatment (based on economic ownership) in the case of any cut-back mechanics or offer limitations. SRS shall not, directly or indirectly, enter into any other transaction in connection with an Extraordinary Transaction that would, or may reasonably result in, additional or disparate consideration for SRS in avoidance of the intent of this provision.

12. <u>Ownership Limit Excess</u>.

(a)   In connection with entering into the Prior Agreement, the Board approved the transactions which resulted in SRS becoming an "interested stockholder" for purposes of Section 203 of the DGCL and, therefore, the restrictions contained in Section 203 of the DGCL do not apply to SRS as a matter of law. If SRS acquires any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of more than the Independent Ownership Limit (an "<u>Ownership Limit Excess Acquisition</u>"), then, unless the Board otherwise approves such Ownership Limit Excess Acquisition prior to such acquisition by resolution that includes the approval of a majority of the directors who are not Applicable Directors (or their Replacements) from and after that date (the "<u>Ownership Limit Excess Date</u>"), SRS agrees that the provisions of Section 203 of the DGCL shall be deemed to apply as a matter of contract to any "business combination" (as defined in Section 203 of the DGCL, but disregarding clause (v) of the definition of "business combination" in Section 203 of the DGCL and all references to a "subsidiary" or "subsidiaries" set forth in the definition of "business combination" in Section 203 of the DGCL) between the Company and SRS as provided in <u>Section 13(b)</u> hereof.

(b)   SRS agrees that if SRS makes an Ownership Limit Excess Acquisition, then, from and after the Ownership Limit Excess Date (x) the restrictions under Section 203 of the DGCL applicable to a "business combination" with an "interested stockholder" shall apply to any such business combination between the Company and SRS as a matter of contract pursuant to this Agreement and (y) SRS will not engage in any "business combination" with the Company for a period of four (4) years following the Ownership Limit Excess Date, unless:

(i)   prior to the Ownership Limit Excess Date, the Board approved, including approval by a majority of the directors who are not Applicable Directors (or their Replacements), either the "business combination" or the Ownership Limit Excess Acquisition;

(ii)   upon consummation of a Ownership Limit Excess Acquisition, SRS owned at least 85% of the voting power of the Voting Securities outstanding at the time the transaction commenced, excluding for purposes of determining the Voting Securities outstanding

-13-

(but not the outstanding Voting Securities owned by SRS) those shares owned (x) by Persons who are directors and also officers of the Company and (y) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer;

(iii)     at or subsequent to such time the "business combination" is approved by the Board, including approval by a majority of the directors who are not Applicable Directors (or their Replacements), and authorized at an annual or special meeting of stockholders (and not by written consent) by the affirmative vote of at least 66 2/3% of the voting power of the outstanding Voting Securities which is not owned by SRS; or

(iv)     unless any of the exceptions in Section 203(b) (3), (4), (5) (6) or (7) of the DGCL would apply if the Ownership Limit Excess Acquisition had caused SRS to become an "interested stockholder" for purposes of Section 203 of the DGCL (with references to "15%" in Section 203 of the DGCL being deemed to be replaced with "Independent Ownership Limit").

13.     Certain Actions. Neither the Board nor any committee thereof, on the one hand, or SRS or any Affiliate thereof, on the other hand, shall take any action that would be reasonably likely to materially interfere with the purposes of this Agreement. Except as required by applicable law or stock exchange rules or listing standards, the Company shall not alter, amend or adopt any Company policies or procedures or amend its bylaws, corporate governance guidelines or other organizational documents in a manner that would be reasonably likely to materially interfere with the purpose of this Agreement. In the event the Company determines to hold the 2025 Annual Meeting (as defined below) more than twenty-five (25) days before or twenty-five (25) days after the one-year anniversary of the 2024 annual meeting of stockholders, the Company will provide notice to SRS of the Advance Notice Deadline no less than seventy-five (75) days prior to the Advance Notice Deadline.

14.     Certain Defined Terms. For purposes of this Agreement:

(a)     "Advance Notice Deadline" means the advance notice deadline as determined pursuant to the Company's bylaws, as then in effect, for stockholders to nominate candidates for the annual meeting of stockholders following the 2024 annual meeting of stockholders (the "2025 Annual Meeting").

(b)     The terms "Affiliate" and "Associate" shall have the respective meanings set forth in Rule 12b-2 promulgated by the United States Securities and Exchange Commission (the "SEC") under the Exchange Act.

(c)     the terms "Beneficial Ownership" and "Beneficially Own" (and similar terms) means having the right or ability to vote, cause to be voted or control or direct the voting of, any Voting Securities (in each case whether directly or indirectly, including pursuant to any agreement, arrangement or understanding, whether or not in writing); provided, that a Person shall be deemed to have "Beneficial Ownership" of any Voting Securities that such Person has a right, option or obligation to own, acquire or control or direct the voting of upon conversion, exercise, expiration, settlement or similar event (an "Exercise") under or pursuant to (i) any Derivative (whether such Derivative is subject to Exercise immediately or only after the passage

-14-

of time or upon the satisfaction of one or more conditions) and (ii) any Synthetic Position that is required or permitted to be settled, in whole or in part, in Voting Securities.

(d)  "Competitor" means China Auto Rental (CAR Inc.), eHi Car Services Limited, Enterprise Holdings, Inc., Europcar Groupe SA, Hertz Global Holdings Inc., Sixt SE and any of their respective Affiliates.

(e)  "Person" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

(f)  "Synthetic Position" shall mean any option, warrant, convertible security, stock appreciation right, or other security, contract right or derivative position or similar right (including any "swap" transaction with respect to any security, other than a broad based market basket or index) (each of the foregoing, a "Derivative"), whether or not presently exercisable, that has an exercise or conversion privilege or a settlement payment or mechanism at a price related to the value of Voting Securities or a value determined in whole or in part with reference to, or derived in whole or in part from, the value of Voting Securities and that increases in value as the market price or value of Voting Securities increases or that provides an opportunity, directly or indirectly, to profit or share in any profit derived from any increase in the value of Voting Securities, in each case regardless of whether (i) it conveys any voting rights in such Voting Securities to any Person, (ii) it is required to be or capable of being settled, in whole or in part, in Voting Securities or (iii) any Person (including the holder of such Synthetic Position) may have entered into other transactions that hedge its economic effect.

(g)  "Third Party" shall mean any Person other than the Company, SRS and their respective Affiliates and representatives.

(h)  "Voting Securities" shall mean the Common Stock and any other securities of the Company entitled to vote in the election of directors.

(i) "Agreement Date" shall mean the date of effectiveness of the Agreement, which is December 23, 2022.

15.  Governing Law; Jurisdiction. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without reference to the conflict of laws principles thereof. Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby

-15-

irrevocably waives, and agrees not to assert in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable legal requirements, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

16.    No Waiver. Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

17.    Entire Agreement. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

18.    Notices. All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by email, when such email is sent to the email address set forth below during normal business hours and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Avis Budget Group, Inc.
6 Sylvan Way
Parsippany, New Jersey 07054
Attention:Jean Sera

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison  LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:Robert B. Schumer
         Brian C. Lavin
Email:    rschumer@paulweiss.com
          blavin@paulweiss.com

-16-

if to SRS:

SRS Investment Management, LLC
1 Bryant Park, 39th Floor
New York, NY 10036
Attention:David Zales

with a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
200 Liberty St.
New York, New York 10281
Attention:Stephen Fraidin
            Richard Brand
            Kiran Kadekar
Email:   stephen.fraidin@cwt.com
        richard.brand@cwt.com
        kiran.kadekar@cwt.com

19.    <u>Severability</u>. If any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

20.    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, which together shall constitute a single agreement.

21.    <u>Successors and Assigns</u>. This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

22.    <u>No Third-Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other Persons.

23.    <u>Amendments</u>. This Agreement may only be amended pursuant to a written agreement executed by SRS and the Company, subject to <u>Section 1(h)</u>.

24.    <u>Interpretation and Construction</u>. Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly

-17-

waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. Any share numbers set forth in this Agreement shall be adjusted as necessary for any stock splits, stock dividends, reverse stock splits, recapitalizations or similar events (other than stock buybacks or repurchases).

*[Signature Pages Follow]*

-18-

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

AVIS BUDGET GROUP, INC.


By:   /s/ Jean M. Sera
     Name: Jean M. Sera
     Title:  Senior Vice President, Corporate
            Secretary and Global Programs


SRS INVESTMENT MANAGEMENT, LLC


By:   /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel


SRS PARTNERS MASTER FUND LP

By:   SRS Investment Management, LLC, its
     investment manager

By:   /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel


SRS SPECIAL OPPORTUNITIES MASTER
II, LP

By:   SRS Investment Management, LLC, its
     investment manager

By:   /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel


*[Signature Page to Fourth Amended and Restated Cooperation Agreement]*

SRS LONG OPPORTUNITIES MASTER
FUND, LP

By:    SRS Investment Management, LLC, its
       investment manager

By:    /s/ David B. Zales
       Name: David B. Zales
       Title: General Counsel

[*Signature Page to Fourth Amended and Restated Cooperation Agreement*]

<u>SCHEDULE A</u>

SRS Investment Management, LLC

SRS Partners Master Fund LP

SRS Special Opportunities Master II, LP

SRS Long Opportunities Master Fund, LP

# EXHIBIT 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No. )

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

# Avis Budget Group, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee paid previously with preliminary materials.

☐    Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**avis budget** group

April 3, 2024

Dear Fellow Shareholder:

This past year, we continued to see strong demand for vehicle rentals, which allowed us to achieve record revenue for our company of more than $12 billion, as normal seasonality returned to our industry. We also experienced inflationary pressures and revenue per day that caused our bottom-line results to be less robust than 2022 yet still the second-highest in our history.

In 2023, we continued to enhance our sustainability practices, community and philanthropical efforts, diversity and inclusion initiatives and reporting. More information can be found in our Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "2023 Annual Report") and the Environmental, Social and Governance ("ESG") section of our website, including our latest ESG Report.

It is our pleasure to invite you to attend the 2024 Annual Meeting of Shareholders of Avis Budget Group, Inc., which will be held virtually on May 22, 2024, at 9:00 a.m. Eastern Time.

This booklet includes the Notice of Annual Meeting and the Proxy Statement. The Proxy Statement describes the business to be conducted at the Annual Meeting and provides other information concerning our Company of which you should be aware when you vote your shares.

On behalf of the Board of Directors and the employees of Avis Budget Group, Inc., we would like to thank you for being a shareholder and express our appreciation for your ongoing support of our Company.

Sincerely,

Bernardo Hees
Executive Chairman of the Board

Jagdeep Pahwa
Vice Chairman of the Board

Joseph A. Ferraro
President and Chief Executive Officer

# Notice of 2024 Annual Meeting of Shareholders

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Meeting") of Avis Budget Group, Inc. (the "Company") will be held online on May 22, 2024, at 9:00 a.m. Eastern Time, to consider and vote upon the following matters:

1. To elect as directors the six nominees named in the accompanying proxy statement for a one-year term expiring in 2025 and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal.

2. To ratify the appointment of Deloitte & Touche LLP as the independent registered public accounting firm for fiscal year 2024.

3. To provide advisory approval of the compensation of our named executive officers.

4. To transact such other business as may properly come before the Meeting or any adjournment or postponement thereof.

This year's Meeting will be held virtually. You will be not be able to attend the Meeting physically in person. We have designed the format of the Meeting to provide shareholders the same ability to participate that they would have at an in-person meeting. Shareholders will be able to listen to the webcast live, submit questions and vote during the online Meeting. You can attend the Meeting by accessing *https://meetnow.global/MG2KPGS* and entering the 15-digit control number found on the proxy card or notice. No password is required. In the event of a technical malfunction or situation that makes it advisable to adjourn the Meeting, the chair will convene the meeting at 9:00 a.m. Eastern Time on May 22, 2024 at the Company's principal business address solely for the purpose of adjourning the meeting to reconvene at a date, time and location announced by the meeting chair. If this happens, more information will be provided at *www.avisbudgetgroup.com*.

The Board of Directors has fixed the close of business on March 28, 2024 as the record date for the Meeting. Only shareholders of record at that time are entitled to notice of, and to vote at, the Meeting and any adjournment or postponement thereof. A list of shareholders entitled to vote at the Meeting will be available for examination by any shareholder, for any purpose germane to the Meeting, for at least ten days prior to the Meeting during ordinary business hours at the Company's principal executive offices, by e-mailing *chairman@avisbudget.com*.

---

**Important Notice Regarding the Availability of Proxy Materials
for the Shareholder Meeting to Be Held on May 22, 2024
The Company's Proxy Statement on Schedule 14A,
form of proxy card and 2023 Annual Report
are available at
www.edocumentview.com/CAR**

---

By Order of the Board of Directors

*Jean M. Sera*

Jean M. Sera
Senior Vice President, General Counsel,
Chief Compliance Officer and Corporate Secretary

Dated: April 3, 2024

# 2024 Proxy Statement Summary

*This summary highlights information contained elsewhere in this Proxy Statement, including under "Executive Compensation." This summary does not contain all of the information that you should consider and you should read the entire Proxy Statement carefully before voting.*

### Annual Meeting of Shareholders

- Date and Time    May 22, 2024 at 9:00 a.m. Eastern Time
- Record Date    March 28, 2024
- Format    Virtual

These materials were first sent or made available to shareholders on April 3, 2024. The Company's principal executive offices are located at 379 Interpace Parkway, Parsippany, NJ 07054.

### Voting Matters and Voting Recommendations

| Voting Matters | Proposal No. | Our Board's Voting Recommendation |
|---|---|---|
| Election of Directors (page 7) | 1 | FOR ALL NOMINEES |
| Ratification of Appointment of Auditors (pages 47-48) | 2 | FOR |
| Advisory Approval of the Compensation of our Named Executive Officers (page 49) | 3 | FOR |

### Corporate Governance Highlights

- 5 of 6 (83%) of our directors are diverse by gender, ethnicity or race

- Our Executive Chairman is currently the only management director. Following the Annual Meeting, we expect to have no management directors

- All members of our Compensation, Corporate Governance and Audit Committees are independent

- Annual election of all directors

- Majority voting (of votes cast) with a director resignation policy for directors in uncontested elections

- Robust executive and director stock ownership guidelines

- Each director nominee who served on the Board in 2023 attended at least 75% of Board and Committee meetings held in 2023

- Policy requiring annual performance evaluation of the Board

### Company Performance and Executive Compensation

We saw strong demand for vehicle rentals for full year 2023, and our revenues increased totaling approximately $12.0 billion, the best full year revenue in our history. For 2023, net income was approximately $1.6 billion and Adjusted EBITDA (as defined and reconciled in the "Compensation Discussion & Analysis" section below (the "CD&A")) was approximately $2.5 billion, both second highest full year records for the Company. In 2023, we also returned capital to our shareholders through the repurchase of $889 million of the Company's common stock, par value $0.01 per share (the "Common Stock"), resulting in the repurchase of 4.3 million shares. Our closing stock price on December 29, 2023 of $177.26 reflected an increase compared to our closing stock price on December 31, 2022.

As described further in the CD&A, compensation paid to our named executive officers ("NEOs") for 2023 was mostly lower compared to 2022, primarily driven by a reduction in long-term incentive awards and lower annual cash incentive payouts.

1

# About the Annual Meeting

**Why am I receiving proxy materials?**

The Board of Directors (the "Board") of Avis Budget Group, Inc. (the "Company" or "Avis Budget") is soliciting your vote at the 2024 Annual Meeting of Shareholders, and any adjournment or postponement thereof (the "Meeting"), to be held virtually on May 22, 2024 at 9:00 a.m. Eastern Time, for the purposes set forth in this Proxy Statement.

On or about April 3, 2024, the Company will first mail to certain shareholders of record the Notice of Internet Availability of Proxy Materials containing instructions on how to access this Proxy Statement online, or in the alternative, request a paper copy of the proxy materials and a proxy card, and also will first mail to certain other shareholders this Proxy Statement and the accompanying proxy card.

**When and where will the Meeting be held?**

The Meeting is scheduled to be held in a virtual-only format at 9:00 a.m. Eastern Time, on May 22, 2024.

**How can I attend the Meeting?**

Shareholders at the close of business on March 28, 2024 (the "Record Date") are entitled to virtually attend the Meeting.

*Registered Shareholders:* If you were a holder of record of the Company's Common Stock as of the Record Date (*i.e.*, you held your shares in your own name as reflected in the records of our transfer agent, Computershare), you can attend the Meeting by accessing *https://meetnow.global/MG2KPGS* and entering the 15-digit control number found on the proxy card or notice. No password is required. You may also vote your shares during the Meeting by following the online instructions.

*Beneficial Owners:* If you hold your shares through an intermediary, such as a bank, broker or other agent, you must register in advance to attend the Meeting. To register, you must obtain and submit a legal proxy from the holder of record, reflecting the number of shares of the Company's Common Stock you held as of the Record Date, along with your name and e-mail address, to Computershare. You must send an e-mail from your broker, bank or other agent, or an image of your legal proxy to *legalproxy@computershare.com*. Requests for registration must be labeled as "Legal Proxy" and be received no later than 5:00 p.m. (Eastern Time) on May 16, 2024. You will receive a confirmation of your registration by e-mail directly from Computershare.

Those without a control number or legal proxy may attend the Meeting as a guest but will not have the option to vote or ask questions at the Meeting. We encourage you to access the Meeting prior to the start time and allow sufficient time to log into the Meeting.

**What items will I be voting on and what are the Board's voting recommendations?**

| Proposal | Board's Voting Recommendation |
|---|---|
| No. 1: Election of Directors (see page 7) | FOR ALL NOMINEES |
| No. 2: Ratification of Appointment of Auditors (pages 47-48) | FOR |
| No. 3: Advisory Approval of the Compensation of our Named Executive Officers (see page 49) | FOR |

**Could other matters be decided at the Meeting?**

The Board is not aware of any other matters to be brought before the Meeting. However, if any other matters properly come before the Meeting, the individuals named as proxies, or their duly constituted substitutes acting at the Meeting, will be authorized to vote or otherwise act thereon in accordance with their judgment on such matters.

**How many votes do I have?**

You will have one vote for every share of Common Stock you owned as of the close of business on the Record Date.

35,647,164 votes, consisting of one vote for each share of Common Stock outstanding on the Record Date. There is no cumulative voting, and the holders of the Common Stock vote together as a single class.

## How many votes must be present to hold the Meeting?

One-third of the outstanding shares of Common Stock entitled to vote at the Meeting, or 11,882,388 votes, must be present, in person or by proxy, to constitute a quorum at the Meeting. Abstentions and broker non-votes, if any, will be counted for the purpose of determining whether a quorum is present.

## How many votes are required to elect directors and adopt the other proposals?

| Proposal | Vote Requirement | Impact of Abstentions |
|---|---|---|
| No. 1: Election of Directors | • Uncontested Election (applies to the Meeting): Directors are elected by a majority of votes cast (number of votes cast "for" each nominee must exceed the number of votes cast "against" that nominee)<br><br>• Contested Election: Directors are elected by a plurality of shares present, in person or by proxy, and entitled to vote | Will have no effect on the outcome |
| No. 2: Ratification of Appointment of Auditors | Majority of shares present, in person or by proxy, and entitled to vote | Counted and will have the same effect as a vote against such proposal |
| No. 3: Advisory Approval of the Compensation of our Named Executive Officers | Majority of shares present, in person or by proxy, and entitled to vote | Counted and will have the same effect as a vote against such proposal |

Under the Company's Amended and Restated By-laws (the "By-laws"), each incumbent director is required to submit a contingent, irrevocable resignation that the Board of Directors may accept if the director fails to receive the required vote for election or re-election in an uncontested election. The Corporate Governance Committee is required to make a recommendation to the Board as to the action to be taken with respect to the tendered resignation. The Board is required to act on the resignation within 90 days of the date of certification of election results.

If for some reason any director nominee is unable to serve, or for good cause will not serve if elected, the persons named as proxies may vote for a substitute nominee recommended by the Board and, unless you indicate otherwise on the proxy card, your shares will be voted in favor of the remaining nominees. If any substitute nominees are designated prior to the Meeting, the Company will file an amended proxy statement, that, as applicable, identifies the substitute nominees, discloses that such nominees have consented to being named in the revised proxy statement and to serve if elected, and includes certain biographical and other information about such nominee as required by the rules of the Securities and Exchange Commission (the "SEC"). Alternatively, the Board may decide, under certain circumstances, to reduce the size of the Board.

Pursuant to the By-laws, written notice by shareholders of qualifying nominations for election to the Board must have been received by our Secretary by February 24, 2024.

## What is a broker non-vote?

A broker non-vote occurs when a broker does not have discretion to vote on a particular proposal and the broker has not received instructions from the beneficial owner of the shares of Common Stock as to how to vote on such proposal. If you hold your shares of Common Stock in "street name" and do not provide voting instructions to your broker within the required time frame before the Meeting, your shares of Common Stock will not be voted by the broker for Proposal Nos. 1 (Election of Directors) or 3 (Advisory Approval of Named Executive Officer Compensation), but the broker will have the discretion to vote your shares of Common Stock on Proposal No. 2 (Ratification of Appointment of Auditors). As a result, broker non-votes will have no effect on the outcome of Proposal Nos. 1 or 3.

# Proposals to Be Voted on at Meeting
# Proposal No. 1

## Election of Directors

The Board of Directors (the "Board") has nominated Bernardo Hees, Jagdeep Pahwa, Anu Hariharan, Lynn Krominga, Glenn Lurie and Karthik Sarma to be elected at the 2024 Annual Meeting of Shareholders (the "Meeting") to serve as directors for a one-year term ending at the 2025 annual meeting of shareholders and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. The nominations of Mr. Pahwa and Mr. Sarma are in accordance with the terms of the Fourth Amended and Restated Cooperation Agreement (as amended through the date hereof, the "Cooperation Agreement"), dated as of December 23, 2022, between the Company and SRS and certain of its affiliates.

## Biographical Information for Nominees

The following material contains information concerning the Board's nominees, including their period of service as a director, their recent employment, other directorships, including those held during the past five years with a public company or registered investment company, and age as of the Meeting.

### *BERNARDO HEES*

**Executive Chairman of the Board**

**Mr. Hees**, age 54, has been a director since February 2020 and Executive Chairman since July 2020. Since March 2024, Mr. Hees has served as an Operating Partner of The Cranemere Group, a diversified holding company. Previously, Mr. Hees served as Chief Executive Officer of The Kraft Heinz Company from 2015 to June 2019. He served as Chief Executive Officer of H.J. Heinz Holding Corporation from 2013 until its merger with Kraft Foods Group in 2015. From 2010 to 2013, Mr. Hees served as Chief Executive Officer of Burger King Worldwide Holdings, Inc., a global fast food restaurant chain, and Burger King Worldwide, Inc. from 2012 to 2013. From 2005 to 2010, he was Chief Executive Officer of América Latina Logística, a Brazilian logistics company. Mr. Hees was also a partner at 3G Capital, a global investment firm, from 2010 to 2019. Mr. Hees is also a director of Bunge Limited, which files reports pursuant to the Exchange Act of 1934, as amended (the "Exchange Act"). As previously announced, subject to his re-election at the Meeting, Mr. Hees will resign as Executive Chairman of the Board but continue to serve as a member of the Board, effective immediately following the completion of the Meeting.

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience
- Public company board experience
- International experience
- Diverse personal background

### *JAGDEEP PAHWA*

**Vice Chairman of the Board**

**Mr. Pahwa**, age 50, has been a director since April 2018 and Vice Chairman since February 2020. Mr. Pahwa has been the President of SRS Investment Management, LLC since 2017 and has led SRS's private equity business since 2006. Previously, Mr. Pahwa worked at McKinsey & Company in the U.S. and India, where he led client engagements in the telecom, technology and real estate sectors. Prior thereto, Mr. Pahwa worked in the Mergers & Acquisitions group of Lehman Brothers in New York. Mr. Pahwa received a Bachelor of Technology from the Indian Institute of Technology, Delhi, and an M.S. from Princeton University and an M.B.A. from Harvard Business School. As previously announced, subject to his re-election at the Meeting, Mr. Pahwa will assume the role of Chairman of the Board, effective immediately following the completion of the Meeting.

**Specific Qualifications, Attributes, Skills and Experience:**

- Financial and investment expertise
- Advisory experience in business strategy and growth
- Broad international experience and understanding of the technology sector
- Diverse personal background

*ANU HARIHARAN*

**Board Committees: Audit**

**Ms. Hariharan**, age 43, has been a director since January 2022. Ms. Hariharan is Founder and Managing Partner of Avra, a venture fund focused on empowering growth stage founders with the right foundation to scale their company. From 2016 until March 2023, Ms. Hariharan was Managing Director at Y Combinator's Continuity Fund focused on growth stage investments, where she led investments in Convoy, Brex, Gusto and Faire, among many others. Prior to joining Y Combinator, Ms. Hariharan was a Partner with the investment team at Andreessen Horowitz, from 2014 to 2016. Previously, Ms. Hariharan was a Principal with The Boston Consulting Group, from 2010 to 2014, and, prior to that, a senior software engineer with Qualcomm. Ms. Hariharan holds a B.E. from the National Institute of Technology Karnataka, an M.S. from Virginia Tech and an M.B.A. from The Wharton School at the University of Pennsylvania.

**Specific Qualifications, Attributes, Skills and Experience:**

- Advisory experience in business strategy and growth
- Investment and technology experience
- Diverse personal background

*LYNN KROMINGA*

**Lead Independent Director**
**Board Committees: Audit, Compensation, Corporate Governance (Chair)**

**Ms. Krominga**, age 73, has been a director since October 2006 and Lead Independent Director since February 2024. Ms. Krominga is an attorney, management consultant and former senior executive of global businesses. Ms. Krominga has served on the boards of directors of public, private and not-for-profit companies, as well as advisory boards of start-up and early stage technology and personal care businesses in the U.S. and abroad. Since 1999, she has been a consultant to private equity, venture capital, hedge funds and angel investors, in which capacity she served in a number of operating and board roles, including Chief Executive Officer of Fashion Wire Daily, Inc.; director and audit committee member of AHAVA Dead Sea Laboratories, Ltd. (a global cosmeceuticals business); advisor to London-based Apax Partners for acquisitions in Israel and the United States; director of StructuredWeb, Inc; board of advisors of Makeover Studios, Inc.; General Manager-North America of Electric Fuel, Inc. (an early stage fuel cell-based technology business); and Internet Consultant for private websites in the U.S. and Europe. From 2007 until January 2013, Ms. Krominga served as a director of publicly traded Sunrise Senior Living, Inc., one of the world's largest assisted living companies, with operations in the U.S., Canada, the U.K. and Germany. From March through November 2008, she served as Chairman of the Board of Sunrise Senior Living and as Lead Director thereafter until January 2013 (when the company was sold). She also served as Chairman of the Compensation Committee (2008-2011), and as a member of the Audit, Compensation and Governance Committees from 2007-2013. Ms. Krominga is the former President of the Revlon and Coleman Worldwide Licensing Divisions, and previously served as General Counsel and International Counsel for Revlon's global operations. Prior to joining Revlon, she was Senior Counsel at American Express Company and an associate at Cleary, Gottlieb, Steen & Hamilton.

**Specific Qualifications, Attributes, Skills and Experience:**

- Significant legal, governance, licensing, technology and regulatory expertise
- International experience
- Executive management experience and financial expertise
- Diverse personal background
- Public company board experience

8

*GLENN LURIE*

---

**Board Committees: Audit (Chair), Compensation**

**Mr. Lurie**, age 58, has been a director since May 2018. Since August 2021, Mr. Lurie has served as General Partner at Stormbreaker Ventures, an early-stage fund focused on capital-efficient startups. Mr. Lurie was the President and Chief Executive Officer of Synchronoss Technologies, Inc. from 2017 to 2020. Prior to joining Synchronoss, Mr. Lurie was employed by AT&T for 27+ years and was President and Chief Executive Officer of AT&T Mobility and Consumer Operations when he retired in September of 2017. Mr. Lurie helped usher in the smartphone era by leading negotiations for AT&T with Apple for the first iPhone and then for the first iPad. He built three groundbreaking businesses at AT&T: IoT (Internet of Things) business – bringing wireless connectivity to tablets, cars, connected cities and consumer electronics; Digital Life – AT&T's home automation and security business; and the launch of Aio Wireless – now Cricket Wireless, the company's industry-leading prepaid flanker brand. At AT&T, Mr. Lurie served in a variety of leadership roles, including as President and Chief Executive Officer of Mobility and Consumer Operations from 2016 to 2017, President and Chief Executive Officer of AT&T Mobility from 2014 to 2016, President of Emerging Enterprises and Partnerships Organization from 2011 to 2014 and President of Emerging Devices Organization (now IoT Organization) from 2008 to 2011. Mr. Lurie previously served as a director of Synchronoss, which files reports pursuant to the Exchange Act. Mr. Lurie also serves as a director of Teal Communications, a global eSIM and IoT connectivity platform provider; Blue Link Wireless, an AT&T Authorized Dealer and service provider; and Pivotal Commware, Inc., which develops 5G network platforms, services and applications.

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience

- Technology, operations, strategy, and business development experience

- Public company board experience

### *KARTHIK SARMA*

---

**Board Committees: Compensation (Chair), Corporate Governance**

**Mr. Sarma**, age 49, has been a director since May 2020. Mr. Sarma is the Managing Partner at SRS, which he founded in 2006. Prior to founding SRS, Mr. Sarma was a Managing Director at Tiger Global Management, LLC, which he joined within a few months of its launch in 2001. Prior to joining Tiger Global, Mr. Sarma worked as a consultant at McKinsey & Company in its New York office. Mr. Sarma received a Bachelor of Technology from the Indian Institute of Technology, Chennai and an M.S. from Princeton University.

**Specific Qualifications, Attributes, Skills and Experience:**

- Experience in the technology sector

- Financial and investment expertise

- Experience providing strategic and operational advice

- Diverse personal background

## Director Nomination Process

---

For additional information regarding the director nomination process, please see the section titled "Director Nomination Procedures" on page 14 of this Proxy Statement.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR ALL" OF THE NOMINEES.**

# Corporate Governance

## Functions and Meetings of the Board of Directors

The Company's corporate governance guidelines, committee charters, codes of conduct and other documents setting forth the Company's corporate governance practices can be accessed in the "Investors—Governance" section of the Company's website at *www.avisbudgetgroup.com*.

### Director Independence

To determine director independence, our Board of Directors reviews, among other things, commercial and charitable relationships of each director to evaluate such director's independence in accordance with the listing standards of the Nasdaq Stock Market LLC ("Nasdaq"). In conducting its review, the Board of Directors considers a number of factors, including the director's and his or her family members' relationships with the Company and its subsidiaries, affiliates, executive officers and auditors and his or her relationships with foundations, universities and other non-profit organizations to which the Company has made a certain level of contributions during the past three years.

#### Independent Nominees

After evaluating the factors described above, the Board of Directors has affirmatively determined that each of the following director nominees is independent in accordance with Nasdaq rules.

| | |
|---|---|
| Lynn Krominga | Karthik Sarma |
| Glenn Lurie | Anu Hariharan |

The Board has determined that Mr. Hees is not independent because of his status as Executive Chairman of the Board and that Mr. Pahwa is not independent because his brother-in-law is a partner at Deloitte Haskins & Sells LLP, which is affiliated with Deloitte & Touche, LLP, our independent auditor. All of the directors currently serving on our Corporate Governance Committee, Compensation Committee, and Audit Committee are independent based upon Nasdaq corporate governance listing standards and applicable rules of the SEC.

### Board Leadership Structure

Our current Board leadership structure consists of:

- Executive Chairman of the Board: Bernardo Hees;
- Vice Chairman of the Board: Jagdeep Pahwa;
- Lead Independent Director: Lynn Krominga; and
- Fully independent Compensation, Corporate Governance and Audit Committees.

The Board of Directors is responsible for establishing and maintaining the most effective leadership structure for the Company. The Board regularly reviews its leadership structure to determine the most appropriate arrangement. The Board, which is comprised of individuals who have extensive experience with board processes, has determined that the current leadership structure, as described above, best serves the Company and its shareholders at this time.

The roles of Chief Executive Officer and Chairman were separated in 2015. Mr. Hees was named Executive Chairman of the Board in July 2020, after having joined the Board as independent Board Chair in February 2020. Our Executive Chairman is typically responsible for (i) together with our Vice Chairman, and in consultation with the Chief Executive Officer and other Directors, collaboratively establishing the annual Board calendar, setting agendas for meetings of the Board and providing input as requested on the meeting agendas for the Board's committees, (ii) leading the discussion at our Board meetings, (iii) chairing the annual meetings of our shareholders, (iv) being available in appropriate circumstances to speak on behalf of the Board and to consult and communicate directly with shareholders, (v) providing guidance and oversight to our management as appropriate, (vi) together with our Vice Chairman, serving as the Board's liaison to management, (vii) with management, exercising oversight of the Company's strategic planning initiatives, M&A opportunities and capital structure allocation policies, and (viii) performing such other duties as may be delegated by the Board from time to time.

10

Under the Company's By-laws, the Board may elect one or more Vice Chairmen to preside at Board and shareholder meetings, in the absence of the Chairman of the Board, and to perform such other duties as may be delegated by the Board. Mr. Pahwa has served as Vice Chairman since February 2020.

On November 1, 2023, the Company announced that, effective immediately following the Meeting, Mr. Hees will resign as Executive Chairman of the Board but continue to serve as a member of the Board, and Mr. Pahwa, currently Vice Chairman of the Board, will assume the role of Chairman of the Board, in each case, subject to their re-election at the Meeting.

To maintain flexibility in carrying out its responsibility with respect to leadership structure, the Board does not currently have a requirement that the roles of Chief Executive Officer and Chairman of the Board be separated, or if separated, that the Chairman be independent. If the Chairman of the Board is not an independent director, the Board may, but is not required to, designate a Lead Independent Director. The Board believes it is in the best interest of our Company to make these determinations based on the position and direction of our Company and the constitution of the Board and management team from time to time, and accordingly the Board regularly evaluates the appropriateness of this structure to the Company and its strategy.

In February 2024, the independent members of the Board appointed Ms. Krominga to serve as Lead Independent Director. The Lead Independent Director's authority includes:

- Serving as liaison between the Chairman and the independent directors;

- Approving the type of information sent to the Board, and consulting with directors as to their information needs;

- Approving meeting agendas and schedules for the Board to assure sufficient time for discussion of all agenda items;

- Having the authority to call meetings of the independent directors, as needed in the Lead Independent Director's discretion; and

- If requested by major shareholders, being available for consultation and direct engagement as appropriate.

Such delegation of well-defined responsibilities to a Lead Independent Director helps ensure that an appropriate independent leadership structure is in place. The Board believes the current structure separating the roles of Chief Executive Officer and Chairman, and having a Lead Independent Director, is currently the most appropriate way for the Company to effectively allocate authority, responsibility, and oversight between management and the independent members of the Board.

11

# Security Ownership of Certain Beneficial Owners

The following table sets forth information regarding beneficial ownership of shares of Common Stock as of March 14, 2024, by (i) each person who is known by us to beneficially own more than 5% of the outstanding shares of Common Stock, (ii) each of the Company's directors and each of its named executive officers, and (iii) all of the Company's directors, nominees and current executive officers, as a group.

| Name of Beneficial Owner | Total Amount of Shares Beneficially Owned[1] | Percent of Common Stock Owned[2] | Of the Total Number of Shares Beneficially Owned, Shares which May be Acquired within 60 Days[3] |
|---|---|---|---|
| **Principal Shareholders:**\*\* | | | |
| SRS Investment Management, LLC[4] One Bryant Park, 39th Floor New York, NY 10036 | 17,430,882 | 48.9% | — |
| FMR LLC[5] 245 Summer Street Boston, Massachusetts 02210 | 4,247,300 | 11.9% | — |
| BlackRock, Inc.[6] 55 East 52nd Street New York, NY 10055 | 1,920,052 | 5.4% | — |
| Vanguard Group, Inc.[7] 100 Vanguard Blvd. Malvern, PA 19355 | 1,822,750 | 5.1% | — |
| **Directors, Nominees and Named Executive Officers:** | | | |
| Bernardo Hees | 506,588 | 1.4% | 1,607 |
| Anu Hariharan | 1,771 | * | 1,771 |
| Lynn Krominga | 17,342 | * | 17,342 |
| Glenn Lurie | 13,542 | * | 13,542 |
| Jagdeep Pahwa | — | * | — |
| Karthik Sarma[8] | 17,430,882 | 48.9% | — |
| Joseph A. Ferraro | 264,095 | * | — |
| Brian J. Choi | 99,179 | * | — |
| Ravi Simhambatla | 865 | * | — |
| Izilda "Izzy" P. Martins | 29,043 | * | — |
| **All Directors, Nominees and Executive Officers as a group (14 persons)** | **18,522,059** | **52.0%** | **34,262**[9] |

\*     Amount represents less than 1% of outstanding Common Stock.

\*\*    Information is based upon the assumption that there was no change in the beneficial ownership of such shares of Common Stock from the publicly filed information through March 14, 2024.

(1)   Shares beneficially owned include (i) direct and indirect ownership of shares, (ii) restricted stock units held by executive officers that may vest within 60 days of March 14, 2024, and (iii) restricted stock units held by directors that may be settled within 60 days of March 14, 2024.

(2)   Based on 35,647,164 shares of Common Stock outstanding on March 14, 2024.

(3)   Includes (i) restricted stock units held by executive officers that may vest within 60 days of March 14, 2024 and (ii) restricted stock units held by directors that may be settled within 60 days of March 14, 2024.

(4)   Reflects beneficial ownership of 17,430,882 shares of Common Stock by SRS and Karthik R. Sarma (the "Reporting Persons"), as derived solely from information reported on Schedule 13D/A under the Exchange Act, as filed with the SEC on August 25, 2023. Such Schedule 13D/A indicates that SRS and Mr. Sarma share voting and dispositive power over the shares of Common Stock. SRS serves as investment manager to certain investment funds (the "Funds") and has investment discretion with respect to the shares of Common Stock held by the Funds. SRS Investment Management, LP ("SRS IM") is the managing member of SRS. SRS Investment Management GP, LLC ("SRS IM GP") is the general partner of SRS IM. Mr. Sarma is the managing member and principal of SRS IM GP. In such capacities, Mr. Sarma and SRS may be deemed to have voting and dispositive power with respect to the shares of Common Stock held for the Funds. The shares of Common Stock beneficially owned by the Reporting Persons include 3,400,000 shares of Common Stock that are subject to a pledge arrangement. See "*Executive Compensation—Compensation, Discussion and Analysis—Setting CEO and other NEO Compensation—Anti-Hedging Policy*" below for more information on the pledge arrangement. The Reporting Persons have economic exposure to, and may be deemed to beneficially own, an additional 2,862,283 notional shares of Common Stock pursuant to cash-settled equity swaps, as derived solely from information reported on the Schedule 13D. Such notional shares represent approximately 8.0% of the shares of Common Stock outstanding on March 14, 2024. Such Schedule 13D indicates that the Reporting Persons do not have voting power or dispositive power with respect to the shares referenced in such swaps, and disclaim beneficial ownership of the shares underlying such swaps.

(5)   Reflects beneficial ownership of 4,247,300 shares of Common Stock by FMR LLC ("FMR") and Abigail P. Johnson, a director and the Chairman and Chief Executive Officer of FMR, as derived solely from information in a Schedule 13G/A under the Exchange Act, filed with the SEC on February 9, 2024. Such Schedule 13G/A indicates that FMR has sole voting power over 4,244,455 shares of Common Stock and sole dispositive power over 4,247,300 shares of Common Stock, and that Ms. Johnson has sole dispositive power over 4,247,300 shares of Common Stock.

(6)   Reflects beneficial ownership of 1,920,052 shares of Common Stock by BlackRock, Inc. ("BlackRock"), as derived solely from information in a Schedule 13G/A under the Exchange Act, filed with the SEC on October 6, 2023. Such Schedule 13G/A indicates that BlackRock has sole voting power over 1,847,480 shares of Common Stock and sole dispositive power over 1,920,052 shares of Common Stock.

(7)   Reflects beneficial ownership of 1,822,750 shares of Common Stock by The Vanguard Group, Inc., as derived solely from information reported in a Schedule 13G/A under the Exchange Act, filed with the SEC on February 13, 2024. Such Schedule 13G/A indicates that The Vanguard Group, Inc. has shared voting power over 7,840 shares of Common Stock, sole dispositive power over 1,793,733 shares of Common Stock, and shared dispositive power over 29,017 shares of Common Stock.

(8)   Reflects shared beneficial ownership of 17,430,882 shares of Common Stock by SRS and Mr. Sarma, as described above in footnote (4). All of these shares are included in the 18,522,059 shares of Common Stock deemed to be beneficially owned by all directors, nominees and executive officers as a group.

(9)   Represents 32,655 restricted stock units held by non-employee directors and 1,607 restricted stock units held by Mr. Hees that may be settled within 60 days of March 14, 2024.

20

# Executive Compensation

## Compensation Discussion and Analysis

*We refer you to our 2023 Annual Report for additional information regarding our financial information discussed below. When we refer to "the Committee" in this "Executive Compensation" section, we are referring to the Compensation Committee.*

### Executive Summary

The Committee uses our executive compensation programs to motivate and retain our executive talent and align their interests with shareholders. Our performance has a direct impact on payouts of compensation. For example, as described below, our 2023 Annual Incentive Plan paid out for our NEOs between 80-93% of target based on performance during 2023 against the plan's goals.

### Company Performance

We saw strong demand for vehicle rentals in 2023, and our revenues increased to just over $12.0 billion, a new record for our Company. For 2023, net income was approximately $1.6 billion and Adjusted EBITDA (as defined below) was approximately $2.5 billion, both the second highest levels achieved for our Company. In 2023, we also returned capital to our shareholders through the repurchase of $889 million of our Common Stock, resulting in the repurchase of 4.3 million shares, and paid a special cash dividend of $10.00 per share. Our closing stock price at the end of 2023 was $177.26 resulting in total shareholder return of 14% for the year.



### Strategy

For 2024, we expect our strategy to continue to primarily focus on costs and customer experience to further strengthen our company, maximize profitability and deliver stakeholder value. To execute our strategy, we expect to continue to leverage marketing and technology, and invest in infrastructure to support our business.

### Compensation Practices

We believe that our compensation programs reflect sound practices, such as:

- executive stock ownership guidelines with significant share ownership requirements;
- an executive compensation recoupment (or "clawback") policy;
- a policy prohibiting executives from entering into speculative (or hedging) transactions in our securities;
- no excise tax gross-up or single-trigger change-in-control provisions; and

**Anti-Hedging Policy**

The Company's insider trading policy prohibits directors, executive officers and other employees required to pre-clear trades in Company securities, along with members of their families and others living in their households and investment partnerships and other entities over which they have or share voting or investment control (collectively, the "Covered Persons") from:

- engaging in hedging and monetization transactions that permit any Covered Person to continue to own the Company's equity securities without the full risks and rewards of ownership, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds;

- holding the Company's equity securities in a margin account or otherwise pledging the Company's equity securities as collateral for a loan;

- participating in transactions involving options in relation to the Company's securities, such as puts, calls or other derivative securities on an exchange or in any other organized market; and

- engaging in short sales of the Company's equity securities.

For purposes of the above, the Company's equity securities include securities acquired by a Covered Person as part of his or her compensation or otherwise. We are party to a Cooperation Agreement with SRS, our largest stockholder, under which the Company has granted to SRS certain board appointment rights and pursuant to which SRS has agreed to certain voting commitments and customary standstill arrangements. Pursuant to the terms of the Cooperation Agreement, SRS and its affiliates are not subject to the Company's policies applicable to directors on pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, the Company's securities that are otherwise in compliance with all applicable laws, regulations and the Cooperation Agreement. As of the date of this proxy statement, SRS has pledged 3,400,000 shares of the Company's Common Stock as permitted under the Cooperation Agreement. The Audit Committee continues to monitor any current or proposed pledges in the Company's Common Stock, including the pledge by SRS, and regularly discusses such matters and any related risks to the Company and its stockholders, with the Board, senior management and, when appropriate, the Company's stockholders, including SRS.

**Recoupment (Clawback) Policy**

In July 2023, we adopted a clawback policy that complies with the new Nasdaq listing standards that implement the new SEC rules under the Dodd-Frank Wall Street Reform and Consumer Protection Act and applies to our executive officers (as defined in applicable SEC rules). This policy applies to all incentive-based compensation (as that term is defined in the new SEC rules), which includes performance-based awards granted under our Amended and Restated Equity and Incentive Plan and the cash bonus payments under the annual incentive plan in which our executive officers participate.

## Compensation Committee Report

The Avis Budget Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on this review and discussion, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this Proxy Statement.

**THE COMPENSATION COMMITTEE**

Karthik Sarma (Chair)
Lynn Krominga
Glenn Lurie

32

# EXHIBIT 3

EX-3.1 2 articles.htm AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF CENDANT CORPORATION

**Exhibit 3.1**

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
CENDANT CORPORATION**

Cendant Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), does hereby certify as follows:

(1)     The name of the Corporation is Cendant Corporation.

(2)     The name under which the Corporation was originally incorporated was Comp-U-Card of America, Inc. and the original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on August 1, 1974.

(3)     This Amended and Restated Certificate of Incorporation was duly adopted in accordance with the provisions of Sections 242 and 245 of the General Corporation Law of the State of Delaware.

(4)     The text of the Amended and Restated Certificate of Incorporation of the Corporation as amended hereby is restated to read in its entirety, as follows:

1.     The name of the Corporation is Avis Budget Group, Inc. (hereinafter, the "Corporation").

2.     The address of its registered office in the State of Delaware is Corporation Service Company, 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

3.     The nature of the business or purposes to be conducted or promoted is:

To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

4.     Capital Stock

The total number of shares of all classes of stock which the Corporation shall have authority to issue is 260,000,000, consisting of (i) 250,000,000 shares of Common Stock, $0.01 par value per share ("Common Stock"), and (ii) 10,000,000 shares of Preferred Stock, $0.01 par value per share ("Preferred Stock"). No stockholder shall have any preemptive right to subscribe to or purchase any additional shares of stock of the Corporation or any securities convertible into any such shares or representing a right or option to purchase any such shares.

A.    Common Stock

The Corporation shall have the authority to issue shares of Common Stock in one series. Such series of Common Stock shall be designated as Common Stock. When the filing of this Amended and Restated Certificate of Incorporation becomes effective, each share of Common Stock (previously classified as Cendant Corporation-CD Common Stock) (and outstanding certificates that had theretofore represented shares of Cendant Corporation-CD Common Stock) outstanding immediately prior thereto shall automatically be reclassified as one share of Common Stock (and outstanding certificates that had theretofore represented shares of Cendant Corporation-CD Common Stock shall thereupon represent an equal number of shares of Common Stock despite the absence of any indication thereon to that effect).

The total number of shares of Common Stock which the Corporation shall have the authority to issue shall initially be 250,000,000. The Board of Directors shall have the authority to increase or decrease from time to time the total number of shares of Common Stock which the Corporation shall have the authority to issue, but not above the number which would exceed the total number of shares of Common Stock that the Corporation has the authority to issue, and not below the number of shares of Common Stock then outstanding.

The powers, preferences and rights, and the qualifications, limitations and restrictions of the Common Stock are as follows:

(1)    Voting. Each stockholder represented at a meeting of the stockholders shall be entitled to cast one (1) vote in person or by proxy for each share of the Common Stock entitled to vote thereat held by such stockholder.

(2)    No Cumulative Voting. The holders of shares of Common Stock shall not have cumulative voting rights.

(3)    Dividends; Stock Splits. Subject to the rights of the holders of Preferred Stock, and subject to any other provisions of this Amended and Restated Certificate of Incorporation, as it may be amended from time to time, holders of shares of the Common Stock shall be entitled to receive such dividends and other distributions in cash, stock or property of the Corporation when, as and if declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

B.    Preferred Stock

The Board of Directors is expressly authorized to adopt, from time to time, a resolution or resolutions providing for the issuance of Preferred Stock in one or more series, to fix the number of shares in each such series (subject to the aggregate limitations thereon in this Article) and to fix the designations and the powers, preferences and relative, participating, optional or other special rights, and the qualifications, limitations and restrictions, of each such series. The authority of the Board of Directors with respect to each such series shall include

determination of the following (which may vary as between the different series of Preferred Stock):

(a)     The number of shares constituting the shares and the distinctive designation of the series;

(b)     The dividend rate on the shares of the series and the extent, if any, to which dividends thereon shall be cumulative;

(c)     Whether shares of the series shall be redeemable and, if redeemable, the redemption price payable on redemption thereof, which price may, but need not, vary according to the time or circumstances of such redemption;

(d)     The amount or amounts payable upon the shares of the series in the event of voluntary or involuntary liquidation, dissolution or winding up of the Corporation prior to any payment or distribution of the assets of the Corporation to any class or classes of stock of the Corporation ranking junior to the Preferred Stock;

(e)     Whether the shares of the series shall be entitled to the benefit of a sinking or retirement fund to be applied to the purchase or redemption of shares of the series and, if so entitled, the amount of such fund and the manner of its application, including the price or prices at which the shares may be redeemed or purchased through the application of such fund;

(f)     Whether the shares of the series shall be convertible into, or exchangeable for, shares of any other class or classes or of any other series of the same or any other class or classes of stock of the Corporation, and, if so convertible or exchangeable, the conversion price or prices, or the rates of exchange, and the adjustments thereof, if any, at which such conversion or exchange may be made, and any other terms and conditions of such conversion or exchange;

(g)     The extent, if any, to which the holders of shares of the series shall be entitled to vote on any question or in any proceedings or to be represented at or to receive notice of any meeting of stockholders of the Corporation;

(h)     Whether, and the extent to which, any of the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of any such series may be made dependent upon facts ascertainable outside of the Amended and Restated Certificate of Incorporation or of any amendment thereto, or outside the resolution or resolutions providing for the issuance of such series adopted by the Board of Directors, provided that the manner in which such facts shall operate upon the voting powers, designations, preferences, rights and qualifications, limitations or restrictions of such series is clearly and expressly set forth in the resolution or resolutions providing for the issuance of such series adopted by the Board of Directors; and

(i)     Any other preferences, privileges and powers and relative, participating, optional or other special rights, and qualifications, limitations or restrictions of such series, as the Board of Directors may deem advisable, which shall not affect adversely any other class

or series of Preferred Stock at the time outstanding and which shall not be inconsistent with the provisions of this Amended and Restated Certificate of Incorporation.

Shares of Common Stock and of Preferred Stock may be issued from time to time as the Board of Directors shall determine and on such terms and for such consideration, not less than par value, as shall be fixed by the Board of Directors. No consent by any series of Preferred Stock shall be required for the issuance of any other series of Preferred Stock unless the Board of Directors in the resolution providing for the issuance of any series of Preferred Stock expressly provides that such consent shall be required.

Subject to the rights, if any, of holders of shares of Preferred Stock from time to time outstanding, dividends may be paid upon the Common Stock as and when declared by the Board of Directors out of any funds legally available therefor.

Except as otherwise provided by law or as otherwise expressly provided in the resolution or resolutions providing for the issuance of shares of any series of the Preferred Stock, the holders of shares of the Common Stock shall have the exclusive right to vote for the election of directors and for all other purposes. Each holder of shares of Common Stock of the Corporation entitled at any time to vote shall have one vote for each share thereof held. Except as otherwise provided with respect to shares of Preferred Stock authorized from time to time by the Board of Directors, the exclusive voting power for all purposes shall be vested in the holders of shares of Common Stock.

C.      Reverse Stock Split

(1)      Upon this amendment becoming effective (the "Effective Time"), a one-for-ten reverse stock split of each of the par value $0.01 Common Stock ("Old Common Stock") shall become effective, such that (a) every ten (10) shares of $0.01 par value Old Common Stock of the Corporation either issued and outstanding or held by the Corporation as treasury stock immediately prior to the Effective Time, will be automatically reclassified, combined and converted into one (1) share of $0.01 par value Common Stock of the Corporation.

(2)      Notwithstanding the immediately preceding sentence, no fractional shares of Common Stock shall be issued to holders of record of Old Common Stock in connection with the foregoing reclassification of shares of Old Common Stock. In lieu thereof, the Corporation shall pay cash equal to such fraction multiplied by the then fair value per share of Common Stock, as applicable, as determined by the Board of Directors of the Corporation.

(3)      Each stock certificate that, immediately prior to the Effective Time, represented shares of Old Common Stock, as applicable, shall, from and after the Effective Time, automatically and without the necessity of presenting the same for exchange, represent that number of whole shares of Common Stock into which the shares of Old Common

Stock, as applicable, represented by such certificate shall have been reclassified (as well as the right to receive cash in lieu of any fractional shares of Common Stock, as set forth above).

5.      The Corporation is to have perpetual existence.

6.      In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized:

(a)      To make, alter, or repeal the By-Laws of the Corporation.

(b)      To authorize and cause to be executed mortgages and liens upon the real and personal property of the Corporation.

(c)      To set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve in the manner in which it was created.

(d)      Subject to the provisions of the By-Laws, to designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Subject to the provisions of the By-Laws, the Board of Directors may designate one or more directors as alternate members of any committee, who shall replace any absent or disqualified member at any meeting of the committee in the manner specified in such designation. Any such committee, to the extent provided in the resolution of the Board of Directors adopted in accordance with the By-Laws of the Corporation, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Amended and Restated Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or amending the By-Laws of the Corporation; and, unless the resolution or By-Laws expressly so provide, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock.

(e)      When and as authorized by the stockholders in accordance with statute, to sell, lease, or exchange all or substantially all of the property and assets of the Corporation, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its Board of Directors shall deem expedient and for the best interests of the Corporation.

7.      Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof, or on the application of any receiver or receivers appointed for this

Corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of Section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement to any reorganization of this Corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders of this Corporation, as the case may be, and also on this Corporation.

8.      Meetings of stockholders may be held within or without the State of Delaware, as the By-Laws may provide. The books of the Corporation may be kept (subject to any provision contained in the statues) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the By-Laws of the Corporation. Elections of directors need not be by written ballot unless the By-Laws of the Corporation shall so provide.

9.      For the management of the business and for the conduct of the affairs of the Corporation, and in further creation, definition, limitation and regulation of the power of the Corporation and of its directors and of its stockholders, it is further provided:

(a)      <u>Election of Directors</u>. Elections of Directors need not be by written ballot unless the By-Laws of the Corporation shall so provide.

(b)      <u>Number, Election and Terms of Directors</u>. The number of Directors of the Corporation shall be fixed from time to time by or pursuant to the By-laws. From and after the annual meeting of stockholders to be held in 2004, the Directors shall hold office for a term expiring at the annual meeting of stockholders to be held in the year following the year of their election, with the members to hold office until their successors are elected and qualified; provided that the term of any Director appointed prior to the annual meeting of stockholders held in 2004 shall be unaffected. At each annual meeting of the stockholders of the Corporation, the Directors whose term expires at that meeting shall be elected to office for a term expiring at the annual meeting of stockholders held in the year following the year of their election.

(c)      <u>Stockholder Nomination of Director Candidates</u>. Advance notice of nominations for the election of Directors, other than by the Board of Directors or a Committee thereof, shall be given in the manner provided in the By-Laws.

(d)      <u>Newly Created Directorships and Vacancies</u>. Newly created directorships resulting from any increase in the number of Directors and any vacancies on the Board of Directors resulting from the death, resignation, disqualification, or removal of a director shall be filled solely by the affirmative vote of the majority of the remaining Directors then in office, even though less than a quorum of the Board of Directors. Any Director

elected (a) to fill any vacancy resulting from the death, resignation, disqualification or removal of a Director shall hold office for the remainder of the full term of the Director whose death, resignation, disqualification or removal created such vacancy or (b) to fill any vacancy resulting from a newly created directorship shall hold office until the next annual meeting of stockholders and, in each case, until such Director's successors shall have become elected and qualified. No decrease in the number of Directors constituting the Board of Directors shall shorten the term of any incumbent Director.

(e)     <u>Removal of Directors</u>. Any Director may be removed from office with or without cause only by the affirmative vote of the holders of a majority of the combined voting power of the then outstanding shares of stock entitled to vote generally in the election of Directors voting together as a single class.

(f)     <u>Stockholder Action</u>. Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of such holders and may not be effected by any consent in writing by such holders. Except as otherwise required by law, special meetings of stockholders of the Corporation may be called only by the Chairman of the Board, the President or the Board of Directors pursuant to a resolution approved by a majority of the entire Board of Directors.

(g)     <u>By-Law Amendments</u>. The Board of Directors shall have power to make, alter, amend and repeal the By-Laws (except so far as the By-Laws adopted by the stockholders shall otherwise provide). Any By-Laws made by the Directors under the powers conferred hereby may be altered, amended or repealed by the Directors or by the stockholders. Notwithstanding the foregoing and anything contained in this Amended and Restated Certificate of Incorporation to the contrary, Sections 1, 2 and 3 of Article II of the By-Laws shall not be altered, amended or repealed and no provision inconsistent therewith shall be adopted without the affirmative vote of the holders of at least 80% of the voting power of all the shares of the Corporation entitled to vote generally in the election of Directors, voting together as a single class and Sections 1, 2 and 3 of Article III of the By-Laws shall not be altered, amended or repealed and no provision inconsistent therewith shall be adopted without the affirmative vote of the holders of at least a majority of the voting power of all shares of the Corporation entitled to vote generally in the election of Directors, voting together as a single class.

(h)     <u>Amendment, Repeal</u>. Notwithstanding anything contained in this Amended and Restated Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80% of the voting power of all shares of the Corporation entitled to vote generally in the election of Directors, voting together as a single class, shall be required to alter, amend, or adopt any provision inconsistent with, or repeal, Article 9 a., c., d., f., g., or h.

10.     (a)     Vote Required for Certain Business Combinations.

A.       Higher Vote for Certain Business Combinations. In addition to any affirmative vote required by law or this Amended and Restated Certificate of Incorporation, and except as otherwise expressly provided herein:

(1)       any merger or consolidation of the Corporation or any Subsidiary (as hereinafter defined) with (a) any Interested Stockholder (as hereinafter defined) or (b) any other corporation (whether or not itself an Interested Stockholder) which is, or after such merger or consolidation would be, an Affiliate (as hereinafter defined) of an Interested Stockholder; or

(2)       any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions) to or with any Interested Stockholder or any Affiliate of any Interested Stockholder of any assets of the Corporation or any Subsidiary having an aggregate Fair Market Value of $10 million or more; or

(3)       the issuance or transfer by the Corporation or any Subsidiary (in one transaction or series of transactions) of any securities of the Corporation or any subsidiary to any Interested Stockholder or to any Affiliate of any Interested Stockholder in exchange for cash, securities or other property (or a combination thereof) having an aggregate Fair Market Value of $10 million or more; or

(4)       the adoption of any plan or proposal for the liquidation or dissolution of the Corporation proposed by or on behalf of any Interested Stockholder or any Affiliate of any Interested Stockholder; or

(5)       any reclassification of securities (including any reverse stock split), or recapitalization of the Corporation, or any merger or consolidation of the Corporation with any of its Subsidiaries or any other transaction (whether or not with or into or otherwise involving an Interested Stockholder) which has the effect, directly or indirectly, of increasing the proportionate share of the outstanding shares of any class of Equity Security (as hereinafter defined) of the Corporation or any Subsidiary which is directly or indirectly owned by any Interested Stockholder or any Affiliate of any Interested Stockholder;

shall require the affirmative vote of the holders of at least 80% of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors (the "Voting Stock"), voting together as a single class (it being understood that for the purposes of Article 10, each share of the Voting Stock shall have one vote). Such affirmative vote shall be required notwithstanding the fact that no vote may be required, or that a lesser percentage may be specified, by law or in any agreement with any national securities exchange or otherwise.

B.       Definition of "Business Combination". The term "Business Combination" used in this Article 10 shall mean any transaction which is referred to in any one or more of clauses (1) through (5) of Paragraph A hereof.

(b)        When Higher Vote is Not Required. The provisions of Article 10(a) shall not be applicable to any particular Business Combination, and such Business Combination shall require only such affirmative vote as is required by law and any other provision of this Amended and Restated Certificate of Incorporation, if all of the conditions specified in either of the following Paragraphs A and B are met:

A.        Approval by Disinterested Directors. The Business Combination shall have been approved by majority of the Disinterested Directors (as hereinafter defined).

B.        Price and Procedure Requirements. All of the following conditions shall have been met:

(i)        The aggregate amount of the cash and the Fair Market Value (as hereinafter defined) as of the date of the consummation of the Business Combination of consideration other than cash to be received per share by holders of Common Stock in such Business Combination shall be at least equal to the higher of the following:

(a)        (if applicable) the highest per share price (including any brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Interested Stockholder for any shares of Common Stock acquired by it (1) within the two-year period immediately prior to the first public announcement of the terms of the proposed Business Combination (the "Announcement Date") or (2) in the transaction in which it became an Interested Stockholder, whichever is higher; and

(b)        the Fair Market Value per share of Common Stock on the Announcement Date or on the date on which the Interested Stockholder became an Interested Stockholder (such latter date is referred to in this Paragraph 10 as the "Determination Date"), whichever is higher.

(ii)    The aggregate amount of the cash and the Fair Market Value as of the date of the consummation of the Business Combination of consideration other than cash to be received per share by holders of shares of any other class of outstanding Voting Stock shall be at least equal to the higher of the following:

(a)    (if applicable) the highest per share price (including any brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Interested Stockholder for any shares of Common Stock acquired by it (1) within the two-year period immediately prior to the Announcement Date or (2) in the transaction in which it became an Interested Stockholder, whichever is higher; and

(b)    the Fair Market Value per share of such class of Voting Stock on the Announcement Date or on the Determination Date, whichever is higher.

(iii)    The consideration to be received by holders of Voting Stock shall be in cash or in the same form as the Interested Stockholder has previously paid for shares of such class of Voting Stock. If the Interested Stockholder has paid for any Voting Stock with varying forms of consideration, the form of consideration for such Voting Stock shall be either cash or the form used to acquire the largest number of shares of such Voting Stock previously acquired by it. The price determined in accordance with paragraphs B(i) and B(ii) of this Article 10(b) shall be subject to appropriate adjustment in the event of any stock dividend, stock split, combination of shares or similar event.

(iv)    After such Interested Stockholder has become an Interested Stockholder and prior to the consummation of such Business Combinations: (a) there shall have been (1) no reduction in the annual rate of dividends paid on the Common Stock (except as necessary to reflect any subdivision of the Common Stock), except as approved by a majority of the Disinterested Directors, and (2) an increase in such annual rate of dividends as necessary to reflect any reclassification (including any reverse stock split), recapitalization, reorganization or any similar transaction which has the effect of reducing the number of outstanding shares of the Common Stock, unless the failure so to increase such annual rate is approved by a majority of the Disinterested Directors; and (b) such Interested Stockholder shall have not become the beneficial owner of any additional shares of Voting Stock except as part of the transaction which results in such Interested Stockholder becoming an Interested Stockholder.

(c)    <u>Certain Definitions</u>. For the purpose of this Article 10:

A.    A "person" shall mean any individual, firm, corporation or other entity.

B.    "Interested Stockholder" shall mean any person (other than the Corporation or any Subsidiary) who or which:

(i)    is the beneficial owner, directly or indirectly, of 5% or more of the voting power of the outstanding Voting Stock; or

(ii)    is an Affiliate of the Corporation and at any time within the two-year period immediately prior to the date in question was the beneficial owner, directly or indirectly, of 5% or more of the voting power of the then outstanding Voting Stock; or

(iii)    is an assignee of or has otherwise succeeded to any shares of Voting Stock which were at any time within the two-year period immediately prior to the date in question beneficially owned by any Interested Stockholder, if such assignment or succession shall have occurred in the course of a transaction or series of transactions not involving a public offering within the meaning of the Securities Act of 1933.

C.    A person shall be a "beneficial owner" of any Voting Stock:

(i)      which such person or any of its Affiliates or Associates (as hereinafter defined) beneficially owns directly or indirectly; or

(ii)      which such person or any of its Affiliates or Associates has (a) the right to acquire (whether such right is exercisable immediately or only after the passage of time), pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise, or (b) the right to vote pursuant to any agreement, arrangement or understanding; or

(iii)      which are beneficially owned, directly or indirectly, by any other person with which such person or any of its Affiliates or Associates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of Voting Stock.

D.      For the purpose of determining whether a person is an interested Stockholder pursuant to paragraph B of this Article 10(c), the number of shares of Voting Stock deemed to be outstanding shall include shares deemed owned through application of paragraph C of the Article 10(c) but shall not include any other shares of Voting Stock which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

E.      "Affiliate" or "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as in effect on January 1, 1985.

F.      "Subsidiary" means any corporation of which a majority of any class of Equity Security is owned, directly or indirectly, by the Corporation, provided, however, that for the purposes of the definition of Interested Stockholder set forth in paragraph B of this Article 10(c), the term "Subsidiary" shall mean only a corporation of which a majority of each class of Equity Security is owned, directly or indirectly, by the Corporation.

G.      "Disinterested Director" means any member of the Board of Directors who is unaffiliated with the Interested Stockholder and was a member of the Board of Directors prior to the time that the Interested Stockholder became an Interested Stockholder, and any successor of a Disinterested Director who is unaffiliated with the Interested Stockholder and is recommended to succeed a Disinterested Director by a majority of Disinterested Directors then on the Board of Directors.

H.      "Fair Market Value" means: (i) in the case of stock, the highest closing bid quotation with respect to a share of such stock during the 30-day period preceding the date in question on the National Association of Securities Dealers, Inc. Automated Quotation System or any system then in use, or, if such stock is then listed on an exchange, the highest closing sale price during the 30-day period immediately preceding the date in question of a share of such stock on the Composition Tape for New York Stock Exchange--Listed Stocks, or, if such stock is not quoted on the Composite Tape, on

the New York Stock Exchange, or, if such stock is not listed on such Exchange, on the principal United States securities exchange registered under the Securities Exchange Act of 1934 on which such stock is listed, or, if such stock is not listed on any such exchange or quoted as aforesaid, the fair market value on the date in question of a share of such stock as determined by the Board of Directors in good faith; and (ii) in the case of property other than cash or stock, the fair market value of such property on the date in question as determined by the Board of Directors, in good faith.

I.      In the event of any Business Combination in which the Corporation survives, the phrase "consideration other than cash to be received" as used in paragraphs B(i) and (ii) of Article 10(b) shall include the shares of Common Stock retained by the holders of such shares.

J.      "Equity Security" shall have the meaning ascribed to such term in Section 3(a)(11) of the Securities Exchange Act of 1934, as in effect on January 1, 1985.

(d)      <u>Powers of the Board of Directors</u>. A majority of the Directors shall have the power and duty to determine for the purposes of this Article 10 on the basis of information known to them after reasonable inquiry, (A) whether a person is an Interested Stockholder, (B) the number of shares of Common Stock beneficially owned by any person, (C) whether a person is an Affiliate or Associate of another (D) whether the assets which are the subject of any Business Combination have, or the consideration to be received for an issuance of transfer of securities by the Corporation or any Subsidiary in any Business Combination has, or an issuance or transfer of securities by the Corporation or any Subsidiary in any Business Combination has, an aggregate Fair Market Value of $10 million or more. A majority of the Directors shall have the further power to interpret all of the terms and provisions of this Article 10.

(e)      <u>No Effect on Fiduciary Obligations of Interested Shareholders</u>. Nothing contained in this Article 10 shall be construed to relieve any Interested Stockholder from any fiduciary obligation imposed by law.

(f)      <u>Amendment, Repeal, etc</u>. Notwithstanding any other provisions of this Amended and Restated Certificate of Incorporation or the By-Laws (and notwithstanding the fact that a lesser percentage may be specified by law, this Amended and Restated Certificate of Incorporation or the By-Laws) the affirmative vote of the holders of 80% or more of the outstanding Voting Stock, voting together as a single class, shall be required to amend or repeal, or adopt any provisions inconsistent with this Article 10.

11.      No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty by such director as a director; provided, however, that this Article 11 shall not eliminate or limit the liability of a director to the extent provided by applicable law (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article 11 shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

12.  This Amended and Restated Certificate of Incorporation shall be effective as of 5:00 p.m. Eastern Standard Time on September 1, 2006.

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed this 1st day of September, 2006.

CENDANT CORPORATION

By:/s/ Karen C. Sclafani
KAREN C. SCLAFANI
Executive Vice President and General
Counsel

# EXHIBIT 4

EFiled: Jul 01 2024 09:37AM EDT
Transaction ID 73521843
Case No. 2023-0520-KSJM

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ANGELO CASCIA,                          :
                                        :
            Plaintiff,                  :
                                        :
      v                                 :   C. A. No.
                                        :   2023-0520-KSJM
COLIN FARMER, JENNIFER FEIKIN, MARK:
FIELDS, VINCENT INTRIERI, MICHAEL       :
GREGORY O'HARA, STEPHEN SCHERR,         :
ANDREW SHANNAHAN, EVANGELINE            :
VOUGESSIS, THOMAS WAGNER,               :
KNIGHTHEAD CAPITAL MANAGEMENT, LLC,:
CERTARES OPPORTUNITIES LLC, and CK      :
AMARILLO LP,                            :
                                        :
            Defendants,                 :
                                        :
      and                               :
                                        :
HERTZ GLOBAL HOLDINGS, INC., a          :
Delaware corporation,                   :
                                        :
            Nominal Defendant.          :

                        - - -

                  Chancery Court Chambers
                  500 North King Street
                  Wilmington, Delaware
                  Thursday, June 20, 2024
                  3:15 p.m.

                        - - -

BEFORE:  HON. KATHALEEN St.J. McCORMICK, Chancellor

                        - - -


TELEPHONIC RULINGS OF THE COURT ON DEFENDANTS' MOTIONS
                  TO DISMISS

2

1 APPEARANCES:

2     MICHAEL J. BARRY, ESQ.
      VIVEK UPADHYA, ESQ.
3     CHRISTINE M. MACKINTOSH, ESQ.
      Grant & Eisenhofer P.A.
4       for Plaintiff

5     RICHARD I.G. JONES, JR., ESQ.
      HARRY W. SHENTON, ESQ.
6     Berger McDermott LLP
              -and-
7     CHRISTOPHER CLARK, ESQ.
      BENJAMIN A. BUTZIN-DOZIER, ESQ.
8     of the New York Bar
      Clark Smith Villazor LLP
9       for Defendants Knighthead Capital Management,
        LLC, Certares Opportunities LLC, CK Amarillo,
10      LP, Thomas Wagner, Andrew Shannahan, Colin
        Farmer, and Michael Gregory O'Hara
11
      BLAKE K. ROHRBACHER, ESQ.
12    SANDY XU, ESQ.
      Richards, Layton & Finger, PA
13            -and-
      MARJORIE P. DUFFY, ESQ.
14    GEOFFREY J. RITTS, ESQ.
      of the Ohio Bar
15    Jones Day
        for Defendants Jennifer Feikin, Mark Fields,
16      Vincent J. Intrieri, Stephen M. Scherr,
        Evangeline Vougessis, and nominal defendant
17      Hertz Global Holdings, Inc.

18                    - - -

19

20

21

22

23

24

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

3

1           THE COURT:  Good afternoon, everyone.

2  This is Kathaleen McCormick.  Do we have a court

3  reporter on the line?

4           THE COURT REPORTER:  Yes, Your Honor.

5  It's Karen.

6           THE COURT:  Hi, Karen.  Can you hear

7  me okay?

8           THE COURT REPORTER:  Yes, I can.

9           THE COURT:  Great.  Let's have

10  appearances briefly for the record.

11           ATTORNEY BARRY:  Sure.  Your Honor,

12  this is Michael Barry from Grant & Eisenhofer.  With

13  me on the line, also from Grant & Eisenhofer, is Vivek

14  Upadhya, and I believe Christine Mackintosh as well.

15           ATTORNEY ROHRBACHER:  Your Honor, for

16  the Hertz defendants, Blake Rohrbacher, Richards

17  Layton & Finger.  On the line with me is Sandy Xu from

18  my office, Geoff Ritts, and Marjorie Duffy.

19           ATTORNEY JONES:  Good afternoon, Your

20  Honor.  Ritchie Jones on behalf of what we call the CK

21  defendants from Berger McDermott.  With me on the line

22  is my associate Harry Shenton, and also our co-counsel

23  Chris Clark and Ben Dozier from the Clark Smith

24  Villazor firm in New York, both of whom are admitted

4

1   *pro hac vice*.

2              Thank you.

3              THE COURT:  Thanks, everyone.  I'm

4   prepared to give you a ruling on the defendants'

5   motions to dismiss.

6              I'll start with the factual background

7   of the case, which I draw from the verified complaint

8   and the documents incorporated by reference.

9              This action arises from the approval

10  of two stock buybacks, one in 2021 and another in

11  2022, by the board of directors of Hertz Global

12  Holdings, Incorporated, which I'll refer to as

13  "Hertz."  And I'll refer to the Hertz board simply as

14  "the Board."

15             The story starts in 2020, when

16  Knighthead Capital Management, LLC, which I'll refer

17  to as "Knighthead," and Cetares Opportunities LLC,

18  which I'll refer to as "Certares," created a fund to

19  target stressed travel companies affected by the

20  COVID-19 pandemic.  That year, Hertz, a rental car

21  company, filed for reorganization proceedings under

22  Chapter 11 of the United States Bankruptcy Code.

23             In March 2021, Knighthead and Certares

24  presented an opening proposal to recapitalize Hertz

5

1  and take it out of bankruptcy.  Knighthead and

2  Certares entered into a joint investment management

3  agreement to consolidate their anticipated holdings in

4  Hertz into a venture called CK Amarillo LP, which I

5  will refer to as "CK Amarillo."

6              In June 2021, the bankruptcy court

7  approved the Knighthead and Certares plan, under which

8  CK Amarillo acquired 41.75 percent of Hertz's

9  outstanding stock.

10             On October 15, 2021, Hertz filed a

11 registration statement to sell additional shares of

12 common stock and list its stock to trade on the Nasdaq

13 stock market.  Those shares began trading on Nasdaq on

14 November 9, 2021.  CK Amarillo sold shares to

15 underwriters in this November offering, which lowered

16 CK Amarillo's holdings to about 39.18 percent of

17 Hertz's outstanding stock.

18             On November 29, 2021, Hertz announced

19 a $2 billion stock repurchase program, and I'll refer

20 to that as the "2021 Buyback."  The 2021 Buyback

21 "included the remainder of the $200 million that was

22 authorized for repurchase at the time of the

23 November 2021 Offering ... [and] gave Company

24 management complete discretion to repurchase Hertz

6

1 common stock and explicitly set 'no time limit' for

2 completion."

3            The Hertz board of directors at the

4 time of the 2021 buyback was comprised of Certares

5 founder and senior managing director Michael Gregory

6 O'Hara; Certares senior managing director, Colin

7 Farmer; Knighthead Partner Andrew Shannahan;

8 Knighthead partner Thomas Wagner; and non-CK

9 Amarillo-affiliated directors Jennifer Feikin; Mark

10 Fields; Vincent Intrieri; Chris Lahoud; and Evangeline

11 Voungessis.  Each of the defendants approved the 2021

12 Buyback.  CK Amarillo did not sell shares in the 2021

13 Buyback.  The 2021 Buyback had the effect, therefore,

14 of raising CK Amarillo's stake in Hertz from

15 39.18 percent to 43.5 percent.

16            On June 15, 2022, Hertz announced

17 another $2 billion stock buyback program, which I'll

18 refer to as the "2022 Buyback."  There was no time

19 limit set for this buyback either.  Board composition

20 had not changed since approval of the 2021 Buyback,

21 except that Hertz's CEO, Stephen Scherr, replaced

22 Lahoud in early 2022 in the board.  The board, again,

23 unanimously approved the transaction.  CK Amarillo did

24 not sell shares in the 2022 Buyback.  The 2022 Buyback

7

1  had the effect of increasing CK Amarillo's holdings

2  from 43.5 percent to 56.28 percent of the Company's

3  outstanding stock.

4          Plaintiff Angelo Cascia owns Hertz

5  stock.  He filed this action in May of 2023 against

6  Certares, Knighthead, and CK Amarillo.  I'll refer to

7  them as the "Controller Defendants."  He also filed

8  against the directors on the board at the time of the

9  2022 Buyback.  The board members at that time were:

10 Again, Hertz CEO Scherr; Certares nominees Farmer and

11 O'Hara; Knighthead nominees Shannahan and Wagner; and

12 the nonaffiliated directors, Feikin, Fields, Intrieri,

13 and Vougessis.  I will refer to these board members

14 collectively as the "Director Defendants," and with

15 the Controller Defendants, the "Defendants."

16          Plaintiff asserts Counts I and II

17 against the director defendants for breach of

18 fiduciary duty, and Counts III and IV against the

19 controller defendants for unjust enrichment.

20 Plaintiffs asserts Count I and III derivatively and

21 Count II and IV directly.  Defendants moved to dismiss

22 in July of 2023.

23          On August 24, 2023, Harlan J. Strauss

24 moved to intervene.  I heard that motion in November

8

1  and gave Strauss two weeks to decide whether to

2  intervene.  He never did to my knowledge.

3            The parties then completed briefing in

4  February of 2024 on pending dismissal motions, and I

5  heard argument in March.

6            I'll now move to the legal analysis.

7            Defendants moved to dismiss

8  plaintiff's claims under Court of Chancery Rule

9  12(b)(6) or 23.1.  They argue that Counts II and IV,

10  asserted directly, are in fact derivative, and thus

11  fail under Rule 12(b)(6).  They argue that plaintiff

12  failed to adequately allege that demand was futile as

13  to Counts I and III, which therefore should be

14  dismissed under Rule 23.1.

15            I'll start with the Rule 23.1

16  analysis.  Plaintiff pleads Counts I and III

17  derivatively.  They are, therefore, subject to the

18  demand requirements of Court of Chancery Rule 23.1.  A

19  stockholder can satisfy this requirement by pleading

20  that demand is futile.  To plead demand futility, the

21  complaint must allege particularized facts that are

22  essential to the claim.  Although the requirement of

23  factual particularity is a heightened pleading

24  requirement, it does not entitle a court to discredit

9

1  or weigh the persuasiveness of well-pled allegations?

2  If a plaintiff pleads particularized facts, those

3  factual allegations are accepted as true and

4  plaintiffs are entitled to all reasonable inferences

5  that logically flow from them.

6            In *Zuckerberg*, the Delaware Supreme

7  Court adopted the "universal test" for demand futility

8  that blends elements of the two precursor tests:

9  *Aronson* and *Rales*.

10           When conducting a demand futility

11  analysis under *Zuckerberg*, Delaware courts ask, on a

12  director-by-director basis: (i) whether the director

13  received a material personal benefit from the alleged

14  misconduct that is the subject of the litigation

15  demand; (ii) whether the director faces a substantial

16  likelihood of liability on any of the claims that

17  would be subject of litigation demand; and (iii)

18  whether the director lacks independence from someone

19  who received a material personal benefit from the

20  alleged misconduct that would be the subject of the

21  litigation demand or who would face a substantial

22  likelihood of liability on any of the claims that are

23  the subject of the litigation demand.

24           If the answer to any of these

10

1  questions is "yes" for at least half of the board

2  members on the demand board, then demand is excused as

3  futile.

4            When plaintiff initiated this action,

5  Hertz's board of directors comprised ten directors:

6  Fran Bermanzohn; Certares senior managing director

7  Jeffrey Nedelman; and eight of the nine director

8  defendants — all except O'Hara, who was replaced on

9  the board by Nedelman.  Collectively, I'll refer to

10 those folks as the "Demand Board."

11            To adequately allege demand futility,

12 plaintiff must plead particularized facts creating

13 reason to doubt that at least five of the ten members

14 of the demand board were incapable of impartially

15 considering a demand.  Plaintiff focuses on the third

16 prong of *Zuckerberg* — which again asks whether the

17 "director lacks independence from someone who received

18 a material personal benefit from the alleged

19 misconduct."

20            Plaintiff argues that five of the

21 Demand Board members lack independence from CK

22 Amarillo, which received a material personal benefit

23 from the transaction in the form of majority control

24 of Hertz.  Plaintiff argues that the four CK Amarillo

11

1  nominees on the Demand Board — Farmer, Nedelman,

2  Shannahan, and Wagner — lacked independence from CK

3  Amarillo by virtue of their positions with Certares

4  and Knighthead.  They also argue that Scherr lacked

5  independence by virtue of his position as CEO.

6              The CK Amarillo affiliates on the

7  Demand Board did lack independence from CK Amarillo,

8  who received a material benefit from the transaction

9  in the form of majority control of Hertz, at least

10 that's reasonably conceivable from the particularized

11 facts alleged.

12             Farmer was a senior managing director

13 at Certares.  Nedelman was a senior managing director

14 at Certares.  Shannahan was a partner and head of

15 research at Knighthead.  And Wagner co-founded and was

16 a managing member of Knighthead.  These four directors

17 were inferably not independent from CK Amarillo for

18 demand futility purposes, and defendants, to their

19 credit, do not meaningfully dispute or dispute at all

20 this conclusion.

21             Nor do they really dispute that Scherr

22 lacked independence from CK Amarillo for demand

23 futility purposes by virtue of his position as CEO.

24 As CEO of a multinational corporation, Scherr

---

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

12

1  inferably earns a great deal in compensation.

2             This Court instructed in *EZCorp* that

3  "Senior corporate officer generally lack independence

4  for purposes of evaluating matters that implicate the

5  interest of a controller" because the senior officer

6  may have to take actions adverse to the controller,

7  from whom the manager relies for his income and their

8  employment.  At the pleading stage, therefore,

9  Scherr's position as CEO and appointment by CK

10 Amarillo, which controlled Hertz at the time this

11 action was filed, is enough to show that he could not

12 impartially consider a demand at that time.

13             Defendants' main argument is that CK

14 Amarillo did not receive a personal material benefit

15 in the buybacks.  They urge the Court to "assess[]

16 where CK Amarillo stood when the [B]uybacks were

17 approved."  They note that CK Amarillo never

18 negotiated with Hertz concerning the Buybacks, and

19 that CK Amarillo was not treated any differently than

20 other stockholders in the transaction.  For that

21 reason, they say, CK Amarillo was not conflicted with

22 respect to the Buybacks.

23             Defendants, however, misconstrue the

24 analysis, which asks whether CK Amarillo "received" a

13

1 material personal benefit from the challenged

2 transactions.  And this is well-received.  It did.  As

3 a consequence of the transaction, CK Amarillo gained

4 hard voting control of Hertz.  And there is reason to

5 doubt whether persons who lacked independence from CK

6 Amarillo when the complaint was filed — which is half

7 of the Demand Board — would be able to impartially

8 consider a demand to pursue claims that would undo

9 that benefit.

10            I note that plaintiff also argues that

11 the seven Demand Board members who participated in the

12 challenged decision are conflicted because they face

13 substantial likelihood of liability on any of the

14 claims in this action.  I don't have to reach that

15 argument for demand futility purposes because

16 plaintiff's argument under the third prong of

17 *Zuckerberg* is sufficient, but I will turn now to the

18 12(b)(6) analysis which has considerable overlap.

19            Defendants argue that each of the

20 counts in the complaint fail to state a claim under

21 Rule 12(b)(6).  And I'll first address the derivative

22 claims in Counts I and III before turning to the

23 direct claims in Counts II and IV.

24            In Count I, plaintiff claims that the

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

14

1  director defendants breached their fiduciary duties

2  when approving first, the 2021 Buyback and, second,

3  the 2022 Buyback.

4           In the breach of fiduciary duty

5  analysis, "the gating question" is "by what standard

6  of review will the court likely adjudicate the claim?"

7  That's a quote from *CBS Corp. Shareholder Class*

8  *Action*.

9           As instructed by the Court in *Metro*

10 *Storage International*, "To determine whether the

11 fiduciary breached its duties, the court evaluates the

12 fiduciary's conduct using the applicable standard of

13 review."  And as many cases instruct, "Entity law

14 generally uses three standards of review: a default

15 standard [] that is highly deferential and known as

16 the business judgment rule; an intermediate standard

17 [] known as enhanced scrutiny; and an onerous standard

18 [] known as [] entire fairness []."  The

19 fact-intensive nature of an entire fairness inquiry

20 "normally will preclude dismissal of a complaint on a

21 Rule 12(b)(6) motion ...."

22           There are a number of ways to trigger

23 entire fairness review.  Here, however, plaintiff

24 focuses his efforts on one avenue only.  Namely, this

15

1    Court recognizes that a plaintiff can "change the

2    standard of review from the business judgment rule to

3    entire fairness" by "alleg[ing] facts supporting a

4    reasonable inference that there were not enough

5    sufficiently informed, disinterested individuals who

6    acted in good faith when taking the challenged actions

7    to comprise a board majority."  That's a quote from

8    *McDonald's*.  Plaintiff seeks to impugn half the board

9    here by claiming that the majority of the board acted

10   in bad faith when approving the Buybacks.

11            A fiduciary acts in bad faith when the

12   fiduciary "intentionally acts with a purpose other

13   than ... advancing the best interests of the

14   corporation."  Again, numerous cases stand for that

15   proposition, but it's directly set forth in the

16   Delaware Supreme Court's decision in *Stone*.

17            "It makes no difference the reason why

18   the [fiduciary] intentionally fails to pursue the best

19   interests of the corporation," as this Court

20   instructed in *Frederick Hsu Living Trust v. ODN*.  "Bad

21   faith can be the result of any emotion that may cause

22   a [fiduciary] to intentionally place his own

23   interests, preferences or appetites before the welfare

24   of the corporation."

16

1          It is reasonably conceivable that each

2 director defendant knew that approving the $2 billion

3 2022 Buyback would convey hard voting control to CK

4 Amarillo.  It's just not hard to do the math.  Prior

5 to the 2021 Buyback, CK Amarillo held approximately

6 181.5 million shares, and Hertz had approximately

7 463.2 million shares outstanding.  So if Hertz's total

8 outstanding shares dipped below 363 million and CK

9 Amarillo's holdings remain static, CK Amarillo's stake

10 would increase above 50 percent.

11          CK Amarillo did not participate in the

12 2021 Buyback, and by the April immediately following,

13 Hertz's total outstanding shares was approximately

14 412 million.  It's reasonably conceivable that the

15 Hertz board was informed of these facts or figured

16 them out before they approved the 2022 Buyback.  And

17 it's no logical leap to conclude that an additional $2

18 billion in authorized share repurchases would push CK

19 Amarillo over the 50 percent limit.

20          It is similarly no stretch to infer

21 that four of the nine director defendants affiliated

22 with CK Amarillo approved the 2022 Buyback for the

23 purpose of benefiting CK Amarillo in this way.  And to

24 Scherr, although CK Amarillo did not hold a hard

17

1  majority at the time of the 2022 Buyback, it held the

2  largest stake of any stockholder of over 40 percent.

3  The influence wielded by a 40 percent stakeholder,

4  coupled with the fact that Scherr was appointed to the

5  CEO position by CK Amarillo, is sufficient in my view

6  to make it reasonably conceivable that Scherr acted

7  for the benefit of CK Amarillo and not the corporation

8  when approving the buyback.

9            Defendants argue that the Court cannot

10 infer that the board acted in bad faith because it was

11 not a foregone conclusion, when approving the 2022

12 Buyback, that the repurchases would convey hard voting

13 control to CK Amarillo.  It was just one of many

14 potential outcomes, they say, because: management

15 might have chosen not to repurchase stock, CK Amarillo

16 might have decided to participate in the Buybacks, or

17 Hertz's stockholders might have dramatically

18 increased.  But it was one possible outcome and

19 certainly a foreseeable one.

20            That is, when the board approved the

21 2022 Buyback, it was definitely possible that what

22 actually transpired would transpire, and that CK

23 Amarillo would gain hard voting control without paying

24 for it.  The board did not have to be certain of this

18

1  course of outcome to take action to avoid it.

2            Plaintiff has therefore adequately

3  alleged facts making it reasonably conceivable that a

4  majority of the board that approved the 2020 Buyback

5  acted in bad faith when doing so.  Consequently, it's

6  reasonably conceivable that the entire fairness

7  standard applies.

8            And plaintiff adequately alleges a

9  claim under the entire fairness standard.  The concept

10  of fairness has two basic aspects: fair dealing and

11  fair price.  Although the two aspects may be examined

12  separately, the test is not bifurcated.  All aspects

13  of the issue must be examined.

14            Plaintiff has alleged facts that tend

15  to show that the transaction was not fair.  The board,

16  including conflicted CK Amarillo directs, approved the

17  Buybacks absent a special committee.  Stockholders did

18  not approve the Buybacks.  This is sufficient to plead

19  an inference of unfair process for these allegations.

20  For price, plaintiff adequately alleged that CK

21  Amarillo gained hard voting control for free.

22            These allegations, taken together, are

23  sufficient to defeat a pleading-stage inference that

24  defendants can show that the transaction was fair.  So

19

1  the motion to dismiss the portion of Count I

2  challenging the 2022 Buyback is denied.

3              I can't draw the same set of

4  inferences as to the 2021 Buyback for a few reasons.

5  First, the math really doesn't add up in the same way

6  that it did with the 2022 Buyback.  And, second,

7  Scherr was not on the board at the time of the 2021

8  Buyback.  He joined it early in 2022.  So the analysis

9  lands on four of nine, as opposed to five of nine at

10  best.

11             That said, plaintiff will have good

12  reason to seek discovery dating back to the 2021

13  Buyback.  If the board was aware of the risks of CK

14  Amarillo gaining a hard voting control at the time,

15  then surely they knew it later.  As a consequence, the

16  portion of Count I challenging the 2021 Buyback is

17  dismissed, albeit without prejudice if discovery

18  proves that, in fact, there was a breach of fiduciary

19  duty an earlier time.

20             Similarly, I cannot infer bad faith as

21  to the four other directors — Vougessis, Feikin,

22  Fields, Intrieri.  Count I is dismissed as to them.

23  Under *Cornerstone*, a plaintiff seeking to assert a

24  claim against a director protected by an exculpatory

20

1  provision must plead "facts supporting a rational

2  inference that the director harbored self-interest

3  adverse to the stockholders' interests ... or acted in

4  bad faith."  A "non-exculpated claim for breach of

5  fiduciary duty," for purposes of Section 102(b)(7),

6  means a well-pled duty of breach of the duty of

7  loyalty (in any of its forms)." Plaintiff has not pled

8  such facts for these four directors.

9            I'll turn now to Count III.

10            Plaintiff advances a derivative claim

11  against the controller defendants for unjust

12  enrichment.  Generally, "where the Court does not

13  dismiss a breach of fiduciary duty claim, it ... does

14  not dismiss a duplicative unjust enrichment claim."

15  And that's the case here.

16            Unjust enrichment has five elements:

17  "(1) an enrichment, (2) an impoverishment, (3) a

18  relation between the enrichment and impoverishment,

19  (4) the absence of justification, and (5) the absence

20  of a remedy provided by law."

21            Defendants challenge elements 1 and 2,

22  arguing there wasn't enrichment nor corresponding

23  impoverishment.  But plaintiff has adequately alleged

24  both that CK Amarillo was enriched by the Buybacks,

21

1   and plaintiff has adequately alleged that the company

2   was harmed for the same reason.  So plaintiff

3   adequately alleged a derivative claim for unjust

4   enrichment.

5           The defendants next argue that

6   plaintiff's direct claims in Counts II and IV fail

7   under Rule 12(b)(6) because they're exclusively

8   derivative.  Whether a claim is direct or derivative

9   is specifically treated as "a threshold inquiry" at

10  the pleading stage.  Some say it should only be

11  evaluated at the pleading stage; others disagree.

12          "If the court determines [that a]

13  claim is solely derivative, then the direct claim ...

14  must be dismissed."

15          To determine whether a claim is direct

16  or derivative, the Court follows the test articulated

17  in *Tooley v. Donaldson*.  Under *Tooley*, the Court asks:

18  "(1) who suffered the alleged harm (the corporation or

19  the suing stockholders, individually); and (2) who

20  would receive the benefit of any recovery or other

21  remedy (the corporation or the shareholders,

22  individually)?"

23          Two years after *Tooley*, the Delaware

24  Supreme Court identified in *Gentile v. Rossette* a type

22

1  of claim that was both direct and derivative, or "dual

2  natured."  In *Gentile*, the corporation's controller

3  caused the company to "forg[i]ve a portion of the

4  company's $3 million debt to him in exchange for

5  additional equity" issued pursuant to a ratio that the

6  plaintiff-stockholder argued was unfavorable to the

7  corporation.

8              The transaction in *Gentile* had the

9  effect of increasing the controller's position from

10 61 percent to 93.5 percent, while the minority's stake

11 fell from 38 percent to 6 percent.  The controller,

12 affiliated with the CEO, then negotiated a favorable

13 put agreement for himself in connection with the

14 merger.  The transactions had the effect of

15 transferring both economic value and voting power from

16 the minority to the controller.  The

17 plaintiff-stockholder then challenged the transaction

18 both directly and derivatively.  And the trial court

19 granted summary judgment in favor of the defendants on

20 the grounds that the claim was exclusively derivative.

21             On appeal, the plaintiff brought a

22 "species of corporate overpayment claim," in the words

23 of the Court.  Typically, claims of corporate

24 overpayment are exclusively derivative.  That is

23

1 because both the harm, the overpayment, and the

2 remedy, the damages, flow to the corporation.  The

3 Court observed on appeal, however, that "[t]here is

4 ... at least one transactional paradigm — that species

5 of overpayment claim — that Delaware case law

6 recognizes as being both derivative and direct in

7 character."

8          The Delaware Supreme Court held that

9 this dual-nature claim arises when: "(1) a stockholder

10 having majority or effective control causes the

11 corporation to issue 'excessive' shares of its stock

12 in exchange for assets of the controlling stockholder

13 that have a lesser value; and (2) the exchange causes

14 an increase in the percentage of outstanding shares

15 owned by the controlling stockholder, and a

16 corresponding decrease in the share percentage owned

17 by the public (minority) shareholders."

18          In this situation, the claim retains

19 the features that make it derivative in nature.  But

20 "the public (or minority) stockholder also has a

21 separate, and direct, claim arising out of the same

22 transaction," due to the "extraction from the public

23 shareholders, and a redistribution to the controlling

24 shareholder, of a portion of economic value and voting

24

1  power embodied in the minority interest[.]"

2          In explaining this decision's apparent

3  tension with *Tooley*, the high court noted that "in the

4  typical corporate overpayment case ... [s]uch claims

5  are not normally regarded as direct, because any

6  dilution in value of the corporation's stock is merely

7  the unavoidable result (from an accounting standpoint)

8  of the reduction in the value of the entire corporate

9  entity, of which each share of equity represents an

10 equal fraction."  And, "Although the corporation

11 suffered harm (in the form of the diminution of its

12 net worth), the minority stockholders also suffered a

13 harm that was unique to them and independent of any

14 injury to the corporation" by way of "a breach of a

15 fiduciary duty owed to them by the controlling

16 shareholder, namely, not to cause the corporation to

17 effect a transaction that would benefit the fiduciary

18 at the expense of the minority shareholders."

19          The reasoning of *Gentile* was sound, in

20 my view, but it "led to doctrinal confusion in our

21 law."  It, thus, stymied one of the policy goals of

22 *Tooley*, which was to create an easy-to-apply test

23 delineating derivative and direct claims.

24 Accordingly, the Delaware Supreme Court cabined the

25

1  holding of *Gentile* and *El Paso Pipeline GP v.*

2  *Brinckerhoff* and ultimately overruled *Gentile* in the

3  *Brookfield Asset Management v. Rosson* case.

4                    *Brookfield* stated plainly corporate

5  overpayment claims are "categorically derivative,

6  rather than dual natured, even when asserted against a

7  controlling stockholder."  The Court's analysis was

8  grounded in two lines of reasoning.  First, the Court

9  held that *Gentile* did not properly apply the *Tooley*

10 test.  Under the Court's analysis, the critical

11 question was whether the economic and voting dilution

12 was independent from the harm imposed on the company.

13 Second, the Court reasoned that the holding of *Gentile*

14 was "superfluous" because "other legal theories [such

15 as] *Revlon* provide a basis for a direct claim for

16 stockholders to address fiduciary duty violations in a

17 change of control context."

18                    Further, "[i]n a corporate-overpayment

19 to-a-controlling shareholder claim, the amount of the

20 overpayment deprives the corporation of assets to

21 which minority shareholders have only a pro rata claim

22 as residual claimants on the corporation's assets.  If

23 the corporation recovers the overpaid funds, then the

24 minority shareholders are beneficiaries of that

26

1  recovery on the same pro rata basis."  That's a quote

2  from *Brookfield*.

3              So what is the effect *of Brookfield* on

4  the plaintiff's claims here?  Defendants argue that

5  plaintiff's claims are exclusively derivative under

6  *Brookfield* such that Counts II and IV must be

7  dismissed.  Plaintiff responds that *Brookfield* left

8  open the possibility that where the transaction at

9  issue in a corporate overpayment claim grants control

10 to a minority stockholder, then it is dual-natured.

11             Plaintiff frames it this way:

12 *Brookfield* and *Gentile* each involved two things: (1)

13 "a pre-existing controlling stockholder" and (2) "the

14 issuance of equity of the corporation to acquire

15 assets of the controller, which diluted the minority

16 stockholders' interests."  The transaction at issue

17 here had neither attribute.  Rather, CK Amarillo held

18 a minority stake before the Buybacks.  And this case

19 isn't about dilution.  The Buybacks did not harm the

20 minority in that way.

21             Rather, the key harm to the minority

22 from the Buybacks is the loss of a control premium.

23 The board authorized the use of company funds to buy

24 back shares, and the result was a change of control —

27

1  CK Amarillo acquired hard voting control for free.

2                    *Brookfield* appeared to leave open the

3  possibility that a transfer of control might give rise

4  to dual-natured claims.  The Court expressly stated in

5  *Brookfield* that *Gentile* was overruled only "[t]o the

6  extent the corporation's issuance of equity does not

7  result in a shift in control from a diversified group

8  of public equity holders to a controlling interest."

9                    The high court also noted, again, that

10 there was no "practical need for the Gentile

11 carve-out" in part because other legal theories

12 "provide a basis for a direct claim for stockholders

13 to address fiduciary duty violations in a change of

14 control context."  Here, plaintiff's case is about the

15 harm resulting from a change of control, thus

16 *Gentile's* overruling in *Brookfield* is inapplicable.

17 It does not foreclose a direct claim.

18                    So back to *Tooley*.  Who was harmed by

19 the loss of a control premium?  Hertz stockholders.

20 Hertz stockholders lost the ability to bargain for

21 that.  Moreover, this injury was independent from any

22 harm to Hertz.  The loss in Hertz value due to the

23 stock buybacks is a parallel harm to the loss of

24 control premium.  Economic and voting dilution would

28

1  occur anyway, even absent a change in control.

2               So who would benefit from the

3  recovery?  The answer is obvious, the stockholders.

4               Look, I recognize that this is a

5  clarification of *Brookfield* that I don't know that our

6  Court has given before.  And at base, I'm unwilling to

7  reach a definitive ruling on this factual and legal

8  issue at the pleading stage.

9               But you-all will have litigation ahead

10 and many opportunities to convince me otherwise.  At

11 this stage, given the pleading-friendly standard we

12 apply to plaintiffs, I'm denying the motion to dismiss

13 the direct claims for the reasons that I've explained.

14               So with that, are there any questions?

15               ATTORNEY BARRY:  From plaintiffs, Your

16 Honor, no.  Thank you very much.

17               ATTORNEY JONES:  Not from the CK

18 defendants, Your Honor.  Thank you.

19               ATTORNEY ROHRBACHER:  Nor from the

20 Hertz defendants.  Thank you.

21               THE COURT:  Well, thank you for your

22 time.  We are adjourned.

23          (Court adjourned at 3:43 p.m.)

24                    - - -

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

29

1                       CERTIFICATE

2

3            I, KAREN L. SIEDLECKI, Official Court

4  Reporter for the Court of Chancery for the State of

5  Delaware, Registered Diplomate Reporter, and Certified

6  Realtime Reporter, do hereby certify that the

7  foregoing pages numbered 3 through 28 contain a true

8  and correct transcription of the rulings as

9  stenographically reported by me at the hearing in the

10 above cause before the Chancellor of the State of

11 Delaware, on the date therein indicated, except as

12 revised by the Chancellor.

13           IN WITNESS WHEREOF I hereunto set my

14 hand at Wilmington this 21st day of June, 2024.

15

16

17

18

19            /s/ Karen L. Siedlecki

20           ----------------------------
             Karen L. Siedlecki
21           Official Court Reporter
             Registered Diplomate Reporter
22           Certified Realtime Reporter

23

24

---

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No. )

Filed by the Registrant [X]

Filed by a Party other than the Registrant [   ]

Check the appropriate box:

[ ]   Preliminary Proxy Statement
[ ]   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
[X]   Definitive Proxy Statement
[ ]   Definitive Additional Materials
[ ]   Soliciting Material Pursuant to §240.14a-12

# Avis Budget Group, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required.
[ ]   Fee paid previously with preliminary materials.
[ ]   Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

## avis budget group

April 8, 2022

Dear Fellow Shareholder:

This past year continued to present regional and global challenges as we all weathered another year of the COVID-19 pandemic, including multiple variants. Through our stringent cost discipline and nimble fleet management, we were able to achieve our best results in our 75-year history.

Due to the continued distribution of effective vaccines, along with other protective measures, over the past year travel advisories and restrictions have eased, primarily in the Americas. We continue to see a number of encouraging developments, such as a significant increase in domestic travel demand, which generated an increase in demand for rental vehicles, suggesting a further increase globally as restrictions continue to ease around the world. While the full extent of the impact of the pandemic on our long-term operational and financial performance will depend on future developments, we believe we have positioned ourselves to emerge from the pandemic as a stronger and more agile company.

In 2021, we continued our work in the area of corporate social responsibility, including enhancements to our sustainability practices, community and philanthropical efforts, diversity and inclusion initiatives and reporting. More information can be found in our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 Annual Report") and the Environmental, Social and Governance ("ESG") section of our website, including our latest ESG Report.

It is our pleasure to invite you to attend the 2022 Annual Meeting of Shareholders of Avis Budget Group, Inc., which will be held virtually on May 25, 2022, at 9:00 a.m. Eastern Time. As part of our COVID-19 precautions, and to prioritize the health and well-being of our shareholders, employees and community, this year's Annual Meeting will be held exclusively online.

This booklet includes the Notice of Annual Meeting and the Proxy Statement. The Proxy Statement describes the business to be conducted at the Annual Meeting and provides other information concerning our Company of which you should be aware when you vote your shares.

On behalf of the Board of Directors and the employees of Avis Budget Group, Inc., we would like to thank you for being a shareholder and express our appreciation for your ongoing support of our Company.

Sincerely,

Bernardo Hees
Executive Chairman of the Board

Joseph A. Ferraro
President and Chief Executive Officer

# Notice of 2022 Annual Meeting of Shareholders

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders of Avis Budget Group, Inc. (the "Company") will be held online on May 25, 2022, at 9:00 a.m. Eastern Time, to consider and vote upon the following matters:

1.  To elect as directors the six nominees named in the accompanying proxy statement for a one-year term expiring in 2023 and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal.

2.  To ratify the appointment of Deloitte & Touche LLP as the independent registered public accounting firm for fiscal year 2022.

3.  To provide advisory approval of the compensation of our named executive officers.

4.  To transact such other business as may properly come before the Meeting or any adjournment or postponement thereof.

This year's Meeting will be held virtually due to the ongoing public health concerns resulting from the COVID-19 pandemic and to support the health and well-being of our employees, shareholders and community. You will be not be able to attend the Meeting physically in person. We have designed the format of the Meeting to provide shareholders the same ability to participate that they would have at an in-person meeting. Shareholders will be able to listen to the webcast live, submit questions and vote during the online Meeting. You can attend the Meeting by accessing *www.meetnow.global/MU7SMJM* and entering the 15-digit control number found on the proxy card or notice. No password is required.

The Board of Directors has fixed the close of business on April 1, 2022 as the record date for the Meeting. Only shareholders of record at that time are entitled to notice of, and to vote at, the Meeting and any adjournment or postponement thereof. A list of shareholders entitled to vote at the Meeting will be available for examination by any shareholder, for any purpose germane to the Meeting, for at least ten days prior to the Meeting by e-mailing *chairman@avisbudget.com*. Additionally, this list will be available under the "Documents" tab on your screen for the duration of the Meeting after entering the 15-digit control number found on the proxy card or notice.

> **Important Notice Regarding the Availability of Proxy Materials**
> **for the Shareholder Meeting to Be Held on May 25, 2022**
> **The Company's Proxy Statement on Schedule 14A,**
> **form of proxy card and 2021 Annual Report**
> **are available at**
> **www.edocumentview.com/CAR**

By Order of the Board of Directors

*Jean M. Sera*

Jean M. Sera
Senior Vice President, General Counsel,
Chief Compliance Officer and Corporate Secretary

Dated: April 8, 2022

# Proposals to Be Voted on at Meeting
# Proposal No. 1

## Election of Directors

The Board of Directors (the "Board") has nominated Bernardo Hees, Jagdeep Pahwa, Anu Hariharan, Lynn Krominga, Glenn Lurie and Karthik Sarma to be elected at the 2022 Annual Meeting of Shareholders (the "Meeting") to serve as directors for a one-year term ending at the 2023 annual meeting of shareholders and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. The nominations of Mr. Pahwa and Mr. Sarma are in accordance with the terms of the Third Amended and Restated Cooperation Agreement (as amended through the date hereof, the "Cooperation Agreement"), dated as of February 23, 2020, between the Company and SRS and certain of its affiliates.

## Biographical Information for Nominees

The following material contains information concerning the Board's nominees, including their period of service as a director, their recent employment, other directorships, including those held during the past five years with a public company or registered investment company, and age as of the Meeting.

### *BERNARDO HEES*

**Executive Chairman of the Board**

**Mr. Hees**, age 52, has been a director since February 2020 and Executive Chairman since July 2020. Previously, Mr. Hees served as Chief Executive Officer of The Kraft Heinz Company from 2015 to June 2019. He served as Chief Executive Officer of H.J. Heinz Holding Corporation from 2013 until its merger with Kraft Foods Group in 2015. From 2010 to 2013, Mr. Hees served as Chief Executive Officer of Burger King Worldwide Holdings, Inc., a global fast food restaurant chain, and Burger King Worldwide, Inc. from 2012 to 2013. From 2005 to 2010, he was Chief Executive Officer of América Latina Logística, a Brazilian logistics company. Mr. Hees was also a partner at 3G Capital, a global investment firm, from 2010 to 2019. Mr. Hees is also a director of Bunge Limited, which files reports pursuant to the Exchange Act of 1934, as amended (the "Exchange Act").

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience
- Public company board experience
- International experience
- Diverse personal background

### *JAGDEEP PAHWA*

**Vice Chairman of the Board**

**Mr. Pahwa**, age 48, has been a director since April 2018 and Vice Chairman since February 2020. Mr. Pahwa has been the President of SRS Investment Management, LLC since 2017 and has led SRS's private equity business since 2006. Previously, Mr. Pahwa worked at McKinsey & Company in the U.S. and India, where he led client engagements in the telecom, technology and real estate sectors. Prior thereto, Mr. Pahwa worked in the Mergers & Acquisitions group of Lehman Brothers in New York. Mr. Pahwa received a Bachelor of Technology from the Indian Institute of Technology, Delhi, and an M.S. from Princeton University and an M.B.A. from Harvard Business School.

**Specific Qualifications, Attributes, Skills and Experience:**

- Financial and investment expertise
- Advisory experience in business strategy and growth
- Broad international experience and understanding of the technology sector
- Diverse personal background

## ANU HARIHARAN

**Board Committees: Audit**

**Ms. Hariharan**, age 41, has been a director since January 2022. Ms. Hariharan is a Partner at Y Combinator's Continuity Fund focused on growth stage investments, where she has led investments in Convoy, Brex, Gusto and Faire, among many others. Prior to joining Y Combinator in 2016, Ms. Hariharan was a Partner with the investment team at Andreessen Horowitz, from 2014 to 2016. Previously, Ms. Hariharan was a Principal with The Boston Consulting Group, from 2010 to 2014, and, prior to that, a senior software engineer with Qualcomm. Ms. Hariharan is a director of Altimeter Growth Corp. 2, a special purpose acquisition company listed on the New York Stock Exchange. Ms. Hariharan holds a B.E. from the National Institute of Technology Karnataka, an M.S. from Virginia Tech and an M.B.A. from The Wharton School at the University of Pennsylvania.

**Specific Qualifications, Attributes, Skills and Experience:**

- Advisory experience in business strategy and growth

- Investment and technology experience

- Diverse personal background

## LYNN KROMINGA

**Board Committees: Audit, Compensation, Corporate Governance (Chair)**

**Ms. Krominga**, age 71, has been a director since October 2006. Ms. Krominga is an attorney, management consultant and former senior executive of global businesses. Ms. Krominga has served on the boards of directors of public, private and not-for-profit companies, as well as advisory boards of start-up and early stage technology and personal care businesses in the U.S. and abroad. Since 1999, she has been a consultant to private equity, venture capital, hedge funds and angel investors, in which capacity she served in a number of operating and board roles, including Chief Executive Officer of Fashion Wire Daily, Inc.; director and audit committee member of AHAVA Dead Sea Laboratories, Ltd. (a global cosmeceuticals business); advisor to London-based Apax Partners for acquisitions in Israel and the United States; director of StructuredWeb, Inc; board of advisors of Makeover Studios, Inc.; General Manager-North America of Electric Fuel, Inc. (an early stage fuel cell-based technology business); and Internet Consultant for private websites in the U.S. and Europe. From 2007 until January 2013, Ms. Krominga served as a director of publicly traded Sunrise Senior Living, Inc., one of the world's largest assisted living companies, with operations in the U.S., Canada, the U.K. and Germany. From March through November 2008, she served as Chairman of the Board of Sunrise Senior Living and as Lead Director thereafter until January 2013 (when the company was sold). She also served as Chairman of the Compensation Committee (2008-2011), and as a member of the Audit, Compensation and Governance Committees from 2007-2013. Ms. Krominga is the former President of the Revlon and Coleman Worldwide Licensing Divisions, and previously served as General Counsel and International Counsel for Revlon's global operations. Prior to joining Revlon, she was Senior Counsel at American Express Company and an associate at Cleary, Gottlieb, Steen & Hamilton.

**Specific Qualifications, Attributes, Skills and Experience:**

- Significant legal, governance, licensing, technology and regulatory expertise

- International experience

- Executive management experience and financial expertise

- Diverse personal background

*GLENN LURIE*

**Board Committees: Audit (Chair), Compensation**

**Mr. Lurie**, age 56, has been a director since May 2018. Mr. Lurie was the President and Chief Executive Officer of Synchronoss Technologies, Inc. from 2017 to 2020. Prior to joining Synchronoss, Mr. Lurie was employed by AT&T for 27+ years and was President and Chief Executive Officer of AT&T Mobility and Consumer Operations when he retired in September of 2017. Mr. Lurie helped usher in the smartphone era by leading negotiations for AT&T with Apple for the first iPhone and then for the first iPad. He built three groundbreaking businesses at AT&T: IoT (Internet of Things) business – bringing wireless connectivity to tablets, cars, connected cities and consumer electronics; Digital Life – AT&T's home automation and security business; and the launch of Aio Wireless – now Cricket Wireless, the company's industry-leading prepaid flanker brand. At AT&T, Mr. Lurie served in a variety of leadership roles, including as President and Chief Executive Officer of Mobility and Consumer Operations from 2016 to 2017, President and Chief Executive Officer of AT&T Mobility from 2014 to 2016, President of Emerging Enterprises and Partnerships Organization from 2011 to 2014 and President of Emerging Devices Organization (now IoT Organization) from 2008 to 2011. Mr. Lurie previously served as a director of Synchronoss, which files reports pursuant to the Exchange Act. Mr. Lurie also serves as a director of Teal Communications, a global eSIM and IoT connectivity platform provider; Blue Link Wireless, an AT&T Authorized Dealer and service provider; and Pivotal Commware, Inc., which develops 5G network platforms, services and applications.

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience
- Technology, operations, strategy, and business development experience
- Public company board experience

*KARTHIK SARMA*

**Board Committees: Compensation (Chair), Corporate Governance**

**Mr. Sarma**, age 47, has been a director since May 2020. Mr. Sarma is the Managing Partner at SRS, which he founded in 2006. Prior to founding SRS, Mr. Sarma was a Managing Director at Tiger Global Management, LLC, which he joined within a few months of its launch in 2001. Prior to joining Tiger Global, Mr. Sarma worked as a consultant at McKinsey & Company in its New York office. Mr. Sarma received a Bachelor of Technology from the Indian Institute of Technology, Chennai and an M.S. from Princeton University.

**Specific Qualifications, Attributes, Skills and Experience:**

- Experience in the technology sector
- Financial and investment expertise
- Experience providing strategic and operational advice
- Diverse personal background

# Director Nomination Process

For additional information regarding the director nomination process, please see the section titled "Director Nomination Procedures" on page 13 of this Proxy Statement.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR ALL" OF THE NOMINEES.**

# Executive Compensation

## Compensation Discussion and Analysis

*We refer you to our 2021 Annual Report for additional information regarding our financial information discussed below. When we refer to "the Committee" in this "Executive Compensation" section, we are referring to the Compensation Committee.*

### Executive Summary

#### Company Performance

In 2021, the impact to our business from the COVID-19 global pandemic subsided and our revenue increased significantly totaling approximately $9.3 billion, a 72% increase compared to 2020. For 2021, net income was $1.3 billion and Adjusted EBITDA was $2.4 billion, which was the highest annual Adjusted EBITDA in our Company's history. In 2021, we also returned capital to our shareholders through the repurchase of $1.4 billion of our Common Stock, resulting in the repurchase of 14.3 million shares. Our closing stock price on December 31, 2021 of $207.37 reflected a significant increase compared to our closing stock price on December 31, 2020 of $37.30.



#### Strategy

As travel demand continues to normalize, we expect our strategy for 2022 to drive a lower cost structure over the long term while maximizing revenue opportunities through continued focus on cost, revenue growth and investment.

- By designing new processes and implementing new systems, we seek to provide enhanced visibility and accountability for fixed and variable costs in our operations.

- By focusing on fleet acquisition, the customer experience, contract signings with corporate accounts and partnerships, we seek to increase our revenue.

- Investments in 2022 are expected to allow us to maximize our infrastructure to further revenue growth and cost efficiencies, and are expected to include investments in our systems, operations, customer experience and electric vehicle capabilities.

#### Compensation Practices

We believe that our compensation programs reflect sound practices, such as:

- executive stock ownership guidelines with significant share ownership requirements;

- an executive compensation recoupment (or "clawback") policy;

- a policy prohibiting executives from entering into speculative (or hedging) transactions in our securities;

- no excise tax gross-up or single-trigger change-in-control provisions; and

**Perquisites and Benefits**

We have historically sought to provide perquisites to our executives that are consistent with those provided by the general market and Peer Group companies. Our perquisites currently consist primarily of financial planning services, auto use or allowance, discounted auto insurance, auto leasing through the employee lease program and limited personal use of Company-leased aircraft services. The group excess liability umbrella insurance perquisite that was previously provided was discontinued in late 2021. The Company does not provide tax reimbursements or gross-ups on perquisites for any of our NEOs other than relocation and expatriate benefits in accordance with the Company's standard policies.

The financial planning and auto use or allowance perquisites referred to above are not expected to be offered to any executive officer who joins the Company after December 31, 2021.

Employees, including our NEOs, may also receive tickets for professional sporting events, which are part of the Company's season ticket subscription, and do not result in an associated incremental cost to our Company. Our ticket allocation policy is generally seniority-based, with a valid business purpose superseding any personal use.

**Anti-Hedging Policy**

The Company's insider trading policy prohibits directors, executive officers and other employees required to pre-clear trades in Company securities, along with members of their families and others living in their households and investment partnerships and other entities over which they have or share voting or investment control (collectively, the "Covered Persons") from:

- engaging in hedging and monetization transactions that permit any Covered Person to continue to own the Company's equity securities without the full risks and rewards of ownership, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds;

- holding the Company's equity securities in a margin account or otherwise pledging the Company's equity securities as collateral for a loan;

- participating in transactions involving options in relation to the Company's securities, such as puts, calls or other derivative securities on an exchange or in any other organized market; and

- engaging in short sales of the Company's equity securities.

For purposes of the above, the Company's equity securities include securities acquired by a Covered Person as part of his or her compensation or otherwise. The Cooperation Agreement exempts Mr. Sarma from this policy. In his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund, Mr. Sarma is not prohibited from pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, the securities of the Company, which transactions are otherwise in compliance with applicable law and the Cooperation Agreement.

**Recoupment (Clawback) Policy**

Our Board of Directors has adopted a policy that provides that if the Board learns of any intentional misconduct by an "executive officer" (as defined under Section 16 of the Exchange Act) that resulted in an increase to incentive income awarded to that officer, the Board will, to the full extent permitted by applicable law, in all appropriate cases, require reimbursement of the increased portion of incentive income awarded to that officer. We intend to amend our clawback policy, if necessary, to comply with any rules adopted by the SEC.

## Compensation Committee Report

The Avis Budget Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on this review and discussion, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this Proxy Statement.

**THE COMPENSATION COMMITTEE**
*Karthik Sarma (Chair)*
*Lynn Krominga*
*Glenn Lurie*

# EXHIBIT 6

TABLE OF CONTENTS

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No. )

Filed by the Registrant    ☒

Filed by a Party other than the Registrant    ☐

Check the appropriate box:

☐    Preliminary Proxy Statement

☐    **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒    Definitive Proxy Statement

☐    Definitive Additional Materials

☐    Soliciting Material Pursuant to §240.14a-12

# Avis Budget Group, Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒    No fee required.

☐    Fee paid previously with preliminary materials.

☐    Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

TABLE OF CONTENTS

# avis budget group

April 5, 2023

Dear Fellow Shareholder:

This past year we saw strong demand for vehicle rentals driven by global travel demand which, coupled with our stringent cost discipline and nimble fleet management, allowed us to achieve our best results in our 75-year history for the second year in a row.

In 2022, we continued to enhance our sustainability practices, community and philanthropical efforts, diversity and inclusion initiatives and reporting. More information can be found in our Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 Annual Report") and the Environmental, Social and Governance ("ESG") section of our website, including our latest ESG Report.

It is our pleasure to invite you to attend the 2023 Annual Meeting of Shareholders of Avis Budget Group, Inc., which will be held virtually on May 24, 2023, at 9:00 a.m. Eastern Time.

This booklet includes the Notice of Annual Meeting and the Proxy Statement. The Proxy Statement describes the business to be conducted at the Annual Meeting and provides other information concerning our Company of which you should be aware when you vote your shares.

On behalf of the Board of Directors and the employees of Avis Budget Group, Inc., we would like to thank you for being a shareholder and express our appreciation for your ongoing support of our Company.

Sincerely,

Bernardo Hees
Executive Chairman of the Board

Joseph A. Ferraro
President and Chief Executive Officer

TABLE OF CONTENTS

# Notice of 2023 Annual Meeting of Shareholders

NOTICE IS HEREBY GIVEN that the Annual Meeting of Shareholders (the "Meeting") of Avis Budget Group, Inc. (the "Company") will be held online on May 24, 2023, at 9:00 a.m. Eastern Time, to consider and vote upon the following matters:

1. To elect as directors the six nominees named in the accompanying proxy statement for a one-year term expiring in 2024 and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal.

2. To ratify the appointment of Deloitte & Touche LLP as the independent registered public accounting firm for fiscal year 2023.

3. To provide advisory approval of the compensation of our named executive officers.

4. To vote on the frequency of advisory approval of the compensation of our named executive officers.

5. To transact such other business as may properly come before the Meeting or any adjournment or postponement thereof.

This year's Meeting will be held virtually. You will be not be able to attend the Meeting physically in person. We have designed the format of the Meeting to provide shareholders the same ability to participate that they would have at an in-person meeting. Shareholders will be able to listen to the webcast live, submit questions and vote during the online Meeting. You can attend the Meeting by accessing *www.meetnow.global/M4WUPKW* and entering the 15-digit control number found on the proxy card or notice. No password is required. In the event of a technical malfunction or situation that makes it advisable to adjourn the Meeting, the chair will convene the meeting at 9:00 a.m. Eastern Time on May 24, 2023 at the Company's principal business address solely for the purpose of adjourning the meeting to reconvene at a date, time and location announced by the meeting chair. If this happens, more information will be provided at *www.avisbudgetgroup.com*.

The Board of Directors has fixed the close of business on March 31, 2023 as the record date for the Meeting. Only shareholders of record at that time are entitled to notice of, and to vote at, the Meeting and any adjournment or postponement thereof. A list of shareholders entitled to vote at the Meeting will be available for examination by any shareholder, for any purpose germane to the Meeting, for at least ten days prior to the Meeting during ordinary business hours at the Company's principal executive offices, by e-mailing *chairman@avisbudget.com*.

---

**Important Notice Regarding the Availability of Proxy Materials
for the Shareholder Meeting to Be Held on May 24, 2023
The Company's Proxy Statement on Schedule 14A,
form of proxy card and 2022 Annual Report
are available at
www.edocumentview.com/CAR**

---

By Order of the Board of Directors

Jean M. Sera
Senior Vice President, General Counsel,
Chief Compliance Officer and Corporate Secretary

Dated: April 5, 2023

TABLE OF CONTENTS

# Proposals to Be Voted on at Meeting
# Proposal No. 1

## Election of Directors

The Board of Directors (the "Board") has nominated Bernardo Hees, Jagdeep Pahwa, Anu Hariharan, Lynn Krominga, Glenn Lurie and Karthik Sarma to be elected at the 2023 Annual Meeting of Shareholders (the "Meeting") to serve as directors for a one-year term ending at the 2024 annual meeting of shareholders and until his or her successor is duly elected and qualified or until his or her earlier resignation or removal. The nominations of Mr. Pahwa and Mr. Sarma are in accordance with the terms of the Fourth Amended and Restated Cooperation Agreement (as amended through the date hereof, the "Cooperation Agreement"), dated as of December 23, 2022, between the Company and SRS and certain of its affiliates.

## Biographical Information for Nominees

The following material contains information concerning the Board's nominees, including their period of service as a director, their recent employment, other directorships, including those held during the past five years with a public company or registered investment company, and age as of the Meeting.

### *BERNARDO HEES*

**Executive Chairman of the Board**

**Mr. Hees**, age 53, has been a director since February 2020 and Executive Chairman since July 2020. Previously, Mr. Hees served as Chief Executive Officer of The Kraft Heinz Company from 2015 to June 2019. He served as Chief Executive Officer of H.J. Heinz Holding Corporation from 2013 until its merger with Kraft Foods Group in 2015. From 2010 to 2013, Mr. Hees served as Chief Executive Officer of Burger King Worldwide Holdings, Inc., a global fast food restaurant chain, and Burger King Worldwide, Inc. from 2012 to 2013. From 2005 to 2010, he was Chief Executive Officer of América Latina Logística, a Brazilian logistics company. Mr. Hees was also a partner at 3G Capital, a global investment firm, from 2010 to 2019. Mr. Hees is also a director of Bunge Limited, which files reports pursuant to the Exchange Act of 1934, as amended (the "Exchange Act").

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience
- Public company board experience
- International experience
- Diverse personal background

### *JAGDEEP PAHWA*

**Vice Chairman of the Board**

**Mr. Pahwa**, age 49, has been a director since April 2018 and Vice Chairman since February 2020. Mr. Pahwa has been the President of SRS Investment Management, LLC since 2017 and has led SRS's private equity business since 2006. Previously, Mr. Pahwa worked at McKinsey & Company in the U.S. and India, where he led client engagements in the telecom, technology and real estate sectors. Prior thereto, Mr. Pahwa worked in the Mergers & Acquisitions group of Lehman Brothers in New York. Mr. Pahwa received a Bachelor of Technology from the Indian Institute of Technology, Delhi, and an M.S. from Princeton University and an M.B.A. from Harvard Business School.

**Specific Qualifications, Attributes, Skills and Experience:**

- Financial and investment expertise
- Advisory experience in business strategy and growth
- Broad international experience and understanding of the technology sector
- Diverse personal background

7

TABLE OF CONTENTS

## *ANU HARIHARAN*

**Board Committees: Audit**

**Ms. Hariharan**, age 42, has been a director since January 2022. Until recently, Ms. Hariharan was Managing Director at Y Combinator's Continuity Fund focused on growth stage investments, where she led investments in Convoy, Brex, Gusto and Faire, among many others. Prior to joining Y Combinator in 2016, Ms. Hariharan was a Partner with the investment team at Andreessen Horowitz, from 2014 to 2016. Previously, Ms. Hariharan was a Principal with The Boston Consulting Group, from 2010 to 2014, and, prior to that, a senior software engineer with Qualcomm. Ms. Hariharan holds a B.E. from the National Institute of Technology Karnataka, an M.S. from Virginia Tech and an M.B.A. from The Wharton School at the University of Pennsylvania.

**Specific Qualifications, Attributes, Skills and Experience:**

•   Advisory experience in business strategy and growth

•   Investment and technology experience

•   Diverse personal background

## *LYNN KROMINGA*

**Board Committees: Audit, Compensation, Corporate Governance (Chair)**

**Ms. Krominga**, age 72, has been a director since October 2006. Ms. Krominga is an attorney, management consultant and former senior executive of global businesses. Ms. Krominga has served on the boards of directors of public, private and not-for-profit companies, as well as advisory boards of start-up and early stage technology and personal care businesses in the U.S. and abroad. Since 1999, she has been a consultant to private equity, venture capital, hedge funds and angel investors, in which capacity she served in a number of operating and board roles, including Chief Executive Officer of Fashion Wire Daily, Inc.; director and audit committee member of AHAVA Dead Sea Laboratories, Ltd. (a global cosmeceuticals business); advisor to London-based Apax Partners for acquisitions in Israel and the United States; director of StructuredWeb, Inc; board of advisors of Makeover Studios, Inc.; General Manager-North America of Electric Fuel, Inc. (an early stage fuel cell-based technology business); and Internet Consultant for private websites in the U.S. and Europe. From 2007 until January 2013, Ms. Krominga served as a director of publicly traded Sunrise Senior Living, Inc., one of the world's largest assisted living companies, with operations in the U.S., Canada, the U.K. and Germany. From March through November 2008, she served as Chairman of the Board of Sunrise Senior Living and as Lead Director thereafter until January 2013 (when the company was sold). She also served as Chairman of the Compensation Committee (2008-2011), and as a member of the Audit, Compensation and Governance Committees from 2007-2013. Ms. Krominga is the former President of the Revlon and Coleman Worldwide Licensing Divisions, and previously served as General Counsel and International Counsel for Revlon's global operations. Prior to joining Revlon, she was Senior Counsel at American Express Company and an associate at Cleary, Gottlieb, Steen & Hamilton.

**Specific Qualifications, Attributes, Skills and Experience:**

•   Significant legal, governance, licensing, technology and regulatory expertise

•   International experience

•   Executive management experience and financial expertise

•   Diverse personal background

•   Public company board experience

TABLE OF CONTENTS

### GLENN LURIE

**Board Committees: Audit (Chair), Compensation**

**Mr. Lurie**, age 57, has been a director since May 2018. Since August 2021, Mr. Lurie has served as Venture Partner at Stormbreaker Ventures, an early-stage fund focused on capital-efficient startups. Mr. Lurie was the President and Chief Executive Officer of Synchronoss Technologies, Inc. from 2017 to 2020. Prior to joining Synchronoss, Mr. Lurie was employed by AT&T for 27+ years and was President and Chief Executive Officer of AT&T Mobility and Consumer Operations when he retired in September of 2017. Mr. Lurie helped usher in the smartphone era by leading negotiations for AT&T with Apple for the first iPhone and then for the first iPad. He built three groundbreaking businesses at AT&T: IoT (Internet of Things) business – bringing wireless connectivity to tablets, cars, connected cities and consumer electronics; Digital Life – AT&T's home automation and security business; and the launch of Aio Wireless – now Cricket Wireless, the company's industry-leading prepaid flanker brand. At AT&T, Mr. Lurie served in a variety of leadership roles, including as President and Chief Executive Officer of Mobility and Consumer Operations from 2016 to 2017, President and Chief Executive Officer of AT&T Mobility from 2014 to 2016, President of Emerging Enterprises and Partnerships Organization from 2011 to 2014 and President of Emerging Devices Organization (now IoT Organization) from 2008 to 2011. Mr. Lurie previously served as a director of Synchronoss, which files reports pursuant to the Exchange Act. Mr. Lurie also serves as a director of Teal Communications, a global eSIM and IoT connectivity platform provider; Blue Link Wireless, an AT&T Authorized Dealer and service provider; and Pivotal Commware, Inc., which develops 5G network platforms, services and applications.

**Specific Qualifications, Attributes, Skills and Experience:**

- Chief Executive Officer experience

- Technology, operations, strategy, and business development experience

- Public company board experience

### KARTHIK SARMA

**Board Committees: Compensation (Chair), Corporate Governance**

**Mr. Sarma**, age 48, has been a director since May 2020. Mr. Sarma is the Managing Partner at SRS, which he founded in 2006. Prior to founding SRS, Mr. Sarma was a Managing Director at Tiger Global Management, LLC, which he joined within a few months of its launch in 2001. Prior to joining Tiger Global, Mr. Sarma worked as a consultant at McKinsey & Company in its New York office. Mr. Sarma received a Bachelor of Technology from the Indian Institute of Technology, Chennai and an M.S. from Princeton University.

**Specific Qualifications, Attributes, Skills and Experience:**

- Experience in the technology sector

- Financial and investment expertise

- Experience providing strategic and operational advice

- Diverse personal background

## Director Nomination Process

For additional information regarding the director nomination process, please see the section titled "Director Nomination Procedures" on page 14 of this Proxy Statement.

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR ALL" OF THE NOMINEES.**

TABLE OF CONTENTS

# Executive Compensation

## Compensation Discussion and Analysis

*We refer you to our 2022 Annual Report for additional information regarding our financial information discussed below. When we refer to "the Committee" in this "Executive Compensation" section, we are referring to the Compensation Committee.*

### Executive Summary

The Committee uses our executive compensation programs to motivate and retain our executive talent and align their interests with shareholders. As described below, we outperformed our 2022 Annual Incentive Plan metrics and goals and 2020-2022 PSU performance metric. As a result, our 2022 Annual Incentive Plan paid out at 140% of target and our 2020-2022 PSUs paid out at the maximum level of 200%.

### Company Performance

We saw strong demand for vehicle rentals for full year 2022, and our revenues increased totaling approximately $12.0 billion, a 29% increase compared to 2021, despite the impact of the Omicron variant of COVID-19 in late 2021 and early 2022 and the uncertainty it caused. For 2022, net income was approximately $2.8 billion and Adjusted EBITDA (as defined below) was approximately $4.1 billion, which was the highest annual Adjusted EBITDA in our Company's history. In 2022, we also returned capital to our shareholders through the repurchase of $3.3 billion of our Common Stock, resulting in the repurchase of 16.7 million shares. Our closing stock price on December 31, 2022 of $163.93 reflected a reduction compared to our closing stock price on December 31, 2021; however, our three-year cumulative total shareholder return was 408%.



### Strategy

For 2023, we expect our strategy to continue to primarily focus on costs and customer experience to further strengthen our company, enable resilience and deliver stakeholder value. To execute our strategy, we expect to leverage marketing and technology, increase the electric vehicles in our fleet, and invest in related infrastructure.

### Compensation Practices

We believe that our compensation programs reflect sound practices, such as:

- executive stock ownership guidelines with significant share ownership requirements;
- an executive compensation recoupment (or "clawback") policy;
- a policy prohibiting executives from entering into speculative (or hedging) transactions in our securities;
- no excise tax gross-up or single-trigger change-in-control provisions; and

22

TABLE OF CONTENTS

**Anti-Hedging Policy**

The Company's insider trading policy prohibits directors, executive officers and other employees required to pre-clear trades in Company securities, along with members of their families and others living in their households and investment partnerships and other entities over which they have or share voting or investment control (collectively, the "Covered Persons") from:

- engaging in hedging and monetization transactions that permit any Covered Person to continue to own the Company's equity securities without the full risks and rewards of ownership, including through the use of financial instruments such as prepaid variable forwards, equity swaps, collars and exchange funds;

- holding the Company's equity securities in a margin account or otherwise pledging the Company's equity securities as collateral for a loan;

- participating in transactions involving options in relation to the Company's securities, such as puts, calls or other derivative securities on an exchange or in any other organized market; and

- engaging in short sales of the Company's equity securities.

For purposes of the above, the Company's equity securities include securities acquired by a Covered Person as part of his or her compensation or otherwise. The Cooperation Agreement exempts Mr. Sarma from this policy. In his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund, Mr. Sarma is not prohibited from pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, the securities of the Company, which transactions are otherwise in compliance with applicable law and the Cooperation Agreement.

**Recoupment (Clawback) Policy**

Our Board of Directors has adopted a policy that provides that if the Board learns of any intentional misconduct by an "executive officer" (as defined under Section 16 of the Exchange Act) that resulted in an increase to incentive income awarded to that officer, the Board will, to the full extent permitted by applicable law, in all appropriate cases, require reimbursement of the increased portion of incentive income awarded to that officer. We intend to amend our clawback policy, if necessary, to comply with any rules adopted by the SEC.

## Compensation Committee Report

The Avis Budget Compensation Committee has reviewed and discussed the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management and, based on this review and discussion, the Compensation Committee recommended to the Board that the Compensation Discussion and Analysis be included in this Proxy Statement.

THE COMPENSATION COMMITTEE

Karthik Sarma (Chair)
Lynn Krominga
Glenn Lurie

32

# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

---

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**
**COMMISSION FILE NO. 001-10308**

---

# AVIS BUDGET GROUP, INC.
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **06-0918165** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **6 Sylvan Way** | |
| **Parsippany, NJ** | **07054** |
| (Address of principal executive offices) | (Zip Code) |

**(973) 496-4700**
(Registrant's telephone number, including area code)

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| TITLE OF EACH CLASS | TRADING SYMBOL(S) | NAME OF EACH EXCHANGE ON WHICH REGISTERED |
|---|---|---|
| Common Stock, Par Value $.01 | CAR | The Nasdaq Global Select Market |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:** None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes  ☒  No  ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes  ☐  No  ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  ☒  No  ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes  ☒  No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ |
| Smaller reporting company | ☐ | Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes  ☐  No  ☑

As of June 30, 2022, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $4,269,199,382 based on the closing price of its common stock on the Nasdaq Global Select Market.

As of February 10, 2023, the number of shares outstanding of the registrant's common stock was 39,470,532.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement to be mailed to stockholders in connection with the registrant's 2023 annual meeting of stockholders (the "Annual Proxy Statement") are incorporated by reference into Part III hereof.

---

Table of Contents

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 2.1 | Separation and Distribution Agreement by and among Cendant Corporation*, Realogy Corporation, Wyndham Worldwide Corporation and Travelport Inc., dated as of July 27, 2006 (Incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, dated August 1, 2006). |
| 2.2 | Letter Agreement dated August 17, 2006 related to the Separation and Distribution Agreement by and among Realogy Corporation, Cendant Corporation*, Wyndham Worldwide Corporation and Travelport Inc. dated as of July 27, 2006 (Incorporated by reference to Exhibit 2.2 to the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2007, dated August 8, 2007). |
| 3.1 | Amended and Restated Certificate of Incorporation of Avis Budget Group, Inc. (Incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, dated September 5, 2006). |
| 3.2 | Amended and Restated Bylaws of Avis Budget Group, Inc., dated August 10, 2020 (Incorporated by reference to Exhibit 3.2 to the Company's Current Report on Form 8-K, dated August 13, 2020). |
| 4.1 | Indenture dated as of September 26, 2016 among Avis Budget Finance plc, as Issuer, the Guarantors from time to time parties hereto and Deutsche Bank Trust Company Americas as Trustee, Deutsche Bank AG, London Branch as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, governing the 4.125% Senior Notes due 2024 (Incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2016, dated November 3, 2016). |
| 4.2 | Indenture dated as of March 8, 2017 among Avis Budget Finance, plc, as Issuer, the Guarantors from time to time parties hereto, Deutsche Bank Trust Company Americas, as Trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, governing the 4.50% Senior Notes due 2025 (Incorporated by reference to Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, dated May 4, 2017). |
| 4.3 | Indenture dated as of October 4, 2018 among Avis Budget Finance, plc, as Issuer, the Guarantors from time to time parties thereto, Deutsche Bank Trust Company Americas, as Trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, governing the 4.75% Senior Notes due 2026 (Incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2018 dated November 6, 2018). |
| 4.4 | Indenture dated as of July 3, 2019 among Avis Budget Car Rental, LLC and Avis Budget Finance, Inc., as Issuers, the Guarantors from time to time parties thereto and Deutsche Bank Trust Company Americas, as Trustee, governing the 5.75% Senior Notes due 2027 (Incorporated by reference to Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019, dated August 6, 2019). |
| 4.5 | First Supplemental Indenture, dated as of August 6, 2020, to the indenture dated as of July 3, 2019 by and among Avis Budget Car Rental, LLC and Avis Budget Finance, Inc., as issuers, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee (Incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, dated August 7, 2020). |
| 4.6 | Indenture, dated as of March 1, 2021, by and among Avis Budget Car Rental, LLC and Avis Budget Finance, Inc., as issuers, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee, governing the 5.375% Senior Notes due 2029 (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, dated March 1, 2021). |
| 4.7 | Indenture, dated as of March 23, 2021, by and among Avis Budget Car Rental, LLC and Avis Budget Finance, Inc., as issuers, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee, governing the 4.75% Senior Notes due 2028 (Incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, dated March 23, 2021). |
| 4.8 | Description of the Company's Securities Registered Pursuant to Section 12 of the Securities Exchange Act of 1934 (Incorporated by reference to Exhibit 4.8 to the Company's Annual Report on Form 10-K for the year ended December 31, 2021, dated February 17, 2022). |
| 10.1 | Agreement between Avis Budget Group, Inc. and Joseph Ferraro (Incorporated by reference to Exhibit 10.5 to the Company's Annual Report on Form 10-K for the year ended December 31, 2015, dated February 24, 2016).† |
| 10.2 | Service Agreement between Patrick Rankin and Avis Budget Services Limited, dated February 22, 2019 (Incorporated by reference to Exhibit 10.8 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, dated February 20, 2020). † |
| 10.3 | Agreement between Patrick Rankin and Avis Budget Services Limited, dated August 15, 2019 (Incorporated by reference to Exhibit 10.9 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, dated February 20, 2020). † |
| 10.4 | Agreement between Avis Budget Group, Inc. and Edward Linnen, dated April 20, 2015 (Incorporated by reference to Exhibit 10.10 to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, dated February 20, 2020). † |
| 10.5 | Offer Letter, dated August 12, 2020, between Brian Choi and Avis Budget Group, Inc. (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated August 13, 2020). † |
| 10.6 | Offer Letter, dated February 4, 2021, between Veresh Sita and Avis Budget Group, Inc. (incorporated by reference to Exhibit 10.6 to the Company's Annual Report on Form 10-K, dated February 17, 2022). † |
| 10.7 | Separation Agreement, dated April 19, 2022, between Veresh Sita and Avis Budget Group, Inc. (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated April 22, 2022). |

| 10.8 | Avis Budget Group, Inc. Executive Severance Pay Plan for Grade A and B Employees and Summary Plan Description (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated December 14, 2020). † |
|---|---|
| 10.9 | Fourth Amended and Restated Cooperation Agreement, dated as of December 23, 2022, by and among Avis Budget Group, Inc., SRS Investment Management, LLC and certain of its affiliates (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated December 27, 2022). |
| 10.10 | Avis Budget Group, Inc. Amended and Restated Equity and Incentive Plan (Incorporated by reference to Annex A to the Company's Definitive Proxy Statement on Schedule 14A, dated March 26, 2019).† |
| 10.11 | Amendment to the Avis Budget Group, Inc. Amended and Restated Equity and Incentive Plan dated October 26, 2021 (Incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2021, dated November 2, 2021).† |
| 10.12 | Form of Award Agreement - Restricted Stock Units (Incorporated by reference to Exhibit 10.12 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018 dated February 21, 2019).† |
| 10.13 | Form of Award Agreement - Performance Based Restricted Stock Units (Incorporated by reference to Exhibit 10.13 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018, dated February 21, 2019).† |
| 10.14 | Form of Non-Employee Director Award Agreement - Restricted Stock Units (Incorporated by reference to Exhibit 10.14 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018, dated February 21, 2019).† |
| 10.15 | Form of Avis Budget Group, Inc. Severance Agreement (Incorporated by reference to Exhibit 10.15 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018, dated February 21, 2019).† |
| 10.16 | Avis Budget Group, Inc. Non-Employee Directors Deferred Compensation Plan, amended and restated as of January 1, 2019 (Incorporated by reference to Exhibit 10.16 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018 dated February 21, 2019).† |
| 10.17 | Amendment No. 1 dated as of December 8, 2022 to the Avis Budget Group, Inc. Non-Employee Directors Deferred Compensation Plan, amended and restated as of January 1, 2019. † |
| 10.18 | Avis Budget Group, Inc. Supplemental Savings Plan, amended and restated as of January 1, 2023. † |
| 10.19 | Avis Budget Group, Inc. Savings Restoration Plan, amended and restated as of November 1, 2008 (Incorporated by reference to Exhibit 10.18 to the Company's Annual Report on Form 10-K for the year ended December 31, 2008, dated February 26, 2009).† |
| 10.20 | Avis Rent A Car System, LLC Pension Plan (Incorporated by reference to Exhibit 10.20 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018, dated February 21, 2019).† |
| 10.21 | Cendant Corporation* Officer Personal Financial Services Policy (Incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, dated January 26, 2005). |
| 10.22 | Tax Sharing Agreement among Cendant Corporation*, Realogy Corporation, Wyndham Worldwide Corporation and Travelport Inc., dated as of July 28, 2006 (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated August 1, 2006). |
| 10.23 | Amendment to the Tax Sharing Agreement, dated July 28, 2006, among Avis Budget Group, Inc., Realogy Corporation, Wyndham Worldwide Corporation and Travelport Inc. (Incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008, dated August 7, 2008). |
| 10.24 | Second Amended and Restated Base Indenture, dated as of June 3, 2004, among Cendant Rental Car Funding (AESOP) LLC***, as Issuer, and The Bank of New York, as Trustee (Incorporated by reference to Exhibit 10.7 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004, dated August 2, 2004). |
| 10.25 | Supplemental Indenture No. 1, dated as of December 23, 2005, among Cendant Rental Car Funding (AESOP) LLC***, as Issuer, and The Bank of New York, as Trustee, to the Second Amended and Restated Base Indenture, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated January 20, 2006). |
| 10.26 | Supplemental Indenture No. 2, dated as of May 9, 2007, among Avis Budget Rental Car Funding (AESOP) LLC, as Issuer, and The Bank of New York Trust Company, N.A. (as successor in interest to The Bank of New York), as Trustee, to the Second Amended and Restated Base Indenture, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.6 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, dated August 8, 2007). |
| 10.27 | Supplemental Indenture No. 3, dated as of August 16, 2013, among Avis Budget Rental Car Funding (AESOP) LLC, as Issuer, and The Bank of New York Trust Company, N.A. (as successor in interest to The Bank of New York), as Trustee, to the Second Amended and Restated Base Indenture, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.35(c) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.28 | Second Amended and Restated Loan Agreement, dated as of June 3, 2004, among AESOP Leasing L.P., as Borrower, Quartx Fleet Management, Inc., as a Permitted Nominee, PV Holding Corp., as a Permitted Nominee, and Cendant Rental Car Funding (AESOP) LLC***, as Lender (Incorporated by reference to Exhibit 10.8 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004, dated August 2, 2004). |

H-2

Table of Contents

| 10.29 | First Amendment, dated as of December 23, 2005, among AESOP Leasing L.P., as Borrower, Quartx Fleet Management, Inc., as a Permitted Nominee, PV Holding Corp., as a Permitted Nominee, and Cendant Rental Car Funding (AESOP) LLC***, as Lender, to the Second Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated January 20, 2006). |
| 10.30 | Second Amendment, dated as of May 9, 2007, among AESOP Leasing L.P., as Borrower, PV Holding Corp., as a Permitted Nominee, Quartx Fleet Management, Inc., as a Permitted Nominee, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Second Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.8 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, dated August 8, 2007). |
| 10.31 | Third Amendment, dated as of August 16, 2013, among AESOP Leasing L.P., as Borrower, PV Holding Corp., as a Permitted Nominee, Quartx Fleet Management, Inc., as a Permitted Nominee, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Second Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.36(c) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.32 | Fourth Amendment, dated as of July 28, 2022, among AESOP Leasing L.P., as Borrower, PV Holding Corp., as a Permitted Nominee, Quartx Fleet Management, Inc., as a Permitted Nominee, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Second Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022, dated November 1, 2022). |
| 10.33 | Amended and Restated Loan Agreement, dated as of June 3, 2004, among AESOP Leasing L.P., as Borrower, and Cendant Rental Car Funding (AESOP) LLC, as Lender (Incorporated by reference to Exhibit 10.29(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, dated March 1, 2007). |
| 10.34 | First Amendment, dated as of December 23, 2005, among AESOP Leasing L.P., as Borrower, and Cendant Rental Car Funding (AESOP) LLC***, as Lender, to the Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.29(b) to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, dated March 1, 2007). |
| 10.35 | Second Amendment, dated as of the May 9, 2007, among AESOP Leasing L.P., as Borrower, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.7 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, dated August 8, 2007). |
| 10.36 | Third Amendment, dated as of August 16, 2013, among AESOP Leasing L.P., as Borrower, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.37(c) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.37 | Fourth Amendment, dated as of July 28, 2022, between AESOP Leasing L.P., as Borrower, and Avis Budget Rental Car Funding (AESOP) LLC, as Lender, to the Amended and Restated Loan Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.5 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022, dated November 1, 2022). |
| 10.38 | Second Amended and Restated Master Motor Vehicle Operating Lease Agreement, dated as of June 3, 2004, among AESOP Leasing L.P., as Lessor, and Cendant Car Rental Group, Inc.**, as Lessee and as Administrator (Incorporated by reference to Exhibit 10.9 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004, dated August 2, 2004). |
| 10.39 | First Amendment, dated December 23, 2005, among AESOP Leasing L.P., as Lessor, and Cendant Car Rental Group, Inc.**, as Lessee and as Administrator, to the Second Amended and Restated Master Motor Vehicle Operating Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, dated January 20, 2006). |
| 10.40 | Third Amendment, dated as of May 9, 2007, among AESOP Leasing L.P., as Lessor and Avis Budget Car Rental, LLC, as Lessee and as the Administrator, to the Second Amended and Restated Master Motor Vehicle Operating Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.9 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, dated August 8, 2007). |
| 10.41 | Fourth Amendment, dated as of August 16, 2013, among AESOP Leasing L.P., as Lessor and Avis Budget Car Rental, LLC, as Lessee and as the Administrator, to the Second Amended and Restated Master Motor Vehicle Operating Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.38(c) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.42 | Fifth Amendment, dated as of July 28, 2022, among AESOP Leasing L.P., as Lessor and Avis Budget Car Rental, LLC, as Lessee and as the Administrator, to the Second Amended and Restated Master Motor Vehicle Operating Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022, dated November 1, 2022). |
| 10.43 | Amended and Restated Master Motor Vehicle Finance Lease Agreement, dated as of June 3, 2004, among AESOP Leasing L.P., as Lessor, Cendant Car Rental Group, Inc.**, as Lessee, as Administrator and as Finance Lease Guarantor, Avis Rent A Car System, Inc.****, as Lessee, and Budget Rent A Car System, Inc., as Lessee (Incorporated by reference to Exhibit 10.30(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, dated March 1, 2007). |

H-3

Table of Contents

| 10.44 | First Amendment, dated as of December 23, 2005, among AESOP Leasing L.P., as Lessor, Cendant Car Rental Group, Inc.**, as Lessee, as Administrator and as Finance Lease Guarantor, Avis Rent A Car System, Inc.****, as Lessee, and Budget Rent A Car System, Inc., as Lessee, to the Amended and Restated Master Motor Vehicle Finance Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.30(b) to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, dated March 1, 2007). |
|---|---|
| 10.45 | Third Amendment, dated as of May 9, 2007, among AESOP Leasing L.P., as Lessor, Avis Budget Car Rental, LLC, as Lessee, as Administrator and as Finance Lease Guarantor, Avis Rent A Car System, LLC, as Lessee, and Budget Rent A Car System, Inc., as Lessee, to the Amended and Restated Master Motor Vehicle Finance Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.11 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2007, dated August 8, 2007). |
| 10.46 | Fourth Amendment, dated as of August 16, 2013, among AESOP Leasing L.P., as Lessor, Avis Budget Car Rental, LLC, as Lessee, as Administrator and as Finance Lease Guarantor, Avis Rent A Car System, LLC, as Lessee, and Budget Rent A Car System, Inc., as Lessee, to the Amended and Restated Master Motor Vehicle Finance Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.39(c) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.47 | Fifth Amendment, dated as of July 28, 2022, among AESOP Leasing L.P., as Lessor, Avis Budget Car Rental, LLC, as Lessee, as Administrator and as Finance Lease Guarantor, Avis Rent A Car System, LLC, as Lessee, and Budget Rent A Car System, Inc., as Lessee, to the Amended and Restated Master Motor Vehicle Finance Lease Agreement, dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.4 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022, dated November 1, 2022). |
| 10.48 | AESOP I Operating Sublease Agreement dated as of March 26, 2013 between Zipcar, Inc., as Sublessee and Avis Budget Car Rental, LLC, as Sublessor (Incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2013, dated May 8, 2013). |
| 10.49 | Second Amended and Restated Administration Agreement, dated as of June 3, 2004, among Cendant Car Rental Funding (AESOP) LLC***, AESOP Leasing L.P., AESOP Leasing Corp. II, Avis Rent A Car System, Inc.****, Budget Rent A Car System, Inc., Cendant Car Rental Group, Inc.** and The Bank of New York, as Trustee (Incorporated by reference to Exhibit 10.34 to the Company's Annual Report on Form 10-K for the year ended December 31, 2005, dated March 1, 2006). |
| 10.50 | First Amendment, dated as of August 16, 2013, among Avis Budget Rental Car Funding (AESOP) LLC, AESOP Leasing L.P., AESOP Leasing Corp. II, Avis Rent A Car System, LLC, Budget Rent A Car System, Inc. and Avis Budget Car Rental, LLC, as Administrator, to the Second Amended and Restated Administration Agreement dated as of June 3, 2004 (Incorporated by reference to Exhibit 10.41(a) to the Company's Annual Report on Form 10-K for the year ended December 31, 2013, dated February 20, 2014). |
| 10.51 | Fifth Amended and Restated Series 2010-6 Supplement, dated as of April 14, 2022, by and among Avis Budget Rental Car Funding (AESOP) LLC, as Issuer, Avis Budget Car Rental, LLC, as Administrator, JPMorgan Chase Bank, N.A., as Administrative Agent, the Non-Conduit Purchasers, the CP Conduit Purchasers, the Committed Note Purchasers, the APA Banks and the Funding Agents named therein and The Bank of New York Mellon Trust Company, N.A., as Trustee and as Series 2010-6 Agent (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated April 19, 2022). |
| 10.52 | Third Amended and Restated Series 2015-3 Supplement, dated as of April 14, 2022, by and among Avis Budget Rental Car Funding (AESOP) LLC, as Issuer, Avis Budget Car Rental, LLC, as Administrator, JPMorgan Chase Bank, N.A., as Administrative Agent, the Non-Conduit Purchasers, the CP Conduit Purchasers, the Committed Note Purchasers, the APA Banks and the Funding Agents named therein and The Bank of New York Mellon Trust Company, N.A., as Trustee and as Series 2015-3 Agent (Incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, dated April 19, 2022). |
| 10.53 | Series 2017-1 Supplement, dated as of March 15, 2017, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2017-1 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated March 21, 2017). |
| 10.54 | Amended and Restated Series 2017-2 Supplement, dated as of May 31, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2017-2 Agent (Incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, dated June 10, 2022). |
| 10.55 | Amended and Restated Series 2018-1 Supplement, dated as of May 31, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2018-1 Agent (Incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K, dated June 10, 2022). |
| 10.56 | Amended and Restated Series 2018-2 Supplement, dated as of June 18, 2021, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2018-2 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated June 23, 2021). |
| 10.57 | Series 2019-1 Supplement, dated as of February 13, 2019, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2019-1 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated February 20, 2019). |
| 10.58 | Amended and Restated Series 2019-2 Supplement, dated as of June 18, 2021, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2019-2 Agent (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated June 23, 2021). |

H-4

| 10.59 | Amended and Restated Series 2019-3 Supplement, dated as of May 26, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2019-3 Agent (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated June 10, 2022). |
| 10.60 | Amended and Restated Series 2020-1 Supplement, dated as of June 18, 2021, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2020-1 Agent. (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated June 23, 2021). |
| 10.61 | Series 2020-2 Supplement, dated as of August 12, 2020, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2020-2 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated August 14, 2020). |
| 10.62 | Series 2021-1 Supplement dated as of May 18, 2021, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2021-1 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated May 21, 2021). |
| 10.63 | Series 2021-2 Supplement, dated as of November 17, 2021, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2021-2 Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated November 19, 2021). |
| 10.64 | Series 2022-1 Supplement, dated as of April 14, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2022-1 Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated April 19, 2022). |
| 10.65 | Series 2022-2 Supplement, dated as of June 7, 2022, between Avis Budget Rental Car Funding (AESOP) LLC, Avis Budget Car Rental, LLC, as Administrator, JPMorgan Chase Bank, N.A., as Administrative Agent, the Non-Conduit Purchasers, the CP Conduit Purchasers, the Committed Note Purchasers, the APA Banks and the Funding Agents named therein, and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2022-2 Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated June 10, 2022). |
| 10.66 | Series 2022-3 Supplement, dated as of July 21, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2022-3 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated July 22, 2022). |
| 10.67 | Series 2022-4 Supplement, dated as of July 21, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and Series 2022-4 Agent (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated July 22, 2022). |
| 10.68 | Series 2022-5 Supplement, dated as of November 29, 2022, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2022-5 Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated December 2, 2022). |
| 10.69 | Series 2023-1 Supplement, dated as of January 17, 2023, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2023-1 Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K dated January 20, 2023). |
| 10.70 | Series 2023-2 Supplement, dated as of January 17, 2023, between Avis Budget Rental Car Funding (AESOP) LLC and The Bank of New York Mellon Trust Company, N.A., as trustee and as Series 2023-2 Agent (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K dated January 20, 2023). |
| 10.71 | Sixth Amended and Restated Credit Agreement, dated as of July 9, 2021, among Avis Budget Holdings, LLC, Avis Budget Car Rental, LLC, Avis Budget Group, Inc., the subsidiary borrowers from time to time party thereto, the financial institutions from time to time party thereto JPMorgan Chase Bank, N.A., as Administrative Agent (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated July 13, 2021). |
| 10.72 | First Amendment, dated as of March 16, 2022, to the Sixth Amended and Restated Credit Agreement, dated as of July 9, 2021, among Avis Budget Holdings, LLC, Avis Budget Car Rental, LLC, Avis Budget Group, Inc., the subsidiary borrowers from time to time party thereto, the financial institutions from time to time party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated March 25, 2022). |
| 10.73 | Second Amendment, dated as of March 24, 2022, to the Sixth Amended and Restated Credit Agreement, dated as of July 9, 2021, among Avis Budget Holdings, LLC, Avis Budget Car Rental, LLC, Avis Budget Group, Inc., the subsidiary borrowers from time to time party thereto, the financial institutions from time to time party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, dated March 25, 2022). |
| 10.74 | Third Amendment, dated as of July 28, 2022, to the Sixth Amended and Restated Credit Agreement, dated as of July 9, 2021, among Avis Budget Holdings, LLC, Avis Budget Car Rental, LLC, as borrower, Avis Budget Group, Inc., the subsidiary borrowers from time to time party thereto, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and the other parties thereto (Incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2022, dated November 1, 2022). |
| 10.75 | Offer Letter, dated May 17, 2022, between Ravi Simhambhatla and Avis Budget Group, Inc.† |

H-5

Table of Contents

| 10.76 | Fourth Amendment, dated as of February 6, 2023, to the Sixth Amended and Restated Credit Agreement, dated as of July 9, 2021, among Avis Budget Holdings, LLC, Avis Budget Car Rental, LLC, as borrower, Avis Budget Group, Inc., the subsidiary borrowers from time to time party thereto, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, and the other parties thereto. |
|---|---|
| 21 | Subsidiaries of Registrant. |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13(a)-14(a) and 15(d)-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13(a)-14(a) and 15(d)-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32 | Certifications Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | XBRL Taxonomy Extension Schema. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase. |
| 104 | The cover page from the Company's Annual Report on Form 10-K for the year ended December 31, 2022, formatted as Inline XBRL and contained in Exhibit 101. |

---

| | |
|---|---|
| * | Cendant Corporation is now known as Avis Budget Group, Inc. |
| ** | Cendant Car Rental Group, LLC (formerly known as Cendant Car Rental Group, Inc.) is now known as Avis Budget Car Rental, LLC. |
| *** | Cendant Rental Car Funding (AESOP) LLC, formerly known as AESOP Funding II L.L.C, is now known as Avis Budget Rental Car Funding (AESOP) LLC. |
| **** | Avis Rent A Car System, Inc. is now known as Avis Rent A Car System, LLC. |
| † | Denotes management contract or compensatory plan. |
| †† | Confidential treatment has been requested for certain portions of this Exhibit pursuant to Rule 24b-2 of the Securities Exchange Act of 1934, as amended, which portions have been omitted and filed separately with the Securities and Exchange Commission. |

H-6

EX-10.1 2 eh220316264_ex1001.htm EXHIBIT 10.1

**EXHIBIT 10.1**

**EXECUTION VERSION**

FOURTH AMENDED AND RESTATED

COOPERATION AGREEMENT

This Fourth Amended and Restated Cooperation Agreement, dated as of December 23, 2022 (this "Agreement"), is by and among Avis Budget Group, Inc. (the "Company") and the entities set forth on Schedule A hereto (together with their Affiliates, "SRS").

WHEREAS, as of the date hereof, SRS Beneficially Owns 18,430,882 shares of common stock of the Company, par value $0.01 per share (the "Common Stock");

WHEREAS, the Company and SRS have previously entered into that certain Third Amended and Restated Cooperation Agreement, dated as of February 23, 2020, and amended on August 12, 2020, and September 15, 2021 (such agreement, as so amended, the "Prior Agreement"), with respect to certain matters relating to the Board of Directors of the Company (the "Board") and certain other matters, as provided therein;

WHEREAS, the Company and SRS wish to amend and restate the Prior Agreement on the terms set forth herein.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Board Representation.

(a)    The Company's slate of nominees for election as directors of the Company at (i) the next annual meeting of stockholders of the Company (the "2023 Annual Meeting") and (ii) each other meeting of stockholders of the Company held during the Standstill Period at which directors are to be elected (such meetings, together with the 2023 Annual Meeting, the "Applicable Meetings") shall include each of the Applicable Directors. The Company shall recommend that the Company's stockholders vote in favor of the election of each of the Applicable Directors at each of the Applicable Meetings and shall support the Applicable Directors for election at each of the Applicable Meetings in substantially the same manner as the Company's other nominees. "Applicable Directors" means each of Jagdeep Pahwa, Karthik Sarma and (in the event a Board Expansion Notice is delivered) the Additional Director (as defined below). No Applicable Director that is (or is appointed to be) a member of the Board prior to the 2023 Annual Meeting shall be removed from or (except in the limited circumstances specifically set forth in Section 1(e)) required to resign from the Board prior to the 2023 Annual Meeting.

(b)    At all times while serving as a member of the Board (and as a condition to such service), the Applicable Directors shall (i) comply with all policies, codes and guidelines applicable to Board members (subject to Section 9), copies of which are either publicly available or have been provided to SRS or their counsel and (ii) not serve as a director or officer of any Competitor ((i) and (ii), the "Applicable Director Criteria"). During the Standstill Period,

SRS shall ensure at least one of the Applicable Directors shall at all times qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements.

(c)     During the Standstill Period, SRS shall be entitled to designate two (2) (or if a Board Expansion Notice has been delivered (and subject to the proviso in 1(g)), three (3)) persons to serve as members of the Board. Such persons shall serve as the Applicable Directors in accordance with this Agreement and may, but are not required to be, former or current employees of SRS or an affiliate of SRS. SRS shall be entitled to change its designation of the persons serving as the Applicable Directors from time to time and at any time during the Standstill Period. The Applicable Directors shall be entitled to resign from the Board at any time in their discretion. Should any of the Applicable Directors resign from the Board, become unable to serve on the Board due to death, disability or other reasons or otherwise cease to serve on the Board for any reason (including as the result of SRS changing its designation of an Applicable Director) prior to the expiration of the Standstill Period, SRS will have the right to recommend for appointment to the Board a replacement director (a "Replacement"); provided, that any Replacement of an Applicable Director shall meet the Applicable Director Criteria. The appointment of a Replacement will be subject to a customary due diligence process by the Board (including the review of a completed D&O questionnaire (in the Company's standard form), interviews with members of the Board and a customary background check) and completion by the Replacement of the following documents required of all non-executive directors on the Board: the Certification for the Procedures and Guidelines Governing Securities Trades by Company Personnel and the Majority Voting Conditional Resignation Letter. The Company will use its reasonable best efforts to complete its approval process as promptly as practicable. The Company shall appoint the Replacement to the Board unless (i) the Board, in good faith, upon the advice of outside legal counsel, determines that appointing the proposed director would be inconsistent with its fiduciary duties under applicable law, (ii) the Replacement fails to satisfy the Applicable Director Criteria or (iii) if upon the appointment of such Replacement, none of the Applicable Directors would qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements. For the avoidance of doubt, SRS will be entitled to continue to recommend different persons which meet the foregoing criteria until a Replacement is appointed. Except as otherwise specified in this Agreement, if a Replacement is appointed, all references in this Agreement to the term "Applicable Director" will include such Replacement. For the avoidance of doubt, in the event that a Board Expansion Notice is delivered, the provisions of this Section 1(c) applicable to Replacements shall apply, mutatis mutandis, to the initial Additional Director (and the designation, approval, appointment and any future replacements thereof).

(d)     During the Standstill Period, (i) SRS shall be entitled to appoint one (1) Applicable Director to the Corporate Governance Committee of the Board, (ii) SRS shall be entitled to appoint one (1) Applicable Director to the Compensation Committee of the Board, which Applicable Director shall serve as Chair of the Compensation Committee of the Board, (iii) the size of each of the Corporate Governance Committee and the Compensation Committees shall be not less than two (2) nor more than three (3) members, all of whom shall qualify as "independent" of the Company pursuant to the applicable stock exchange listing requirements (unless the Board (including, solely in the case of an Applicable Director joining such committee, a majority of the directors who are not former or current employees of, or advisors or consultants to, SRS or an Affiliate of SRS) approves the appointment to such committee of a director who does not qualify as "independent" of the Company in accordance with an applicable exception

-2-

thereunder) and (iv) SRS shall be entitled to designate one Applicable Director to serve as Vice Chairman of the Board. SRS shall be entitled to change its appointments and designations pursuant to this <u>Section 1(d)</u> from time to time and at any time during the Standstill Period. If SRS elects to change the Vice Chairman or the committee positions on which an Applicable Director serves, SRS shall provide written notice furnishing the name of the Person being replaced, the name of the Person to be appointed, and setting forth the positions in which the new appointee will serve. The Company shall promptly appoint the Applicable Director to the designated positions so long as, in the case of any committee appointments, such Applicable Director satisfies the applicable stock exchange listing requirements for serving on such committee. As of the Agreement Date, SRS has designated Mr. Sarma (x) to serve on the Corporate Governance Committee and (y) to serve on, and be Chair of, the Compensation Committee. SRS has presently designated Mr. Pahwa to serve as Vice Chairman of the Board.

(e)    Promptly after the execution and delivery of this Agreement (or, in the case of any Replacement or the Additional Director, immediately prior to such Person's appointment to the Board), each of the Applicable Directors shall deliver (and any Replacement shall deliver, as applicable) to the Company an irrevocable resignation letter pursuant to which such Person shall resign from the Board and all applicable committees thereof, subject to the Board's acceptance of such resignation (which may be accepted or rejected in its sole discretion), in the event of any of the following:

(i)    such Applicable Director is required to resign pursuant to the proviso set forth in the first sentence of <u>Section 5</u> as a result of SRS's aggregate Beneficial Ownership of Voting Securities falling below the Minimum Ownership Level set forth in the applicable of clause (a), clause (b) and/or clause (c) of <u>Section 5</u> hereof, as applicable;

(ii)    a judicial determination that such Applicable Director has materially breached any of the terms of this Agreement, in which case the resignation letter provided by such Applicable Director shall become effective; or

(iii)    a judicial determination that SRS has materially breached any of the terms of this Agreement, in which case the resignation letters provided by all of the Applicable Directors shall become effective.

(f)    During the period commencing with the Agreement Date through the expiration or termination of the Standstill Period, the Board and all applicable committees of the Board shall take all necessary actions (including with respect to nominations for election at the Applicable Meetings) so that the size of the Board is (i) (if no Board Expansion Notice has been delivered) six (6) directors, (ii) (if a Board Expansion Notice has been delivered but the Company Expansion Right has not been exercised) seven (7) directors and (iii) (if a Board Expansion Notice has been delivered and the Company Expansion Right has been exercised) eight (8) directors.

(g)    At any time during the Standstill Period, SRS may deliver written notice to the Company (a "<u>Board Expansion Notice</u>") to require the increase of the size of the Board to seven (7) directors and to designate a third director to the Board. Subject to the following sentence, upon the delivery by SRS of a Board Expansion Notice (i) the Board shall take all such

-3-

action as is required to expand the size of the Board to seven (7) directors (it being understood that the resulting new seventh seat on the Board shall remain vacant unless and until the Additional Director (as defined below) is appointed to or elected to fill such seat) and (ii) SRS shall be entitled to designate a third director to the Board, subject to the following sentence (in addition to Mr. Sarma (or any Replacement therefor) and Mr. Pahwa (or any Replacement therefor)) (the "Additional Director"). At any time during the Standstill Period after SRS has delivered a Board Expansion Notice, the Company shall have the right (the "Company Expansion Right"), but not the obligation, to further expand the size of the Board at any time from seven (7) directors to eight (8) directors; provided that if, after SRS has delivered a Board Expansion Notice but before the Additional Director has been appointed or elected to the Board, the Company notifies SRS of its intention to exercise the Company Expansion Right, the Additional Director shall only be appointed to the Board at the earlier of (i) sixty (60) days following the date of delivery of the Board Expansion Notice or (ii) the time at which the Company appoints a director to fill the eighth seat (the director initially appointed to such seat, the "Company Expansion Director") on the Board resulting from the exercise of the Company Expansion Right. During the Standstill Period, candidates for the Company Expansion Director shall be proposed for appointment to the Board only by a majority of the members of the Board other than the Applicable Directors.  Any other candidates for the Board of Directors (other than Applicable Directors and the Company Expansion Director) may be proposed by any member of the Board of Directors, and all members of the Board shall be entitled to take part in the consideration and voting upon all non-Applicable Director candidates for the Board.

(h)    Unless the Board determines otherwise, all determinations regarding, and actions with respect to, SRS and this Agreement (including any amendment to or waiver under this Agreement) shall be made by either (i) the Board (excluding all directors who are current or former employees of, or advisors or consultants to, SRS or an Affiliate of SRS) or (ii) a committee of the Board comprised solely of directors who are independent under the standards of the Nasdaq Stock Exchange and are not current or former employees of, or advisors or consultants to, SRS or an Affiliate of SRS.

(i)    SRS agrees that the Applicable Directors shall recuse themselves from the portion of any Board or committee or subcommittee meeting at which the Board or any such committee or subcommittee is evaluating and/or taking action with respect to (i) the exercise of any of the Company's rights or enforcement of any of the obligations under this Agreement, (ii) any proposed or pending (x) Extraordinary Transaction between the Company or any of its subsidiaries and SRS or its Affiliates, (y) other material transaction between the Company or any of its subsidiaries and SRS or any of its Affiliates from which SRS or an Affiliate of SRS receives or otherwise derives a material benefit (other than a benefit to which SRS or any of its Affiliates would be entitled in its capacity as a shareholder of the Company and in which all shareholders of the Company participate pro rata) or (z) material transaction between the Company or any of its subsidiaries and another entity in which SRS has representation on the board of directors (or equivalent governing body), or has beneficial ownership of 10% or more, of such entity or such entity's direct or indirect parent company, or (iii) any public stockholder proposal or public proposal to nominate any Person for election to the Board made by SRS or its Affiliates (the matters described in clauses (i)–(iii) of this Section 1(i) referred to as "Recusal Matters"). SRS agrees that the Applicable Directors shall not have access to documents or other information relating to Recusal Matters.

2.    <u>Standstill Provisions</u>. During the period (the "<u>Standstill Period</u>") commencing with the execution and delivery of this Agreement and ending on the earliest to occur of (i) December 31, 2024, (ii) the date on which SRS's Beneficial Ownership ceases to satisfy the Minimum Ownership Level set forth in clause (c) of <u>Section 5</u> hereof and (iii) the date that is sixty (60) calendar days prior to the Advance Notice Deadline, SRS shall not, directly or indirectly, in any manner, take any of the following actions (unless specifically permitted to do so in writing in advance by the Board):

(a)    acquire, offer to acquire, or cause to be acquired any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of more than the greater of (x) 18,500,000 and (y) 44.5% of the outstanding Voting Securities (the "<u>Independent Ownership Limit</u>") immediately following the consummation of such transaction; <u>provided</u>, that for the avoidance of doubt, nothing contained in this Agreement shall in any way limit the ability of SRS to acquire, offer to acquire or cause to be acquired any ownership or other interest in any Synthetic Position that (i) is not required or permitted to be settled, in whole or in part, in Voting Securities and (ii) does not grant SRS a right, option or obligation to own, acquire or control or direct the voting of any Voting Securities upon Exercise;

(b)    solicit proxies or written consents of stockholders or conduct any other type of referendum (binding or non-binding) with respect to, or from the holders of, Voting Securities, or become a "participant" (as such term is defined in Instruction 3 to Item 4 of Schedule 14A promulgated under the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>")), in or assist, advise, knowingly encourage or knowingly influence any Third Party in any "solicitation" of any proxy, consent or other authority (as such terms are defined under the Exchange Act) to vote any Voting Securities (other than such advice, encouragement or influence that is consistent with the Board's recommendation in connection with such matter);

(c)    other than through open market or block trade brokered sale transactions where (i) the identity of the purchaser is unknown to SRS, or (ii) SRS does not directly or indirectly select or influence the selection of the purchaser, sell, offer or agree to sell any Voting Securities of the Company to any Third Party that, to the knowledge of SRS after due inquiry, (x) has aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock or (y) would result in such Third Party having aggregate Beneficial Ownership (together with its Affiliates and Associates) of more than 9.9% of the issued and outstanding Common Stock;

(d)    effect or seek to effect, offer or propose to effect, cause or participate in, or in any way assist, facilitate or encourage any other Person to effect or seek, offer or propose to effect or participate in, any tender or exchange offer, merger, consolidation, acquisition, scheme, arrangement, business combination, recapitalization, reorganization, sale or acquisition of all or a substantial portion of the Company's assets, liquidation, dissolution or other extraordinary transaction involving the Company or any of its subsidiaries or any of their respective securities (each, an "<u>Extraordinary Transaction</u>"); <u>provided</u> that nothing in this <u>paragraph (d)</u> shall preclude or prohibit SRS (or its Affiliates) from (i) tendering into a tender or exchange offer; (ii) making a proposal providing for a Change of Control Transaction (as defined below) involving the acquisition of all of the outstanding Common Stock of the Company (a "<u>Wholeco Transaction</u>")

-5-

directly to the Board or a committee thereof and making filings in connection with such proposal and related discussions or negotiations under Section 13(d) of the Exchange Act and related regulations; underlined provided, that SRS has provided notice of its intention to make such filing (together with a reasonable description of the material items to be disclosed in such filing and, if available, a draft thereof) to the Company as soon in advance as reasonably practicable; (iii) in the event the Board is no longer engaging in good faith negotiations relating to, or rejects an offer made by SRS (whether binding or non-binding), in each case, in accordance with clause (ii) above, making such offer directly to stockholders of the Company after providing notice of its intent to do so as soon in advance as reasonably practicable; or (iv) engaging in discussions with Third Parties (other than a Competitor) for a period of no more than seventy-five (75) days after providing written notice to the Company (which notice may be given not more than once during any twelve (12) month period; provided that an additional notice may be given during any twelve (12) month period if the Third Party enters into a confidentiality and standstill agreement on customary terms with the Company with respect to a potential Wholeco Transaction), about the possibility of partnering in the making of an offer for a Wholeco Transaction under clause (ii) or, to the extent applicable, clause (iii) above and making an offer (whether binding or non-binding) contemplated by such clauses in partnership with any Person (other than a Competitor) as long as such offer to the Board under clause (ii) above is first made on or prior to the end of such 75-day period; provided, that (x) nothing in clauses (ii)–(iv) above shall be deemed to permit SRS to disclose any confidential information of the Company to any Person without the prior written consent of the Company (which consent shall not be withheld, delayed or further conditioned in the event that such Person is willing to enter into a confidentiality agreement and a standstill agreement, in each case on customary terms), (y) Sections 2(d), (f), (g), (h) and (j) shall not prevent actions (and the other subsections of Section 2 shall not be deemed to prohibit actions taken by SRS that otherwise would be prohibited by Sections 2(d), (f), (g), (h) and (j) had they applied) to the extent such actions are taken in connection with discussions and offers made in compliance with clause (iii) or (iv) above (provided, that for the avoidance of doubt, Section 2(a) shall continue to prohibit the acquisition of Voting Securities except as results solely from being deemed a "group" with another Person as a result of such discussions or offers or from consummating a Wholeco Transaction that otherwise complies with this Section 2(d)), and (z) exploratory discussions by SRS in response to an unsolicited initiation by another Person of discussions with SRS with respect to partnering in the making of an offer for a Wholeco Transaction shall not be deemed to contravene the restrictions set forth in this Section 2(d), provided that thereafter engaging in substantive discussions about the material terms of the partnership and Wholeco Transaction shall either require the consent of the Board or the giving of the notice contemplated by clause (iv) above.

(e)    (i) call or seek the Company or any other Person to call any meeting of stockholders, including by written consent, (ii) seek representation on, or nominate any candidate to the Board (except as expressly provided by this Agreement), (iii) nominate any candidate to the board of directors of any Competitor unless such candidate is independent from SRS and SRS takes all appropriate acts to prevent such third party from providing any competitively sensitive information to SRS, (iv) seek the removal of any member of the Board or (v) make any proposal at any annual or special meeting of the Company's stockholders; provided, that, the foregoing clauses (ii) and (iv) of this Section 2(e) shall not prevent the Applicable Directors from (x) discussing such matters at any Board or Board committee meeting or discussing such matters with other members of the Board at any time and (y) introducing qualified director candidates to the Board or the Corporate Governance Committee;

-6-

(f)     take any public action in support of or make any public proposal or request that constitutes or relates to: (i) advising, controlling, changing or influencing the Board or management of the Company, including any plans or proposals to change the number or term of directors or to fill any vacancies on the Board, (ii) any material change in the capitalization, stock repurchase programs and practices, capital allocation programs and practices or dividend policy of the Company, (iii) any other material change in the Company's management, business or corporate structure, (iv) seeking to have the Company waive or make amendments or modifications to the Company's certificate of incorporation or bylaws, or other actions that may impede or facilitate the acquisition of control of the Company by any Person, (v) causing a class of securities of the Company to be delisted from, or to cease to be authorized to be quoted on, any securities exchange or (vi) causing a class of securities of the Company to become eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act;

(g)     make any public disclosure, announcement or statement regarding any intent, purpose, plan or proposal with respect to the Board, the Company, its management, policies or affairs, any of its securities or assets or this Agreement that is inconsistent with the provisions of this Agreement;

(h)     except as is reasonably acceptable to the Company, form or join in a partnership, limited partnership, syndicate or other group, including a "group" as defined under Section 13(d) of the Exchange Act (a "Group"), with respect to the Voting Securities (for the avoidance of doubt, excluding any group composed solely of SRS and its Affiliates or as contemplated by Section 2(d) herein);

(i)     institute, solicit or join, as a party, any litigation, arbitration or other proceeding (including any derivative action) against the Company or any of its future, current or former directors or officers or employees (provided, that nothing shall prevent SRS from bringing litigation to enforce the provisions of this Agreement, seeking a declaratory judgment with respect to compliance with the terms of this Agreement or being a party to a class action instituted by a Third Party without the assistance or encouragement of SRS);

(j)     except as is reasonably acceptable to the Company or as contemplated by Section 2(d) herein, enter into any discussions, negotiations, agreements, or understandings with any Third Party with respect to any of the foregoing, or assist, advise, knowingly encourage or knowingly influence any Third Party to take any action or make any statement with respect to any of the foregoing, or otherwise take or knowingly cause any action, or make any statement, inconsistent with any of the foregoing; or

(k)     (i) contest the validity of, or (ii) publicly request any waiver of, the obligations set forth in this Section 2; provided, that clause (i) shall not be deemed to prevent SRS from defending any claim by the Company that SRS has breached this Section 2.

Notwithstanding anything in this Agreement to the contrary, the foregoing provisions of this Section 2 shall not be deemed to (x) prohibit SRS or its directors, officers, partners, employees, members or agents (acting in such capacity) from communicating privately with the Company's directors or officers so long as such communications are not intended to, and would not reasonably be expected to, require any public disclosure (including under Section 13(d)

-7-

of the Exchange Act and related regulations) of such communications (except to the extent permitted by <u>Section 2(d)</u>) or (y) restrict any Applicable Director in the exercise of his fiduciary duties to the Company and all of its stockholders. Notwithstanding anything to the contrary in this Agreement, <u>Sections 2(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> shall be of no further force and effect (and the other subsections of <u>Section 2</u> shall not be deemed to prohibit actions taken by SRS that otherwise would be prohibited by <u>Sections 2(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> had they been in effect to the extent such actions are taken in pursuit of a Change of Control Transaction; <u>provided</u>, that for the avoidance of doubt, <u>Section 2(a)</u> shall continue to fully apply in accordance with its terms except for offers (but not acquisitions of Voting Securities) relating to a Change of Control Transaction) in the event that (i) the Company shall enter into a definitive agreement providing for (A) a merger, consolidation, business combination or similar transaction immediately following which the stockholders of the Company immediately prior to the consummation of such transaction (other than stockholders of the Company who have entered into, or who are members of a Group any member of which has entered into, a definitive agreement with the Company in respect of a transaction of the type described in this <u>clause (A)</u>) will hold less than 80% of the total combined voting power of the Company or any successor holding company, (B) a tender or exchange offer for 20% or more of the Voting Securities of the Company, (C) a sale of 20% or more of the consolidated assets of the Company and its subsidiaries (including equity securities of subsidiaries) in a single transaction or series of related transactions (other than in the ordinary course of business), or (D) a sale of 20% or more of the Voting Securities outstanding immediately prior to such sale in a single transaction or series of related transactions (each of (A), (B), (C) and (D) constituting a "<u>Change of Control Transaction</u>"), (ii) the Company formally or publicly commences a process contemplating a Change of Control Transaction and (x) does not provide SRS an opportunity to participate in such a process on the same terms as Third Parties, or (y) includes conditions to participation that are designed to prevent SRS from participating in such a process on the same terms as Third Parties or (iii) a Third Party shall commence a tender offer or exchange offer or otherwise make a bona fide public offer to acquire the Company, all or substantially all of the assets of the Company, or 50% or more of the Voting Securities of the Company, in each case, not resulting from a violation of this <u>Section 2</u>.

3.    <u>Stockholder Rights Plan</u>. The Company agrees not to, at any time prior to five (5) business days before the expiration of the Standstill Period, adopt or enter into any stockholder rights plan or similar agreement that would cause the rights thereunder to be "triggered" by (or would otherwise cause SRS to be materially and disproportionately adversely affected as compared to other stockholders of the Company as a result of) any action to be taken by SRS that would otherwise be permitted by <u>Section 2</u> (except in response to SRS delivering a notice of its intent to make an offer directly to stockholders of the Company pursuant to <u>Sections 2(d)(iii)</u> or <u>2(d)(iv)</u> with respect to which the Company shall be permitted to adopt or enter such a plan or agreement; <u>provided</u> that thereafter SRS shall not be restricted from (i) in connection with such offer taking actions that would otherwise be prohibited by <u>Sections 2(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(j)</u> had they applied and (ii) acquiring, offering to acquire, or causing to be acquired any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of no more than the Independent Ownership Limit immediately following the consummation of such transaction).

-8-

4.    <u>Voting Commitments</u>.

(a)    SRS agrees that it will cause all Voting Securities Beneficially Owned by SRS as of the record date for any meeting of stockholders of the Company occurring during the Standstill Period (including, for the avoidance of doubt, Beneficial Ownership of any Voting Securities acquired after the date of this Agreement) to be present for quorum purposes and voted at such meetings (i) in favor of the Company's nominees, (ii) against the election of any directors that have not been nominated by the Company, (iii) in accordance with the Board's recommendation with respect to auditor ratification proposals and (iv) in accordance with the Board's recommendation with respect to any other proposal presented at such meeting, <u>provided however</u>, that in the case of this <u>clause (iv)</u>, SRS shall be permitted to vote in its sole discretion (subject to any limitations attached to Excess Voting Rights pursuant to <u>Section 4(b)</u>) with respect to any proposal (A) related to an Extraordinary Transaction, (B) which has received an "against" recommendation from Institutional Shareholder Services, (C) related to the implementation of takeover defenses or adversely affecting the rights of stockholders, or (D) related to new or amended incentive compensation plans.

(b)    In the event SRS Beneficially Owns (as a result of buybacks or repurchases by or on behalf of the Company, purchases by SRS, or otherwise) the right to exercise voting rights attached to Voting Securities in excess of 35% of the outstanding Voting Securities (the "<u>Excess Voting Rights</u>"), and for so long as SRS continues to (i) have the right to exercise such Excess Voting Rights and (ii) Beneficially Own more than 35% of the outstanding Voting Securities, SRS shall (A) on each and every matter that is submitted to the stockholders of the Company for their vote and with respect to which the Excess Voting Rights may be voted by SRS, exercise such Excess Voting Rights in the same proportion in which all other Voting Securities voted on such matter are voted (treating broker non-votes and abstentions as votes "against" (except with respect to votes of the stockholders of the Company for the election of directors) and without taking into consideration, in determining such proportions, any Voting Securities that are voted by SRS on such matter), and (B) take reasonable steps to cooperate with the Company in order to exercise such Excess Voting Rights in the manner contemplated by this <u>Section 4(b)</u>.

5.    <u>Minimum Ownership</u>. If at any time following the execution and delivery of this Agreement, SRS's aggregate Beneficial Ownership of Voting Securities is less than (in each case, subject to adjustment in the event of stock splits, dividends, recapitalizations, reorganizations and the like) (a) the greater of (x) 3,946,970 and (y) 10% of the issued and outstanding Voting Securities publicly disclosed as of such date, then (solely in the event that there are then three Applicable Directors on the Board) the resignation letter provided by one Applicable Director (or any Replacement thereof) shall become effective, (b) the greater of (x) 2,960,227 and (y) 7.5% of the issued and outstanding Voting Securities publicly disclosed as of such date, then (solely in the event that there are then at least two Applicable Directors on the Board) the resignation letter provided by one Applicable Director (or any Replacement thereof) shall become effective or (c) the greater of (x) 1,973,485 and (y) 5% of the issued and outstanding Voting Securities publicly disclosed as of such date, the resignation letter provided by the final Applicable Director (or any Replacement thereof), shall become effective (each of the percentages in clauses (<u>a</u>), (<u>b</u>) and (c), a "<u>Minimum Ownership Level</u>"); <u>provided</u>, that in the case of <u>clauses (a)</u> and (<u>b</u>),

-9-

SRS shall promptly notify the Company of which Applicable Director (as applicable) will resign in each instance and, failing such notice, the Corporate Governance Committee of the Board shall determine which Applicable Director (as applicable) will resign. Following the effectiveness of an Applicable Director's resignation letter pursuant to this Section 5, SRS shall no longer be entitled to recommend for appointment to the Board any Replacement for such Applicable Director and (ii) the Company shall not be obligated to nominate such Applicable Director or any Replacement thereof (as applicable) for election to the Board at any meeting of stockholders at which directors are to be elected occurring after such time. SRS shall promptly (and in any event within five (5) business days) inform the Company in writing if at any time SRS has failed to maintain any Minimum Ownership Level.

6.    Non-Disparagement. Until the expiration of the Standstill Period, SRS and the Company agree not to (and will cause any Persons acting on their behalf not to) make, or cause to be made (whether directly or indirectly), any public statement or any public announcement (including in any document filed with or furnished to the SEC or through the media), or any statement made by a senior officer or director of SRS or the Company to any stockholder or investor of the other party or any analyst, in each case which constitutes an *ad hominem* attack on, or otherwise disparages, the other party's past, present or future directors, officers, partners, principals or employees; provided, that from and after the time at which Sections 2(d), (f), (g), (h) and (j) of this Agreement are no longer in full force and effect (including, for the avoidance of doubt, such time at which SRS provides notice pursuant to Sections 2(d) (iii)–(iv) in connection with the relevant offer), nothing herein shall limit SRS from making any statement or announcement regarding any breach of fiduciary duty by the Company or any of its officers or directors to the extent such statement or announcement is made in pursuit of a Change of Control Transaction; provided, further, that the Company shall also be permitted to make its own statement or announcement or comment on any statement or announcement made by SRS. Nothing in this Section 6 shall be deemed to prevent either the Company or SRS from complying with its respective disclosure obligations under applicable law, legal process, subpoena, law, the rules of any stock exchange, or legal requirement or as part of a response to a request for information from any governmental authority with jurisdiction over the party from whom information is sought.

7.    Public Announcements. The Company acknowledges that SRS may file this Agreement as an exhibit to its Schedule 13D. The Company shall be given a reasonable opportunity to review and comment on any Schedule 13D filing made by SRS with respect to this Agreement, and SRS shall give reasonable consideration to the comments of the Company. SRS acknowledges and agrees that the Company may file this Agreement and file or furnish the Press Release with the SEC as exhibits to a Current Report on Form 8-K and other filings with the SEC.

8.    Confidentiality.

(a)    Each Applicable Director shall be required to comply with the Company's Code of Business Conduct and Ethics for Directors applicable to the other members of the Board, including provisions relating to the confidentiality, disclosure and use of (including trading or influencing the actions of any Person based on) any non-public information entrusted to or obtained by such director by reason of his or her position as a director of the Company ("Confidential Information").

-10-

(b)        Notwithstanding the foregoing, each of the Applicable Directors (or any Replacement thereof that is an Affiliate of SRS) may, if he wishes to do so, provide Confidential Information to SRS's investment professionals ("SRS Investment Professionals"), solely to the extent such SRS Investment Professionals need to know such information in connection with SRS's investment in the Company; provided, however, that SRS (i) shall inform each SRS Investment Professional of the confidential nature of the Confidential Information, (ii) shall cause each SRS Investment Professional not to disclose any Confidential Information to any Person other than SRS Investment Professionals in compliance with this Section 8(b) and (iii) shall cause each SRS Investment Professional not to use any Confidential Information other than in connection with SRS's investment in the Company. SRS shall be responsible for the breach of this Section 8(b) by any of its directors, officers, employees, agents or other representatives (collectively, its "Representatives").

(c)        Notwithstanding anything in this Agreement to the contrary, in the event that the SRS or any of its Representatives is required in connection with a legal, judiciary, regulatory or administrative investigation or proceeding, by interrogatories, subpoena, civil investigative demand or similar legally mandatory process (excluding any such requirement arising out of any action or proceeding initiated by SRS or its Representatives, including for the avoidance of doubt any requirement to make a filing with the SEC or under any securities laws or regulations) (each, a "Legal Requirement"), to disclose Confidential Information, it is agreed that SRS or such Representative will, to the extent legally permissible, provide the Company with prompt written notice of such event so that the Company may seek a protective order or other appropriate remedy, at its expense, or waive compliance with the applicable provisions of this Agreement and, if applicable, the Company's Code of Business Conduct and Ethics for Directors by SRS or such Representative. In the event that (x) such protective order or other remedy is not obtained and disclosure of Confidential Information is therefore required (and such requirement does not arise from a breach of this Agreement by SRS) or (y) the Company consents in writing to having the Confidential Information produced or disclosed pursuant to such Legal Requirement, SRS or such Representative, as the case may be, (i) may, without liability hereunder, furnish that portion (and only that portion) of the Confidential Information that SRS or such Representative's legal counsel advises is legally required to be disclosed and (ii) will use reasonable efforts, at the Company's expense, to obtain reasonable assurance that confidential treatment is accorded to any Confidential Information so furnished. In no event will SRS or its Representatives oppose any action by the Company to obtain a protective order or other relief to prevent the disclosure of the Confidential Information or to obtain reliable assurance that confidential treatment will be afforded to the Confidential Information.

(d)        Any confidentiality obligations under this Section 8 shall expire 24 months after the date on which no Applicable Director (or any Replacement thereof that is an Affiliate of SRS) serves as a director of the Company; provided, that SRS shall maintain in accordance with the confidentiality obligations set forth herein any Confidential Information constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3); and provided, further, that this Section 8 is not intended to be, and shall not be interpreted as, a contractual restriction on any trading activities of SRS taken in SRS's own judgment.

-11-

9.    Securities Laws. SRS acknowledges that it is aware, and will advise each SRS Investment Professional who receives Confidential Information pursuant to Section 8(b), that United States securities laws prohibit any Person who has received material, non-public information from purchasing or selling securities on the basis of such information or from communicating such information to any other Person under circumstances in which it is reasonably foreseeable that such Person may trade securities on the basis of such information. SRS agrees that neither it nor its investment professionals will use or communicate any Confidential Information in violation of such laws. SRS maintains customary policies and procedures designed to prevent unauthorized disclosure and use of material, non-public information. As long as the Applicable Directors (or any Replacement thereof that is an Affiliate of SRS) are on the Board, SRS shall not purchase or sell, directly or indirectly, any securities of the Company during any blackout periods applicable to all directors under the Company's insider trading policy; provided, however, that nothing herein shall prohibit SRS or Mr. Sarma (solely in his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund) from purchasing or selling any securities of the Company pursuant to a 10b5-1 trading plan that complies with Rule 10b5-1 under the Exchange Act and that is not adopted during any such blackout period. The Company agrees to notify SRS of the opening and closing of any such blackout periods. The restrictions contained in the Company's policies and procedures applicable to the Applicable Directors (in their capacity as such) on pledging or making purchases on margin of, or entering into derivative or hedging arrangements (including options) with respect to, securities of the Company, which transactions are otherwise in compliance with applicable law and this Agreement, shall not be deemed to apply to SRS or Mr. Sarma (solely in his capacity as an advisor, director, general partner or manager of SRS or any affiliated fund).

10.    Representations and Warranties of All Parties. Each of the parties represents and warrants to the other party that: (a) such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms (subject to applicable bankruptcy and similar laws relating to creditors' rights and to general equity principles), and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such Person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

11.    Extraordinary Transactions. For so long as (i) SRS or an Affiliate of SRS has Beneficial Ownership of 5% or more of the issued and outstanding Voting Securities or (ii) a director of the Company that was appointed or designated by SRS or an Affiliate of SRS continues to serve on the Board, any Extraordinary Transaction between the Company or its subsidiaries and SRS or its Affiliates shall be  negotiated with and approved by a special committee of the Board comprised solely of directors who and who are not former or current employees of, or advisors or consultants to, SRS or an Affiliate of SRS. For so long as (i) SRS or an Affiliate of SRS has Beneficial Ownership of 5% or more of the issued and outstanding Voting Securities or (ii) a director of the Company that was appointed or designated by SRS or an Affiliate of SRS continues to serve on the Board, in the event of any Extraordinary Transaction, SRS shall not, directly or indirectly, in any way participate in a such transaction, unless such Extraordinary Transaction provides for the same type and amount of per share consideration (or the right to elect to receive the same type and amount of consideration), in respect of shares of Company Common Stock

-12-

and/or any other equity interests of the Company or its subsidiaries that is subject to such Extraordinary Transaction (excluding, for the avoidance of doubt, any customarily "excluded shares" such as dissenting stockholders); provided, that, with respect to any such Extraordinary Transaction involving less than 100% of the Company Common Stock, each holder of Company Common Stock (other than customarily "excluded shares" such as dissenting stockholders) must have the same right to participate in such Extraordinary Transaction, including with respect to the election to participate in such transaction (if any) on the same economic terms and to proportionate treatment (based on economic ownership) in the case of any cut-back mechanics or offer limitations. SRS shall not, directly or indirectly, enter into any other transaction in connection with an Extraordinary Transaction that would, or may reasonably result in, additional or disparate consideration for SRS in avoidance of the intent of this provision.

12.    <u>Ownership Limit Excess</u>.

(a)    In connection with entering into the Prior Agreement, the Board approved the transactions which resulted in SRS becoming an "interested stockholder" for purposes of Section 203 of the DGCL and, therefore, the restrictions contained in Section 203 of the DGCL do not apply to SRS as a matter of law. If SRS acquires any ownership or other interest in any Voting Securities or any Synthetic Position such that SRS would collectively have Beneficial Ownership of more than the Independent Ownership Limit (an "<u>Ownership Limit Excess Acquisition</u>"), then, unless the Board otherwise approves such Ownership Limit Excess Acquisition prior to such acquisition by resolution that includes the approval of a majority of the directors who are not Applicable Directors (or their Replacements) from and after that date (the "<u>Ownership Limit Excess Date</u>"), SRS agrees that the provisions of Section 203 of the DGCL shall be deemed to apply as a matter of contract to any "business combination" (as defined in Section 203 of the DGCL, but disregarding clause (v) of the definition of "business combination" in Section 203 of the DGCL and all references to a "subsidiary" or "subsidiaries" set forth in the definition of "business combination" in Section 203 of the DGCL) between the Company and SRS as provided in <u>Section 13(b)</u> hereof.

(b)    SRS agrees that if SRS makes an Ownership Limit Excess Acquisition, then, from and after the Ownership Limit Excess Date (x) the restrictions under Section 203 of the DGCL applicable to a "business combination" with an "interested stockholder" shall apply to any such business combination between the Company and SRS as a matter of contract pursuant to this Agreement and (y) SRS will not engage in any "business combination" with the Company for a period of four (4) years following the Ownership Limit Excess Date, unless:

(i)    prior to the Ownership Limit Excess Date, the Board approved, including approval by a majority of the directors who are not Applicable Directors (or their Replacements), either the "business combination" or the Ownership Limit Excess Acquisition;

(ii)    upon consummation of a Ownership Limit Excess Acquisition, SRS owned at least 85% of the voting power of the Voting Securities outstanding at the time the transaction commenced, excluding for purposes of determining the Voting Securities outstanding

-13-

(but not the outstanding Voting Securities owned by SRS) those shares owned (x) by Persons who are directors and also officers of the Company and (y) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer;

        (iii)    at or subsequent to such time the "business combination" is approved by the Board, including approval by a majority of the directors who are not Applicable Directors (or their Replacements), and authorized at an annual or special meeting of stockholders (and not by written consent) by the affirmative vote of at least 66 2/3% of the voting power of the outstanding Voting Securities which is not owned by SRS; or

        (iv)    unless any of the exceptions in Section 203(b) (3), (4), (5) (6) or (7) of the DGCL would apply if the Ownership Limit Excess Acquisition had caused SRS to become an "interested stockholder" for purposes of Section 203 of the DGCL (with references to "15%" in Section 203 of the DGCL being deemed to be replaced with "Independent Ownership Limit").

        13.    <u>Certain Actions</u>. Neither the Board nor any committee thereof, on the one hand, or SRS or any Affiliate thereof, on the other hand, shall take any action that would be reasonably likely to materially interfere with the purposes of this Agreement. Except as required by applicable law or stock exchange rules or listing standards, the Company shall not alter, amend or adopt any Company policies or procedures or amend its bylaws, corporate governance guidelines or other organizational documents in a manner that would be reasonably likely to materially interfere with the purpose of this Agreement. In the event the Company determines to hold the 2025 Annual Meeting (as defined below) more than twenty-five (25) days before or twenty-five (25) days after the one-year anniversary of the 2024 annual meeting of stockholders, the Company will provide notice to SRS of the Advance Notice Deadline no less than seventy-five (75) days prior to the Advance Notice Deadline.

        14.    <u>Certain Defined Terms</u>. For purposes of this Agreement:

        (a)    "<u>Advance Notice Deadline</u>" means the advance notice deadline as determined pursuant to the Company's bylaws, as then in effect, for stockholders to nominate candidates for the annual meeting of stockholders following the 2024 annual meeting of stockholders (the "<u>2025 Annual Meeting</u>").

        (b)    The terms "<u>Affiliate</u>" and "<u>Associate</u>" shall have the respective meanings set forth in Rule 12b-2 promulgated by the United States Securities and Exchange Commission (the "<u>SEC</u>") under the Exchange Act.

        (c)    the terms "<u>Beneficial Ownership</u>" and "<u>Beneficially Own</u>" (and similar terms) means having the right or ability to vote, cause to be voted or control or direct the voting of, any Voting Securities (in each case whether directly or indirectly, including pursuant to any agreement, arrangement or understanding, whether or not in writing); <u>provided</u>, that a Person shall be deemed to have "Beneficial Ownership" of any Voting Securities that such Person has a right, option or obligation to own, acquire or control or direct the voting of upon conversion, exercise, expiration, settlement or similar event (an "<u>Exercise</u>") under or pursuant to (i) any Derivative (whether such Derivative is subject to Exercise immediately or only after the passage

-14-

of time or upon the satisfaction of one or more conditions) and (ii) any Synthetic Position that is required or permitted to be settled, in whole or in part, in Voting Securities.

(d)    "<u>Competitor</u>" means China Auto Rental (CAR Inc.), eHi Car Services Limited, Enterprise Holdings, Inc., Europcar Groupe SA, Hertz Global Holdings Inc., Sixt SE and any of their respective Affiliates.

(e)    "<u>Person</u>" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

(f)    "<u>Synthetic Position</u>" shall mean any option, warrant, convertible security, stock appreciation right, or other security, contract right or derivative position or similar right (including any "swap" transaction with respect to any security, other than a broad based market basket or index) (each of the foregoing, a "<u>Derivative</u>"), whether or not presently exercisable, that has an exercise or conversion privilege or a settlement payment or mechanism at a price related to the value of Voting Securities or a value determined in whole or in part with reference to, or derived in whole or in part from, the value of Voting Securities and that increases in value as the market price or value of Voting Securities increases or that provides an opportunity, directly or indirectly, to profit or share in any profit derived from any increase in the value of Voting Securities, in each case regardless of whether (i) it conveys any voting rights in such Voting Securities to any Person, (ii) it is required to be or capable of being settled, in whole or in part, in Voting Securities or (iii) any Person (including the holder of such Synthetic Position) may have entered into other transactions that hedge its economic effect.

(g)    "<u>Third Party</u>" shall mean any Person other than the Company, SRS and their respective Affiliates and representatives.

(h)    "<u>Voting Securities</u>" shall mean the Common Stock and any other securities of the Company entitled to vote in the election of directors.

(i) "<u>Agreement Date</u>" shall mean the date of effectiveness of the Agreement, which is December 23, 2022.

15.    <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without reference to the conflict of laws principles thereof. Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder brought by the other party hereto or its successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware). Each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement in any court other than the aforesaid courts. Each of the parties hereto hereby

-15-

irrevocably waives, and agrees not to assert in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable legal requirements, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

16. <u>No Waiver</u>. Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

17. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

18. <u>Notices</u>. All notices, consents, requests, instructions, approvals and other communications <u>provided</u> for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by email, when such email is sent to the email address set forth below during normal business hours and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Avis Budget Group, Inc.
6 Sylvan Way
Parsippany, New Jersey 07054
Attention:Jean Sera

with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison  LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:Robert B. Schumer
          Brian C. Lavin
Email:    rschumer@paulweiss.com
          blavin@paulweiss.com

-16-

if to SRS:

SRS Investment Management, LLC
1 Bryant Park, 39th Floor
New York, NY 10036
Attention:David Zales

with a copy (which shall not constitute notice) to:

Cadwalader, Wickersham & Taft LLP
200 Liberty St.
New York, New York 10281
Attention:Stephen Fraidin
          Richard Brand
          Kiran Kadekar
Email:   stephen.fraidin@cwt.com
          richard.brand@cwt.com
          kiran.kadekar@cwt.com

19.    <u>Severability</u>. If any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

20.    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, which together shall constitute a single agreement.

21.    <u>Successors and Assigns</u>. This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

22.    <u>No Third-Party Beneficiaries</u>. This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other Persons.

23.    <u>Amendments</u>. This Agreement may only be amended pursuant to a written agreement executed by SRS and the Company, subject to <u>Section 1(h)</u>.

24.    <u>Interpretation and Construction</u>. Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly

-17-

waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. Any share numbers set forth in this Agreement shall be adjusted as necessary for any stock splits, stock dividends, reverse stock splits, recapitalizations or similar events (other than stock buybacks or repurchases).

*[Signature Pages Follow]*

-18-

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

AVIS BUDGET GROUP, INC.

By:    /s/ Jean M. Sera
     Name: Jean M. Sera
     Title:  Senior Vice President, Corporate
             Secretary and Global Programs

SRS INVESTMENT MANAGEMENT, LLC

By:    /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel

SRS PARTNERS MASTER FUND LP

By:    SRS Investment Management, LLC, its
     investment manager

By:    /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel

SRS SPECIAL OPPORTUNITIES MASTER
II, LP

By:    SRS Investment Management, LLC, its
     investment manager

By:    /s/ David B. Zales
     Name: David B. Zales
     Title:  General Counsel

*[Signature Page to Fourth Amended and Restated Cooperation Agreement]*

SRS LONG OPPORTUNITIES MASTER
FUND, LP

By:    SRS Investment Management, LLC, its
       investment manager

By:    /s/ David B. Zales
       Name: David B. Zales
       Title:  General Counsel

[*Signature Page to Fourth Amended and Restated Cooperation Agreement*]

<u>SCHEDULE A</u>

SRS Investment Management, LLC

SRS Partners Master Fund LP

SRS Special Opportunities Master II, LP

SRS Long Opportunities Master Fund, LP

# EXHIBIT 8



# SEC Filings

**Group**

Choose from list

**Filing year**

- Any -

| Filing Date ▼ | Description ⇅ | Form ⇅ | View |
|---|---|---|---|
| Dec 15, 2023 | Filed by "insiders" prior intended sale of restricted stock. Non-EDGAR filing | 144 | |
| Dec 14, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Dec 06, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 22, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 08, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 02, 2023 | Quarterly report which provides a continuing view of a company's financial position | 10-Q | |
| Nov 01, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 01, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Oct 06, 2023 | An amendment to the SC 13G filing | SC 13G/A | |
| Sep 21, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Sep 05, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Aug 25, 2023 | An amendment to a SC 13D filing | SC 13D/A | |
| Aug 25, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Aug 01, 2023 | Quarterly report which provides a continuing view of a company's financial position | 10-Q | |
| Jul 31, 2023 | Report of unscheduled material events or corporate event | 8-K | |

| Dec 14, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Dec 06, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 22, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 08, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 02, 2023 | Quarterly report which provides a continuing view of a company's financial position | 10-Q | |
| Nov 01, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Nov 01, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Oct 06, 2023 | An amendment to the SC 13G filing | SC 13G/A | |
| Sep 21, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Sep 05, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Aug 25, 2023 | An amendment to a SC 13D filing | SC 13D/A | |
| Aug 25, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Aug 01, 2023 | Quarterly report which provides a continuing view of a company's financial position | 10-Q | |
| Jul 31, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Jul 28, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Jul 14, 2023 | Report of unscheduled material events or corporate event | 8-K | |
| Jul 05, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Jun 15, 2023 | Statement of changes in beneficial ownership of securities | 4 | |
| Jun 13, 2023 | Filed by "insiders" prior intended sale of restricted stock. Non-EDGAR filing | 144 | |

« First    ‹ Previous    1    2    3    **4**    5    6    7    8    9    …    Next ›    Last »          Displaying 61 - 80 of 3108 results

Data provided by Kaleidoscope.



@ Email Alerts          RSS News Feeds          Print Page          Email Page          Search

Contact Us   •   Developers   •   Licensing   •   Connect on Linked In

Privacy Policy    Terms of Service    Code of Conduct    Accessibility          Copyright © Avis Budget Group 2024. All Rights Reserved

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# SCHEDULE 13D/A

**(Amendment No. 23)***
**Under the Securities Exchange Act of 1934**

---

# AVIS BUDGET GROUP, INC.
**(Name of Issuer)**

**Common Stock, par value $0.01 per share**
**(Title of Class of Securities)**

**053774105**
**(CUSIP Number)**

**David Zales**
**SRS Investment Management, LLC**
**One Bryant Park**
**39th Floor**
**New York, New York 10036**
**(212) 520-7900**

---

*With a copy to:*

**Stephen Fraidin**
**Richard M. Brand**
**Kiran Kadekar**
**Cadwalader, Wickersham & Taft LLP**
**200 Liberty Street**
**New York, New York 10281**
**(212) 504-6000**
**(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)**

**August 25, 2023**
**(Date of Event which Requires Filing of this Statement)**

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), Rule 13d-1(f) or Rule 13d-1(g), check the following box.  ☐

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

| 1 | NAME OF REPORTING PERSON<br><br>SRS INVESTMENT MANAGEMENT, LLC | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(a) ☐     (b) ☐ | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS<br><br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e)<br><br>☐ | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware, United States | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br><br>-0- | |
| | 8 | SHARED VOTING POWER<br><br>17,430,882 shares of Common Stock | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>-0- | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>17,430,882 shares of Common Stock | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>17,430,882 shares of Common Stock | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES<br><br>☐ | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>45.0% | | |
| 14 | TYPE OF REPORTING PERSON<br><br>IA, OO | | |

| 1 | NAME OF REPORTING PERSON<br><br>KARTHIK R. SARMA | | |
|---|---|---|---|
| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP<br>(a) ☐     (b) ☐ | | |
| 3 | SEC USE ONLY | | |
| 4 | SOURCE OF FUNDS<br><br>AF | | |
| 5 | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS 2(d) or 2(e)<br><br>☐ | | |
| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>India | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER<br><br>-0- | |
| | 8 | SHARED VOTING POWER<br><br>17,430,882 shares of Common Stock | |
| | 9 | SOLE DISPOSITIVE POWER<br><br>-0- | |
| | 10 | SHARED DISPOSITIVE POWER<br><br>17,430,882 shares of Common Stock | |
| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>17,430,882 shares of Common Stock | | |
| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES<br><br>☐ | | |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>45.0% | | |
| 14 | TYPE OF REPORTING PERSON<br><br>IN | | |

This Amendment to Schedule 13D (this "Amendment") relates to the Schedule 13D filed with the Securities and Exchange Commission (the "SEC") on January 25, 2016 (the "Initial 13D" and, as amended and supplemented through the date of this Amendment, collectively, the "Schedule 13D") by the Reporting Persons, relating to the common stock, par value $0.01 per share (the "Common Stock"), of Avis Budget Group, Inc., a Delaware corporation (the "Issuer"). Capitalized terms used herein and not otherwise defined in this Amendment have the meanings set forth in the Schedule 13D.

Percentage beneficial ownership reported herein is based on 38,738,944 shares of common stock outstanding as of July 31, 2023, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended June 30, 2023.

This Amendment amends Items 4, 5, and 6 as set forth below:

Item 4.        PURPOSE OF TRANSACTION

The response to Item 4 is amended and supplemented by adding the following:

On August 25, 2023, the Reporting Persons sold to the Issuer an aggregate of 1,000,000 shares of Common Stock in a broker to broker transaction at market price at the time of the trade (which was $222.91 (rounding to the nearest cent)). The Reporting Persons effected such sale to obtain liquidity. The sale is also being undertaken to enable the Reporting Persons to maintain, at least for the time being, a percentage ownership range in the Company consistent with their recent percentage ownership range in light of the Issuer's Common Stock repurchases. The Reporting Persons continue to support the Issuer's Common Stock buyback program, and have confidence in the management of the Issuer.

The Reporting Persons intend to continue to review their investment in the Issuer on a continuing basis and depending upon various factors, including, without limitation, the Issuer's financial position and strategic direction, overall market conditions, the outcome of any discussions referenced above, other investment opportunities available to the Reporting Persons, and the availability of securities of the Issuer at prices that would make the purchase or sale of such securities desirable, the Reporting Persons may endeavor (i) to increase or decrease its position in the Issuer through, among other things, the purchase or sale of securities of the Issuer, including through transactions involving Common Stock and/or other equity, debt, notes, other securities, or derivative or other instruments that are based upon or relate to the value of securities of the Issuer in the open market or in private transactions, including through a trading plan created under Rule 10b5-1(c) or otherwise, on such terms and at such times as the Reporting Persons may deem advisable; and/or (ii) to enter into transactions that increase or hedge its economic exposure to the Common Stock without affecting its beneficial ownership of shares of Common Stock. In addition, the Reporting Persons may, at any time and from time to time, (i) review or reconsider its position and/or change its purpose and/or formulate plans or proposals with respect thereto and (iii) propose or consider one or more of the actions described in subparagraphs (a)—(j) of Item 4 of Schedule 13D.

Item 5.        INTEREST IN SECURITIES OF THE ISSUER

Paragraphs (a)-(c) of Item 5 of the Schedule 13D are hereby amended and restated in their entirety, as follows:

(a) The aggregate number of shares of Common Stock to which this Schedule 13D relates is 17,430,882 shares of Common Stock, constituting approximately 45.0% of the outstanding Common Stock. All percentages set forth herein are based on 38,738,944 shares of outstanding common stock, par value $0.01, of the Issuer outstanding as of July 31, 2023, as reported in the Issuer's Quarterly Report on Form 10-Q for the quarter ended June 30, 2023. Pursuant to certain cash-settled equity swaps, the Reporting Persons have economic exposure to an additional notional 2,862,283 shares of Common Stock, constituting approximately 7.4% of the outstanding shares of Common Stock, as more fully described in Item 6 of this Schedule 13D.

(b) Each of the Reporting Persons has the shared power to vote or to direct the vote or dispose or direct the disposition of 17,430,882 shares of Common Stock.

(c) The response to Item 4 of this Amendment is incorporated herein by reference.

Item 6.        CONTRACTS, ARRANGEMENTS, UNDERSTANDINGS OR RELATIONSHIPS WITH RESPECT TO SECURITIES OF THE ISSUER

Item 6 of the Schedule 13D is hereby amended and supplemented by the addition of the following:

Item 4 of this Amendment is incorporated herein by reference.

**SIGNATURES**

After reasonable inquiry and to the best of his or its knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: August 25, 2023

**SRS INVESTMENT MANAGEMENT, LLC**

By:  /s/ David B. Zales
     Name: David B. Zales
     Title: General Counsel

By:  /s/ Karthik R. Sarma
     **KARTHIK R. SARMA**

# EXHIBIT 10

**FORM 4**    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* <br><br> **SRS Investment Management, LLC** <br><br> (Last) (First) (Middle) <br><br> **1 BRYANT PARK** <br> **39TH FLOOR** <br><br> (Street) <br><br> **NEW YORK**   **NY**    **10036** <br><br> (City) (State) (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br><br> **AVIS BUDGET GROUP, INC.** [ **CAR** ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> X   Director     X   10% Owner <br><br> ☐ Officer (give title below)    ☐ Other (specify below) |
|---|---|---|
| | 3. Date of Earliest Transaction (Month/Day/Year) <br> **08/25/2023** | |
| | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br><br> ☐ Form filed by One Reporting Person <br><br> X   Form filed by More than One Reporting Person |
| | Rule 10b5-1(c) Transaction Indication <br><br> ☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10. | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/25/2023 | | D[(1)] | | 1,000,000 | D | $222.91 | 17,430,882 | I | See Footnote[(2)(3)] |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

| 1. Name and Address of Reporting Person* <br><br> **SRS Investment Management, LLC** <br><br> (Last) (First) (Middle) <br><br> **1 BRYANT PARK** <br> **39TH FLOOR** <br><br> (Street) <br><br> **NEW YORK**   **NY**    **10036** <br><br> (City) (State) (Zip) |
|---|

| 1. Name and Address of Reporting Person* <br><br> **Sarma Karthik R.** <br><br> (Last) (First) (Middle) <br><br> **C/O SRS INVESTMENT MANAGEMENT, LLC** <br> **1 BRYANT PARK, 39TH FLOOR** <br><br> (Street) <br><br> **NEW YORK**   **NY**    **10036** <br><br> (City) (State) (Zip) |
|---|

**Explanation of Responses:**

1. On August 25, 2023, the Reporting Persons sold to the Issuer an aggregate of 1,000,000 shares of Common Stock in a broker to broker transaction at market price at the time of the trade (which was $222.91 (rounding to the nearest cent)) (the "2023 Repurchase"). The 2023 Repurchase was approved by the Compensation Committee and was exempt pursuant to Rule 16b-3 under the Exchange Act.

2. SRS Investment Management, LLC, a Delaware limited liability company ("SRS"), serves as investment manager to certain investment funds (the "Funds") and has investment discretion with respect to the securities reported herein which are held by the Funds. SRS Investment Management, LP ("SRS IM"), a Delaware limited partnership, is the managing member of the Investment Manager. SRS Investment Management GP, LLC, a Delaware limited liability company ("SRS IM GP"), is the general partner of SRS IM. Karthik R. Sarma ("Mr. Sarma," and together with SRS, the "Reporting

Persons") is the managing member and principal of SRS IM GP. In such capacities, Mr. Sarma and the Investment Manager may be deemed to have voting and dispositive power with respect to the shares of Common Stock held by the Fund and the Managed Account. SRS managed Account's authorization to file on behalf of the reporting person with respect to a the Common Stock held.

3. The filing of this statement shall not be deemed an admission that any of the Reporting Persons is, for purposes of Section 16 or otherwise, the beneficial owner of the securities reported herein for purposes of Section 16 of the Securities Act of 1934, as amended, or otherwise. Each of the Reporting Persons expressly disclaims beneficial ownership of the securities reported herein except to the extent of its or his pecuniary interest therein.

| | |
|---|---|
| SRS INVESTMENT MANAGEMENT, LLC; by: /s/ David B. Zales, General Counsel | 08/25/2023 |
| /s/ Karthik R. Sarma | 08/25/2023 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 11

# Press Release Details

# Avis Budget Group Announces Management Realignment

November 1, 2023 at 4:07 PM EDT

 PDF Version

Izzy Martins to be appointed EVP & CFO and Brian Choi to be appointed EVP & Chief Transformation Officer

Jagdeep Pahwa to become Chairman and Bernardo Hees to continue as Board Member

PARSIPPANY, N.J., Nov. 01, 2023 (GLOBE NEWSWIRE) -- Avis Budget Group, Inc. **(NASDAQ: CAR)** today announced significant changes within its leadership team, reinforcing the company's commitment to its strategic vision and long-term success.

Effective January 1, 2024, Izzy Martins, currently serving as EVP Americas, will assume the role of EVP & Chief Financial Officer, succeeding Brian Choi, who will take on the newly established position of EVP & Chief Transformation Officer.

Ms. Martins has been with Avis Budget Group for nearly 20 years in various senior strategic and financial roles, including Chief Financial Officer, Americas, Chief Accounting Officer and most recently EVP Americas, where she obtained a wealth of operational expertise through her responsibilities for the Americas region.

Mr. Choi's appointment as EVP & Chief Transformation Officer underscores Avis Budget Group's commitment to leveraging data, analytics, and cutting-edge technology to enhance the customer experience, revenue management, and overall operational performance. Mr. Choi has served as the company's EVP & Chief Financial Officer since August 2020.

Joe Ferraro, Chief Executive Officer of Avis Budget Group, said, "Izzy's deep financial acumen coupled with her operational expertise will ensure a seamless transition into the CFO role. She is a key strategic partner to me, the Board, and the leadership team, and has been instrumental to our success over the years.   Brian's thought leadership in identifying strategies to position our business for growth and profitability has led to the creation of our transformation function. I asked Brian to lead these efforts as part of his evolving responsibilities. I want to thank both Izzy and Brian for their contributions in driving our Company's performance over the past several years, inclusive of our post-pandemic transformation.

Izzy and Brian are great examples of our longstanding focus on developing talent at all levels of our organization."

In addition, effective immediately following the 2024 Annual Meeting, Jagdeep Pahwa, currently Vice Chairman of the Board, will become Chairman replacing Bernardo Hees in that capacity. Mr. Hees will continue to be a member of the Company's Board of Directors. Mr. Pahwa has been a director since April 2018 and Vice Chairman since 2020. Mr. Pahwa serves as President of SRS Investment Management. Mr. Hees has been a director since February 2020 and Executive Chairman since July 2020.

Bernardo Hees, Executive Chairman said, "I could not be more pleased with the Company's performance under the leadership of Mr. Ferraro and this board over the past four years.   The success achieved through our focused strategy, aligned organization structure, and excellence in execution makes this a natural time for me to transition from Executive Chairman to a member of the Board. I have worked closely with Jagdeep and am confident that the company will continue its strong performance under his guidance. I wish him the best in his new role."

Jagdeep Pahwa, Vice Chairman, added, "On behalf of the company and its board, I extend my gratitude to Bernardo for his significant contributions over the past four years. He has played a pivotal role in leading both the Board and the management team and building a sustainable high-performance culture at Avis. I am honored to take on the role of Chairman and look forward to working with Joe, the management team, and fellow Board members as we guide the company through its continued evolution."

**About Avis Budget Group**

Avis Budget Group, Inc. is a leading global provider of mobility solutions, both through its Avis and Budget brands, which have more than 10,000 rental locations in approximately 180 countries around the world, and through its Zipcar brand, which is the world's leading car sharing network. Avis Budget Group operates most of its car rental offices in North America, Europe and Australasia directly, and operates primarily through licensees in other parts of the world. Avis Budget Group is headquartered in Parsippany, N.J.

**Forward-Looking Statements**

*Certain statements in this press release constitute "forward-looking statements." Any statements that refer to outlook, expectations or other characterizations of future events, circumstances, or results, including the management and board changes discussed in this press release, are forward-looking statements. Various risks that could cause future results to differ from those expressed by the forward-looking statements included in this press release include, but are not limited to, risks related to the management and board changes discussed in this press release and the other factors described in the "Risk Factors" and "Forward-Looking Statements" sections of Avis Budget Group's Annual Report on Form 10-K for the year ended December 31, 2022 and Quarterly Report on Form 10-Q for the three months ended June 30, 2023. Accordingly, actual results, levels of activity, performance, achievements, and events could differ materially from those stated, anticipated or implied by such forward-looking statements. The Company undertakes no obligation to update any forward-looking statements to reflect subsequent events or circumstances.*

**Contacts**

*Investor Contact:* David Calabria IR@avisbudget.com

*Media Contact:* James Tomlinson Abgpress@edelman.com

# EXHIBIT 12

**EFiled: Feb 19 2013 01:06PM EST**
**Transaction ID 49619361**
**Case No. 6476-CS**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE PUDA COAL, INC.          :
STOCKHOLDERS LITIGATION        :
                               :   Consolidated
                               :   C.A. No.6476-CS


                     -  -  -

                     Chancery Courtroom No. 12A
                     New Castle County Courthouse
                     Wilmington, Delaware
                     Wednesday, February 6, 2013
                     10:00 a.m.


BEFORE:  HON. LEO E. STRINE, JR., Chancellor.


                     -  -  -


          ORAL ARGUMENT AND THE COURT'S RULING


                     -  -  -


------------------------------------------------------
              CHANCERY COURT REPORTERS
         500 North King Street - Suite 11400
            Wilmington, Delaware 19801-3759
                  (302) 255-0525

2

1   APPEARANCES:

2       NICHOLAS J. ROHRER, ESQ.
        Young Conaway Stargatt & Taylor, LLP
3            -and-
        GEORGE C. AGUILAR, ESQ.
4       of the California Bar
        Robbins Umeda LLP
5         Liaison Counsel for Plaintiffs

6       S. MARK HURD, ESQ.
        D. McKINLEY MEASLEY, ESQ.
7       Morris, Nichols, Arsht & Tunnell LLP
             -and-
8       RICHARD M. STRASSBERG, ESQ.
        MARY K. DULKA, ESQ.
9       of the New York Bar
        Goodwin Procter LLP
10        For Defendants Lawrence S. Wizel and
          C. Mark Tang

11                              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

3

 1            MR. ROHRER:  Good morning, Your Honor.

 2   Nicholas Rohrer.  I wanted to introduce my co-counsel,

 3   George Aguilar of the Robbins Umeda law firm who will

 4   be making argument for plaintiffs.  Thank you.

 5            THE COURT:  Good morning.

 6            Good morning, Mr. Hurd.

 7            MR. HURD:  Good morning, Your Honor.

 8   Mark Hurd of Morris Nichols for defendants Wizel and

 9   Tang.  I wanted to introduce to Your Honor Rich

10   Strassberg and Mary Dulka of Goodwin Procter.

11   Mr. Strassberg will be presenting argument on behalf

12   of our clients.

13            THE COURT:  Let's be to the point this

14   morning.  There are a few discrete issues, then we can

15   get to an answer.

16            Also, there's a motion for default

17   judgment; right?

18            MR. AGUILAR:  Yes, Your Honor.

19            THE COURT:  It's granted.  What you

20   need to prepare is an order.  I don't know what you

21   want in terms of relief.  I think what you need to be

22   thinking about is -- given what I understand all the

23   parties before the case say is basically a theft of

24   corporate assets, I don't know what we can do in the

CHANCERY COURT REPORTERS

4

1   United States to get them back.  But it would seem to

2   me a fairly strong judgment, which also allows you the

3   ability to get at any assets that the defendants have

4   placed in any channels of international commerce where

5   it's permissible to place liens against them or

6   transfer judgments to is in order.

7                    MR. AGUILAR:  Thank you.

8                    THE COURT:  Mr. Strassberg.

9                    Mr. Strassberg, I'm going to be

10  really -- your demand excusal theory is one I'm trying

11  to understand.  The three independent directors

12  resigned; right?

13                   MR. STRASSBERG:  Yes, they did, Your

14  Honor.  They resigned.  While the suit -- the suit

15  had --

16                   THE COURT:  The suit had already been

17  filed here.

18                   MR. STRASSBERG:  Yes, Your Honor.

19                   THE COURT:  They concluded the assets

20  had been stolen out from under them?

21                   MR. STRASSBERG:  Well, Your Honor, I

22  would say that the audit committee investigation that

23  they were compromising of did report back that it

24  appeared that Mr. Zhao had sold the assets.

CHANCERY COURT REPORTERS

5

1          THE COURT:  What I mean is, sold the

2     assets.  He didn't sell the assets and get

3     remuneration that was put in the corporate treasury.

4          MR. STRASSBERG:  No.  That's correct,

5     Your Honor.

6          THE COURT:  That's what I mean by -- I

7     used the '70s-school-playground-kid kind of thing,

8     "stolen out from under."

9          Then the three independent directors,

10    because of lack of cooperation, resigned.  Correct?

11         MR. STRASSBERG:  They did resign, Your

12    Honor.

13         THE COURT:  And they now stand before

14    the Court represented by excellent law firms saying

15    that demand is excused because, at the time this

16    complaint was filed, there were three independent

17    directors, and that would be a majority of the board

18    who could control what the company did.  After those

19    three directors concluded that it appeared that the

20    assets of the company had been stolen out from under

21    them, they did not cause the company to sue to recover

22    the assets using their control of the board.  They

23    quit, leaving the company in the hands of -- how many?

24    The two directors?

CHANCERY COURT REPORTERS

6

1          MR. STRASSBERG:  The first director,

2   Mr. Zhu, had resigned first in September.  So he had

3   left before any of the other independent directors had

4   resigned.

5          THE COURT:  This was a five-member

6   board.

7          MR. STRASSBERG:  Mr. Zhao would be the

8   remaining director.

9          THE COURT:  I thought there were five

10  directors.

11         MR. STRASSBERG:  There were two

12  implicated in the theft.

13         THE COURT:  So it left the two.

14         MR. STRASSBERG:  One of those two had

15  resigned earlier.

16         THE COURT:  So it left the principal

17  suspected wrongdoer in control of the company.  So as

18  I understand it, this is like you win because there's

19  cases that say you measure demand excusal by the board

20  in place when you filed the complaint.  Your clients,

21  by quitting, immunized themselves from suit while

22  simultaneously making it impossible for the company

23  itself to bring the suit.  I'm just wondering how, if

24  my state embraces this, we are not subject to totally

CHANCERY COURT REPORTERS

7

1  legitimate ridicule.

2              MR. STRASSBERG:  Your Honor, so let me

3  address that point directly.  I think your comments,

4  which go to the heart of the underlying activity by

5  Chairman Zhao reflect what appears to be a horrible

6  activity from him.

7              THE COURT:  No.  They go directly to

8  the argument that you and Mr. Hurd have made to me,

9  which is a demand excusal argument.  Mr. Strassberg, I

10 did not ask you and Mr. Hurd to make this argument.

11 You made it.  You did not bring just a 12(b)(6)

12 motion, you brought a demand excusal dismissal motion

13 seeking to impose upon the plaintiffs a higher burden

14 of pleading particularized facts on the grounds that

15 your clients -- and you don't represent the

16 independent director from China?

17              MR. STRASSBERG:  No.

18              THE COURT:  And the default judgment

19 motion has been against him, too?

20              MR. AGUILAR:  Yes, Your Honor.

21              THE COURT:  Well, I'm entering one.

22 You don't get to serve as a Delaware company and then

23 say, teeheehee, I'm not coming to Delaware on the

24 grounds that the three of them were independent

8

 1   directors.  They're a board majority.  They could act

 2   to take care of the company.

 3                   Of course, the undisputed fact is,

 4   after they concluded that it appeared that the assets

 5   were stolen out from under them, they did not cause

 6   the company to sue.  They quit.  Then they come to

 7   court and seek to have the case dismissed.

 8                   By the way, they're seeking to act on

 9   behalf of the defaulting defendants.  Well, Mr. Hurd

10   looks quizzical.  If I dismiss the case on demand

11   excusal grounds, I can't enter a default judgment

12   against a wrongdoer, can I?

13                   MR. STRASSBERG:  Your Honor --

14                   THE COURT:  Can I?

15                   MR. STRASSBERG:  I'm not sure the

16   answer to that question.

17                   THE COURT:  Wait a minute.  Why are

18   you not sure?

19                   MR. STRASSBERG:  What --

20                   THE COURT:  A Delaware lawyer is

21   telling me, I think, if I dismiss the case on demand

22   excusal grounds, I dismissed it because control of the

23   lawsuit belongs to the company, therefore the decision

24   to sue the insiders who took the assets belongs to the

9

1    company.  The company might conclude that it's

2    perfectly okay to take the assets, or there's a cost

3    benefit analysis of suing and it's just not worth it.

4    I can't take on to myself in that situation.  I can't

5    enter a judgment at the instance of derivative

6    plaintiffs because control of a lawsuit belongs to the

7    board, which is now controlled by the guy who your

8    clients suspect stole the assets out from under them.

9                    MR. STRASSBERG:  Your Honor, the

10    reason for the demand -- we hear Your Honor and we

11    believe that the 12(b)(6) motion is a meritorious one.

12    But the reason for the demand, as Your Honor has

13    asked -- as Your Honor knows better than anyone, the

14    reason for the demand requirement is to put these

15    decisions to the corporation at the time in May when

16    the case is filed.

17                    THE COURT:  I understand what it is.

18    And there's also the idea: yes, at the time that you

19    do it, you should ask the corporation to act.  If at

20    the time motion practice occurs the people who are

21    claiming that they could act have concluded that the

22    entire corporate asset base has been sold out from

23    under the independent directors and what they decided

24    to do was to quit, for you, then, to say to the Court

10

1    that they could impartially consider a demand they

2    would have prior in time -- again, the law is supposed

3    to make common sense.  There's a measuring stick of,

4    yes, if they stayed in office and stuck to their guns,

5    then the measuring stick is when they sued because

6    they were the ones you should have gone and made the

7    demand to.  When, as a matter of undisputed reality,

8    when they were faced with knowing in their view that

9    there had been the most extreme sort of fiduciary

10   violation you could imagine, rather than have the

11   company sue, they quit, then come into court and seek

12   to use 23.1 and, frankly, disable the derivative

13   plaintiffs from even going after the bad guys.  When I

14   mean bad guys, I'm using your client's own view of

15   these people.  I'm trying to understand how my

16   state -- if I were to embrace this -- my state's

17   corporate law would not be justly subject to ridicule.

18               MR. STRASSBERG:  Judge, again, I don't

19   want to belabor.  I hear Your Honor and I respect Your

20   Honor's obviously views about this issue and I think

21   the motion and the plaintiffs' complaint is not

22   sufficient to sustain even the plaintiff friendly

23   standard under 12(b)(6).  But if Your Honor -- so I'm

24   happy -- if Your Honor would like me to --

11

```
 1                    THE COURT:  Do your clients speak

 2   Chinese?

 3                    MR. STRASSBERG:  One of the two

 4   clients does speak Chinese.

 5                    THE COURT:  One of them does.

 6                    MR. STRASSBERG:  But one of them does

 7   not.

 8                    THE COURT:  These assets were sold out

 9   from under him almost two years before they had any

10   inkling?

11                    MR. STRASSBERG:  Eighteen months, Your

12   Honor, yes.  Your Honor, let me then turn, if I

13   might --

14                    THE COURT:  I actually don't.

15                    MR. STRASSBERG:  If you want me to

16   stay on it --

17                    THE COURT:  Actually, I'm pretty hep.

18   I have a question for your friend about one of their

19   counts, otherwise I'm fine.

20                    MR. STRASSBERG:  Okay.

21                    THE COURT:  Thank you, Mr. Strassberg.

22                    Mr. Aguilar, what is this unjust

23   enrichment count about?

24                    MR. AGUILAR:  It's about the
```

12

1    compensation received by the individual defendants.

2              THE COURT:  I understand that theory,

3    having decided the Scrushy case.  As an innovator in

4    this field, I guess I would say the Scrushy case was

5    fairly unique in the sense -- what the Scrushy case

6    went to was the following.  There was a situation

7    where, as I recall, there was difficulty getting

8    testimony, or whatever, from Mr. Scrushy because he

9    was in hot water with the CR part of the law rather

10   than the part that starts with CI.  Some innovative

11   plaintiffs from -- one of the funny things is, you

12   know, some journals wrote about the law firm, the

13   obscure law firm that won Southern Peru.  And they

14   mention some Pennsylvania law firm when it was really

15   the Prickett firm.  Well, this was the Prickett firm

16   who won Scrushy, like they won Van Gorkom.  What they

17   came up with was the theory of unjust enrichment and

18   the argument was pretty simple.  There was a loan, or

19   something like that, where he had it and he paid it

20   back using equity at a time when the financial

21   statements of the companies were materially overstated

22   and had to be restated.  So the theory was, without

23   any kind of fault -- right? --irrespective of whether

24   he's at fault, it was unjust enrichment, because what

13

1  he was allowed to pay back with was worthless, if you

2  get my drift.  What I'm asking about here is, unjust

3  enrichment in this context, you plead nothing about

4  whether these guys got equity grants or option grants

5  or anything that was based on the financial

6  statements.  It all seems to be they were stingy, bad

7  directors, who didn't put in any effort, therefore

8  they shouldn't get paid.  To my mind, if it's the

9  latter theory, if that's really what you're about,

10 that's not a distinct cause of action.  That is, the

11 remedy for a breach of fiduciary duty should include

12 that.  And I saw nothing about whether there was, you

13 know, any tie to the amount of compensation they got

14 to the misstated financial statements.

15              MR. AGUILAR:  You're correct, Your

16 Honor.  It is our latter theory or how you expressed

17 it is our theory.  We do not have any evidence of

18 compensation tied to the value of the asset that was

19 taken.

20              THE COURT:  Okay.  Thank you.

21              I'm actually -- unless you have

22 something to comment on that part, Mr. Strassberg, I'm

23 good.

24              MR. STRASSBERG:  I don't, Your Honor.

CHANCERY COURT REPORTERS

14

1          THE COURT:  Okay.  I'm going to deny

2   the motion to dismiss, except in one minor respect.

3   I'll start with 23.1.  I did find this an astonishing

4   argument from these gentlemen, because it actually

5   could have fairly catastrophic consequences on the

6   ability of the derivative plaintiffs to go after

7   persons that they claim to be essentially thieves.

8   I'm kind of an old-school Delaware guy.  If there's a

9   demand excusal motion to dismiss that's granted, then

10  control of the entire lawsuit belongs to the board of

11  directors of the company, not to the derivative

12  plaintiffs.  It doesn't just dismiss the suit as to

13  the independent directors.  And that means I couldn't

14  have entered the default judgment that I entered

15  because the decision whether to bring an action

16  against those suspected wrongdoers would be in the

17  control of the board of directors, the sole member of

18  which is now the one who's alleged by the independent

19  directors to be the principal wrongdoer.

20          Why use the term ridicule?  I think

21  those of us who actually -- judges in Delaware who

22  participate in corporate law in Delaware take

23  legitimate umbrage when folks say that we don't hold

24  managers accountable for breaches of fiduciary duty in

CHANCERY COURT REPORTERS

15

1   Delaware.  I find that claim to be astonishingly

2   outdated and simple-minded, when any review of our

3   corporate law will see -- just out of our statutory

4   corporate law will say that is, frankly, much more pro

5   stockholder and more balanced than any of our other

6   states, most of which have stronger insulations

7   against director liability, many of which allow

8   directors in the context of takeovers to use takeover

9   defenses not permissible in Delaware, and when the

10  major controversies that have come out of Delaware

11  over the last 30 years, some of them have been about

12  things that are anti stockholder.  Many of them are

13  cases like Van Gorkom, Omnicare, Quickturn.  Guys like

14  me, El Paso, Southern Peru, Loral, where we've held

15  people accountable in big ways for things.  And we

16  take seriously in the derivative suit contest that,

17  frankly, you shouldn't lightly take away from the

18  board of directors the ability to control a lawsuit.

19  But to use doctrinal law in some sort of gotcha way is

20  just not appropriate.

21              The plain, simple reality here, as

22  admitted by the moving defendants, is the following.

23  When these plaintiffs sued, they were a majority of

24  the board.  So they claim they're independent with

16

1    their colleague from China.  They could have

2    controlled the lawsuit.  They investigate the very

3    things that are at the very bottom of the plaintiffs'

4    suit.  They conclude that what the plaintiffs are

5    complaining about they subjectively believe is true.

6    But they have been stonewalled.  In the face of

7    stonewalling and knowing that they could actually

8    cause the company to join the lawsuit and pursue

9    things, these directors quit.  They quit.  They leave

10   the company under the sole dominion of a person they

11   believe has pervasively breached his fiduciary duty of

12   loyalty.

13                  Then, when faced with this lawsuit,

14   rather than simply defend it as to themselves on the

15   straight up 12(b)(6) ground, they use the shield of

16   23.1 and claim that because when they were in a board

17   majority at the time the lawsuit was done, the

18   plaintiffs can't go forward, even while telling the

19   Court that what they would do when they concluded

20   there was wrongdoing was not to bring suit but to quit

21   and leave the company in the control of a person that

22   they believed had seriously breached his fiduciary

23   duty of loyalty.

24                  Now, I have read Kafka because I like

CHANCERY COURT REPORTERS

1    literature.  I think it would be drawing the wrong

2    lessons from Kafka for me to premise a dismissal of

3    this case on demand excusal grounds.  I think

4    Kafkaesque is the only way one could put that.  It

5    would be ridiculous and it would be wrong.  And I will

6    not -- do not believe our law requires such a

7    ridiculous result, and I am rejecting the demand

8    excusal argument.

9                    On 12(b)(6), I am sorry.  Even if it's

10   just purely looked at as a Caremark case, drawing

11   reasonable, rational inferences in favor of the

12   plaintiffs, as I must, I believe the inference -- one

13   possible inference you can draw from this complaint is

14   that essentially somebody took hold of an American

15   vehicle, filled it with assets, sold a large amount of

16   stock to the American investing public that

17   independent directors were willing to go on and be a

18   vehicle and get payments without understanding the

19   duties they were taking on.  That if you're going to

20   have a company domiciled for purposes of its relations

21   with its investors in Delaware and the assets and

22   operations of that company are situated in China that,

23   in order for you to meet your obligation of good

24   faith, you better have your physical body in China an

18

1   awful lot.  You better have in place a system of

2   controls to make sure that you know that you actually

3   own the assets.  You better have the language skills

4   to navigate the environment in which the company is

5   operating.  You better have retained accountants and

6   lawyers who are fit to the task of maintaining a

7   system of controls over a public company.  When a

8   board of directors -- one of the things Caremark

9   people lose sight of, one of the things at the root of

10  Caremark, if you look at all the cases in the pattern,

11  there's also something that is a violation of law that

12  the company has been called out about.  Important.

13  Companies -- we should all try to be as law compliant

14  as we can.  I won't ask anybody about how compliant

15  they are with speed limits all the time.  Often you

16  can be at a company where it has a $25 billion market

17  cap and it's assessed a $45 million regulatory penalty

18  for one of its pharmaceutical units in the northwest

19  of the United States.  Right?  Directors are sitting

20  on top of a board of a $25 billion company.  That

21  proportionality comes into play in assessing Caremark

22  and the reasonableness of peoples' efforts at

23  compliance because you can't watch everybody

24  everywhere.  You have to have a system.  This is a

CHANCERY COURT REPORTERS

19

1   little bit distinct from your typical Caremark case.

2   Why?  Because the entire asset base of the company was

3   sold out from under the independent directors nearly

4   two years before they discovered it.  And did they

5   discover it?  No.  Apparently people who can blog

6   about things discovered it.

7                    Now, it may go that these directors

8   toured the organizations every quarter and were

9   actually having quarterly board meetings in facilities

10  the companies no longer owned.  It might be that they

11  had their auditors in there.  They had change of

12  control.  It may be -- it may also be that they

13  basically met telephonically quarterly.  Never went to

14  China.  And I'm not going to dismiss it for anything.

15  There's a breach of fiduciary duty count.  I believe

16  that the magnitude of what happened here, the length

17  of time it went undiscovered, the repetitive filing of

18  statements saying that the company owned assets they

19  didn't, I do think it gives rise to a Caremark claim

20  in these circumstances, and it gives rise again to the

21  possibility that people allow themselves to be -- I

22  just taught last night in class the Francis case from

23  New Jersey, the old bank case about the insurance

24  brokerage case, the woman who was on the board and she

CHANCERY COURT REPORTERS

20

 1   never read any financial statements for ten years.

 2   Whatever.  And the Court said, "We didn't allow dummy

 3   directors."  What they mean by that, we actually do

 4   allow dummy directors.  You can be a dummy director.

 5   You just have to be an active dummy director.

 6              You're actually dumb; right?  Strine

 7   misses stuff.  If I'm trying and I miss stuff, you get

 8   credit for that.  What you can't be is a dummy

 9   director in the sense of an actual dummy.  Like

10   somebody, a mannequin, somebody who allows themselves

11   to be appointed to something without any serious

12   effort to fulfill the duties.

13              Now we're at the motion to dismiss

14   stage.  That is the most plaintiff-friendly,

15   least-defendant-friendly context of the case.  But in

16   this situation, frankly -- and this is a troubling

17   thing for Delaware, and this court has taken very

18   seriously this -- the use of Delaware entities.  And I

19   forget whether this was a shell.  I suspect it was a

20   shell.  I suspect it was something that never went

21   public in this form in the United States.  It was

22   revived.  I take very seriously our integrity.  This

23   is a very troubling case in terms of that, the use of

24   a Delaware entity in something along these lines.

CHANCERY COURT REPORTERS

1    Independent directors who step into these situations

2    involving essentially the fiduciary oversight of

3    assets in other parts of the world have a duty not to

4    be dummy directors.  I'm not mixing up care in the

5    sense of negligence with loyalty here, in the sense of

6    your duty of loyalty.  I'm talking about the loyalty

7    issue of understanding that if the assets are in

8    Russia, if they're in Nigeria, if they're in the

9    Middle East, if they're in China, that you're not

10   going to be able to sit in your home in the U.S. and

11   do a conference call four times a year and discharge

12   your duty of loyalty.  That won't cut it.  That there

13   will be special challenges that deal with linguistic,

14   cultural and others in terms of the effort that you

15   have to put in to discharge your duty of loyalty.

16   There's no such thing as being a dummy director in

17   Delaware, a shill, someone who just puts themselves up

18   and represents to the investing public that they're a

19   monitor.  Because the only reason to have independent

20   directors -- remember, you don't pick them for their

21   industry expertise.  You pick them because of their

22   independence and their ability to monitor the people

23   who are managing the company.  And a lot of life -- I

24   would not serve on -- if I were in the private

22

1    sector -- not that anybody would want me -- but there

2    are a lot of companies on boards I would not serve

3    because the industry's too complex.  So if I can't

4    understand how the company makes money, that's a

5    danger.  If it's a situation where, frankly, all the

6    flow of information is in the language that I don't

7    understand, in a culture where there's, frankly, not

8    legal strictures or structures or ethical mores yet

9    that may be advanced to the level where I'm

10   comfortable?  It would be very difficult if I didn't

11   know the language, the tools.  You better be careful

12   there.  You have a duty to think.  You can't just go

13   on this and act like this was an S&L regulated by the

14   federal government in Iowa and you live in Iowa.

15                So on Caremark alone, I have no

16   problem saying that it passes muster under 12(b)(6).

17   Again, 12(b)(6) is different than 23.1.  One of the

18   things these directors tried to do was to impose a

19   particularized pleading burden.  It's not a

20   particularized pleading burden.  It's 12(b)(6).  It's

21   perfectly conceivable on these pled facts that there

22   wasn't a good faith effort to try to monitor.

23                There's also another thing that in my

24   view states a claim for breach of fiduciary duty,

23

1   which is the behavior of these directors once they

2   recognized what the insiders had done.

3              I'm not sure that the Monty Python

4   response -- and I refer to the scene involving the

5   words "run away."  I don't believe that -- there are

6   some circumstances in which running away does not

7   immunize you.  It in fact involves a breach of duty.

8   And I think the extreme circumstances here might well

9   constitute one.  If these directors are going to

10  eventually testify that at the time that they quit

11  they believed that the chief executive officer of the

12  company had stolen the assets out from under the

13  company, and they did not cause the company to sue or

14  do anything, but they simply quit, I'm not sure that

15  that's a decision that itself is not a breach of

16  fiduciary duty.  And that's another reason for

17  sustaining the complaint.

18             So the motion to dismiss the breach of

19  fiduciary duty counts is denied.

20             I am going to dismiss the unjust

21  enrichment count for the following reasons that's pre

22  staged by my colloquy of both Mr. Aguilar.

23             Having been the Judge who kind of

24  innovated a bit with the use of unjust enrichment in

CHANCERY COURT REPORTERS

24

1    the Scrushy case, I think that is a fairly narrow use.

2    Unjust enrichment is an equitable gap filler that

3    exists when there isn't another legal or equitable

4    cause of action.  The appropriate way to recover a

5    compensation paid to these directors, if it's on the

6    theory that they essentially didn't show up to work is

7    as an element -- that should be really part of the

8    damages that are assessed against them if the

9    plaintiffs prevail on their breach of fiduciary duty.

10   It's another thing if, as my colloquy with Mr. Aguilar

11   indicated, I think it would be another thing if they

12   got compensation that was measured by the false

13   financial statements.  That, I think, would be more

14   analogous to Scrushy, where you wouldn't necessarily

15   have to prove fault on their behalf.  They were simply

16   unjustly enriched, being the people who were --

17   approved the financial statements that were false and

18   were the basis for their excess compensation.  I think

19   you could get to something, and I wouldn't probably

20   dismiss.  You didn't engage on that point and I

21   applaud Mr. Aguilar's candor that that was not his

22   theory.  So I'm going to dismiss that count without

23   prejudice.  If there turns out to be some element of

24   compensation that is more tied to the statements, but

25

1    the present theory I don't expect to see again.

2                    So why don't you all work on an

3    implementing order and we'll go from there.  That

4    includes obviously, as to the default judgment,

5    figuring out where to go.

6                    I also encourage, in light of the

7    entry of the default judgment, in light of the

8    colloquy this morning, perhaps there should be some

9    discussions between the plaintiffs and the defendants.

10   And there might be more commonality of interests than

11   perhaps has been suspected.  I don't know.  It may be

12   just a little bit of an adjustment of the perspective,

13   of widening the lens of these fellows and a little bit

14   of counsel yourselves about what this dynamic

15   involves.  Because I think even your friends on the

16   plaintiffs' side would say your clients are

17   differently situated than the other defendants.  But

18   sometimes in acknowledgment -- it's like when people

19   talk about doctors and patients where something goes

20   wrong; right?  How far it goes with the patients

21   sometimes for the doctor to acknowledgment, but the

22   problem in the legal context is it's hard for people

23   to say they're sorry.  Where somebody says I'm sorry,

24   which means I'm sorry that the operation didn't turn

26

1    out as well, it doesn't mean I'm sorry, in the sense

2    I'm admitting that I committed professional

3    malpractice and therefore I owe you all my net worth.

4    Those conversations don't happen because when you're

5    in a legal context.  But the reality is that these

6    fellows were directors and the company was sold out

7    from under them.  It can't feel good.  In some way

8    that I'm not tied to any legal standard, they have got

9    to feel some sense of responsibility, probably, and it

10   might be working together to try to actually clamp

11   down in as big a way as possible on the wrongdoer,

12   together can be a mutually beneficial thing on a

13   kind -- all kinds of levels.  But that's really up to

14   you all.

15           For now, I'm just doing the things I

16   said.  So prepare an implementing order.  Think hard

17   about what should be in the default judgment.  I would

18   urge you all -- and, you know, I'd urge the plaintiffs

19   to not rush that one in.  The only thing -- what I

20   mean by that is, it's a fairly serious document in

21   terms of how it's going to be used, what you can do

22   with it.  The difficulties of collection or

23   enforcement I don't underestimate.  You know,

24   experience does tend to indicate that folks who end up

1    with tens of millions of dollars often place them in

2    more than one nation, and that sometimes they're

3    wiring money, doing other things, and you're able to

4    capture that in places other than their home country.

5                    I also, you know -- frankly, have no

6    understanding of whether there's the potential to get

7    something in China against them or not, but that

8    should obviously be explored.  And to the extent that

9    China wishes to facilitate in-bound investment, this

10   is exactly the thing I wouldn't be putting on a

11   marketing brochure.  There perhaps might be more

12   receptivity than folks might originally imagine to

13   being able to enforce a judgment in China.  I don't

14   know.  But what I'm saying is, it strikes me that, if

15   the principal purpose of this is to get recourse, it's

16   best to take a good patch of time seriously looking at

17   how the order should read and what you need from the

18   Court, and we can have a further hearing about that

19   when you're satisfied.

20                    So, thank you.  See you soon.

21                    (Court adjourned at 10:41 a.m.)

22

23

24

28

1                          CERTIFICATE

2                 I, DIANE G. McGRELLIS, Official Court

3   Reporter of the Chancery Court, State of Delaware, do

4   hereby certify that the foregoing pages numbered 3

5   through 27 contain a true and correct transcription of

6   the proceedings as stenographically reported by me at

7   the hearing in the above cause before the Vice

8   Chancellor of the State of Delaware, on the date

9   therein indicated.

10                 IN WITNESS WHEREOF I have hereunto set

11  my hand at Wilmington, this 7th day of February, 2013.

12

13              /s/ Diane G. McGrellis
                -----------------------------
14              Official Court Reporter
                 of the Chancery Court
15                State of Delaware

16

17  Certification Number: 108-PS
    Expiration:   Permanent
18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

# General Information

| | |
|---|---|
| **Case Name** | CLOSED CONF ORD ON DISC - CONS W/ 6492, 6503, 6515-CS - IN RE PUDA COAL, INC. STOCKHOLDERS LITIGATION |
| **Court** | Delaware Court of Chancery |
| **Date Filed** | Thu May 12 00:00:00 EDT 2011 |
| **Judge(s)** | Andre G. Bouchard |
| **Docket Number** | 6476 |
| **Parties** | Paul Batterson; Jianfei Ni; Ming Zhao; Yao Zhao; C Mark Tang; New Castle County, Sheriff; Susan Cittone; Puda Coal; Liping Zhu; Mark Tang; Puda Coal Inc; Lawrence S Wizel; Qiong Wu; Thomas Erhardt; Ellen Murray |

**Bloomberg Law**®    © 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT 13

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

### SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒
Filed by a Party other than the Registrant ☐
Check the appropriate box:

☐  Preliminary Proxy Statement

☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☒  Definitive Proxy Statement

☐  Definitive Additional Materials

☐  Soliciting Material Pursuant to §240.14a-12



# The Kraft Heinz Company

**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
 (1) Title of each class of securities to which transaction applies:
 (2) Aggregate number of securities to which transaction applies:
 (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
 (4) Proposed maximum aggregate value of transaction:
 (5) Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
 (1) Amount Previously Paid:
 (2) Form, Schedule or Registration Statement No.:
 (3) Filing Party:
 (4) Date Filed:

# THE KRAFT HEINZ COMPANY

**200 East Randolph Street, Suite 7600**
**Chicago, Illinois 60601**

## NOTICE OF 2020 ANNUAL MEETING OF STOCKHOLDERS

| | |
|---|---|
| TIME AND DATE: | 11:00 a.m. EDT on Thursday, May 7, 2020 |
| LOCATION: | Offices of McGuireWoods LLP<br>Tower Two-Sixty<br>260 Forbes Avenue, Suite 1800<br>Pittsburgh, PA 15222 |

**ITEMS OF BUSINESS:**

(1)   To elect all eleven director nominees named in the Proxy Statement to one-year terms expiring in 2021;

(2)   To approve The Kraft Heinz Company's executive compensation;

(3)   To approve The Kraft Heinz Company 2020 Omnibus Incentive Plan;

(4)   To ratify the selection of PricewaterhouseCoopers LLP as our independent auditors for 2020;

(5)   To vote on one stockholder proposal, if properly presented; and

(6)   To transact any other business properly presented at the meeting.

**WHO MAY VOTE:**   Stockholders of record at the close of business on March 9, 2020 (the "Record Date").

**WHO MAY ATTEND:**   If you would like to attend the Annual Meeting, you must be a stockholder of record on the Record Date and obtain an admission ticket in advance. For details on attending the Annual Meeting, see Question 18 on page 59 of the Proxy Statement.

**DATE OF DISTRIBUTION:**   We mailed our Notice of Internet Availability of our proxy materials as well as our Proxy Statement, our Annual Report on Form 10-K for the year ended December 28, 2019, as applicable, and the proxy card on or about March 27, 2020.

We intend to hold our Annual Meeting in person. However, we are actively monitoring the coronavirus (COVID-19) pandemic. We are sensitive to the public health and travel concerns our stockholders may have and the protocols that federal, state, and local governments may impose. In the event it is not possible or advisable to hold our Annual Meeting in person, we will announce alternative arrangements for the meeting as promptly as practicable, which may include holding the meeting solely by means of remote communication. Please monitor our Web site at *www.KraftHeinzCompany.com/2020AMSInformation* for updated information. If you are planning to attend our meeting, please check this website one week prior to the meeting date. As always, we encourage you to vote your shares prior to the Annual Meeting.

March 27, 2020

Rashida La Lande
Senior Vice President, Global General
Counsel and Head of CSR and Government Affairs; Corporate
Secretary

---

**IMPORTANT NOTICE REGARDING THE AVAILABILITY OF PROXY**
**MATERIALS FOR THE ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON MAY 7, 2020**
The Kraft Heinz Company's Proxy Statement and Annual Report on Form 10-K
are available at *http://www.proxyvote.com*

---

# EXECUTIVE COMPENSATION TABLES

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Year | Salary[2] ($) | Bonus ($) | Stock Awards[3][4] ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation[5] [6]($) | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($) | All Other Compensation[9] ($) | Total Compensation ($) |
|---|---|---|---|---|---|---|---|---|---|
| Miguel Patricio, Chief Executive Officer[1] | 2019 | 500,000 | 1,000,000 | 40,746,195 | — | 360,807 | — | 690,478 | 43,297,480 |
| Bernardo Hees, Former Chief Executive Officer | 2019 | 536,538 | — | — | — | 1,084,000 | — | 1,212,904 | 2,833,442 |
| | 2018 | 1,000,000 | — | 25,483,713 | — | 1,060,000 | — | 149,136 | 27,692,849 |
| | 2017 | 1,000,000 | — | 2,730,557 | — | — | — | 463,622 | 4,194,179 |
| Paulo Basilio, Global Chief Financial Officer | 2019 | 750,000 | — | 13,556,182 | — | 780,000 | — | 283,212 | 15,369,394 |
| | 2018 | 750,000 | — | 16,989,123 | — | 1,023,000 | — | 83,699 | 18,845,822 |
| | 2017 | 623,077 | — | 1,499,909 | — | — | — | 79,840 | 2,202,826 |
| David Knopf, Former Chief Financial Officer[7] | 2019 | 500,000 | — | 2,728,142 | — | 293,098 | — | 1,077,423 | 4,598,663 |
| | 2018 | 500,000 | — | 5,946,213 | 497,835 | 500,000 | — | 28,177 | 7,472,225 |
| | 2017 | 288,461 | — | 2,833,532 | 327,515 | — | — | 27,714 | 3,477,222 |
| Rafael Oliveira, Zone President International[8] | 2019 | 611,467 | — | 9,836,855 | — | 389,401 | — | 251,917 | 11,089,640 |
| | 2018 | 560,101 | — | 8,937,536 | — | 733,854 | — | 101,918 | 10,333,408 |
| | 2017 | 450,657 | — | 303,273 | 409,397 | 412,029 | — | 166,835 | 1,742,191 |
| Rashida La Lande, SVP, Global General Counsel & Head of CSR and Government Affairs; Corporate Secretary | 2019 | 650,000 | — | 5,907,815 | — | 590,000 | — | 233,925 | 7,381,740 |
| | 2018 | 612,500 | 1,000,000 | 2,973,163 | 580,808 | 543,000 | — | 86,910 | 5,796,381 |
| Nina Barton, Chief Growth Officer | 2019 | 600,000 | — | 6,909,346 | — | 769,838 | — | 212,052 | 8,491,236 |

(1) In June 2019, Mr. Hees stepped down as CEO and Mr. Patricio became our CEO. In connection with his employment by the Company, Mr. Patricio purchased $20,000,000 of the Company's common stock at the market price on August 16, 2019, which Mr. Patricio has agreed to hold for four years from the date of purchase.

(2) For Mr. Hees, the amount shown in this column includes accrued vacation paid out pursuant to his separation agreement.

(3) The 2019 amounts shown in this column include the aggregate grant date fair value, computed in accordance with FASB ASC Topic 718, of (i) Matching RSUs, (ii) PSUs, and (iii) RSUs granted to the NEOs. For a discussion of the assumptions made in the valuation of the awards in this column, see Note 11, *Employees' Stock Incentive Plans*, in the section entitled *Notes to Consolidated Financial Statements*, in Item 8, *Financial Statements and Supplementary Data* in our Annual Report on Form 10-K for the year ended December 28, 2019. For the 2019 PSUs (other than Mr. Patricio's PSU grant based on stock appreciation), the performance metric was approved by the Compensation Committee on December 9, 2019. For the 2019 PSUs, if the maximum performance level is achieved, the amounts that would be received with respect to the 2019 performance shares calculated as of the grant date are as follows: Mr. Patricio, $25,746,189, Mr. Basilio, $6,618,668, Mr. Knopf, $1,103,121 (which were forfeited), Mr. Oliveira, $4,412,455, Ms. La Lande, $2,757,788, and Ms. Barton, $3,309,334. Under our Bonus Swap Program, the Matching RSUs for the NEOs were calculated as the product of the calculated gross bonus and the swap election percentage, divided by the closing price reported on the Nasdaq on the date of purchase. For a discussion of the terms applicable to the Matching RSUs, PSUs, and RSUs as well as vesting, forfeiture, and other terms, see "Elements of Compensation Program" in the CD&A.

(4) The 2017 and 2018 amounts shown in this column include the aggregate grant date fair value, computed in accordance with FASB ASC Topic 718, of (i) Matching RSUs, (ii) PSUs, and (iii) RSUs granted to the NEOs. As of December 28, 2019, due to the performance of our business, the expected payout of the 2017 and 2018 PSUs was determined to be zero. Of the amounts shown in 2017 and 2018 for each NEO, PSUs represent $17,838,582 for Mr. Hees in 2018, $11,892,369 for Mr. Basilio in 2018, $2,618,398 and $4,162,349 for Mr. Knopf in 2017 and 2018, respectively, $5,946,213 for Mr. Oliveira in 2018, and $1,486,582 for Ms. La Lande in 2018. Mr. Hees forfeited his 2017 and 2018 RSUs and 2018 PSUs pursuant to his separation agreement and Mr. Knopf forfeited his 2017 and 2018 RSUs and PSUs pursuant to his separation agreement.

(5) The 2019 amounts shown in this column reflect compensation earned for 2019 performance under our PBP. The bonuses were paid in cash to each NEO after the end of 2019.

(6) The 2018 amounts shown in this column reflect compensation earned for 2018 performance under our PBP. Consistent with our pay for performance philosophy, due to the difficult operating environment in 2018 and the Company's financial performance, Messrs. Hees, Knopf, and Basilio asked to forfeit their rights to the amounts payable pursuant to the PBP with respect to fiscal year 2018 and the Committee approved their forfeitures. The bonuses were paid in cash to each other NEO after the end of 2018.

(7) Mr. Knopf's 2018 stock awards were forfeited pursuant to his separation agreement.

(8) Foreign currency conversion based on daily average for calendar year 2019. Mr. Oliveira's base salary is paid in British pounds. The amounts shown in the table above are based on the following 12-month average exchange rate: British pounds (.7839 USD/GBP).

44

(9)  The following table sets forth a detailed breakdown of the items which comprise "All Other Compensation" for 2019.

| Name | Matching Contribution to Kraft Heinz 401(k) [a] ($) | Dividend Equivalents Accrued on all Dividend Eligible RSUs ($) | Basic Life Insurance Coverage ($) | Relocation Expenses[b] ($) | Commuting and Housing Stipend[c] ($) | Base Salary as Advisor[d] ($) | Separation Pay[e] ($) | Tax Support and Payments ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Mr. Patricio | 19,600 | 475,506 | 1,710 | 23,124 | 18,230 | 152,308 | — | — | 690,478 |
| Mr. Hees | 19,600 | 42,536 | 1,311 | 149,457 | — | — | 1,000,000 | — | 1,212,904 |
| Mr. Basilio | 19,600 | 262,772 | 840 | — | — | — | — | — | 283,212 |
| Mr. Knopf | 19,600 | 57,391 | 432 | — | — | — | 1,000,000 | — | 1,077,423 |
| Mr. Oliveira | 42,803 | 200,613 | — | — | — | — | — | 8,501 | 251,917 |
| Ms. La Lande | 19,600 | 99,890 | 1,080 | — | 113,355 | — | — | — | 233,925 |
| Ms. Barton | 19,600 | 119,007 | 990 | — | — | — | — | 72,455 | 212,052 |

(a)  For Mr. Oliveira, the amounts shown include a matching contribution to the UK contribution scheme.

(b)  For Mr. Hees, the amounts shown include the reimbursement of costs associated with the sale of Mr. Hees' house due to his job transfer to Chicago in 2017 pursuant to his relocation offer. Mr. Hees' house was sold in 2019.

(c)  For Mr. Patricio, the amounts shown include a commuting stipend. For Ms. La Lande, the amounts shown include a commuting and housing stipend.

(d)  For Mr. Patricio, the amounts shown include his base salary as an Advisor to the CEO from May 2019 to June 2019.

(e)  For Mr. Knopf, the amounts shown also include $500,000 relating to the payment of a retention bonus.

45

**GRANTS OF PLAN-BASED AWARDS TABLE**

The following table sets forth information regarding the grant of plan-based awards for each of the NEOs in 2019.

| Name | Grant Date[3] | Grant Type | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | Estimated Future Payouts Under Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units (#) | Grant Date Fair Value of Stock and Option Awards ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Threshold($) | Target ($) | Maximum ($) | Threshold(#) | Target (#) | Maximum (#) | | |
| Mr. Patricio | | PBP[1] | 15,750 | 1,500,000 | 2,484,000 | | | | | |
| | 8/16/19 | RSUs | | | | | | | 590,319 | 15,000,000 |
| | 8/16/19 | PSUs[6] | | | | 314,837 | 787,092 | 787,092 | | 22,062,189 |
| | 8/16/19 | PSUs[7] | | | | 200,000 | — | 600,000 | | 3,684,000 |
| Mr. Hees | | PBP[2] | | 1,084,000 | | | | | | |
| Mr. Basilio | | PBP[1] | 19,688 | 1,875,000 | 3,105,000 | | | | | |
| | 8/16/19 | Annual RSUs | | | | | | | 36,895 | 937,502 |
| | 8/16/19 | RSUs | | | | | | | 236,128 | 6,000,012 |
| | 8/16/19 | PSUs[6] | | | | 94,451 | 236,128 | 236,128 | | 6,618,668 |
| Mr. Knopf | | PBP[1] | 9,188 | 875,000 | 1,449,000 | | | | | |
| | 8/16/19 | Annual RSUs[3] | | | | | | | 24,597 | 625,010 |
| | 8/16/19 | RSUs[3] | | | | | | | 39,355 | 1,000,011 |
| | 8/16/19 | PSUs[3] | | | | 15,742 | 39,355 | 39,355 | | 1,103,121 |
| Mr. Oliveira | | PBP[4] | 4,105 | 1,303,037 | 2,157,829 | | | | | |
| | 8/16/19 | Matching RSUs | | | | | | | 26,186 | 665,386 |
| | 8/16/19 | Annual RSUs | | | | | | | 29,870 | 758,997 |
| | 8/16/19 | RSUs | | | | | | | 157,419 | 4,000,017 |
| | 8/16/19 | PSUs[6] | | | | 62,968 | 157,419 | 157,419 | | 4,412,455 |
| Ms. La Lande | | PBP[1] | 10,238 | 975,000 | 1,614,600 | | | | | |
| | 8/16/19 | Annual RSUs | | | | | | | 25,581 | 650,013 |
| | 8/16/19 | RSUs | | | | | | | 98,387 | 2,500,014 |
| | 8/16/19 | PSUs[6] | | | | 39,355 | 98,387 | 98,387 | | 2,757,788 |
| Ms. Barton | | PBP[5] | 3,308 | 1,050,000 | 1,738,800 | | | | | |
| | 8/16/19 | Annual RSUs | | | | | | | 23,613 | 600,006 |
| | 8/16/19 | RSUs | | | | | | | 118,064 | 3,000,006 |
| | 8/16/19 | PSUs[6] | | | | 47,226 | 118,064 | 118,064 | | 3,309,334 |

(1) For Messrs. Patricio, Basilio and Knopf, and Ms. La Lande, the PBP is based 70% on global Adjusted Net Income and 30% on NSV, which has a combined Threshold assumption of 15% and Maximum assumption of 144%. Threshold amounts also assume a minimum individual MBO Score of 7%, while Target amounts assume an individual MBO score of 100% and Maximum amounts assume an individual MBO Score of 115%. The actual payment would be based on achievement of individual and financial performance goals. Annual incentive award payments were made in cash to each NEO after the end of 2019 based on actual results achieved. Actual amounts earned are reflected in the Summary Compensation Table under Non-Equity Incentive Plan Compensation.

(2) For Mr. Hees, the PBP is based upon a pro-rata payment of his annual bonus assuming performance at 85%, both with respect to the metrics related to Kraft Heinz's financial performance (i.e., the "Financial Multiplier") and Mr. Hees' MBOs (i.e., the "Individual Rating").

(3) As a result of Mr. Knopf's separation on December 31, 2019, all equity awards granted in 2019 were forfeited.

(4) For Mr. Oliveira, the EMEA Zone PBP is based 70% on EMEA Segment Adjusted EBITDA and 30% on EMEA NSV, which has a combined Threshold assumption of 4.5% and Maximum assumption of 144%. Threshold amounts also assume a minimum individual MBO Score of 7% while Target amounts assume an individual MBO score of 100% and Maximum amounts assume an individual MBO Score of 115%. Mr. Oliveira's actual payment is based on achievement of individual goals and will receive a weighting on financial performance split by 70% of the EMEA Zone metrics plus 30% of the global metrics. Annual incentive award payments were made in cash to each NEO after the end of 2019 based on actual results achieved. Actual amounts earned are reflected in the Summary Compensation Table under Non-Equity Incentive Plan Compensation.

(5) For Ms. Barton, the Canada Zone PBP has a weight of 45% and is based 70% on Canada Segment Adjusted EBITDA and 30% on Canada NSV and the Digital Growth PBP has a weight of 55% and is based 70% on Digital Growth Adjusted EBITDA and 30% on Digital Growth NSV, which has a combined Threshold assumption of 4.5% and Maximum assumption of 144%. Threshold amounts also assume a minimum individual MBO Score of 7%, while Target amounts assume an individual MBO score of 100% and Maximum amounts also assume an individual MBO Score of 115%. Ms. Barton's actual payment is based on achievement of individual goals and would receive a weighting on financial performance split by 70% of the Canada and Digital Growth metrics plus 30% of the global metrics. Annual incentive award payments were made in cash to each NEO after the end of 2019 based on actual results achieved. Actual amounts earned are reflected in the Summary Compensation Table under Non-Equity Incentive Plan Compensation.

(6) The PSUs granted on August 16, 2019 were granted under the 2016 Omnibus Incentive Plan. The performance metric was approved by the Compensation Committee on December 9, 2019. The target number of shares shown in the table reflects the number of shares of common stock that will be earned if each of the performance metrics are achieved at target levels by June 2021. Actual shares awarded will vest 50% on the

46

second anniversary of the grant date, 25% on the third anniversary of the grant date, and 25% on the fourth anniversary of the grant date. Dividends are not earned on the PSUs.

(7) Subject to the terms and conditions of the applicable award agreement, these performance stock units are scheduled to vest on the third anniversary of the date of grant based on the Company's stock appreciation target. The stock appreciation metric is defined using the highest average closing price over 30 consecutive trading days during a three-year period from the grant date. The number of performance stock units granted and the specific stock appreciation targets follow three specific ranges: (i) 200,000 performance stock units if the stock price is between $45 per share and $49.99 per share; (ii) 400,000 shares if the stock price is between $50 per share and $54.99 per share; and (iii) 600,000 shares if the stock price is above $55 per share.

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR END**

The following table sets forth each NEO's outstanding equity awards, as of the end of 2019.

| | | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Grant Date | Grant Type | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested[2] ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested[2] ($) |
| Mr. Patricio | 8/16/19 | RSUs | | | | | 590,319 [15] | 18,665,887 | | |
| | 8/16/19 | PSUs | | | | | | | 787,092 [17] | 24,887,849 |
| | 8/16/19 | PSUs | | | | | | | 200,000 [18] | 6,324,000 |
| Mr. Hees | 8/20/15 | Stock Options | 121,213 [14] | | 74.25 | 7/30/20 | | | | |
| | 2/12/15 | Option-match | 57,455 [14] | | 30.46 | 6/30/20 | | | | |
| | 2/14/14 | Option-match | 98,951 [14] | | 22.56 | 7/30/20 | | | | |
| | 7/1/13 | Stock Options | 1,329,996 [14] | | 22.56 | 6/30/20 | | | | |
| Mr. Basilio | 8/16/19 | Annual RSUs | | | | | 36,895 [16] | 1,166,620 | | |
| | 8/16/19 | RSUs | | | | | 236,128 [15] | 7,466,367 | | |
| | 8/16/19 | PSUs | | | | | | | 236,128 [17] | 7,466,367 |
| | 3/1/18 | RSUs | | | | | 89,700 [12] | 2,836,314 | | |
| | 3/1/18 | PSUs | | | | | | | 167,439 [13] | 5,294,421 |
| | 3/1/17 | RSU-match | | | | | 18,576 [1] | 587,373 | | |
| | 3/1/16 | RSU-match | | | | | 8,991 [1] | 284,295 | | |
| | 8/20/15 | Stock Options | | 134,681 [3] | 74.25 | 8/20/25 | | | | |
| | 2/12/15 | Option-match | | 41,377 [4] | 30.46 | 2/12/25 | | | | |
| | 2/14/14 | Option-match | 38,257 [5] | | 22.56 | 2/14/24 | | | | |
| | 7/1/13 | Stock Options | 531,998 [6] | | 22.56 | 7/1/23 | | | | |
| Mr. Knopf | 8/16/19 | Annual RSUs | | | | | 25,248 [16] | 798,342 | | |
| | 8/16/19 | RSUs | | | | | 40,398 [15] | 1,277,385 | | |
| | 8/16/19 | PSUs | | | | | | | 39,355 [17] | 1,244,405 |
| | 3/1/18 | RSUs | | | | | 31,395 [12] | 992,710 | | |
| | 3/1/18 | PSUs | | | | | | | 58,604 [13] | 1,853,058 |
| | 3/1/17 | PSUs | | | | | | | 19,687 [8] | 622,503 |
| Mr. Oliveira | 8/16/19 | RSU-match | | | | | 26,186 [1] | 828,001 | | |
| | 8/16/19 | Annual RSUs | | | | | 29,870 [16] | 944,489 | | |
| | 8/16/19 | RSUs | | | | | 157,419 [15] | 4,977,589 | | |
| | 8/16/19 | PSUs | | | | | | | 157,419 [17] | 4,977,589 |
| | 3/1/18 | RSUs | | | | | 44,850 [12] | 1,418,157 | | |
| | 3/1/18 | PSUs | | | | | | | 83,720 [13] | 2,647,226 |
| | 3/1/18 | RSU-match | | | | | 7,287 [1] | 230,415 | | |
| | 3/1/17 | RSU-match | | | | | 3,756 [1] | 118,765 | | |
| | 3/1/17 | Stock Options | | 27,344 [7] | 91.43 | 3/1/27 | | | | |

48

| Name | Grant Date | Award Type | Options Exercisable | | Options Unexercisable | | Exercise Price | Expiration Date | Shares Not Vested | | Market Value | Equity Incentive # | | Equity Incentive Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/1/16 | RSU-match | | | | | | | 7,289 | (1) | 230,478 | | | |
| | 3/1/16 | Stock Options | | | 32,192 | (9) | 77.66 | 3/1/26 | | | | | | |
| | 2/12/15 | Option-match | | | 4,492 | (4) | 30.46 | 2/12/25 | | | | | | |
| | 2/12/15 | Stock Options | | | 16,419 | (4) | 30.46 | 2/12/25 | | | | | | |
| | 5/21/14 | Stock Options | 110,833 | (10) | | | 22.56 | 5/21/24 | | | | | | |
| Ms. La Lande | 8/16/19 | Annual RSUs | | | | | | | 26,258 | (16) | 830,278 | | | |
| | 8/16/19 | RSUs | | | | | | | 100,994 | (15) | 3,193,430 | | | |
| | 8/16/19 | PSUs | | | | | | | | | | 98,387 | (17) | 3,110,997 |
| | 3/1/18 | RSUs | | | | | | | 26,163 | (12) | 827,274 | | | |
| | 3/1/18 | PSUs | | | | | | | | | | 20,930 | (13) | 661,807 |
| | 3/1/18 | Stock Options | | | 52,325 | (11) | 66.89 | 3/1/28 | | | | | | |
| Ms. Barton | 8/16/19 | Annual RSUs | | | | | | | 24,238 | (16) | 766,406 | | | |
| | 8/16/19 | RSUs | | | | | | | 121,193 | (15) | 3,832,123 | | | |
| | 8/16/19 | PSUs | | | | | | | | | | 118,064 | (17) | 3,733,184 |
| | 3/1/18 | RSUs | | | | | | | 22,425 | (12) | 709,079 | | | |
| | 3/1/18 | PSUs | | | | | | | | | | 41,860 | (13) | 1,323,613 |
| | 3/1/17 | RSU-match | | | | | | | 2,012 | (1) | 63,619 | | | |
| | 3/1/17 | PSUs | | | | | | | | | | 19,687 | (8) | 622,503 |
| | 3/1/17 | Stock Options | | | 21,875 | (7) | 91.43 | 3/1/27 | | | | | | |
| | 8/31/16 | Stock Options | | | 16,762 | (19) | 89.49 | 8/31/26 | | | | | | |
| | 3/1/16 | RSU-match | | | | | | | 1,000 | (1) | 31,620 | | | |
| | 8/20/15 | Stock Options | | | 20,203 | (3) | 74.25 | 8/20/25 | | | | | | |
| | 2/26/15 | Stock Options | 7,572 | (20) | | | 52.70 | 2/26/25 | | | | | | |
| | 2/27/14 | Stock Options | 8,446 | (21) | | | 45.59 | 2/27/24 | | | | | | |
| | 2/25/13 | Stock Options | 4,901 | (22) | | | 38.63 | 2/25/23 | | | | | | |

(1) For all Matching RSUs, this total includes dividends that are reinvested at the dividend payment date in additional RSUs that are subject to the same restrictions as the original grant. The Matching RSUs granted on March 1, 2016, March 1, 2017, and March 1, 2018 are scheduled to vest on the fifth anniversary of the grant date. The Matching RSUs granted on August 16, 2019 are scheduled to vest on March 1, 2024.

(2) The market value of the shares that have not vested is based on the closing price of $31.62 for Kraft Heinz common stock on December 27, 2019, the last trading day of our fiscal year, as reported on Nasdaq.

(3) 100% of these awards are scheduled to vest on August 20, 2020.

(4) 100% of these awards vested on February 12, 2020, and they are scheduled to expire on February 12, 2025. Options and exercise price reflect the conversion in connection with the 2015 Merger.

(5) 100% of these awards vested on February 14, 2019, and they are scheduled to expire on February 14, 2024. Options and exercise price reflect the conversion in connection with the 2015 Merger.

(6) 100% of these awards vested on July 1, 2018, and they are scheduled to expire on July 1, 2023. Options and exercise price reflect the conversion in connection with the 2015 Merger.

(7) 100% of the award is scheduled to vest on March 1, 2022.

(8) As of December 28, 2019, due to the performance of our business, the expected payout of the PSUs was determined to be zero. The shares reported in these rows represent potentially issuable shares under the PSU award granted on March 1, 2017, which cliff vest on March 1, 2022. The PSUs represent the right to receive a variable number of shares based on Kraft Heinz's actual performance during a defined performance period. As of December 28, 2019, 80% of the performance target was not achieved. If 80% of the target is achieved in 2020, participant will receive 65% of the underlying shares and if 80% of the performance target is achieved in 2021, the participant will receive 60% of the underlying shares. The number of shares reported in this row is based on threshold performance. Dividend equivalents do not accrue on the PSUs. If the participant is terminated prior to March 1, 2020, he or she will forfeit the entire award. The PSUs will vest as earned on March 1, 2022. Mr. Knopf forfeited his 2017 PSUs pursuant to his separation agreement.

(9) 100% of the award is scheduled to vest on March 1, 2021.

(10) 100% of the award vested on May 21, 2019, and they are scheduled to expire on May 21, 2024. Options and exercise price reflect the conversion in connection with the 2015 Merger.

49

(11) 100% of these awards are scheduled to vest on March 1, 2023.

(12) 100% of these awards are scheduled to vest on March 1, 2023, and the RSU awards are not dividend eligible. Mr. Knopf forfeited these RSUs pursuant to his separation agreement.

(13) As of December 28, 2019, due to the performance of our business, the expected payout of the PSUs was determined to be zero. The shares reported in these rows represent potentially issuable shares under the PSU award granted on March 1, 2018, which cliff vest on March 1, 2023. The PSUs represent the right, to the extent not forfeited, to receive a variable number of Kraft Heinz shares based on Kraft Heinz's actual performance during a defined performance period. If the threshold of the performance target is achieved by the end of 2020, the participant will receive 80% of the underlying shares. If the threshold for the performance target is not achieved by the end of 2020, the target and threshold opportunities roll over to 2021 with a 20 percentage point payout penalty. The number of shares reported in these rows is based on threshold levels. Dividend equivalents do not accrue on the PSUs. If the participant is terminated prior to March 1, 2021, he or she will forfeit the entire award. The PSUs will vest as earned on March 1, 2023 provided the awardee also meets certain requirements. Mr. Knopf forfeited his 2018 PSUs pursuant to his separation agreement.

(14) In June 2019, Mr. Hees stepped down as CEO. As a result of his departure, Mr. Hees had portions of his awards vest based on prorated schedules. Stock Options awarded on July 1, 2013, 100% vested. Matching Options awarded on February 14, 2014, 100% vested. Matching Options awarded on February 12, 2015, 80% vested 57,455 shares of 71,819. Stock Options awarded on August 20, 2015, 60% vested 121,213 shares of 202,021.

(15) These awards are scheduled to vest 50% on August 16, 2021, 25% on August 16, 2022, and 25% on August 16, 2023. Mr. Knopf forfeited these RSUs pursuant to his separation agreement.

(16) These awards are scheduled to vest 50% on August 16, 2021 and 50% on August 16, 2022. Mr. Knopf forfeited these RSUs pursuant to his separation agreement.

(17) These PSUs are scheduled to vest 50% on the 2nd anniversary of the grant date, 25% on the 3rd anniversary of the grant date, and 25% on the fourth anniversary of the date of the grant date. Performance results are based upon EBITDA and Cash Conversion from June 2019 to June 2021.

(18) These PSUs are scheduled to vest 50% on the third anniversary of the date of grant based on the Company's stock appreciation target. The stock appreciation metric is defined using the highest average closing price over 30 consecutive trading days during a three-year period from the grant date. The number of performance stock units granted and the specific stock appreciation targets follow three specific ranges: (i) 200,000 performance stock units if the stock price is between $45 per share and $49.99 per share; (ii) 400,000 shares if the stock price is between $50 per share and $54.99 per share; and (iii) 600,000 shares if the stock price is above $55 per share.

(19) 100% of these awards are scheduled to vest on August 31, 2021.

(20) 100% of these awards vested on February 26, 2018.

(21) 100% of these awards vested on February 27, 2017.

(22) 100% of these awards vested on February 25, 2016.

## OPTION EXERCISES AND STOCK VESTED TABLE

The following table details each NEO's option exercised and stock vested, as of the end of 2019.

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting(2) ($) |
| Mr. Patricio | — | — | — | — |
| Mr. Hees(1) | — | — | 25,880 | 803,315 |
| Mr. Basilio | — | — | — | — |
| Mr. Knopf(2) | — | — | 1,677 | 53,882 |
| Mr. Oliveira | — | — | — | — |
| Ms. La Lande | — | — | — | — |
| Ms. Barton | — | — | — | — |

(1) For Mr. Hees, the number of shares acquired on vesting represents (i) 60% of the Matching RSU award shares on March 1, 2016 (11,203), (ii) 40% of the Matching RSU award shares on March 1, 2017 (11,946), and (iii) dividends accrued on these RSUs (2,731). The value realized on vesting is based upon the closing stock price of $31.04 on last trading day prior to Mr. Hees' separation date of June 28, 2019.

(2) For Mr. Knopf, the number of shares acquired on vesting represents (i) 60% of the Matching RSU award shares on March 1, 2016 (525), (ii) 40% of the Matching RSU award shares on March 1, 2017 (941), and (iii) dividends accrued on these RSUs (211). The value realized on vesting is based upon the closing stock price of $32.13 on last trading day prior to Knopf's separation date of December 31, 2019.

## PENSION BENEFITS TABLE

None of our NEOs participate in any defined benefit pension arrangements.

## NONQUALIFIED DEFERRED COMPENSATION TABLE

None of our NEOs participate in any nonqualified deferred compensation arrangements.

**POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL**

The table, footnotes, and narratives below reflect the assumption that a hypothetical termination of employment or change in control occurred on the last day of 2019.

| Name | Element | Involuntary Term. without Cause[1] or Term. upon Change in Control ($) | Other Types of Separations[2] ($) |
|------|---------|----------------------------------------------------------------------:|----------------------------------:|
| Mr. Patricio | | | |
| | Salary | 1,000,000 | — |
| | Bonus | — | 360,807 |
| | Intrinsic Value of Accelerated Equity | — | — |
| | Health & Welfare Benefits[4] | 14,586 | — |
| | Outplacement Assistance | 3,200 | — |
| | Total | 1,017,786 | 360,807 |
| Mr. Basilio | | | |
| | Salary | 750,000 | — |
| | Bonus | — | 780,000 |
| | Intrinsic Value of Accelerated Equity[3] | 443,924 | 443,924 |
| | Health & Welfare Benefits[4] | 14,586 | — |
| | Outplacement Assistance | 3,200 | — |
| | Total | 1,211,710 | 1,223,924 |
| Mr. Oliveira | | | |
| | Salary | 611,467 | — |
| | Bonus | — | 389,401 |
| | Intrinsic Value of Accelerated Equity[3] | 205,198 | 205,198 |
| | Health & Welfare Benefits[4] | 963 | — |
| | Outplacement Assistance | 1,829 | — |
| | Total | 819,457 | 594,599 |
| Ms. La Lande | | | |
| | Salary | 650,000 | — |
| | Bonus | — | 590,000 |
| | Intrinsic Value of Accelerated Equity | — | — |
| | Health & Welfare Benefits[4] | 14,586 | — |
| | Outplacement Assistance | 3,200 | — |
| | Total | 667,786 | 590,000 |
| Ms. Barton | | | |
| | Salary | 600,000 | — |
| | Bonus | — | 769,838 |
| | Intrinsic Value of Accelerated Equity[3] | 459,426 | 459,426 |
| | Health & Welfare Benefits[4] | 12,901 | — |
| | Outplacement Assistance | 3,200 | — |
| | Total | 1,075,527 | 1,229,264 |

(1) No enhanced severance is provided on a termination in connection with a change in control. Kraft Heinz does not have a specified Change in Control Plan for executives, and treatment is determined by the plan agreements and local regulations applicable to each employee. Our Severance Pay Plan generally provides for 12 months of base salary with a signed release of claims. The Severance Pay Plan would also include Company-paid COBRA for U.S.-based employees for the severance period and outplacement services.

(2) Relates to termination due to death, disability, or normal retirement.

(3) As of the last day of 2019, in the event of a termination without cause or due to retirement, death, or disability, stock options vest as if 20% of the options vested on each anniversary date of the specific grant. Amounts reflect the intrinsic value of shares underlying options that would vest, calculated as the difference between $31.62, the closing price of Kraft Heinz common stock on December 27, 2019 (the last trading day of our fiscal year, as reported on Nasdaq), and the exercise price of the options. Amounts also include the vesting of Matching RSUs granted in 2016 and 2017 at a pro rata rate of 20% of the RSUs as if they vested on each annual anniversary date of the grant. The 2018 RSUs and Matching RSUs are not presented in this table because no pro rata vesting would occur if such event occurs prior to the second anniversary of the grant.

(4) Amount reflects 12 months of medical and dental benefit coverage continuation under COBRA, less the executive premium contribution.

Table of Contents

*Severance Pay Plan*

Generally, Kraft Heinz provides for severance benefits to U.S.-based salaried employees, including our U.S.-based NEOs, pursuant to the terms of the U.S. Severance Pay Plan. The severance benefits for non-U.S.-based salaried employees are made pursuant to the local laws and regulations governing the jurisdiction in which they work, subject to adjustment at the discretion of Kraft Heinz for employees at certain organizational levels (such benefits, together with the U.S. Severance Pay Plan, are referred to as the "Severance Pay Plan").

NEOs are eligible for severance benefits under the Severance Pay Plan upon an involuntary termination of employment, such as job elimination, location closing, or reduction in the workforce. NEOs must be willing to provide satisfactory transitional assistance in order to be eligible for severance benefits.

Pursuant to the U.S. Severance Pay Plan, Messrs. Patricio, Hees, Basilio, and Knopf and Mses. La Lande and Barton would generally be eligible to receive a severance payment equal to 12 months of base salary upon the execution of a release of claims against Kraft Heinz. In addition, the Committee may, in its sole discretion, authorize payment of additional severance in respect of a participant's annual bonus opportunity. Although Mr. Oliveira is not based in the U.S. and not otherwise covered by the U.S. Severance Pay Plan, the Company has determined that he is eligible to receive the same benefits as the other NEOs. Severance payments are generally made in a cash lump-sum, but may occasionally be made in periodic payments at Kraft Heinz's discretion, as soon as administratively feasible after the termination of employment and after the former NEO's executed release has become irrevocable.

On April 22, 2019, Kraft Heinz announced that Mr. Hees would leave Kraft Heinz in 2019. On June 5, 2019, the Committee approved the following severance terms for Mr. Hees, which became payable pursuant to Mr. Hees' separation agreement and subject to his execution of a release of claims against Kraft Heinz: (1) a severance payment equal to 12 months of base salary, and (2) a pro-rata payment of his annual bonus under the PBP assuming performance at 85%, both with respect to the metrics related to Kraft Heinz's financial performance (i.e., the "Financial Multiplier") and Mr. Hees' MBOs (i.e., the "Individual Rating"). Mr. Hees' outstanding equity awards were treated in accordance with the terms set forth in the governing agreements as described below.

On August 26, 2019, Kraft Heinz announced that Mr. Basilio would be moving back into the Global Chief Financial Officer role and that following a transition period, Mr. Knopf would be departing from the Company to return to 3G Capital, where he has been a Partner since 2015. On December 9, 2019, the Committee approved the following severance terms for Mr. Knopf, which became payable following Mr. Knopf's separation of employment and subject to his execution of a release of claims against Kraft Heinz: (1) a severance payment equal to 12 months of base salary, and (2) a payment of his annual bonus under the PBP based on Kraft Heinz's Financial Multiplier and Mr. Knopf's Individual Rating. Mr. Knopf's outstanding equity awards were treated in accordance with the terms set forth in the governing agreements as described below.

No enhanced severance is provided on a termination in connection with a change in control of Kraft Heinz, and Kraft Heinz does not maintain any individual change in control severance or other similar agreements with any of the NEOs. None of the NEOs are entitled to receive a gross-up for golden parachute taxes that may become payable pursuant to Section 280G of the Code in connection with a change in control of Kraft Heinz.

*Equity Awards*

In April 2019, the Committee modified award agreements for outstanding equity awards (options, PSUs, Matching RSUs, and RSUs) with respect to the treatment upon a termination due to death, disability, or retirement. Such terminations, for option awards on or after the first anniversary of the specific grant date, and for RSU and Matching RSU awards on or after the anniversary deadlines outlined in the award agreements, would result in such awards being fully vested and exercisable, in the case of PSUs, to the extent the performance conditions had been satisfied. In addition, the Committee modified award agreements for outstanding options such that the exercise period for a termination without cause would be one year.

52

# EXHIBIT 14

# Press Release Details

# Avis Budget Group Appoints Bernardo Hees chairman of the Board of Directors

February 10, 2020 at 8:30 AM EST

 PDF Version

PARSIPPANY, N.J., Feb. 10, 2020 (GLOBE NEWSWIRE) -- Avis Budget Group, Inc. (NASDAQ: CAR) (the "Company") today announced that Bernardo Hees has been appointed to the Company's Board of Directors (the "Board") and named Independent Chairman of the Board and Chair of the Board's Executive Committee, effective immediately. Over the last 15 years, Mr. Hees has served as CEO of The Kraft Heinz Company, Burger King Worldwide Holdings, Inc., and America Latina Logistica. He succeeds Independent Chairman Leonard Coleman, who will continue as a Director. Mr. Coleman has been a long-standing member of the Board and has provided continuity of leadership during a period of significant change in the company.

Lynn Krominga, Director and Governance Chair of the Avis Board, stated, "We are extremely pleased to welcome Bernardo to the Board. He is a proven executive who has led some of the world's leading consumer brands and has a successful track record in transportation and logistics. We are confident his experience and expertise will benefit Avis as we seek to maximize value for all its stakeholders."

"I am honored to serve as the next Chairman of Avis Budget Group," said Mr. Hees. "With its iconic brands, irreplaceable physical assets, and fleet management expertise across its 30,000 employees, Avis is well positioned to take advantage of the evolving mobility ecosystem. I believe there is substantial opportunity to create shareholder value and am excited to work with the Board, the CEO, and the management team to drive Avis forward."

Mr. Hees is making a personal investment of $15 million in Avis shares to align his interests with those of all shareholders. The shares will be issued at the closing price of Avis common stock on February 7, 2020.

Karthik Sarma, Managing Partner at SRS Investment Management, Avis's largest shareholder, said, "We are pleased with today's news, which we believe significantly strengthens Avis moving forward. Bernardo has an exceptional track record of fostering high performance cultures and identifying strong executive leaders, making him an ideal fit as Chairman of Avis. Furthermore, Bernardo thinks like an owner, as evidenced by his significant personal investment."

**About Bernardo Hees**

Mr. Hees served as Chief Executive Officer of The Kraft Heinz Company from 2015 to June 2019. He served as Chief Executive Officer of H.J. Heinz Holding Corporation since 2013. Prior to that, from 2010 to 2013 Mr. Hees served as Chief Executive Officer of Burger King Worldwide Holdings, Inc. From 2005 to 2010, he was Chief Executive Officer of América Latina Logística, a Brazilian logistics company. Mr. Hees was also a partner at 3G Capital from 2010 to 2019. In December 2019, Mr. Hees was elected to the Board of Directors of Bunge Ltd. (NYSE: BG).

**About Avis Budget Group**

Avis Budget Group, Inc. is a leading global provider of mobility solutions, both through its Avis and Budget brands, which have more than 11,000 rental locations in approximately 180 countries around the world, and through its Zipcar brand, which is the world's leading car sharing network with more than one million members. Avis Budget Group operates most of its car rental offices in North America, Europe and Australasia directly, and operates primarily through licensees in other parts of the world. Avis Budget Group has approximately 30,000 employees and is headquartered in Parsippany, N.J. More information is available at avisbudgetgroup.com.

Contact:
David Calabria
IR@avisbudget.com

# EXHIBIT 15

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan for the purchase or sale of equity securities of the issuer that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Ferraro Joseph A. | AVIS BUDGET GROUP, INC. [ CAR ] | ___ Director     ___ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X  Officer (give title below)    ___ Other (specify below) |
| 379 INTERPACE PARKWAY | 12/15/2023 | President and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| PARSIPPANY   NJ   07054 | | X  Form filed by One Reporting Person |
| (City)    (State)    (Zip) | | ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/15/2023 | | s | | 4,023 | D | $194.33[1] | 231,842 | D | |
| Common Stock | 12/15/2023 | | s | | 7,630 | D | $195.3[2] | 224,212 | D | |
| Common Stock | 12/15/2023 | | s | | 6,807 | D | $196.17[3] | 217,405 | D | |
| Common Stock | | | | | | | | 2,476 | I | By 401(k) |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $193.73 to $194.69. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

2. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $194.74 to $195.69. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

3. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $195.80 to $196.57. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

**Remarks:**

/s/ Jean M. Sera, by Power of Attorney for Joseph Ferraro    12/19/2023

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

| FORM 4 | | |
|---|---|---|

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Ferraro Joseph A. | AVIS BUDGET GROUP, INC. [ CAR ] | Director 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) Other (specify below) |
| 6 SYLVAN WAY | 12/15/2022 | President and CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| PARSIPPANY NJ 07054 | | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/15/2022 | | s | | 1,700 | D | $182.3[1] | 184,609 | D | |
| Common Stock | 12/15/2022 | | s | | 900 | D | $183.32[2] | 183,709 | D | |
| Common Stock | 12/15/2022 | | s | | 13,300 | D | $185.4[3] | 170,409 | D | |
| Common Stock | 12/15/2022 | | s | | 100 | D | $186.06 | 170,309 | D | |
| Common Stock | | | | | | | | 2,476 | I | By 401(k) |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $182.03 to $183.02. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

2. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $183.03 to $183.69. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

3. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sale prices ranged from $185.23 to $185.72. The reporting person will provide, upon request by the Staff, the Company, or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

**Remarks:**

| /s/ Jean M. Sera, by Power of Attorney for Joseph Ferraro | 12/16/2022 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 16

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan for the purchase or sale of equity securities of the issuer that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Martins Izilda P | AVIS BUDGET GROUP, INC. [ CAR ] | ☐ Director ☐ 10% Owner <br> X Officer (give title below) ☐ Other (specify below) |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | EVP, Americas |
| 379 INTERPACE PARKWAY | 12/15/2023 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| PARSIPPANY    NJ    07054 | | X Form filed by One Reporting Person <br> ☐ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/15/2023 | | S | | 3,950 | D | $195.86[1] | 21,145 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Price reflects the weighted average sale price for the sale transactions made on the date reported above. Sales prices ranged from $195.77 to $195.86. The reporting person will provide, upon request by the Staff, the Company or a security holder of the Company, full information regarding the number of shares purchased or sold at each separate price.

**Remarks:**

| Jean M. Sera by Power of Attorney for Izilda P. Martins | 12/19/2023 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

| | UNITED STATES SECURITIES AND EXCHANGE COMMISSION | OMB APPROVAL |
|---|---|---|

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden | |
| hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Martins Izilda P | AVIS BUDGET GROUP, INC. [ CAR ] | Director     10% Owner<br>X Officer (give title below)   Other (specify below)<br>EVP, Americas |
| (Last) (First) (Middle)<br>6 SYLVAN WAY | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/15/2022 | |
| (Street)<br>PARSIPPANY NJ 07054 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X Form filed by One Reporting Person<br>☐ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/15/2022 | | s | | 4,150 | D | $186.21 | 16,645 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

| | |
|---|---|
| Jean M. Sera, by Power of Attorney for Izilda P. Martins | 12/16/2022 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**