# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

PAULA DEANGELIS,

                Plaintiff,

    v.

BERNARDO HEES, *et al.*,

                Defendants,

AVIS BUDGET GROUP, INC.,

                Nominal Defendant.

Civil Action No. 24-05687 (JXN) (JSA)

**<u>OPINION</u>**

**<u>NEALS</u>**, District Judge

      In this shareholder derivative lawsuit, Plaintiff Paula DeAngelis ("Plaintiff") challenges the manner in which SRS Investment Management, LLC ("SRS") became Avis Budget Group's ("Avis") largest shareholder. The Avis and SRS Defendants[1] moved to dismiss the Amended Complaint (ECF No. 18) under Federal Rules of Civil Procedure[2] 12(b)(6) and 23.1. (ECF Nos. 59, 60.) Plaintiff opposed (ECF No. 61), and Defendants replied (ECF Nos. 62, 63). The Court has carefully reviewed the Amended Complaint and the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1.[3] For the reasons set forth below, Defendants' motions to dismiss are **GRANTED**.

---

[1] The "Avis Defendants" are: Bernardo Hees ("Hees"), Anu Hariharan ("Hariharan"), Lynn Krominga ("Krominga"), Glenn Lurie ("Lurie"), Joseph A. Ferraro ("Ferraro"), Izilda P. Martins ("Martins"), and Nominal Defendant Avis. The "SRS Defendants" are: SRS, Jagdeep Pahwa ("Pahwa"), and Karthik Sarma ("Sarma"). "Defendants" collectively refer to the Avis Defendants and SRS Defendants.

[2] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

[3] The Court has jurisdiction because Count III of the Amended Complaint arises under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). 28 U.S.C. § 1331 The Court has supplemental jurisdiction over the remaining state law claims because they sufficiently relate to the § 14(a) claim. 28 U.S.C. § 1367. Venue is proper pursuant to 28 U.S.C. § 1391.

# I.    __BACKGROUND__[4]

## A.    Avis

Avis is a national rental car company incorporated in Delaware and headquartered in New Jersey. (Am. Compl. ¶¶ 11, 65–66, ECF No. 18.) Avis's profits depend on efficient fleet management—"getting older cars out of the fleet inventory and getting new cars to replace them while carefully balancing supply and demand." (*Id.* ¶ 69.) Plaintiff alleges that, from 2022 to 2023, Avis faced delays in new vehicle deliveries, preventing Avis from replacing old cars. (*Id.* ¶¶ 72–75.) The old cars had higher "depreciat[ion], lease[s], interest, [and] maintenance costs," and "had to be either sidelined or [were] rented at lower rates." (*Id.* ¶ 74.) As a result, Avis's Adjusted EBITDA[5] dropped from $658 million in 2022 to $311 million in 2023. (*Id.* ¶¶ 74–75.) Yet Plaintiff alleges that during an August 2023 earnings call, Avis President and CEO Ferraro did not disclose the delays and instead touted the company's fleet management successes. (*Id.* ¶¶ 70–71.)

## B.    SRS

SRS is an SEC-registered investment management firm and Avis's largest shareholder. (*Id.* ¶¶ 20, 26.) Before 2015, SRS gradually acquired Avis shares through purchases, swaps, and options. (*Id.* ¶¶ 20, 76–87.) Between 2015 and 2024, SRS expanded its stake in Avis by nearly 40%, culminating in a 49.3% position by late 2023. (*Id.* ¶¶ 84–102.)

## C.    Individual Defendants

In addition to Avis and SRS, Plaintiff sued Avis's six-member Board of Directors ("Board"). Four Directors, Hees, Krominga, Lurie, and Hariharan ("Outside Directors"), have no

---

[4] When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[5] "EBITDA, short for earnings before interest, taxes, depreciation, and amortization, tells you how much money a business makes just from running its day-to-day operations." Adam Hayes, *EBITDA*, Investopedia, https://www.investopedia.com/terms/e/ebitda.asp (last updated Sept. 23, 2025).

affiliation with SRS. (*Id.* ¶¶ 12, 14-16.) The other two Directors are SRS President Pawla and SRS CEO Sarma ("SRS Directors"). (*Id.* ¶¶ 13, 17.) Plaintiff also sued two Avis Officers: President and CEO Ferraro and Executive Vice President Martins ("Avis Officers"; with the Board, "Individual Defendants"). (*Id.* ¶¶ 18-19.)

### D.     The Cooperation Agreements

As SRS accumulated Avis shares, Avis became wary of a takeover. In 2016, SRS and Avis entered the first of four agreements ("Cooperation Agreements"), expanding the Board from six to twelve members and appointing an SRS affiliate to the Board. (*Id.* ¶ 103.) In exchange, SRS limited its purchases of outstanding Avis stock. (*Id.*) In 2020, the Third Cooperation Agreement added two SRS Directors to the Board while shrinking the Board back to six members. (*Id.* ¶ 108.) The current Fourth Cooperation Agreement allows SRS to appoint a third Board member and expand the Board to seven seats; grants SRS the power to pick the Compensation Committee chair; caps SRS's voting power at 35% of shares, regardless of how many additional shares it purchases; and sets forth other limitations on SRS. (Avis Br. Ex. 1 ("Fourth Cooperation Agreement") §§ 1(d), 1(g), 4(b), 2(a)-(k), ECF No. 59-3.[6])

Plaintiff alleges the Cooperation Agreements unlawfully divest the Board of its powers under Delaware General Corporate Law ("DGCL") § 141(a) and violate Avis's governing documents and committee charters, effectively granting SRS control over Avis's corporate affairs.

---

[6] In ruling on a motion to dismiss, the Court generally "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But there is an exception for a "document *integral to or explicitly relied* upon in the complaint." *Id.* (emphasis in original) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996), *superseded on other grounds by* the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(1)-(2)). "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* Here, Plaintiff bases several claims on the Cooperation Agreements. (*See* Am. Compl. ¶¶ 103-20, 156-63, 168-73.)

(Am. Compl. ¶ 172.) Additionally, Plaintiff claims the Cooperation Agreements violate NASDAQ independence rules and SEC disclosure rules for related party transactions. (*Id.* ¶ 159.)

### E.    The Stock Repurchase Program

Plaintiff alleges SRS became Avis's largest shareholder through a Stock Repurchase Program, wherein Avis bought back many of its own shares. (*Id.* ¶¶ 56, 88.) The Program started in 2013 and expanded each year until 2024. (*Id.* ¶¶ 121-24.) With fewer shares on the market, Plaintiff argues SRS increased its ownership of Avis indirectly without having to pay a "control premium." (*Id*. ¶¶ 59, 88.) Plaintiff claims the Stock Repurchase Program essentially used Avis's cash to gift SRS control of the company, while depleting Avis's shareholder equity and borrowing capacity. (*Id.* ¶¶ 124-26.) Moreover, Plaintiff argues SRS used the Program to sell one million shares back to Avis in August 2023 in a broker-to-broker transaction. (*Id.* ¶ 93.) According to Plaintiff, a broker-to-broker transaction "obscure[s] the sale of large blocks of stock from the market." (*Id.* ¶ 97.) Sarma, as chair of the Avis Compensation Committee, purportedly approved the transaction. (*Id.*) Plaintiff thus alleges SRS authorized a "related party transaction between a controlling shareholder," SRS, "and the controlled corporation," Avis. (*Id*. ¶ 139.) Plaintiff claims this transaction, as well as December 2023 stock sales by the Avis Officers (*Id.* ¶¶ 100–01), exploited Avis's then-undisclosed shipment delays and fleet issues, constituting insider trading and improper related-party transactions. (Am. Compl. ¶¶ 140–42.)

### F.    Litigation

Plaintiff, an owner of Avis stock since 2022, filed a Verified Stockholder Derivative Complaint on April 26, 2024. (Compl., ECF No. 1.) After a joint stipulation (ECF No. 7), she filed a five-count Amended Complaint on July 15, 2024. (*See* Am. Compl.)

Count I (Insider Trading) alleges SRS, the SRS Directors, and the Avis Officers traded Avis stock based on material non-public information, namely, Avis's delivery delays in 2022 and 2023. (*Id.* ¶¶ 141-42.) Count I further asserts SRS's August 2023 stock sale was a related party transaction and breached the duty of loyalty. (*Id.* ¶¶ 139-40.)

Count II (Breach of Fiduciary Duty) claims the Individual Defendants breached their fiduciary duties to Avis by favoring SRS's interests over Avis's, while also allowing Avis to make false and misleading statements to the public. (*Id.* ¶¶ 143-49.)

Count III (Exchange Act) argues the Individual Defendants made materially false and misleading proxy statements in 2022, 2023, and 2024 by "fail[ing] to disclose and explain to investors the material aspects of the relationship between SRS and Avis and SRS ownership of and transactions in Avis stock." (*Id.* ¶ 154.) Plaintiff alleges these purported misstatements violate Section 14(a) of the Exchange Act and Rule 14a-9. (*Id.* ¶¶ 150-63.)

Count IV (Unjust Enrichment) claims Defendants financially benefited from their improper, misleading, and illegal conduct. (*Id.* ¶¶ 164-67.)

Count V (Declaratory Judgment) seeks to invalidate provisions of the Fourth Cooperation Agreement that allow SRS to appoint directors and chairpersons as violating DGCL § 141 and Avis's bylaws. (*Id.* ¶¶ 168-73.)

Defendants moved to dismiss the Amended Complaint on March 20, 2025. (Avis Br., ECF No. 59; SRS Br., ECF No. 60.) Plaintiff opposed (Pl. Opp'n, ECF No. 61), and Defendants replied

(Avis Reply, ECF No. 62; SRS Reply, ECF No. 63). This motion is now fully briefed and ripe for the Court to decide.[7]

## II.    **LEGAL STANDARD**

Defendants move to dismiss all Counts under Rule 23.1 for failure to plead demand futility, and under Rule 12(b)(6) for failure to state a claim.

### A.    **Rule 23.1 – Failure to Plead Demand Futility**

Rule 23.1 imposes a heightened pleading standard for shareholder derivative actions. *See In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 549 (D.N.J. 2011). "In a shareholder derivative suit, the plaintiff seeks to bring a claim that belongs to the corporation on the corporation's behalf." *In re Cognizant Tech. Sols. Corp. Derivative Litig.*, 101 F.4th 250, 257 (3d Cir. 2024). "'By its very nature,' this sort of suit 'encroaches on the managerial freedom of directors by seeking to deprive the board of control over a corporation's litigation asset.'" *Id.* (quoting *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021)). Under Rule 23.1, therefore, a plaintiff must "plead 'with particularity' either that a satisfactory pre-suit demand was presented to and refused by the board of directors or 'the reasons for not obtaining the action or not making the effort.'" *Id.* (quoting Fed. R. Civ. P. 23.1(b)(3)).

"However, Rule 23.1 merely sets the pleading *standard*; it 'does not create a demand requirement of any particular dimension.'" *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)). "Rather, the law of the state of incorporation (here, Delaware) establishes the

---

[7] On August 14, 2024, the Avis Defendants filed a pre-motion letter asserting reasons for dismissal under Rules 12(b)(6), 23.1, and 12(b)(1), primarily arguing that Plaintiff had failed to adequately plead demand futility and had neglected to consider the 35% cap on SRS' voting control, which precluded SRS' "controlling shareholder" status. (ECF No. 27.) The SRS Defendants filed a similar letter under Rule 12(b)(6). (ECF No. 28.) On August 23, 2024, Plaintiff filed a letter in response. (ECF No. 31.)

demand requirement and governs the analysis of whether demand was wrongfully refused or whether demand must be excused as futile." *Id.* (citing *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007), *overruled in part by In re Cognizant*, 101 F.4th 250).

It is a fundamental tenet of Delaware law that a corporation "shall be managed by or under the direction" of its board of directors. Del. Code Ann. tit. 8, § 141(a). The board's authority includes whether to "initiate, or refrain from entering, litigation." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). Where a shareholder-plaintiff fails to make a demand on the board to pursue litigation, the plaintiff, to survive a motion to dismiss, must show that a pre-suit demand "would have been futile because the directors were incapable of impartially considering the demand." *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, 2021 WL 4593777, at *6 (Del. Ch. 2021). To successfully plead demand futility, the plaintiff must meet "stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000). "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Zuckerberg*, 262 A.3d at 1047.

Delaware courts apply the three-factor *Zuckerberg* test to assess demand futility. *Id.* at 1058-59. Courts using the *Zuckerberg* test must consider whether each director on the demand board: (1) "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand"; (2) "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand"; or (3) "lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that

7

are the subject of the litigation demand." *Id.* at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.* This is a fact-intensive analysis. *See Khanna v. McMinn*, 2006 WL 1388744, at \*14 (Del. Ch. May 9, 2006).

### B.    Rule 12(b)(6) - Failure to State a Claim

The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). A court must only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint is sufficient under Rule 12(b)(6), the Third Circuit applies a three-part inquiry: (1) the court identifies the elements plaintiff must plead to state a claim; (2) the court determines which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court assumes the well-pleaded factual allegations are true to ascertain

"whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010) (citations omitted).

## III.     DISCUSSION

### A.     Demand Futility

As stated earlier, demand is futile under Delaware law if a majority of the demand board: (1) "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand"; (2) "face[] a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand"; or (3) "lack[] independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *In re Cognizant*, 101 F.4th at 257 (quoting *Zuckerberg*, 262 A.3d at 1059). "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile." *Id.* (quoting *Zuckerberg*, 262 A.3d at 1059). Plaintiff "must 'state with particularity' facts showing that making a demand on the board would be futile." *Id.* at 262 (quoting *Zuckerberg*, 262 A.3d at 1059); Fed. R. Civ. P. 23.1(b)(3)(B).

Courts typically apply the *Zuckerberg* test to the demand board members who were serving when Plaintiff's derivative claims were validly placed "in litigation," i.e., when Plaintiff filed her original complaint on April 26, 2024.[8] *See Braddock v. Zimmerman*, 906 A.2d 776, 785–86 (Del.

---

[8] In November 2023, Hees publicly announced he would step down as Executive Chair of the Board (but remain a Board member) and ultimately resigned on May 22, 2024. (*See* Avis Br. Ex. 11, ECF No. 59-13.) When Plaintiff sued, Hees was still Executive Chair. (*See* Compl. ¶ 12, ECF No. 1.) But Defendants argue the Court should evaluate the Board *after* Hees resigned as Executive Chair, citing *Park Employees' & Retirement Board Employees' Annuity & Benefit Fund of Chicago v. Smith*, 2016 WL 3223395, at *9–11 (Del. Ch. May 31, 2016). (Avis Br. at 30.) In *Park Employees*, a board member resigned four days after the plaintiff sued. *Id.* at *10. The court evaluated demand futility using the post-resignation Board, noting it would not "unduly interrupt the litigation," and "even had the [p]laintiff made a demand on the May 7 Board, it would not, practically, have had the opportunity to evaluate the [c]omplaint before the installment of the new May 11 Board." *Id.* at *10. Thus, a "Kafkaesque quality would attach to a decision that the superseded May 7 Board, rather than the May 11 Board actually served with the Complaint, is the appropriate body to which a demand futility analysis must apply." *Id.* at *11. This case is different. Hees resigned as Executive

2006). At the time, six people served on the Board: Hees, Hariharan, Krominga, Lurie, Pahwa, and Sarma. (Am. Compl. ¶¶ 12-17.) Therefore, Plaintiff must show at least three directors had *Zuckerberg* conflicts. *In re Carvana Co. S'holders Litig.*, 2022 WL 2352457, at *7 (Del. Ch. June 30, 2022) ("Where, as here, a board is even numbered, a plaintiff only needs to demonstrate conflicts as to half of the board.").

Plaintiff argues demand is futile under all three *Zuckerberg* factors. (*See generally* Am. Compl.). With respect to the first *Zuckerberg* factor,[9] Plaintiff claims at least three directors received a material benefit from SRS' seizure of power, in the form of job security and compensation. (Pl. Opp'n at 26.) Under the second *Zuckerberg* factor,[10] Plaintiff argues a majority of Directors face a substantial likelihood of personal liability for alleged insider trading and non-exculpated breaches of fiduciary duty, including oversight violations for consciously disregarding Avis's insider trading, hedging, and related-party transaction policies. (Am. Compl. ¶¶ 143-163.) As for the third factor,[11] Plaintiff argues that three of Avis's six directors—Pahwa (SRS's President), Sarma (SRS's CEO), and Hees (whose Avis compensation, Plaintiff alleges, is

---

Chair a month after Plaintiff sued. Defendants do not argue the Board that reviewed the complaint did not include Hees. Nor can they, because Hees stayed on the Board after resigning. The Court, therefore, examines demand futility using the April 26, 2024 Board.

[9] Whether the director "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand." *In re Cognizant*, 101 F.4th at 257 (quoting *Zuckerberg*, 262 A.3d at 1059).

[10] Whether the director "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand." *Id.*

[11] Whether the director "lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." *Id.*

controlled by SRS)—lack independence from SRS due to their employment and financial ties. (*Id.* ¶¶ 12-20, 134-37.)

Defendants do not contest that the two SRS Directors (Sarma and Pahwa) are not independent from SRS. To determine whether Plaintiff has met the required majority threshold, the Court need only address whether Plaintiff adequately pleads demand futility as to any of the four Outside Directors. Plaintiff, however, fails to do so. The Court addresses each *Zuckerberg* factor in turn.

    i.    *Factor One: No Outside Director Received a Material Benefit from the Challenged Conduct*

Under the first *Zuckerberg* factor, "a director is disabled for demand futility purposes if the director received a material personal benefit from the wrongdoing that was not shared equally with the stockholders." *Hanna v. Paradise*, 2025 WL 1836642, at *6 (Del. Ch. July 3, 2025). "Whether a benefit is material is a question of fact that takes into consideration the amount, the recipient's wealth, and the circumstances surrounding the benefit." *Id.*

Plaintiff argues the SRS Directors materially benefitted from SRS's takeover of Avis, because control of a corporation is a benefit other shareholders do not enjoy. (Pl. Opp'n at 26-27.) Plaintiff claims this benefit was wrongful because the Cooperation Agreements and Stock Repurchase Program wrongfully spent Avis resources to enable SRS's takeover. (*Id.*) As for the Outside Directors, Plaintiff exclusively focuses on Hees. (Am. Compl. ¶¶ 129-37.) Plaintiff argues SRS used its control of Avis to give Hees the "improper benefit" of his "executive role and enormous salary." (Pl. Opp'n at 27.) According to Plaintiffs, Hees would be unable to consider a litigation demand challenging the transactions that allowed SRS to take over Avis. (Pl. Opp'n at 27; Am. Compl. ¶ 135.)

Thus, as a threshold issue, the Court must determine whether SRS controlled Avis. Delaware courts presume a stockholder with more than 50% of a corporation's stock has "hard" control of the corporation, with the ability to control its internal affairs and "levers of power." *In re Oracle Corp. Derivative Litig.*, 339 A.3d 1, 19 (Del. 2025). A stockholder with less than 50% of shares may be a "controlling stockholder" if they exercise "actual" control over the corporation's general "business and affairs" or over a "specific transaction." *Id.* at 19-20.

"The test for actual control by a minority stockholder 'is not an easy one to satisfy.'" *Id.* (quoting *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)). The minority stockholder must have "a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock." *Id.* (quoting *Corwin v. KKR Fin. Holdings. LLC*, 125 A.3d 304, 307 (Del. 2015)). Such power must be "so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution from the controlling minority [stock]holder." *Frank v. Mullen*, 337 A.3d 824, 838 (Del. Ch. 2025) (quoting *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013)). A minority shareholder's "*potential* ability to exercise control is not sufficient." *Id.* (quoting *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)). Rather, Plaintiff must plead facts "supporting a reasonable inference" that the minority shareholder actually dominated or controlled the Board's corporate decision-making process. *Id.* Delaware law has identified a non-exhaustive list of possible sources of influence, including

> (i) relationships with particular directors, (ii) relationships with key managers or advisors, (iii) the exercise of contractual rights to channel the corporation into a particular outcome, and (iv) the existence of commercial relationships that provide the [potential controller] with leverage over the corporation, such as status as a key customer or supplier.

*Voigt v. Metcalf*, 2020 WL 614999, at *12 (Del. Ch. Feb. 10, 2020). "Ultimately, the inquiry turns on 'the facts and circumstances surrounding the particular transaction.'" *Frank*, 337 A.3d at 839 (quoting *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *28 (Del. Ch. July 6, 2018)).

The parties agree SRS never had "hard" control of Avis because it never owned at least 50% of Avis stock. (Am. Compl. ¶ 88.). Thus, the crucial question is whether the facts and circumstances support a reasonable inference that SRS exercised actual control over Avis. *See Frank*, 337 A.3d at 838; *Glean Tech Fund II LP v. McIntosh*, 2025 WL 2505049, at *6 (Del. Ch. Sept. 2, 2025); *Voigt*, 2020 WL 614999, at *11. Plaintiff does not clear this high bar.

Plaintiff claims SRS had actual control through a combination of (i) "49% of voting control," (ii) representation on the Avis Board, (iii) provisions in the Cooperation Agreement allowing SRS to "restrict Avis['s] board size" and install "non-removable [SRS] [D]irectors," and (iv) the SRS Directors' respective roles on Avis's Compensation and Governance Committees. (Pl. Opp'n at 22-24.)

As an initial matter, Plaintiff's assertion that SRS holds "49% of voting control," (*id.* at 24), ignores the Fourth Cooperation Agreement's limitations on SRS's voting power. The Agreement requires that, to the extent SRS holds shares in excess of 35%, SRS shall "exercise such voting rights . . . in the same proportion in which all other Voting Securities are voted." (Fourth Cooperation Agreement § 4(b).) Such "mirror voting" provisions, requiring that a stockholder vote excess shares proportionally to the vote of all other shareholders, allow a company to mitigate the possibility of de facto control. *See Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *20 (Del. Ch. May 31, 2017) (finding "contractual handcuffs" on minority shareholder's voting rights prevented court "from finding it reasonably conceivable that

the Stockholder Defendants were capable of exercising actual control over [the corporation]."); Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers, 87 Fed. Reg. 78,770 (Dec. 22, 2022) (codified at 17 C.F.R. pts. 240, 249, 270, 274) (noting that requiring shareholders to "vote their [excess] securities in the same proportion as the vote of all other holders . . . limits the ability of such [shareholders] to influence the outcome of shareholder votes."). Thus, contrary to Plaintiff's contention that SRS dominated Avis's decision-making, the Fourth Cooperation Agreement *restrains* SRS's influence. *Sciabacucchi,* 2017 WL 2352152, at *17–20.

Nor do SRS's two members on the six-member Board establish "actual control," even when coupled with SRS's stake in Avis. As Defendants correctly state, minority board representation and an equity stake, by themselves, fall short of boardroom "domination" and the de facto ability to dictate corporate decisions. *In re Morton's*, 74 A.3d at 665 ("The fact that two employees of [a 27.7% shareholder] sat on the board, without more, does not establish actual domination of the board, especially given that there were eight directors not affiliated with [the shareholder]."). Moreover, the Fourth Cooperation Agreement prohibits the SRS Directors from participating in or voting on any matter involving a potential conflict of interest with SRS, including transactions between Avis and SRS or related-party approvals. (Fourth Cooperation Agreement §1(i); Avis Br. at 17.) Accordingly, neither SRS's stake in Avis nor its two Directors prove actual control.

Plaintiff claims SRS's contractual rights under the Fourth Cooperation Agreement show actual control. Again, however, there is no indication these rights allow SRS to dominate Avis. Exercising a contractual right "standing alone is unlikely to support a reasonable inference of control." *Voigt*, 2020 WL 614999, at *19; *see also Thermopylae Cap. Partners, L.P. v. Simbol,*

*Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) ("[A]n individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary."). But, depending on the facts of the case, exercising a contractual right "can be a highly effective form of control." *Voigt*, 2020 WL 614999, at *19. Indeed, "the holder of the contract rights can use them to channel a corporation into a particular outcome by blocking other paths." *Id.* The question is whether the minority shareholder, through its contractual rights, "had the ability to shut down the effective operation of the . . . board of directors by vetoing board actions." *Williamson*, 2006 WL 1586375, at *5.

"The paradigmatic example involves a cash-burning, asset-light company that does not yet generate sufficient revenue to finance its business plan and has reached the point where it requires external financing." *Voigt*, 2020 WL 614999, at *19 (citing *Basho*, 2018 WL 3326693, at *29). "Under those circumstances, a party that has a veto right over the company's access to financing can 'sit on the company's lifeline, with the ability to turn it on or off.'" *Id.* (citation omitted). "When cash is like oxygen, the ability to choke off the air supply is a strong indicator of control, particularly if there are factual allegations (and later evidence) that the party holding the veto right used it to force the company into a vulnerable position." *Id. See also Basho*, 2018 WL 3326693, at *31 (finding control where shareholder used contractual rights to "force[] the [c]ompany into a financial crisis.").

Plaintiff does not allege SRS had the contractual power to destroy Avis or deadlock the Board. (*See* Am. Compl.) Nor does Plaintiff claim SRS used its contractual rights to force the Board to act. "Nor does the pleading suggest that the shadow of the [contract] rights led the directors to act differently than they would have." *Voigt*, 2020 WL 614999, at *20. To the contrary,

the Fourth Cooperation Agreement is expressly tailored to *prevent* SRS from dominating Avis. Among other restrictions, SRS could not obtain more than a 44.5% stake in Avis, hold its own referendums, effect a merger or acquisition of Avis, call its own stockholder meetings, or take public action to advise, control, or change the Board. (*See* Fourth Cooperation Agreement § 2.) Although the Agreement allows SRS to designate an additional Board member (in addition to Pahwa and Sarma), SRS could only have only three designees on a seven-member Board—still short of a majority, and still subject to the Agreement's recusal requirements. (*Id.* § 1(g).) If SRS *were* to elect a third designee, the Board retained "the right, but not the obligation, to further expand the size of the Board to eight directors, which eighth director shall be designated by a majority of the directors of the Board not designated by SRS." (*Id.*) These provisions are clearly designed to *limit* SRS's potential influence and *prevent* domination, ensuring that SRS could not stack the Board to gain de facto control.

In sum, Avis limited SRS's voting power and its ability to influence, pressure, or stack the Board. Plaintiff, therefore, fails to raise a reasonable suspicion that SRS controlled Avis, effectively dooming Plaintiff's argument that Hees, or any other Outside Director, is unable to impartially consider a litigation demand against SRS by virtue of its status as an influential minority shareholder.

Because Plaintiff failed to prove SRS controlled Avis, the SRS Directors could not have materially benefitted from such control, and SRS could not have improperly granted Hees his role or salary. Even if Plaintiff had shown actual control, Delaware courts routinely refuse to infer that a director's role and compensation are sufficient to doubt the director's impartiality from the party responsible for setting such compensation. "[T]he mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis . . . unless the

16

pleadings demonstrate, for example, that the status or compensation was somehow 'material' to the director or otherwise outside the norm." *Khanna v. McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006). *See also In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *19 (Del. Ch. Nov. 30, 2021) ("Without more, pleading that a board of directors elevated an executive to her current role or approved her compensation is insufficient to establish that the recipient is 'beholden' to any director who approved that decision."); *In re Carvana*, 2022 WL 2352457, at *8 ("Mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence.")

Further, Plaintiff pleads no facts to create a reasonable inference that SRS played a decisive role in the Outside Directors' compensation or Hees's appointment as Executive Chair. Nor can they, considering the Outside Directors held majorities on both the Board and Compensation Committees. (Am. Compl. ¶¶ 15-16) Under Delaware law, "the transaction of business by [a] committee or subcommittee" requires the vote of "the majority of the members . . . present at a meeting at which a quorum is present . . . unless the certificate of incorporation, the bylaws, a resolution of the board of directors or a resolution of a committee that created the subcommittee requires a greater number." Del. Code Ann. tit. 8, § 141(c)(4). Thus, compensation decisions cannot be made unilaterally by any single member of a three-person committee, contrary to Plaintiff's contention that Hees's compensation depended on "Sarma's decisions as Chair of the Compensation Committee." (Am. Compl. ¶ 135.) The fact that SRS could not dictate the makeup of Avis's board or the compensation of its directors defeats Plaintiff's argument that the Outside Directors received a material personal benefit or "stood to lose a related material benefit" if they did not approve the challenged transactions. *See In re Vaxart*, 2021 WL 5858696, at *20. In sum, the facts do not indicate Hees or any other Outside Director received a material benefit from the

challenged transactions such that a demand would be futile. Therefore, Plaintiff has failed to show any Outside Director had a conflict under *Zuckerberg* factor one.

> ii.    *Factor Two: No Outside Directors Face a Substantial Likelihood of Liability under the Amended Complaint*

The second *Zuckerberg* factor examines whether the directors face a substantial likelihood of personal liability on the claims asserted, such that there exists a reasonable doubt as to whether the directors' respective abilities to impartially consider a demand are impaired. *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (citing *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1984), *overruled in part on other grounds by Brehm*, 746 A.2d 244). However, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815). Plaintiff must instead make "particularized allegations" that the demand board faces a substantial likelihood of non-exculpated liability for "engaging in the conduct that the derivative claim challenges." *See Zuckerberg*, 262 A.3d at 1057. This analysis is conducted on a "claim-by-claim basis." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003).

Delaware law authorizes companies, via exculpation provisions, to shield directors from monetary liability for breaches of the duty of care, including negligence and gross negligence. Del. Code Ann. tit. 8, § 102(b)(7). Delaware corporations, however, may not exculpate:

> (i) A director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders;
> (ii) A director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;
> (iii) A director under § 174 of this title;
> (iv) A director or officer for any transaction from which the director or officer derived an improper personal benefit; or
> (v) An officer in any action by or in the right of the corporation.

*Id.* Where, as here, an exculpation provision protects the directors from liability,[12] "a substantial likelihood of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *In re Vaxart¸* 2021 WL 5858696, at *20 (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62-63 (Del. Ch. 2015)). *See also In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179-80 (Del. 2015) (stating that, where a director is protected by an exculpatory provision, a plaintiff must plead "facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests . . . or acted in bad faith.")

Plaintiff, however, has failed to plead particularized facts that any of the Outside Directors would face a substantial likelihood of liability on a non-exculpated claim.

### a.    Count I- Insider Trading

In Count I, Plaintiff asserts an insider trading claim against SRS, the SRS Directors and the Avis Officers under *Brophy v. Cities Service Co.*, 70 A.2d 5, 7-8 (Del. Ch. 1949). To prevail on a *Brophy* claim, Plaintiff "must show that: 1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004). Essentially, Plaintiff claims SRS and the Avis Officers separately sold substantial blocks of Avis stock while in possession of material non-public information; namely, that Avis faced new vehicle delivery delays in 2022 and 2023. (Am. Compl. ¶¶ 18-20, 63.)

---

[12] Avis's Certificate of Incorporation provides "No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty by such director as a director." (*See* Avis Br. Ex. 3 ("Avis Certificate of Incorporation") § 11, ECF No. 59-5.)

Plaintiff asserts this claim against only *two* Directors (Sarma and Pahwa), which is detrimental to the Amended Complaint. Insider trading claims against the Avis Officers who never sat on the Board, "do nothing to raise a reasonable doubt about the ability of the Directors themselves to exercise business judgment and cannot establish demand futility." *Taylor v. Kissner*, 893 F. Supp. 2d 659, 673 (D. Del. 2012). Because Plaintiff does not assert Count I against *any* Outside Director, (Am. Compl. ¶¶ 138-42), she concedes they face no substantial likelihood of liability with respect to this claim. *See Bricklayers Pension Fund of W. Pa. v. Brinkley*, 2024 WL 3384823, at *13 (Del. Ch. July 12, 2024) (finding that, by naming only eight of thirteen directors as defendants, plaintiff had "concede[d]" demand was not futile as to the remaining five).

### b.    Count II- Breach of Fiduciary Duty

In Count II, Plaintiff claims the Outside Directors (1) breached the duty of loyalty by approving and executing the Stock Repurchase Program, thus allowing SRS to take control of Avis without paying a control premium, and (2) breached the duty of oversight articulated in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 971 (Del. Ch. 1996), by failing to monitor and/or enforce Avis's disclosure obligations and policies regarding related party transactions and insider trading in violation of their fiduciary duties and obligations. (Am. Compl. ¶¶ 143-49.)

A plaintiff attempting to make a breach of fiduciary duty claim against an exculpated director must plead facts "supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Cornerstone*, 115 A.3d at 1179-80. Plaintiff fails to plead facts supporting an inference that any Outside Director Defendant faces personal liability under this standard.

20

### *Duty of Loyalty*

Plaintiff first argues the Outside Directors breached the duty of loyalty by "gifting" SRS control of Avis through the Stock Repurchase Program. (Am. Compl. ¶ 58-59.) A plaintiff can "call into question a director's loyalty by showing" (1) "the director was interested in the transaction under consideration or not independent of someone who was," or (2) "the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014). "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Id.* (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993)). "Corporate fiduciaries 'are not permitted to use their position of trust and confidence to further their private interests.'" *Id.* (quoting *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del. 1939)).

The Court applies the business judgment rule to determine whether a director has breached a fiduciary duty. *Id.* at 33-34. The business judgment rule presumes "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. Unless Plaintiff rebuts an element of the business judgment rule, "the [C]ourt merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Orchard*, 88 A.3d at 34 (quoting *In re Dollar Thrifty S'holder Litig.,* 14 A.3d 573, 598 (Del. Ch. 2010)). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *Id.*

If Plaintiff successfully rebuts the business judgment rule, i.e., by showing the directors did not act on an informed basis, in good faith, or in the best interests of the corporation, the Court reviews the challenged decision under the entire fairness doctrine, "Delaware's most onerous standard of review." *Id.* Under the entire fairness doctrine, Defendants bear the burden of proving "to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price." *Id.*

Plaintiff claims the Board put SRS's interests above Avis's by "gifting" SRS control of Avis through the Stock Repurchase Program. This argument fails for two reasons. First, as discussed above, as Plaintiff does not sufficiently allege that SRS ever controlled Avis, Plaintiff similarly does not sufficiently allege the Board "gifted" SRS control of anything. Further, because SRS never controlled Avis, it did not need to pay a control premium. (Am. Compl. ¶ 59.) Second, the Board entered the Cooperation Agreements to *prevent* SRS from obtaining control of Avis. "A board acting loyally may take action to oppose, constrain, or even dilute a large or controlling stockholder." *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013). Thus, the Board did not "allow" SRS to control Avis because the Board *did* take affirmative steps, consistent with its duty of loyalty, to restrain SRS's influence.

Plaintiff also contends that the Outside Directors gave SRS an unfair benefit at Avis's expense by repurchasing Avis shares from SRS at inflated market prices while in possession of material non-public information about the company's impending financial headwinds. (Am. Compl. ¶ 60.) Although the Stock Repurchase Program may have increased SRS's ownership percentage, buying back stock at market price is a common practice, particularly in times of market volatility, and falls squarely within the bounds of the valid exercise of business judgment. *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 137 (Del. Ch. 2009). ("[P]laintiffs have

alleged nothing that would explain how buying stock at the market price—the price at which presumably ordinary and rational businesspeople were trading the stock—could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration.").

Plaintiff further asserts the Stock Repurchase Program was "disadvantageous to Avis," (Am. Compl. ¶ 58), because Avis could have bought back the shares for less after the share price dropped, (*id.* ¶ 60). But "[i]t is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision." *In re Citigroup*, 964 A.2d at 126. "Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future." *Id.* "To impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks." *Id.* Simply put, the Board cannot be held liable "for failure to predict the future." *Id.* at 131. And, in any event, Plaintiff fails to substantiate the theory that the Outside Directors approved the Stock Repurchase Program in bad faith. *See In re Zimmer Biomet Holdings, Inc. Derivative Litig.*, 2021 WL 3779155, at *22 (Del. Ch. Aug. 25, 2021) ("The Complaint does not include any particularized facts regarding the Board's involvement in the stock repurchase, when the Board voted to approve the stock repurchase, or the Board's composition at that time."). Therefore, Plaintiff has failed to prove any of the Directors faced a substantial likelihood of liability for breaching the duty of loyalty.

### *Caremark Claim*

Plaintiff's *Caremark* claim fares no better. A *Caremark* claim is a specific breach of the duty of loyalty, characterized by "a sustained or systematic failure of the board to exercise oversight." *In re Caremark*, 698 A.2d at 971. To survive a Rule 23.1 motion to dismiss, a *Caremark* claim must state particularized facts supporting a reasonable inference that either "(a)

the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 359 (Del. Ch. 2023) (quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

"[D]irector liability for oversight claims always requires a showing of bad faith." *Id.* at 371. Bad faith exists when a director (a) "intentionally acts with a purpose other than that of advancing the best interests of the corporation," (b) "acts with the intent to violate applicable positive law," or (c) "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Citigroup*, 964 A.2d at 125 (quoting *In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 67 (Del. 2006)). Moreover, to show an exculpated director is substantially likely to face liability on a claim involving illegal, fraudulent, or bad faith conduct, "a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper." *Id.* (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)). "A plaintiff can thus plead bad faith by alleging with particularity that a director *knowingly* violated a fiduciary duty or failed to act in violation of a *known* duty to act, demonstrating a *conscious* disregard for her duties." *Id.*

While the Amended Complaint does not explicitly invoke *Caremark*, Plaintiff argues the Outside Directors breached their fiduciary duties to Avis through a sustained pattern of oversight lapses which, in Plaintiff's view, evinces both a deficient framework of "internal legal, financial, and management controls," and a deliberate "failure to enforce Avis's standards and codes and policies." (Am. Compl. ¶¶ 30-31.) These allegations, however, fall short of the exacting standard

for *Caremark* liability, "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967.

With respect to the first *Caremark* prong—whether the Outside Directors utterly failed to implement a sufficient system of reporting or controls—Plaintiff's Amended Complaint does not state particularized facts showing the Outside Directors abdicated their oversight responsibilities. On one hand, Plaintiff alleges the Board knowingly violated their duties "to establish and maintain systematic and accurate records and reports" and to "maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Avis's operations would comply with all applicable laws." (Am. Compl. ¶¶ 31-32.) On the other hand, Plaintiff claims the Board "failed to enforce Avis's anti-hedging and related party transactions and insider trading policies." (*Id*. ¶ 61; *see also id*. ¶¶ 47-49 (describing Avis anti-hedging and insider trading policies).) Avis either had an oversight system or it did not. The Amended Complaint makes both claims. *See South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012) (finding "existence and mandate" of company's internal safety committee was "inconsistent" with plaintiff's assertion that board "failed . . . to fulfill their oversight obligations."); *Ash v. McCall*, 2000 WL 1370341, at *15 n.57 (Del. Ch. Sept. 15, 2000) ("Nevertheless, the existence of an audit committee, together with [the company's] retention of . . . [an] outside auditor . . . , is some evidence that a monitoring and compliance system was in place . . . .").

Moreover, Plaintiff concedes Avis "adopted written procedures for the review, approval or ratification of transactions with related persons," (Am. Compl. ¶ 50); and acknowledges that Avis's Audit Committee was tasked with reviewing "reports and disclosures of significant conflicts of interest and related person transactions" and with "evaluat[ing] annually the processes, activities and effectiveness of the Committee," (*id.* ¶ 36). These facts demonstrate Avis had basic

reporting mechanisms and internal compliance reviews, belying Plaintiff's claims that no such system existed.

Plaintiff also falls short of satisfying the second *Caremark* prong—whether the Board "consciously failed to monitor or oversee" its own reporting or control systems, "thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Plaintiff alleges "red flags" the Board supposedly ignored, including: (i) SRS's options and derivatives trades, in violation of Avis's anti-hedging and related parties policies (Am. Compl. ¶¶ 47-49); (ii) the Cooperation Agreements, through which Plaintiff contends SRS gained influence and usurped authority in violation of Delaware Law and Avis's bylaws (*id.* ¶¶ 103, 158, 172); (iii) proxy statements recommending the election of SRS-conflicted Directors which enabled SRS's domination of the Avis Board (*id.* ¶¶ 154-59); and (iv) the non-disclosure of material non-public information regarding fleet replacement delays which allegedly allowed SRS and the Board to sell Avis shares at inflated prices, (*id.* ¶¶ 72, 141-42).

But none of Plaintiff's allegations show with particularity that the Board consciously disregarded its responsibilities. First, Plaintiff does not claim the Board knew of any alleged violations or instances of wrongdoing, (*see generally id.*), much less that it exhibited a "sustained and systematic" refusal to respond, *Caremark*, 698 A.2d at 967. As Defendants correctly assert, Plaintiff attempts "to hold [the Outside Directors] liable for merely having served on the Board and relevant committees" when purported misconduct took place. (Avis Br. at 20.) But "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007). *See also Wood*, 953 A.2d at 142 (determining that membership on the Audit Committee was not enough evidence to infer knowing involvement in illegal conduct).

26

Moreover, the record affirmatively contradicts any inference of willful inaction. The Board took deliberate steps to oppose and restrict SRS's influence through the very Cooperation Agreements Plaintiff criticizes—imposing voting restrictions, recusal requirements, and other limitations. (*See* Fourth Cooperation Agreement.) Though Plaintiff paints the Cooperation Agreements, proxies, hedging, and disclosures as pro-SRS oversight violations, they more appropriately infer that the Board proactively monitored and restrained SRS, precisely to prevent the "domination" and "usurp[ation]" Plaintiff alleges these actions produced. Even if, as Plaintiff alleges, the Board failed to stop SRS from seizing control of Avis, "imperfect attempts at compliance are not indicative of bad faith." *In re Transunion Derivative S'holder Litig.*, 324 A.3d 869, 888 (Del. Ch. 2024)

Accordingly, even when viewed in the light most favorable to Plaintiff, Plaintiff's allegations amount to conclusory assertions of negligence or poor judgment, neither of which can sustain a *Caremark* claim. *See Stone*, 911 A.2d at 370-373. None of the Outside Directors, therefore, face a substantial likelihood of liability under the allegations of Count II of the Amended Complaint.

### c.    Count III- Exchange Act

Count III of the Amended Complaint asserts a derivative claim against the entire Board and the Officer Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9. (Am. Compl. ¶ 153.)

Section 14(a) makes it "unlawful for any person . . . to solicit . . . any proxy" in violation of the Rules promulgated under the Exchange Act. 15 U.S.C. § 78n(a)(1). Rule 14a-9 prohibits proxy statements from "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). Section 14(a) "seeks to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 709–10 (3d Cir. 2020) (quoting *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006)).

To plead a Section 14(a) violation, Plaintiff must allege: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (internal quotation omitted). Here too, Plaintiff has not pled specific facts showing the Outside Directors face a substantial likelihood of liability for violating Section 14(a).

Plaintiff alleges the proxy statements contained omissions which "would have been highly material to shareholders' vote to elect the Defendant directors." (Pl. Opp'n at 51.) Omitting information from a proxy statement violates Section 14(a) and Rule 14a-9 "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (quoting *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002)). "But not every omission or misrepresentation will support a claim for damages." *Jaroslawicz*, 962 F.3d at 710. Rather, the omission must be material. An omission is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* (quoting *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003)) "That involves an assessment of whether 'the disclosure of the omitted fact or misrepresentation would have been viewed by the reasonable investor as having significantly altered the total mix of

information made available.'" *Id.* (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000)). Courts "assess the materiality of a statement 'at the time and in the light of the circumstances under which it is made.'" *Id.* (quoting *Seinfeld*, 461 F.3d at 369). "[L]iability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).

Plaintiff alleges the proxy statements Avis issued for its 2022, 2023, and 2024 annual shareholder meetings (collectively, "Proxy Statements") failed to: (i) disclose Sarma's lack of independence from SRS; (ii) fairly and accurately describe the benefits to SRS from Avis's Share Repurchase Program and the roles played the SRS Directors played in approving those repurchases; (iii) describe the Cooperation Agreements and SRS's August 2023 sale of Avis stock as "related party transactions"; (iv) disclose all information regarding the Cooperation Agreements and August 2023 stock sale required by SEC Regulation S-K Item 404, 17 C.F.R. 229.404; (v) disclose that Avis had not conducted "appropriate review and oversight" of such alleged related party transactions as required by Rule 404 and NASDAQ Marketplace Rule 5630; and (vi) classify the Repurchases as "related party transactions." (Am. Compl. ¶¶ 155-63.) These alleged deficiencies, Plaintiff contends, tainted shareholder votes on director elections and other proposals, harming Avis. (*Id*. ¶ 160.)

None of the purported omissions, however, form the basis for Section 14(a) liability.

### *Sarma's Independence*

First, Plaintiff's assertion that the proxy statements failed to "disclose Defendant Sarma's lack of independence due to his ownership of SRS" is facially inaccurate. (Am. Compl. ¶ 159.) The Proxy Statements each plainly state Sarma "is the Managing Partner at SRS." (*See* Avis Br. Ex. 5 ("2022 Proxy Statement") at 9, ECF No. 59-7; Avis Br. Ex. 6 ("2023 Proxy Statement") at

9, ECF No. 59-8; Avis Br. Ex. 2 ("2024 Proxy Statement") at 9, ECF No. 59-4.) And the Proxy Statements explicitly disclose that the "nominations of Mr. Pahwa and Mr. Sarma are in accordance with the terms of [the Cooperation Agreements] between the Company and SRS." (*See* 2022 Proxy Statement at 7; 2023 Proxy Statement at 7; 2024 Proxy Statement at 7.) There is no material omission here. *See, e.g., In re NAHC*, 306 F.3d at 1332–33 (no Section 14(a) violation where proxy disclosures, read as a whole, provided shareholders with adequate information).

### *Stock Repurchase Program*

Plaintiff similarly fails to demonstrate the Board did not adequately describe how the Stock Repurchase Program would benefit SRS. (Am. Compl. ¶ 159.) As Defendants note, the "[P]roxy [S]tatements each explicitly mention that Avis repurchased 14.3 million, 16.7 million, and 4.3 million shares in the 2022, 2023, and 2024 proxy statements, respectively." (Avis Br. at 23; 2022 Proxy Statement at 21; 2023 Proxy Statement at 22; 2024 Proxy Statement at 23.)

Contrary to Plaintiff's claim that "unaffiliated shareholders" did not benefit from the Stock Repurchase Program, stock buybacks inherently benefit *all* shareholders by increasing share prices.[13] (Am. Compl. ¶ 159.) Moreover, to the extent the Share Repurchase Program increased SRS's stake in Avis, the restrictions in the Cooperation Agreements mitigated any purported SRS-specific "benefit." The Cooperation Agreements were filed publicly on "multiple occasions," (*see, e.g.*, Avis Br. Ex. 1 ("2022 8-K Disclosure"), ECF No. 59-3), and are incorporated by reference in the Proxy Statements, supplying the requisite information on which a "reasonable shareholder" could cast their vote, (2022 Proxy Statement at 7; 2023 Proxy Statement at 7; 2024 Proxy Statement at 7.)

---

[13] "Buybacks tend to boost share prices in the short-term, as they reduce the supply of outstanding shares and the buying itself bids the share higher in the market." Trevir I. Nath, *4 Reasons Investors Like Buybacks*, Investopedia, https://www.investopedia.com/articles/investing/123115/4-reasons-why-investors-buybacks.asp (last updated June 7, 2025).

### *Item 404 Disclosures*

Plaintiff argues the Proxy Statements did not disclose the Cooperation Agreements and the August 2023 sale of Avis stock, as required by SEC Regulation S-K, Item 404. (Am. Compl. ¶ 159.) Item 404 requires the registrant to describe any transaction "in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a). But a failure to disclose a related-party transaction under Item 404 does not automatically constitute a material omission. *Takata v. Riot Blockchain, Inc.*, No. 18-2293, 2023 WL 7133219, at *8 (D.N.J. Aug. 25, 2023) ("[T]he Court cannot find that a violation of Item 404 . . . automatically gives rise to a material omission under Rule 10b-5, as each requires disclosure of information that does not meet Rule 10b-5's higher standard of materiality.").

Here, Avis publicly filed the Cooperation Agreements and share repurchases with the SEC. (*See* 8-K Disclosure; Avis Br. Ex. 9 ("13-D Disclosure"), ECF No. 59-11.) Information disclosed to the SEC is not withheld. *Lovallo v. Pacira Pharm., Inc.*, No. 14-06172, 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015) (noting motion to dismiss may be granted "where the company's SEC filings or other documents disclose the very information necessary to make their public statements not misleading." (citation omitted)). *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *11 (E.D. Pa. Nov. 1, 2006) ("[P]rior public disclosure negates a finding that material information was withheld.").

Plaintiff also claims the Proxy Statements omitted other "information required by Rule 229.404" and failed to disclose that Avis had not conducted "appropriate review and oversight" of the stock sale under Rule 5630. (Am. Compl. ¶ 159.) Without explaining what information the Board omitted or why it would be material to shareholders, Plaintiff simply concludes the

supposedly missing information "was critical because it would have alerted shareholders that the board did or planned to benefit SRS at the expense of other shareholders." (Pl. Opp'n at 52–53.[14]) Rule 23.1 requires more; Plaintiff must "state with particularity" why a director faces a substantial likelihood of liability on a claim. *Zuckerberg*, 262 A.3d at 1057; Fed. R. Civ. P. 23.1(b)(3). Alleging the Board omitted some unspecified information from their Proxy Statements will not do. *Murashko v. Hammer*, No. 17-2533, 2018 WL 1022575, at *9 (D.N.J. Feb. 22, 2018) (dismissing derivative complaint for failure to plead particularized facts about demand futility). Accordingly, Plaintiff fails to sufficiently allege that the Board made material omissions under Section 14(a).

### *Transaction Causation*

Even if Plaintiff demonstrated the Board made material omissions, Plaintiff does not sufficiently allege that the Proxy Statements caused Avis to enter the transactions Plaintiff claims harmed Avis; namely, the Cooperation Agreements and Share Repurchase Program. To state a Section 14(a) claim, Plaintiff must show "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction" which injured Plaintiff. *Tracinda*, 502 F.3d at 228. Here, the Proxy Statements solicited votes solely to re-elect directors, not to approve the Cooperation Agreements, Share Repurchase Program, or any other transaction. (*See* 2022 Proxy Statement, 2023 Proxy Statement, 2024 Proxy Statement.)

This is a fatal flaw. "[D]amages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger,

---

[14] Even after being apprised, via Defendants' motions to dismiss, of the conclusory nature of their allegations, Plaintiff reiterated the bare legal conclusions contained in the Amended Complaint. *In re NAHC*, 306 F.3d at 1332–33 (affirming dismissal of Section 14(a) claims where plaintiffs failed to plead "with particularity" specific misleading omissions or misrepresentations.)

are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought." *Gen. Elec. Co. ex rel. Levit v. Cathcart*, 980 F.2d 927, 933 (3d Cir. 1992). Electing directors does not "create any cognizable harm because the shareholders' votes did not authorize the transactions that caused the losses." *Id.* And while Plaintiff reiterates that the directors eventually approved the challenged transactions, (Pl. Opp'n at 51), "this is precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement." *Cathcart*, 980 F.2d at 933. *See also Gannon v. Cont'l Ins. Co.*, 920 F. Supp. 566, 584 (D.N.J. 1996) (dismissing Section 14(a) claim where "plaintiff does not contend that the merger itself was wrongful; he simply alleges that mismanagement by the board of directors . . . reduced the value of [company] stock."). Plaintiff failed to prove a link between the 2022, 2023, and 2024 Proxy Statements and the transactions she challenges. Accordingly, Plaintiff cannot demonstrate the Directors face a substantial likelihood of liability on Count III.

### d.    Count IV- Unjust Enrichment

For two independent reasons, Plaintiff fails to show the Directors face a substantial likelihood of liability for unjust enrichment (Count IV).

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. Ch. 1988)). Under Delaware law, unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Id.*

Plaintiff does not plead with particularity facts to support any element of unjust enrichment. Plaintiff does not identify how Defendants were enriched, how Avis was impoverished, any connection between the enrichment and impoverishment, the absence of any justification, or the lack of remedy. (*See* Am. Compl.) Moreover, Plaintiff "failed to plead the necessary relationship between the conduct at issue and the alleged harm to the Company to support a claim for unjust enrichment."[15] *In re Nanthealth, Inc. S'holder Litig.*, 2020 WL 211065, at *8 (Del. Ch. Jan. 14, 2020). And Plaintiff fails to make the particularized showing Rule 23.1 requires. *Murashko*, 2018 WL 1022575, at *9. Accordingly, Plaintiff has not demonstrated the Directors face a substantial likelihood of liability for Count IV.

### e.    Count V- Declaratory Judgment

Under Count V, Plaintiff seeks declaratory relief regarding "the validity" of SRS's ability to appoint directors, designate board committee members, and restrict the size and composition of Avis's board under the Fourth Cooperation Agreement. (Am. Compl. ¶¶ 168-73.) Specifically, Plaintiff seeks a declaration that the aforesaid provisions unlawfully restrict the Board's powers under DGCL § 141(a) and/or Avis's governing documents and are therefore "illegal and ultra vires and must be nullified." (*Id.* ¶ 172.)

Plaintiff's Count V allegations fail under the second *Zuckerberg* factor. As a threshold matter, Plaintiff's assertion that the Fourth Cooperation Agreement granted SRS "a contractual

---

[15] While Plaintiff does not identify any conduct subject to the unjust enrichment claim, none of the conduct referenced in the rest of the complaint suffices. To the extent Plaintiff alleges the Directors were enriched by their regular salaries and benefits, that claim fails. The Directors' purportedly wrongful conduct was "unrelated to [their] receipt of compensation from the Company." *In re Nanthealth*, 2020 WL 211065, at *8. And, to the extent Count IV is premised on the allegedly wrongful acts in Counts I, II, and III, Count IV is wholly derivative. Because Counts I, II, and III fail to show a substantial likelihood of liability, Count IV similarly fails. *See Seinfeld v. Slager*, 2012 WL 2501105, at *16 (Del. Ch. Jun. 29, 2012) (dismissing "claims [that] are derivative of the claims that I have already dismissed above."); *Friedman v. Khosrowshahi*, 2014 WL 3519188, at *13 (Del. Ch. July 16, 2014) (dismissing unjust enrichment claim because it was derivative of a fiduciary duty claim for which plaintiff had failed to plead demand futility).

right to exercise control over [the Board's] functions and powers," (*id.* ¶ 172), incorrectly assumes SRS controlled Avis, and thus rests on a fundamental misinterpretation of the Agreement. Further, Plaintiff pleads no facts to support the contention that the Outside Directors knowingly violated § 141(a) or acted in bad faith, or which provisions of § 141(a) were violated. At most, any potential flaw or anti-Avis provision contained in the Fourth Cooperation Agreement amounts to a duty of care breach for which the Outside Directors are exculpated.[16] Plaintiff alleges only a series of legal conclusions regarding the validity of the Cooperation Agreements and SRS's usurpation of Avis's power, which are belied by the Agreement itself. With no well-pled facts exposing any Outside Directors to a substantial likelihood of personal liability, Count V fails to meet the second *Zuckerberg* factor.

In sum, none of the Directors face a substantial likelihood of personal liability under any Count in the Amended Complaint. Therefore, Plaintiff fails to satisfy the second *Zuckerberg* factor.

> iii.    *Factor Three: The Outside Directors are Independent Because SRS Does Not Control Avis*

Under the third *Zuckerberg* factor, Plaintiff must allege "the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties." *Zuckerberg*, 262 A.3d at 1060-61 (quoting *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018)). "The primary basis upon which a director's independence must be measured is whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or

---

[16] "No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty by such director as a director." (Avis Certificate of Incorporation § 11.)

influences." *Id.* at 1060 (quoting *Beam*, 845 A.2d at 1049). To show a director lacks independence, Plaintiff must plead with particularity facts creating a "a reasonable doubt that a director is . . . so 'beholden' to an interested [party] . . . that his or her 'discretion would be sterilized.'" *Id.* (quoting *Beam*, 845 A.2d at 1050). *See also McElrath ex rel. Uber Techs., Inc. v. Kalanick*, 2019 WL 1430210, at *17 (Del. Ch. Apr. 1, 2019) (holding "a plaintiff must demonstrate 'ties [that] are material, in the sense that the alleged ties could have affected the impartiality of the director.'" (citation omitted)); *In re Kraft Heinz Co. Derivative Litig.*, 2021 WL 6012632 at *3 (Del. Ch. Dec. 15, 2021) (noting "majority ownership of a company does not strip the directors of the presumption of independence" in itself but must be "coupled with . . . facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." (quoting *Aronson*, 473 A.2d at 814). Plaintiff, therefore, must state particularized facts raising a reasonable inference that the Outside Directors had substantial ties to SRS such that they could not impartially consider a litigation demand against SRS. *Id.*

Plaintiff makes no claims about Krominga, Hariharan, or Lurie's independence. (Am. Compl. ¶¶ 129-37.) Plaintiff instead focuses on Hees, who served as Executive Chairman of the Avis Board from 2021 to 2024. (*Id.* ¶¶ 108, 135.) Plaintiff claims SRS controlled Avis and had the power to determine executive roles and salaries. (Pl. Opp'n at 19, ECF No. 61.) In Plaintiff's telling, Hees could not fairly consider a litigation demand against SRS because he depended on SRS for his job and "lucrative compensation." (*Id.*)

But, as discussed above, Plaintiff fails to sufficiently allege that SRS controlled Avis or had the power to determine roles and salaries. Thus, Plaintiff's assertion that Hees depended on SRS for a position and a paycheck at Avis falls flat. Plaintiff also claims Sarma's role on the Avis Compensation Committee left Hees unable to "impartially consider a litigation demand" against

SRS. (Pl. Opp'n at 19). This argument fares no better. To start, the Compensation Committee had two other members: Outside Directors Lurie and Krominga. (Am. Compl. ¶¶ 23-24.) Neither SRS nor Sarma could unilaterally dictate Hees's salary. And, to the extent Plaintiff alleges Sarma had outsized influence over Hees's compensation, Plaintiff offers no evidence showing Sarma used such influence. Delaware law "requires actual control, not merely the potential to control." *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006). Here, Plaintiff pleads no facts showing SRS or Sarma pressured the Compensation Committee, or that the Committee feared SRS would apply such pressure.

Finally, Plaintiff alleges Hees was not independent from SRS because NASDAQ listing rules identified him as a "non-independent" director. (Am. Compl. ¶¶ 108, 133.) This is equally unpersuasive. The NASDAQ listing rules provide a director is non-independent unless they "can act independently of the company or its managers." *Sandys v. Pincus*, 152 A.3d 124, 133-34 (Del. 2016) (citing NASDAQ Marketplace Rule 5605(a)(1)). Some relationships, including employment relationships, automatically preclude a finding of independence. *See* NASDAQ Marketplace Rule 5605(a)(2)(A). Avis employed Hees as Executive Chair, so the NASDAQ rules identified him as non-independent.

But a board member's independence under the NASDAQ rules "concerns his [or her] independence from [the company]—not from [a shareholder]." *In re Kraft Heinz Co.*, 2021 WL 6012632, at *12. Under the NASDAQ rules, Hees was not independent from Avis because Avis employed him as Executive Chair. That determination has nothing to do with SRS. Indeed, the NASDAQ rules identified Sarma, the CEO of SRS, as an independent director. (See 2024 Proxy Statement at 10.) So, the NASDAQ rules do not bear on any director's independence from SRS. Moreover, stock exchange rules are "qualitatively different from, and thus do[] not operate as a

surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61 (Del. Ch. 2015). In sum, Plaintiff has failed to plead particularized facts creating a reasonable doubt as to any Outside Director's independence from SRS and is therefore unsuccessful in pleading demand futility under the third *Zuckerberg* factor.

Because Plaintiff has failed to plead particularized facts establishing demand futility as to a majority of the demand board under any *Zuckerberg* factor, the Amended Complaint must be dismissed pursuant to Rule 23.1. The Court therefore need not reach Defendants' additional arguments for dismissal under Rule 12(b)(6).

### B.    Leave to Amend

Leave to amend must be "freely given when justice so requires," Fed. R. Civ. P. 15(a), and denied "when amendment is inequitable or futile," *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 113 (3d Cir. 2002). But a plaintiff must first "properly request leave to amend." *LabMD Inc. v. Boback*, 47 F.4th 164, 192 (3d Cir. 2022).

Plaintiff has not "explained . . . how an amended pleading would cure the defects in h[er] original complaint." *King ex rel. Cephalon Inc. v. Baldino*, 409 F. App'x 535, 539 (3d Cir. 2010). Nor has Plaintiff "offer[ed] any facts which, if pled, would have cured the defects in [her] complaint." *Baker v. Hartford Underwriters Ins. Co.*, 490 F. App'x 467, 470 (3d Cir. 2012). Instead, Plaintiff dedicates two sentences to explaining why the Court should grant leave to amend, stating: "Here, allowing Plaintiff to amend would not be futile as she could provide additional factual content to try and cure the deficiencies in the [Amended Complaint]. This is especially true here given the apparent conflicts of at least three of the six-member board." (Pl. Opp'n at 60.)

Plaintiff's barebones argument offers no new curative facts and doubles down on her deficient pleading.

However, in light of the deficiencies identified herein, Plaintiff shall have the opportunity to seek leave to amend. Plaintiff shall have 30 days to properly file a request for leave to amend. However, Plaintiff's "failure to satisfy the pleading requirements of Rule 23.1 and to propose an amended pleading purporting to cure those defects [will] satisf[y] the Court that a dismissal with prejudice is proper in this case." *Fagin v. Gilmartin*, No. 03-2631, 2004 WL 5835749, at *15 n.15 (D.N.J. Aug. 20, 2004). Accordingly, the Court **denies** Plaintiff leave to amend and **dismisses** the Amended Complaint ***without prejudice***.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss (ECF Nos. 59, 60) are **GRANTED.** The Amended Complaint is **DISMISSED** *without prejudice*. Plaintiff shall have 30 days to properly file a request for leave to amend. However, Plaintiff's "failure to satisfy the pleading requirements of Rule 23.1 and to propose an amended pleading purporting to cure those defects satisfies the Court that a dismissal with prejudice is proper in this case." An appropriate Order accompanies this Opinion.

**DATED:** <u>12/23/2025</u>

HONORABLE JULIEN XAVIER NEALS
United States District Judge